JUDGE HART

MAGISTRATE JUDGE DENLOW

ETHEL WILLIAMS and JAN WRIGHTSELL,

       Plaintiffs

     v.

ROD BLAGOJEVICH, in his official capacity as
Governor of the State of Illinois, CAROL L. ADAMS,
in her official capacity as Secretary of the Illinois
Department of Human Services, LORRIE STONE,
in her official capacity as Director of the Division
of Mental Health of the Illinois Department of
of Human Services, ERIC E. WHITAKER, in his
official capacity as Director of the Illinois Department
of Public Health, and BARRY S. MARAM, in his
official capacity as Director of the Illinois Department
of Healthcare and Family Services,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

# 05C 4673

**DEMAND FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**

# FILED

AUG 1 5 2005

AUG 15 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## Complaint for Relief

Plaintiffs Ethel Williams and Jan Wrightsell, residents of Monroe Pavilion Health and

Treatment Center, bring this action against the defendants Rod Blagojevich, Carol L. Adams,

Lorrie Stone, Eric E. Whitaker, and Barry S. Maram (collectively, "Defendants") for needlessly

segregating them in a restrictive institution for people with mental illness that fails to provide

them with services in the most integrated setting appropriate to their needs—in violation of their

rights under federal statutes and regulations—and allege as follows:

## Preliminary Statement

1.    Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131,

12132, prohibits discrimination against individuals with disabilities. The United States

Department of Justice has promulgated regulations under Title II stating that "a public entity

shall administer services, programs, and activities *in the most integrated setting appropriate to the needs* of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d) (emphasis added). Similarly, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no person with a disability shall "solely by reason of his or her disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

2.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the U.S. Supreme Court held that disability-based discrimination includes placing people with mental illness in "unjustified isolation."

3.     This action is brought to compel defendants' cessation of violations of these mandates with regard to Ms. Williams and Ms. Wrightsell. In 1992, Ms. Williams was discharged from the John J. Madden Mental Health Center and placed in the Monroe Pavilion Health and Treatment Center ("Monroe"). In 2002, Ms. Wrightsell was discharged from St. Joseph Hospital and placed in Monroe. Monroe is a private, intermediate-care nursing home classified as an Institution for Mental Diseases ("IMD"), designed—for private profit—to warehouse large numbers of people with mental illness in a segregated setting. Defendants have failed to assure that Ms. Williams and Ms. Wrightsell are placed in a more integrated setting where they could lead more independent and more productive lives within the community.

4.     Defendants fail to prevent the inappropriate placement of individuals with mental illness in nursing homes that lack adequate staffing, psychiatric treatment, therapeutic activities and social rehabilitation. Some, such as Monroe, provide little more than shelter and board to individuals with mental illness.

5. Ms. Williams and Ms. Wrightsell continue to languish in the segregated setting of Monroe, while equally affordable and more integrated residential settings exist and/or could be made available. Such residential settings would more appropriately meet Ms. Williams and Ms. Wrightsell's needs.

6. Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to assure that their services are administered to Ms. Williams and Ms. Wrightsell in the most integrated setting appropriate to their needs. Instead, they have isolated and institutionalized Ms. Williams and Ms. Wrightsell at Monroe in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

## Nature and Statutory Basis of Action

7. This action includes claims for violation of Title II of the ADA, 42 U.S.C. §§ 12131, 12132, which prohibits state and local government entities from discriminating against individuals with disabilities.

8. This action also includes claims for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits recipients of federal funding from discriminating against individuals with disabilities.

## Parties

9. Ms. Williams and Ms. Wrightsell are Illinois residents who have mental illnesses that substantially limit their ability to perform major life activities. They also have a record of such mental illnesses, and are regarded by defendants as having such mental illnesses. They are therefore individuals with disabilities for purposes of the ADA and the Rehabilitation Act. 42 U.S.C. § 12102, 29 U.S.C. § 705(20).

10.     Ms. Williams and Ms. Wrightsell currently reside in Monroe, an intermediate care nursing home classified by the Illinois Department of Healthcare and Family Services ("DHFS") (formerly the Illinois Department of Public Aid) as an IMD. This classification is based on the fact that Monroe is an institution with more than sixteen beds that is primarily engaged in providing diagnosis, treatment or care of persons with mental disabilities. 42 U.S.C. § 1396d(i). IMDs are funded by the state insofar as federal law prohibits Medicaid funding for IMD residents aged 22-64. Monroe residents must contribute all but thirty dollars ($30) of their monthly Supplemental Security Income ("SSI") checks directly to Monroe for their shelter and board. DHFS helps fund the remaining expenses associated with Ms. Williams and Ms. Wrightsell's shelter and board at Monroe.

