ETHEL WILLIAMS, JAN WRIGHTSELL, )
EDWARD BRANDON, and GILBERT )
PARHAM, on behalf of themselves )
and all others similarly situated, )
)
Plaintiffs, )
)
v. ) No. 05 C 4673
)
PAT QUINN, in his official capacity )
as Governor of the State of Illinois, )
MICHELLE R.B. SANDLER, in her official )
capacity as Secretary of the Illinois )
Department of Human Services, LORRIE )
RICKMAN-JONES, in her official )
capacity as Director of the Division )
of Mental Health of the Illinois )
Department of Human Services, )
DAMON T. ARNOLD, in his official )
capacity as Director of the Illinois )
Department of Public Health, and )
BARRY S. MARAM, in his official )
capacity as Director of the Illinois )
Department of Healthcare and Family )
Services, )
)
Defendants. )

## OPINION AND ORDER

### I. INTRODUCTION

This class action concerns the State of Illinois's

alleged duty under the Americans with Disabilities Act ("ADA"),

42 U.S.C. §§ 12101(a)(2), 12101(a)(5), 12132, and § 504 of the

Rehabilitation Act, 29 U.S.C. § 794(a), to provide persons with mental illnesses who reside in privately owned Institutions for Mental Diseases ("IMD") the opportunity to be placed in an integrated community setting. See generally Olmstead v. L.C., 527 U.S. 581 (1999). The defendants in this case, all sued in their official capacity, are the Governor of Illinois; the Secretary of the Illinois Department of Human Services; the Director of the Division of Mental Health of the Department of Human Services; the Director of the Illinois Department of Public Health; and the Director of the Illinois Department of Healthcare and Family Services.

There are 25 IMDs in Illinois with approximately 4300 residents. The IMDs are not parties in this litigation, but each IMD is potentially affected by the resolution of this case. The IMDs have cooperated with discovery and have expressed their views at hearings and in writing.

A Fed. R. Civ, P 23(b)(2) class was certified "consisting of Illinois residents who: (a) have a mental illness; (b) are institutionalized in a privately owned Institution for Mental Diseases; and (c) with appropriate supports and services may be able to live in an integrated community setting." Williams v. Blagojevich, 2006 WL 3332844 *5 (N.D. Ill. Nov. 13, 2006) ("Williams I").

- 2 -

The Class[1] and defendants have reached a Settlement, consisting of a proposed Consent Decree, as modified. See Order dated May 27, 2010 [Docket Entries 266-67].[2]  Following preliminary approval, a Fairness Hearing to consider final approval of the Consent Decree was held on September 7, 2010. Notice of the Fairness Hearing and of the opportunity to comment in writing was distributed through various means.  The IMDs distributed notices to IMD residents and their guardians and family.  Notice was also published in newspapers and posted on the websites of various parties and organizations.  Some, or all, of the IMDs distributed their own information sheets to residents and family members urging them to object to the Consent Decree.

Some of the written information distributed by the IMDs was found to be misleading.  See Williams v. Quinn, 2010 WL 3021576 *3-4 (N.D. Ill. July 27, 2010).  After the IMDs' information sheets had circulated, the IMDs were directed to

---

[1]Arguments and other statements made by Class Counsel are referred to as statements of the Class, as distinguished from statements made by or on behalf of a group of Class Objectors represented by counsel and other individual members of the Class.

[2]There is no separate settlement agreement, only a proposed Consent Decree that was submitted by the parties and slightly modified before receiving preliminary approval.  The Consent Decree as modified can be found at pages 4-28 of Docket Entry 267.  The parties also agreed to forms of notice that were modified by the court.  The remainder of today's ruling will refer to approval of the Consent Decree which is approval of a class settlement.

refrain from further soliciting residents and family members to be represented by particular attorneys. Id. at *3. No order was entered requiring that the information sheets be retracted nor directing that any corrective notice be distributed. See id. at *4.