11.     Defendant Rod Blagojevich is the Governor of the State of Illinois, a public entity covered by Title II of the ADA. 42 U.S.C. § 12131(1). Governor Blagojevich is ultimately responsible for ensuring that Illinois operates its service systems in conformity with the ADA and the Rehabilitation Act. 20 ILL. COMP. STAT. 2407/20(c). He is sued in his official capacity.

12.     Defendant Carol L. Adams is the Secretary of the Illinois Department of Human Services ("DHS"), the state agency responsible for assisting Illinois residents in achieving self-sufficiency, independence and health to the maximum extent possible by providing integrated family-oriented services, promoting prevention and establishing measurable outcomes in partnership with communities. DHS advertises itself as Illinois' largest agency, employing more than 15,000 people. It has an annual budget of nearly five billion dollars. DHS is a public entity covered by Title II of the ADA. 42 U.S.C. § 12131(1). DHS is the recipient of federal funds subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Carol L. Adams is responsible for the operation and administration of DHS and is ultimately responsible

4

for ensuring that DHS provides services in conformity with the ADA and the Rehabilitation Act. 20 ILL. COMP. STAT. 2407/20(c). She is being sued in her official capacity.

13. Defendant Lorrie Stone is the Director of the Division of Mental Health ("DMH"), the division of DHS responsible for helping to maximize community supports and develop skills for persons with serious mental illness. DMH is responsible for administering mental health screening and assessment of individuals with mental disabilities considered for placement in nursing homes like Monroe. DMH is responsible for the placement of individuals with mental illness in an appropriate facility or program. DMH is the recipient of federal funds subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. DMH is a public entity subject to the requirements of Title II of the ADA, 42 U.S.C. § 12131. Dr. Stone is responsible for the operation and administration of DMH and for ensuring that DMH, as the division of DHS responsible for providing residential and mental health services to people with mental illness, operates in conformity with the ADA and the Rehabilitation Act. She is being sued in her official capacity.

14. Defendant Eric E. Whitaker is the Director of the Department of Public Health ("DPH"), the state agency responsible for licensing, regulating and inspecting all nursing homes, including IMDs, in the state of Illinois. DPH is responsible for certifying these facilities for participation in federal payment reimbursement programs. DPH is also responsible for ensuring that persons with mental illness are appropriately screened and placed in nursing homes, and receive discharge planning. 77 Ill Admin. Code §§300.4010, 300.4060; 210 ILL. COMP. STAT. 45/3-202.2. DPH is a public entity covered by Title II of the ADA. 42 U.S.C. § 12131(1). DPH is the recipient of federal funds subject to the requirements of Section 504 of the Rehabilitation

Act, 29 U.S.C. § 794. Eric E. Whitaker is responsible for the operation and administration of DPH. He is being sued in his official capacity.

15.     Defendant Barry S. Maram is the Director of the Illinois Department of Healthcare and Family Services ("DHFS"), the state agency responsible for providing health care coverage for the citizens of Illinois and for administering medical assistance programs and other fiscal programs.   DHFS helps fund IMDs for resident services, including assessment, care planning, discharge planning, and treatment.   89 Ill. Admin. Code §145.20, subchapter d; 305 ILL. COMP. STAT. 5/5-5.5.  DHFS is a public entity covered by Title II of the ADA.  42 U.S.C. § 12131(1). DHFS is the recipient of federal funds subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  Barry S. Maram is responsible for operation and administration of DHFS and for ensuring that DHFS operates in conformity with the ADA and the Rehabilitation Act.  He is being sued in his official capacity.

### Jurisdiction and Venue

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States and 28 U.S.C. § 1343 for actions arising under laws providing for the protection of civil rights.

17.     Venue in the Northern District of Illinois is proper under 28 U.S.C. § 1391, as it is the judicial district in which a substantial portion of the events or omissions giving rise to these claims occurred.