After the notices were distributed, Class Counsel held informational meetings in each IMD. At a few IMDs, an attorney representing objecting Class Members held informational meetings and some IMDs organized their own informational meetings. Also, some IMD staff had informal conversations with various residents, including when residents approached staff with questions after receiving the court-approved notices.

A large number of comments were received in response to the notices. The impact of the IMDs' opposition, in terms of both the number of total comments submitted and the number of negative comments, cannot be accurately measured. To the extent approval and implementation of the proposed Consent Decree could eventually result in a decrease of IMD residents and possible closure of some or many IMDs, the IMDs clearly have a financial interest in opposing, or delaying, approval and implementation of the Consent Decree. The IMDs may also be motivated by genuine concern for the well-being of their residents. Regardless of the IMDs' motivations, though, they raise valid concerns and have

contributed to motivating residents, guardians of residents, and concerned family members or friends to raise valid concerns. Because they are important and pertinent issues, these concerns will be addressed.

Of the 1803 comments received by August 20, 2010, 1635 were submitted on forms the IMDs provided with their information sheets. The majority of comments expressed opposition to the Consent Decree.[3] Some persons who signed form comment sheets opposing the Consent Decree later submitted comments supporting the Consent Decree. No scientific poll of IMD residents, their guardians, and interested family or friends was conducted and, regardless, approval or disapproval of a class settlement is not decided by a vote of class members. It is clear, though, that a substantial segment of Class Members and non-party family, friends, and interested persons oppose or have concerns about the Consent Decree as proposed. As is set forth below, that is a

---

[3]Additionally, at the Fairness Hearing, sign-in sheets were provided on which each person attending could fill in: (a) the person's name; (b) identify oneself as an IMD resident, a relative of a resident, or other; (c) identify the resident's IMD, the IMD of a relative, or the IMD with which the signer was otherwise affiliated; and (d) note whether the person supported or opposed the proposed Consent Decree. 350 persons signed in with 158 (45.14%) noting opposition, 124 (35.43%) noting support, and 68 (19.43%) giving no indication. 59 of the signers identified themselves as IMD residents, with 21 (35.59%) noting opposition, 24 (40.68%) noting support, and 14 (23.73%) giving no indication.

factor to consider in deciding whether to approve the proposed
Consent Decree.

A substantial number of Class Members, including the
Illinois State Guardian speaking on behalf of 120 wards who are
in IMDs, expressed support for the Decree, including a desire for
community placement opportunities. A group of objectors (the
"Objector Group") retained counsel and filed a brief [Docket
Entry 303] opposing approval of the Consent Decree in its present
form.   The objections raised by the Objector Group generally
cover the objections separately raised in the numerous individual
objections that were submitted.

Many of the individual comments (both unfavorable and
favorable), as well as those orally stated at the Fairness
Hearing, include individual accounts about difficulties Class
Members (and their relatives) had in Class Members trying to
function outside (as well as inside) institutional settings.
These accounts have been taken into consideration.  As was noted
by Class Counsel at the Fairness Hearing, living with and
treating mental illness is a challenge, one that lasts a
lifetime.   The challenge continues whether inside or outside
institutional settings.   The family members and friends who
submitted comments and/or appeared at the Fairness Hearing showed
a genuine concern for their loved ones and a commitment to

continue to face the challenge. Their contributions are appreciated by the court and, whether they always are able to express it or not, by their loved ones as well. Discovering and providing the appropriate treatment for each individual is also a challenge to the professionals providing services and the administrators trying to determine the best way to deliver the services. Evidence before the court supports that a range of good and bad episodes in the treatment of Class Members has occurred both within institutional settings (including IMDs) and in various circumstances outside institutional settings.