18.     Declaratory and injunctive relief are sought under 28 U.S.C. § 2201 *et seq.*

### Background

19.     Beginning in the late 1960s the State of Illinois began releasing thousands of individuals with mental illness from its psychiatric institutions.  As this "de-institutionalization"

6

progressed, however, the state failed to create and develop adequate community housing and community services for large numbers of "de-institutionalized" individuals. Instead, the state funneled funds to nursing home operators who profited from the large numbers of mentally ill individuals recently de-institutionalized. Throughout the 1970s and 1980s, nursing home operators opened up large, for-profit facilities ("IMDs") designed to house these individuals, oftentimes in settings nearly as segregated and restrictive as the state psychiatric institutions they had just exited. Today, individuals with mental illness continue to be discharged from psychiatric hospitals into these restrictive facilities, where they continue to be needlessly segregated from society-at-large. This segregation occurs under the supervision of state agencies which, rather than helping re-integrate these individuals back into their communities by funding community-based programming, endorse and fund the IMDs. These IMDs do not prepare their residents to live independently and deny residents privacy and control over their lives. In many cases, the choice for persons with mental illness is between residence in an IMD—and compliance with its restrictive and controlling environment—or homelessness.

20.     Some fortunate individuals are discharged from psychiatric hospitals and placed in residential programs that are designed to help them achieve independence and manage their illness. Many others, however, like Ms. Williams and Ms. Wrightsell, are instead discharged to nursing homes, many of which are IMDs, because they primarily serve individuals with mental illness. In most Illinois nursing homes designated as IMDs, nearly 100% of the residents have mental illness.

21.     Defendant Eric E. Whitaker directs DPH, whose regulations permit the placement of an individual with mental illness in a nursing home, including an IMD, "for a medical reason

directly related to the person's diagnosis of serious mental illness, such as medication management." 77 Ill. Admin. Code § 300.4000(c).

22. Federal law prohibits Medicaid reimbursement to any individual who is older than 21 years of age and under 65 years of age and who is a resident of an IMD (42 U.S.C. § 1396d(a)(1), (2), (4)). Ms. Williams and Ms. Wrightsell are required to contribute all but thirty dollars ($30) of their monthly Supplemental Security Income ("SSI") check directly to Monroe for their shelter and board. DHFS helps fund the remaining expenses associated with Ms. Williams and Ms. Wrightsell's support and housing at Monroe.

23. Defendants have failed to integrate the state's mental health system by failing to develop and fund community alternatives. Many IMD residents could be served in more community-integrated settings; however, as a practical matter, the choice most residents face is either an IMD or homelessness. Most residents of Monroe and other IMDs remain there for years, because they are provided few opportunities to obtain services in more integrated settings and to become more independent within the surrounding community. IMDs segregate individuals with mental illness from others who do not have mental illness.

24. Like most IMDs, Monroe provides only beds, meals, and spartan rehabilitative services. For many individuals, including Ms. Williams and Ms. Wrightsell, the services provided by Monroe could be better provided in a more integrated, community residential program.

25. Instead of serving individuals with mental illness in more integrated settings, Defendants continue to fund and operate a mental health system wherein IMDs may profit from segregating and restricting these individuals' access to the outside world.

8

26.     Ms. Williams and Ms. Wrightsell seek declaratory and injunctive relief requiring Defendants to provide services to them in the most integrated setting appropriate to their needs.

## Facts

27.     Illinois has historically provided, and currently provides, inpatient hospitalization to individuals with mental illness in public and private psychiatric hospitals.

28.     Some individuals discharged from psychiatric hospitals return home to family or friends. Others are discharged to various community residential programs for individuals with mental illness.

29.     In many of these residential programs, individuals live in their own apartments with greater privacy and with a greater choice of activities than now found in the IMDs. Individuals in community programs sometimes live in integrated buildings with individuals who do not have mental illnesses. They usually are able to receive and entertain visitors and communicate by phone in privacy. Residents go to stores to shop for food and other necessities. Most of these individuals may go to doctors of their choice, as well as engage in social activities of their choice. They tend to these and other daily needs to the degree they are able, with supportive services provided by case managers. These programs are designed to foster independence and to enable individuals to become as self-sufficient as possible. Such programs are generally known as "supported housing." Unlike IMDs, they are not institutional in character.

30.     When state agencies fail to develop or fund community services, individuals with serious mental illness are discharged to nursing homes, including IMDs.