Today's ruling will focus on the objections as stated in the briefs of the Objector Group and the IMDs.[4]

## II. LEGAL STANDARD

Federal courts favor the settlement of class actions. The purpose of a fairness hearing is not to resolve the merits of the case, but to determine whether the settlement is fair, reasonable, and adequate when viewed in its entirety, and not a product of collusion. Mirfasihi v. Fleet Mortg. Corp., 450 F.3d

---

[4]The IMDs are not parties to this litigation. Advocacy groups that have submitted comments also are not parties. The input of nonparties, however, may be considered to the extent it is useful. See Gould v. Alleco, Inc., 883 F.2d 281, 284 n.3 (4th Cir. 1989); Wilson v. Sw. Airlines, Inc., 880 F.2d 807, 817 n.1 (5th Cir. 1989); San Francisco NAACP v. San Francisco Unified Sch. Dist., 59 F. Supp. 2d 1021, 1033 (N.D. Cal. 1999). The IMDs' brief objecting to the Consent Decree is Docket Entry 295.

745, 748 (7th Cir. 2006); Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279 (7th Cir.2002); Isby v. Bayh, 75 F.3d 1191, 1196, 1200 (7th Cir. 1996); Williams v. Rohm & Haas Pension Plan, 2010 WL 1490350 *2 (S.D. Ind. April 12, 2010); Meyenburg v. Exxon Mobil Corp., 2006 WL 5062697 *3 (S.D. Ill. June 5, 2006). This court must act in a fiduciary-like capacity for the class, carefully scrutinizing the Consent Decree to make sure that class counsel have properly exercised the fiduciary duties they owe to the class. Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004); Reynolds, 288 F.3d at 279-80. Factors that may be considered in determining whether a class settlement is fair, adequate, and reasonable include: (a) the strength of plaintiffs' case compared to the benefits of the settlement; (b) as regards a damages settlement, defendants' ability to pay; (c) the likely complexity, length, and expense of further litigation; (d) opposition to the settlement from members of the class; (e) any indications of collusion; (f) the opinions of counsel; (g) the stage of the proceeding and the amount of discovery completed at the time of settlement; and (h) the public interest. See Synfuel Tech., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006); Mirfasihi, 450 F.3d at 748; Isby, 75 F.3d at 1199; Abrams v. Van Kampen Funds, Inc., 2006 WL 163023 *1 (N.D. Ill. Jan. 18, 2006). In determining whether to

approve a settlement, the Federal Rules of Evidence do not apply.
Case law supports that any information can be considered,
including affidavits and other items not normally admissible at
trial, that will aid the court in reaching an informed and
reasoned decision.  See Mars Steel Corp. v. Cont'l Bank N.A.,
880 F.2d 928, 937-38 (7th Cir. 1989) (dictum); Int'l Union,
UAW v. Gen. Motors Corp., 497 F.3d 615, 636 (6th Cir. 2007)
(collecting cases).

### III.  TERMS OF THE DECREE

The Consent Decree provides procedures for evaluating IMD
residents for possible placement in community settings and
providing community placements and services for those who may
appropriately be placed in such settings and do not oppose such a
placement.  The type of Community-Based Services to be considered
and offered are those set forth in 59 Ill. Adm. Code, Part 132
("Rule 132").  The Consent Decree provides a timetable for
evaluating and placing individuals that is measured from
defendants' finalization of an Implementation Plan.  Within two
years after finalization of the Implementation Plan, all IMD
residents are to "receive an independent, professionally
appropriate and person-centered Evaluation of his or her
preferences, strengths and needs in order to determine the
Community-Based Services required for him or her to live in PSH

- 9 -

[Permanent Supportive Housing] or another appropriate Community-Based Setting." Decree ¶ 6(a).

The evaluations are to be conducted by "Qualified Professionals," the definition of which incorporates provisions of state law. Based on the evaluations, an individualized Service Plan is to be developed by a Qualified Professional in conjunction with the resident and, if applicable, the resident's guardian and other persons of the resident's choosing. The Decree identifies certain items that are to be included in the Service Plan, general criteria to consider, and that each person's Service Plan is to be periodically updated. Id. ¶ 7. There is a timetable, with intermediary benchmarks, setting forth that, within five years after the Implementation Plan is finalized, all those who qualify and do not oppose being transferred to a Community-Based Setting will be placed in such a setting. Id. ¶ 10. Defendants agree to fund and provide sufficient services, in adequate quality, scope, and variety, to meet their obligations under the Decree. Id. ¶ 5.