## Monroe Pavilion

31.     Monroe is an intermediate-care nursing home, classified as an IMD, located at 1400 W. Monroe St., Chicago, Illinois 60607. It houses approximately 136 residents. Monroe's

9

residents all have some form of mental illness. Common diagnoses include bipolar disorder, schizophrenia and major recurrent depression. Most residents at Monroe are active and ambulatory.

32.     Like other Illinois nursing homes classified as IMDs, Monroe places many limitations on residents' autonomy and privacy. Residents are subjected to a highly regimented lifestyle in which most daily activities are conducted in one place in the company of large numbers of other individuals with mental illness, and which is characterized by restrictive rules and policies. In contrast, the more integrated community residential programs for individuals with mental illness afford residents much more choice, freedom and privacy, as well as the opportunity to maintain family relationships and to interact with and form friendships with people who do not have mental illness.

33.     Meals are provided with little choice. Well over one hundred individuals share access to a single common area. Residents must line up for meals and for medication, which is only dispensed at specific times in the common areas. Residents are often paged to come take their medications if they do not line up to get them at the designated time.

34.     Like other IMDs, Monroe provides very few recreational or other activities geared toward helping residents gain independence. Residents spend hours watching television in a common room or smoking cigarettes in a smoking room during the winter or outside on the sidewalk—beside the facility —when the weather allows. Residents wander aimlessly in and out of the common room and smoking room with nothing to do for the majority of the day. There are some activities on weekday afternoons that purportedly develop residents' practical skills; however, these activities are minimal, if not altogether ineffective. Some residents are able to attend day programs outside the facility, where they may learn skills to help them become more

independent and more productive members of the community. However, at the end of the day, these residents must return to Monroe.

35. Residents of Monroe and other IMDs have almost no control over their personal space. Most Monroe residents share a bedroom and bathroom with three other people. Residents have no control over when or by whom their rooms are cleaned or who has access to their rooms.

36. Residents of Monroe have virtually no privacy. Payphones are located only in common areas, where anyone can overhear their conversation. Residents can receive calls only through the switchboard, and are usually paged over a loudspeaker to come to a phone that is not in a private space.

37. The lack of privacy makes it very difficult for residents to exercise their rights. Since it is difficult for residents to make phone calls without Monroe staff knowing they are doing so, residents may be reluctant to call advocates when they have a problem. This serves as a further disincentive to residents exercising any kind of independence.

38. Residents have little contact with members of the community outside the facility. Outsiders' visits are limited. Most visitors may not be received in privacy.

39. No food, liquids or medicines can be brought in to the facility without permission of the Administrator or nurse in charge.

40. The depersonalization and lack of mental stimulation in the facility erodes residents' ability to live independently.

41. Moreover, Monroe has policies and practices, similar to many IMDs, that prevent residents from moving out of the institution. Such policies create barriers that inhibit the ability of residents to obtain appropriate services and supports that will provide them an opportunity to

lead more fulfilling and more independent lives outside Monroe. Discharge planning is not regularly conducted. Furthermore, residents receive virtually no education or information about the limited alternatives to nursing homes.

42.    Residents of Monroe are typically not given a choice of what doctors and pharmacies to use. Residents' doctors and pharmacies are chosen by the facility.

43.    Monroe's operator serves as the representative payee for residents and thus controls the residents' finances. As the representative payee, the operator receives residents' SSI checks directly from the government and distributes to residents the small personal needs allowance they are permitted to retain from these checks. This "personal needs allowance" is currently $30.00 a month, or about $1.00 per day. The remaining amount is retained for use by the IMD.

44.    In fact, residents' privileges may be suspended if they attempt to increase financial leverage by borrowing, loaning, buying or selling items to others.

45.    Monroe provides little or no rehabilitative treatment designed to promote recovery, independence and integration into the community.

46.    Monroe lacks a sufficient number of trained staff necessary to provide adequate care to individuals with mental illness and to provide them with the opportunities to lead happy, independent, and productive lives.

47.    All residents of Monroe are subject to a Behavior Management Program ("BMP"). Monroe's BMP is a "four level" system similar to those used in psychiatric hospitals. A resident's freedom to leave the facility is restricted to different degrees based on the staff's assessment of how the individual complies with institutional rules. In short, residents must meet the behavioral standards set by the institution in order to obtain greater freedom. Residents who

12

fail to perform required activities or who violate the rules are punished by being downgraded to a lower level or by losing their "pass" to leave the facility for a period of time. Each requirement for each level must be met to maintain status on that level.