An independent and impartial Monitor is to be appointed who will monitor compliance with the Decree; submit periodic reports to the court and parties; and seek to resolve any disputes that may arise regarding compliance and implementation. Id. ¶¶ 16-20. It is expressly provided that any unresolved

disputes between the parties or between the Monitor and a party is to be brought before the court. Id. ¶ 19. The annual reports that the Monitor files with the court are to be sufficient for the court to evaluate compliance or noncompliance with the Decree. Id. ¶ 17. The Implementation Plan, id. ¶ 14, and certain compliance requirements, id. ¶ 19, are to be deemed as incorporated in the Decree and enforceable by the court. Implicit in the reporting and incorporation provisions, as well as the fact that the parties' settlement is being structured as a consent decree, is that the implementation of the Consent Decree is subject to court approval.[5]

Within nine months following approval of the Consent Decree, the Implementation Plan is to be adopted. Id. ¶ 12.

> Defendants, with the input of the
> Monitor and Plaintiffs, shall create and
> implement an Implementation Plan to

---

[5]If the Monitor or plaintiffs cannot agree with defendants as to the Implementation Plan, it is to be submitted to the court for approval. Decree ¶ 12. Even if agreement is reached as to the Implementation Plan, it shall be submitted to the court for approval. Although not mentioned by any of the parties, the Implementation Plan apparently would be an agency rule subject to Illinois's rulemaking procedures. See 5 ILCS 100/1-5, 1-20, 1-70, 5-5. That generally requires public notice and a period for comments. Id. § 5-40. Emergency rules permit immediate implementation of rules adopted pursuant to "[c]onsent orders or other court orders adopting settlements negotiated by an agency." Id. § 5-45(b). Emergency rules may only be effective for up to 150 days and must be adopted using § 5-40 procedures in order to remain in effect beyond that time. Id. § 5-45(c); County of Du Page v. Ill. Labor Relations Bd., 358 Ill. App. 3d 174, 830 N.E.2d 709, 714 (2d Dist. 2005).

accomplish the obligations and objectives set forth in the Decree. The Implementation Plan must, at a minimum:

a)  Establish specific tasks, timetables, goals, programs, plans, strategies and protocols to assure that Defendants fulfill the requirements of the Decree;

b)  Describe the hiring, training and supervision of the personnel necessary to implement the Decree;

c)  Describe the activities required to develop Community-Based Services and Community-Based Settings, including inter-agency agreements, requests for proposals and other actions necessary to implement the Decree;

d)  Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality or geographic location;

e)  Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services and supports which, based on demographic or other data, are expected to be required within one year to meet the obligations of the Decree;

f)  Identify any necessary changes to regulations that govern IMDs in order to strengthen and clarify requirements for services to persons with Mental Illness and to provide for effective oversight and enforcement of all regulations and laws; and

g)  Describe the methods by which Defendants shall ensure compliance with their obligations under Paragraph 6 of this Decree[; and]

h)  Describe the mechanisms by which Defendants shall ensure compliance with

> their obligations under Paragraph 10 of
> this Decree.

Id. ¶ 11.

The Consent Decree also contains the following provision:

> In the event that any IMD seeks to discharge
> any Class Member before appropriate housing is
> available, including but not limited to
> circumstances in which an IMD decides to close,
> Defendants will ensure that those individuals are
> not left without appropriate housing options
> based on their preferences, strengths and needs.

Id. ¶ 15.

## IV. OBJECTIONS

The principal concern expressed by objectors appears to be the possibility that implementation of the Consent Decree will eventually result in the closure of some or all IMDs and residents who do well in and/or prefer to stay in IMDs will be left without that option or be forced to move to a different IMD or other type of non-community facility, with the move itself causing turmoil or setbacks or the new IMD/facility not being as effective a placement as the current one. Closely related to this concern is a fear that residents will be out on the street when IMDs close. The latter is an unfounded concern. Paragraph 15 of the Decree expressly provides that residents will not be left without appropriate housing options due to an IMD closing and that no one will be discharged from an IMD prior to

appropriate housing arrangements being made. Additionally, the Decree does not deprive residents of any rights to government subsidy and placement that they already have nor does it deprive them of existing procedural rights in the event of an IMD closure. The Decree itself will not result in any person being deprived of shelter, food, or medications.