48.    All residents discharged to Monroe are, at first, assigned to "Level One." At this level, a resident is not allowed to leave the facility at any time, with the exception of a single monthly visit with family. In order to reach "Level Two," residents must participate in an informal solitary or group leisure activity daily, such as reading the newspaper or playing cards. "Level Two" residents are allowed to leave the facility only if accompanied by a member of the Monroe staff.

49.    In order to reach "Level Three," residents must participate in at least one structured leisure activity weekly (e.g., bingo), wake up at 6 a.m. and clean one's living space and make one's bed by 9 a.m., enroll in a day treatment and/or work program, and take prescribed medications at scheduled times. A "Level Three" resident is allowed to leave the facility alone for limited periods of time. In order to reach "Level Four," residents must follow all the requirements of the preceding levels and, in addition, must participate in at least two structured leisure activities weekly, participate regularly and productively in a day treatment and/or work program, independently make needs known, be on time for meals, and attend assigned facility therapy groups regularly and productively. "Level Four" residents can leave the facility more freely, but are still subject to curfews and other restrictions.

50.    In order to move up a level within Monroe's BMP, a resident must first complete a petition and get the approval and signature of all staff members with responsibility for the resident's care. If the petition is approved and signed, the resident must then wait an additional four weeks to move up to the approved level. Monroe's staff purportedly reviews petitions every

week. However, petitions can only be submitted every few months. In addition, the Monroe staff reserves and regularly exercises the right to determine each resident's level, despite a resident's fulfillment of each level's stated requirements. In fact, Monroe's staff may even choose arbitrarily to *add* additional requirements for individual residents.

51.     If a resident borrows, loans, buys, sells or gives items to others, he/she may be expected to cease this behavior before having a petition even considered by the staff.

52.     A resident's level within Monroe's BMP is subject to forfeiture at all times. While it can take months to petition and earn a new level, a resident's current level—and as a result, his or her free access to the world outside of Monroe—can be reduced at any time for various infractions of the rules and regulations of Monroe. If a level that was previously earned by a resident is taken away, there is no process which will allow such resident to circumvent the lengthy process of petitioning to regain the level and consequent privileges that have been taken away.

## Ethel Williams

53.     Plaintiff Ethel Williams has been a resident of Monroe for approximately thirteen years, or since she was discharged from the John J. Madden Mental Health Center. Ms. Williams has been diagnosed with bipolar disorder. Ms. Williams is alert, active and ambulatory. She maintains close contact with her children and grandchildren. Ms. Williams spends her weekends with her brother and sister-in-law. She takes her medication independently while staying with her family. In the past, Ms. Williams has worked within the retail industry.

54.     Ms. Williams wishes to leave Monroe and to live in a more integrated community setting, in order to accelerate her rehabilitation and to lead a more independent life. Professionals familiar with Ms. Williams's circumstances have indicated that she is ready to live

in the community and that continued institutionalization is unnecessary and potentially harmful to her.

55.     Defendants, however, have failed to provide meaningful, adequate, and periodic assessments of Ms. Williams's potential for placement in the most integrated community setting available. Ms. Williams has repeatedly told the staff of Monroe that she wishes to leave, and facility records indicate her desire to live more independently. Her medical records and progress notes indicate that she is a good candidate for placement in an integrated community setting. However, Defendants fail to ensure that Ms. Williams receives adequate discharge planning and fail to provide opportunities for her to lead a more independent and more productive life.

56.     Ms. Williams entered Monroe at "Level One"; however, she has complied with institutional rules to the point where she has been "awarded" a "Level Four" status. As a "Level Four" resident, Ms. Williams is permitted to be outside Monroe for most of the day in order to, for example, visit family members.

57.     Ms. Williams has repeatedly expressed an interest in returning to the community. She does not require nursing care in an institutional setting. She could live in the community if she were provided with the types of home and community-based supports and services currently provided in Illinois. However, Defendants have failed to ensure adequate discharge planning for Ms. Williams, even though she has demonstrated skills (*e.g.*, working in the retail industry) that would enable her to succeed in more independent living.

58.     Ms. Williams has no significant physical health needs being addressed by Monroe.

### Jan Wrightsell

59.     Plaintiff Jan Wrightsell, has been a resident of Monroe since early 2002, when she was discharged from the psychiatric unit of Chicago's St. Joseph's Hospital. Ms. Wrightsell has

been diagnosed with schizophrenia and has a history of major recurrent depression. She is alert, active and ambulatory. Ms. Wrightsell maintains close contact with her family, and has substantial prior work experience as a sales clerk. She is well-educated and enjoys reading, writing short stories and composing poetry. Interacting with animals and pets is one of her favorite activities.