There is a genuine concern that, if enough people leave IMDs for community placements, some of the IMDs will close due to not having enough residents to remain financially viable. The Class is broadly defined as including persons at IMDs who "may," with appropriate supports and services, be able to live in an integrated community setting. Based on the estimate of one of their experts, Class Plaintiffs contend that in the order of 90% of IMD residents could qualify for some form of community placement. Since the class definition only requires that a person might qualify in order to be a Member of the Class, most or virtually all IMD residents are Members of the Class.[6] Some of the Members of the Class could qualify for community placement, but presently have no interest in being transferred

_____

[6]The Objector Class contends the class definition should be changed to expressly include all IMD residents. They complain the definition contains a subjective criteria that requires a lengthy evaluation to determine who is a Member. However, this definition was previously certified and is sufficiently definite. See Williams I, 2006 WL 3332844 at *4-5; Colbert v. Blagojevich, 2008 WL 4442597 *2-4 (N.D. Ill. Sept. 29, 2008).

- 14 -

out of an IMD. As expressed in a number of comments, many of these Class Members and/or their family members believe they are getting good care in their present IMDs and presently want to stay there. The number of such residents is unknown. It is a significant number, but there is no indication it is close to a majority. Still, this is an interest of a significant number of Class Members and will be considered. Also, the Objector Group and a number of other independent objectors have expressly stated that, although they do not presently want to be transferred, they are not opposed to others having the right and opportunity to transfer to a community setting.

While the Objector Group and others who believe their particular IMD is providing them with good care do not want to lose the care they are presently receiving, there is no contention that they have a legal right to the particular placement they now have. There is no dispute, however, that Illinois has a legal obligation to provide sufficient opportunity for placement in the least restrictive environment, including a community placement if appropriate and not opposed. Even if the Consent Decree is not approved and Plaintiffs were required to proceed to the merits of their case, there would likely be relief granted requiring that Illinois provide adequate opportunities for community placement. Defendants have never contended that

Illinois presently satisfies federal requirements for providing such opportunities nor do objectors contend Illinois does. Instead, defendants raised a defense based on budgetary concerns and the effect on other programs it offers. While the merits of the case are not presently being resolved, the evidence before the court is that community placement is less expensive for Illinois, in large part due to the fact that there are larger federal subsidies for such placements compared to an IMD. If this case were to proceed to its merits, Illinois is unlikely to succeed on its financial defenses.[7] Even if the present settlement were not to be approved, that does not mean that the status quo will remain. One way or another change is likely to occur in how Illinois delivers services to the mentally ill, likely including less placements in IMDs. Approval of the Consent Decree cannot be withheld based on the incorrect assumption that lack of approval guarantees those who prefer IMDs will stay in their particular IMDs whereas they will not if the

---

[7] While there is a fundamental-alteration defense in these types of lawsuits, see generally Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 613-14 & n.5 (7th Cir. 2004), that defense does not necessarily come into play in the present situation of a settlement. Defendants are not presently contending that they do not want to pay for community placements because they would rather spend their limited resources on other services. In any event, community placement is less expensive for the state so it would not take resources away from being available for other services. Just as now, it would be left to the state to determine whether it wants to continue to commit resources to IMD placements.

- 16 -

Consent Decree is approved. There is no legal basis for withholding approval because some IMDs may close nor is there a legal basis for requiring that the Consent Decree include a provision guaranteeing that persons who so desire can stay in their present placement at a particular IMD.