60.     Ms. Wrightsell wishes to leave Monroe in order to live in a more integrated community setting, in order to accelerate her rehabilitation and to lead a more independent life. Professionals familiar with her circumstances, and with whom Ms. Wrightsell has interacted in her day programs, have indicated that she is ready to live in a less restrictive program in the community and that continued institutionalization is unnecessary and potentially harmful to her.

61.     Defendants, however, have provided only formulaic assessments of Ms. Wrightsell that lack any individual plan or review. Ms. Wrightsell has repeatedly told the staff of Monroe that she wishes to leave; however, facility records fail to reflect her desire to live more independently. Defendants fail to ensure that Ms. Wrightsell receives adequate discharge planning and fail to provide opportunities for her to lead a more independent and more productive life. Instead, Defendants have consigned her to an institution that refuses to help her progress toward social independence.

62.     Ms. Wrightsell entered Monroe at "Level One"; however, she has complied with institutional rules to the point where she has been "awarded" a "Level Three" status. As a "Level Three" resident, Ms. Wrightsell is only permitted to leave Monroe on her own for between two and six hours per day, depending on the length of the pass assigned to her at any given time. Although she has fulfilled "Level Four" requirements (*e.g.*, successfully graduating from several day programs), Monroe refuses to grant her "Level Four" privileges.

63.    Ms. Wrightsell has repeatedly petitioned Monroe to move to "Level Four." However, her petitions have been regularly denied by Monroe staff with neither sound nor written reason. In fact, Ms. Wrightsell's privileges have often been suspended based on arbitrary reasons (*e.g.*, bringing her winter coat to the cafeteria).

64.    Ms. Wrightsell has repeatedly expressed an interest in returning to the community. She does not require nursing care in an institutional setting. She could live in the community if she were provided with the types of home and community-based supports and services currently provided in Illinois. These supports and services provided in the community would cost the same or less than the amount currently spent on Ms. Wrightsell's care. However, Defendants fail to ensure adequate discharge planning for Ms. Wrightsell, even though she has demonstrated skills (*e.g.*, working as a cook in the day program she now attends) that would enable her to succeed in more independent living.

65.    Ms. Wrightsell has no significant physical health needs being addressed by Monroe.

### The Roles of Defendants

66.    Defendants are all charged with administering and/or overseeing long-term care services for individuals with mental illness in both institutional and community settings.

67.    Over six years after *Olmstead* was decided, Defendants have failed to develop a comprehensive and effective working plan for identifying people with mental illness unnecessarily institutionalized in nursing homes and moving them into more integrated settings. The defendants are responsible for the operation and administration of their respective agencies and are ultimately responsible for ensuring that their agencies provide services in conformity with the ADA and the Rehabilitation Act. 20 ILL. COMP. STAT. 2407/20(c). However, no viable

17

working plan has been produced nor have Defendants evidenced a commitment to action which would show "ongoing progress toward community placement." *See Penn. P.P.A., Inc. v. Penn. Dept. of Public Welfare*, No. 03-1461, 2005 WL 674500 (3d Cir. March 24, 2005).

68.     DHS' duties also include monitoring the care given by nursing homes, including IMDs, and providing input into the licensing process on such matters as staffing and program content.

69.     DHS is responsible for the screening of individuals such as Ms. Williams and Ms. Wrightsell, who are being considered for admission to nursing facilities and who are ages 18 through 59, and for individuals aged 60 and over who have a severe mental illness, in order to determine whether nursing facility care is appropriate. 77 Ill. Adm. Code § 300.615.

70.     DPH, in conjunction with DHS, is required to develop minimum standards for licensing facilities for people with mental illness, including IMDs. 210 ILL. COMP. STAT. 45/3-203.

71.     DPH is also responsible for regulating and inspecting all nursing facilities, including IMDs, in Illinois. DPH is required to develop a curriculum for training nursing assistants and habilitation aides. 210 ILL. COMP. STAT. 45/3-206.

72.     DPH is responsible for promulgating rules governing the provision of services by nursing facilities to residents who have a serious mental illness, including assessment, care planning, treatment, and discharge planning. 210 ILL. COMP. STAT. 45/3-202.2.