The Objector Group contends approval of the Consent Decree should be withheld until the details of the Implementation Plan are developed and incorporated in the Decree.[8] Consistent with comity and federalism, it is best to allow details of state programs, even ones developed pursuant to court order, to be initially developed by state actors subject to court oversight. See Lewis v. Casey, 518 U.S. 343, 362 (1996); Ass'n of Comm'y Org. for Reform Now v. Edgar, 56 F.3d 791, 797-98 (7th Cir. 1995); Disability Advocates, Inc. v. Paterson, 653 F. Supp. 2d 184, 312 (E.D.N.Y. 2009) ("DAI"). Contrary to contentions of objectors, the Decree sets forth details of the type of community services to be offered. Since Class Members have not yet been evaluated, they cannot presently know the specific services that will be offered to a particular Class Member, but the Decree does

---

[8]Class Plaintiffs contend objectors confuse wanting to know the details of their particular recommended placement with the details of the Implementation Plan. While that may be true of some objectors, the Objector Group and other objectors have complained that details of the Implementation Plan itself have not yet been developed.

inform Class Members as to what the range of services will be. The Decree does so by incorporating Rule 132.[9] The details to be developed in the Implementation Plan are not the particular types of services to be made available, but how to build the necessary services (hire, train, contract, requisition, etc.); how to fund this; how to determine the amount of need for different types of services; and how to ensure compliance with the benchmarks and other requirements of the Decree itself. The level of detail in the Decree itself is sufficient.

Another aspect of a claimed need for more details is the contention that details will be developed behind closed doors without the class notice and court approval required for the Decree itself. As previously discussed, however, the Implementation Plan is subject to court approval and will likely require state regulations which are published with an opportunity for public comment.

It is also questioned whether the provision of community services will be adequately funded. It is inappropriate to provide in the Decree that funding will come from a particular source. See United States v. Bd. of Educ. of Chicago, 717 F.2d 378, 384-85 (7th Cir. 1983). The Decree does require that

_____

[9]Incorporating detailed Rule 132 does not intrude on federalism concerns since Rule 132 is a regulation already developed by a state agency.

- 18 -

adequate resources will be provided and, if the state fails to meet this requirement, that is an enforceable provision of the Decree. <u>Frew v. Hawkins</u>, 540 U.S. 431, 440 (2004); <u>Wis. Hosp. Ass'n v. Reivitz</u>, 820 F.2d 863, 868 (7th Cir. 1987).

Objectors contend it should be required that psychiatrists and family participate in each resident's evaluation for placement in a Community-Based Setting. Objectors also contend residents should only be evaluated if they request to be evaluated. The Decree provides that the evaluations are to be conducted by a Qualified Professional, who is defined as a person "appropriately licensed, credentialed, trained and employed by a PASRR [Pre-Admission Screening and Resident Review] Agency." Decree ¶¶ 4(xix); 6(b). These are the same professionals who are responsible for determining if a person qualifies to be placed in an IMD. It is also provided that legal guardians are to participate in the evaluation. <u>Id.</u> ¶ 7(c). Family, friends, or others may participate at the resident's request. <u>Id.</u> ¶¶ 4(viii), 7(c). The evaluation is to include an assessment of the resident's medical condition, including a consultation with the resident's psychiatrist and/or other professional staff "where appropriate." <u>Id.</u> ¶ 4(viii). Class Plaintiffs contend that this last provision will generally result in consultation with a psychiatrist, but leaves open the

possibility that such a consultation is not always necessary, particularly where the resident's designated psychiatrist has had little contact with the resident.

The provisions of the Decree are consistent with the mental health assessment provisions of Rule 132, which require consideration of the person's family and medical history and allow for the participation of family and physicians consistent with confidentiality rules, but do not mandate that a family member or psychiatrist participate in the assessment. See 59 Ill. Adm. Code § 132.148. These provisions of the Decree are reasonable and consistent with state law.