73.     DHFS classifies nursing homes as IMDs and administers funding to IMDs as appropriate. 89 Ill. Adm. Code §§145.20, 145.40, 140.500. DHFS is required to verify the need for group care for individuals with severe mental illness in accordance with 89 Ill. Adm. Code § 140.642. DHFS is also required to approve the placement in the nursing facility based upon a

determination that a need for nursing level of care exists and that the nursing facility meets state law requirements. An individual will be determined to need this level of care if he or she needs a) professional observation for medication monitoring, adjustment or stabilization; or b) daily supervision and assistance in at least two areas: self-maintenance, social functioning, community living activities, and work-related skills. DHFS authorizes payment to the nursing facility. 89 Ill. Adm. Code § 140.510.

74.     Like many individuals who live in Monroe and other IMDs, Ms. Williams and Ms. Wrightsell were discharged directly from a psychiatric unit of a private hospital to an IMD.

75.     There are long waiting periods for admission to supported housing programs, so people with serious mental illness are inappropriately discharged from psychiatric hospitals to Monroe and other IMDs because of insufficient capacity in community residential programs, including supported housing. The decision to discharge individuals such as Ms. Williams and Ms. Wrightsell to Monroe or any other IMD, as opposed to supported housing, is not based on any relevant treatment criteria or diagnosis, but simply on the lack of availability of appropriate alternatives.

76.     Once individuals, such as Ms. Williams and Ms. Wrightsell, are placed in Monroe or some other IMD, opportunities for discharge to supported housing are rare.

77.     Defendants do not consider the needs of Ms. Williams and Ms. Wrightsell or other IMD residents for more integrated housing when they plan for development of integrated supported housing programs.

78.     Despite the fact that they are responsible for ensuring appropriate placement of individuals with mental illness and for establishing appropriate discharge procedures, Defendants

have not provided Ms. Williams and Ms. Wrightsell with information that will enable them to lead more independent and more productive lives in society.

79. In violation of their statutory duties, Defendants are administering their programs and providing services in a manner that supports and encourages the segregation of individuals with mental illness, by inappropriately relying on IMDs such as Monroe.

80. Defendants have developed and funded long-term residential programs that enable individuals to receive services in settings far more integrated than nursing homes.

81. However, Defendants have failed to develop and fund sufficient capacity in these programs, forcing into nursing homes thousands of individuals with mental illness who could, and would, prefer to be served in more integrated settings.

82. Defendants have policies, rules and practices that discourage the placement of individuals with mental illness in integrated residential settings and, instead, perpetuate the current system of IMDs such as Monroe. Changing these policies, rules and practices would not be a fundamental alteration under Defendants' service system for people with psychiatric disabilities. Services can be provided in a more integrated setting at a cost equivalent to or less than the average cost of providing services to a nursing home resident. Moreover, Defendants already provide the services needed by Ms. Williams and Ms. Wrightsell to other people with mental illness.

### Count I

### Violation of the Americans With Disabilities Act Mandate To Administer Services And Programs In The Most Integrated Setting

83. Ms. Williams and Ms. Wrightsell repeat and reallege paragraphs 1-82 above.

84. Ms. Williams and Ms. Wrightsell are individuals with serious mental illnesses. Each Plaintiff has a mental impairment that substantially limits one or more major life activity,

such as self care and interaction with others. They also have a record of such mental illnesses, and are regarded by defendants as having such mental illnesses.

85.     Ms. Williams and Ms. Wrightsell reside in Monroe, a facility classified as an IMD, and each is qualified to participate in a more integrated community residential program that would meet their mental health needs. Ms. Williams and Ms. Wrightsell are, therefore, qualified individuals with disabilities within the meaning of 42 U.S.C. § 12131(2).

86.     Defendants Blagojevich, Adams, Stone, Whitaker and Maram are responsible for the operation of public entities covered by Title II of the ADA. 42 U.S.C. §§ 12131(1)(A) and (B).

87.     The United States Department of Justice has promulgated regulations under Title II of the ADA stating that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

88.     Defendants are obligated under the ADA to administer Illinois programs in a manner that supports the availability of services and programs in the most integrated setting for individuals with disabilities.