The Objector Group contends only those who affirmatively choose to be evaluated for community placements should be evaluated.[10] The language of the Decree, however, is consistent with Olmstead, 527 U.S. at 607, which provides that community

---

[10]The Objector Group incorrectly contends the Decree is internally inconsistent regarding evaluations of residents who do not agree to participate or do not want to be placed in the community. The Decree provides that all Class Members are to be evaluated for Community-Based Services. Decree ¶ 6(a). Each Class Member will be evaluated, but he or she is not required to participate in the evaluation. Id. If a Class Member is found to be appropriate for a Community-Based Setting, a service plan for such a transition is to be developed that reflects whether or not the Class Member desires to be placed in such a setting. Id. ¶ 7(a). If the Class Member does not oppose a community placement, then the service plan must also include particulars as to necessary services and a timetable for the transition. Id. ¶ 7(b).

placement that can be accommodated should be provided as long as it is not opposed by the recipient. See also Ligas ex rel. Foster v. Maram, 478 F.3d 771, 775 (7th Cir. 2007); Omega Healthcare Investors, Inc. v. Res-Care, Inc., 475 F.3d 853, 864 (7th Cir. 2007); Colbert, 2008 WL 4442597 at *1; Benjamin v. Dep't of Pub. Welfare of Commonwealth., 267 F.R.D. 456, 461-62 (M.D. Pa. 2010); DAI, 653 F. Supp. 2d at 267. The language of the Decree is also consistent with federal ADA regulations. See 29 C.F.R. § 35.130(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.") (emphasis added). The opt-out nature of the evaluation procedure is consistent with applicable law.

## V. GENERAL FACTORS

Turning to the general factors, this settlement was reached after extensive discovery was taken in this case. Class Plaintiffs appear to have a strong case and, accordingly, the provisions of the Decree reflect achievement of the primary goals of this litigation. Despite potential strengths of the case, trial of this case would have been lengthy and expensive. Settlement avoided some of that expense. Competent counsel

support the settlement and there is no indication of collusion.[11]
The only factor that brings some pause in approving the
settlement are the vigorous and heartfelt objections raised by
many Class Members and their families.  However, many of the
objections are inconsistent with the terms of the Decree and/or
the Decree is more consistent with the applicable law than
proposed modifications.  It is still a concern that those who are
receiving appropriate and beneficial treatment in their current
IMD placement might have to be moved to another IMD or elsewhere
if some or many IMDs close down as a result of losing residents
to community placements.  But that could very well happen even if
the Decree is not approved, moreover, and the Decree does not
deprive Class Members of any right to their current placement
that they otherwise have.

        The United States Department of Justice has appeared and
filed a statement of interest in this case.  The Statement
supports approval of the decree and notes that approval would be
consistent with action taken in other states.  See DAI, supra
(E.D.N.Y.); Long v. Benson, 2008 WL 4571903 (N.D. Fla. Oct. 14,
2008), aff'd by published order, 2010 WL 2500349 (11th Cir.

---

[11]Magistrate Judge Denlow mediated settlement discussions
between the parties.  His efforts were valuable in achieving the
settlement.

- 22 -

June 22, 2010); Rolland v. Cellucci, 1999 WL 34815562 (D. Mass. Feb. 2, 1999).

For the foregoing reasons, the substantive provisions of the Decree will be approved.

The Decree provides for an award of $1,990,000 in attorneys fees, costs, and expenses. Decree ¶ 22. This is substantially less than the lodestar for the work that was performed and represents a reasonable settlement. Also, this case does not involve a damages or other type of financial settlement in which money used to pay fees would otherwise be paid to the Class. Additionally, the fees will not be kept by any of the attorneys and instead will go to the advocacy groups that supported this litigation. The attorneys fees provision of the Decree is also approved.

In order to make today's ruling more readily available to Class Members, the entities that posted the Fairness Hearing notices on their websites are requested to promptly add a copy of today's ruling to those postings.

IT IS THEREFORE ORDERED that the settlement reached with the defendants in this case is found to be fair, adequate, and reasonable and is approved. The Clerk of the Court is directed to enter the Consent Decree. The Clerk of the Court is further directed to enter judgment in favor of Class Counsel and against

- 23 -

defendants in the amount of $1,990,000 representing attorney
fees, costs, and expenses. The court retains jurisdiction to
enforce the terms of the Consent Decree. Within 21 days, the
parties shall submit their nominee(s) for Monitor, including the
nominee(s)' curriculum vitae. A status hearing is set for
October 28, 2010 at 11:00 a.m.

ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 29 , 2010