89.     Serving Ms. Williams and Ms. Wrightsell in a more integrated setting can be reasonably accomplished.

90.     Defendants have failed to meet this obligation. Defendants are instead requiring Ms. Williams and Ms. Wrightsell to live and receive services in Monroe, a nursing home for people with mental illness, although this location is not the most integrated setting appropriate to their needs.

**Count II**

21

**Violation Of The Americans With Disabilities Act's Prohibition On Using Methods Of Administration That Subject Plaintiffs To Discrimination**

91.     Ms. Williams and Ms. Wrightsell repeat and reallege paragraphs 1-82 above.

92.     Ms. Williams and Ms. Wrightsell reside in Monroe, an IMD, and each is qualified to participate in a more integrated community residential program that meets their mental health needs.

93.     Title II of the ADA, 42 U.S.C. §§ 12131, 12132, prohibits Defendants from discriminating against individuals with disabilities.

94.     Regulations implementing Title II of the ADA, 28 C.F.R. § 35.130(b)(3), provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ."

95.     Defendants, however, utilize methods of administration that have the effect of subjecting Ms. Williams and Ms. Wrightsell to discrimination. Defendants continue to utilize methods of administration that perpetuate Ms. Williams and Ms. Wrightsell's placement in Monroe, rather than facilitating their receipt of services in the most integrated setting appropriate to their needs.

## Count III

**Failure to Administer Services in the Most Integrated Setting Appropriate in Violation of the Rehabilitation Act**

96.     Ms. Williams and Ms. Wrightsell repeat and reallege paragraphs 1-82 above.

97.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

98. DPH, DHFS, DMH and DHS are recipients of Federal financial assistance.

99. Defendants Blagojevich, Adams, Stone, Whitaker and Maram are responsible for the operation of DPH, DHFS, DMH and DHS.

100. Ms. Williams and Ms. Wrightsell reside in an IMD and are qualified to participate in a more integrated community residential program that meets their mental health needs.

101. Section 504 of the Rehabilitation Act requires Defendants to serve individuals with disabilities in the most integrated setting appropriate to their needs.

102. Serving Ms. Williams and Ms. Wrightsell in more integrated settings can be reasonably accomplished.

103. Defendants have violated Section 504 of the Rehabilitation Act by failing to administer services to Ms. Williams and Ms. Wrightsell in the most integrated setting appropriate to their needs.

## Count IV

## Violation of the Rehabilitation Act's Prohibition on Using Methods of Administration That Subject Plaintiffs to Discrimination

104. Ms. Williams and Ms. Wrightsell repeat and reallege paragraphs 1-82 above.

105. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 prohibits Defendants from discriminating against individuals with disabilities.

106. Regulations implementing Section 504 of the Rehabilitation Act provide that "a recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified handicapped persons to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating

or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons . . . ." 45 C.F.R. § 84.4(b).

107. DPH, DHFS, DMH and DHS are recipients of Federal financial assistance.

108. Defendants Blagojevich, Adams, Stone, Whitaker and Maram are responsible for the operation of DPH, DHFS, DMH and DHS.

109. Defendants utilize methods of administration that have had the effect of subjecting Ms. Williams and Ms. Wrightsell to discrimination. Defendants utilize methods of administration that perpetuate the current IMD system rather than facilitate the receipt of services in the most integrated setting appropriate to the needs of Ms. Williams and Ms. Wrightsell, which have resulted in Ms. Williams and Ms. Wrightsell's placement in Monroe, a setting that is segregated and inappropriate.

## Prayer for Relief

WHEREFORE, Ms. Williams and Ms. Wrightsell request the following relief:

   a. Declaratory and injunctive relief, including an order requiring that Defendants promptly take such steps as are necessary to enable Ms. Williams and Ms. Wrightsell to receive services in the most integrated setting appropriate to their needs;

   b. An award of prevailing party costs, disbursements and attorney fees;

   c. Such other relief as the Court deems appropriate.

Dated: August 15, 2005          Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION OF
ILLINOIS
Benjamin S. Wolf
180 North Michigan Avenue
Suite 2300
Chicago, Illinois 60601
Telephone: (312) 201-9740
Facsimile: (312) 201-9760

EQUIP FOR EQUALITY
Amy F. Peterson
20 N. Michigan, #300
Chicago, IL 60602
Telephone: (312) 341-0022
Facsimile: (312) 341-0295

KIRKLAND & ELLIS, LLP
Donna M. Welch
Joseph M. Russell
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

ATTORNEYS FOR PLAINTIFFS