**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| ETHEL WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 05 C 4673 |
| | ) | |
| vs. | ) | |
| | ) | Judge William T. Hart |
| | ) | Magistrate Judge Morton Denlow |
| PAT QUINN, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CONSENT DECREE**

)

# TABLE OF CONTENTS

**INTRODUCTION AND BACKGROUND** .............................................................................. 1

**DECREE**.................................................................................................................................. 2

I. JURISDICTION ..................................................................................................................... 2

II. PURPOSE……......…………………………………………………………………….2

III. CLASS DEFINITION ......................................................................................................... 2

IV. DEFINITION OF TERMS ................................................................................................... 2

V. THE MENTAL HEALTH SERVICES SYSTEM .................................................................. 7

VI. INDIVIDUALIZED EVALUATIONS AND PLANNING FOR INDIVIDUALS
RESIDING IN IMDS.................................................................................................................. 7

VII. OUTREACH....................................................................................................................... 15

VIII. IMPLEMENTATION........................................................................................................ 15

IX. MONITORING AND COMPLIANCE................................................................................. 18

X. NAMED PLAINTIFFS......................................................................................................... 20

XI. ATTORNEYS' FEES AND COSTS.................................................................................... 20

XII. MISCELLANEOUS PROVISIONS................................................................................... 21

## INTRODUCTION AND BACKGROUND

Plaintiffs[1], a class of Illinois residents with Mental Illness living in Institutions for Mental Diseases ("IMDs"), filed this lawsuit on August 15, 2005, seeking declaratory and injunctive relief to redress violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Plaintiffs allege that they are needlessly segregated and institutionalized in IMDs, where they are forced to live with dozens—and often hundreds—of other people with Mental Illness, in violation of the ADA and the Rehabilitation Act requirements to administer services in the most integrated appropriate setting.    See generally    Williams v. Blagojevich, 2006 WL 3332844 (N.D. Ill. Nov. 13, 2006).

Plaintiffs allege that Defendants have denied them the opportunity to live in integrated settings where they could lead more independent and more productive lives in their own communities. Plaintiffs seek injunctive relief (1) requiring Defendants to inform Plaintiffs that they may be eligible for community services and have a choice of such services, (2) requiring Defendants to promptly determine eligibility for such services, (3) prohibiting Defendants from arbitrarily denying eligibility for services, and (4) requiring Defendants to promptly provide appropriate services that allow Plaintiffs to live in the most integrated setting appropriate. Defendants deny liability and specifically deny that they have violated the ADA or the Rehabilitation Act.

Therefore, upon all of the foregoing, and the Court being otherwise fully advised, the Court hereby ORDERS, ADJUDGES and DECREES as follows:

---

[1] Capitalized terms set forth herein are defined in Section IV, "Definition of Terms." Noncapitalized terms will have the meaning ordinarily attributed to them and shall be separate and apart from the terms defined in Section IV, "Definition of Terms."

<u>**DECREE**</u>

## I. JURISDICTION

1. The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

## II. PURPOSE

2. The purpose of this Consent Decree is to assure that Defendants provide Plaintiffs with the opportunity to receive the services they need in the most integrated setting appropriate and to promote and ensure the development of integrated settings that maximize individuals' independence, choice, opportunities to develop and use independent living skills, and afford the opportunity to live similar lives to individuals without disabilities.

## III. CLASS DEFINITION

3. The Class is defined as:

All Illinois residents who are eighteen (18) years old or older and who:

(a) have a Mental Illness;

(b) are institutionalized in a privately owned Institution for Mental Diseases; and

(c) with appropriate supports and services may be able to live in an integrated community setting.

## IV. DEFINITION OF TERMS

4. As used herein, the following terms have the following meanings:

i) "Class" and "Class Members" mean the persons who, as of the date of Approval of the Consent Decree or at any time in the future while this lawsuit is pending and during the time covered by the Decree, meet the definition set forth in Section III, above.

ii) "Community-Based Services" means those services provided under the Illinois Medicaid State Plan, as well as the services described in the Medicaid Community Mental Health Services Program administered by the Illinois Department of Human Services' Division of Mental Health and authorized pursuant to 59 Ill. Adm. Code Part 132 (hereafter referenced as Rule 132), in effect as of the date of Approval of the Decree, including any amendments thereto.

iii) "Community-Based Setting" means the most integrated setting appropriate

for a person with Mental Illness, where the setting is designed to promote independence in daily living, economic self-sufficiency and the ability to interact with non-disabled persons to the fullest extent possible. A Community-Based Setting may include: (1) Permanent Supportive Housing; (2) independent housing with the Class Member's family or friends; (3) other independent housing not owned or operated by a social service entity; or (4) any supported or supervised residential service within the DMH service taxonomy.

iv) "Community-Service Provider" or "Provider" means a provider certified by the Illinois Department of Human Services for the provision of Community-Based Services.

v) "Court" means the United States District Court for the Northern District of Illinois, Eastern Division.

vi) "Decree" means this Consent Decree.

vii) "Defendants" means the Governor of the State of Illinois, the Secretary of the Illinois Department of Human Services, the Director of the Division of Mental Health of the Illinois Department of Human Services, the Director of the Illinois Department of Public Health, the Director of the Illinois Department of Healthcare and Family Services, and any of their successors.

viii) "Evaluation" means an assessment provided by a Qualified Professional under contract with the State to residents of IMDs or potential residents of IMDs, and includes Evaluations conducted (i) to implement this Decree, (ii) as part of a PASRR Process, (iii) in response to a report of significant change in a resident's physical or mental condition, (iv) in response to a request from a resident, or (v) as part of a regular assessment of residents. Each Evaluation shall include, although not be limited to, an assessment of the Class Member's medical condition as it bears on his or her appropriateness for placement in a Community-Based Setting, a consultation with the Class Member's psychiatrist and/or other professional staff where appropriate, and a consultation with other appropriate people of the Class Member's choosing.

ix) "Implementation Plan" means the plan set forth in Subsection VIII.11. below.

x) "Illinois Medicaid State Plan" or "State Plan" means the plan that was submitted by the State of Illinois to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services,

4

in accordance with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, in effect as of the date of the Approval of the Decree, including any amendments.

xi)    "Institution for Mental Diseases" or "IMD" means a privately owned long-term care facility classified as an Institution for Mental Diseases for purposes of claiming Federal Medicaid matching funds.

xii)    "Mental Illness" means serious mental illness as defined in 77 Illinois Administrative Code, Chapter I, Section 300.4000.

xiii)    "Monitor" means the person or entity appointed by the Court pursuant to Section IX hereof to perform the functions more fully described therein.

xiv)    "Named Plaintiffs" means the following people, each of whom the Court certified as a class representative in the litigation: Ethel Williams, Jan Wrightsell, Edward Brandon, and Gilbert Parham.

xv)    "Parties" means Plaintiffs and Defendants, collectively.

xvi)    "Plaintiffs" means the Named Plaintiffs and Class Members, collectively.

xvii)    "Pre-Admission Screening and Resident Review (PASRR) Agency" means any independent agency that (1) contracts with the State to perform, in conformance with federal screening requirements, pre-admission screening and resident reviews on persons with Mental Illness who may be placed or currently reside in an IMD, and (2) as a condition of its contract with the State, has received sufficient training and/or has sufficient experience providing services to demonstrate a comprehensive

understanding of the available residential options, including Permanent Supportive Housing, and Community-Based Services.

xviii) "Pre-Admission Screening and Resident Review (PASRR) Process" means the eligibility, admission and assessment process for individuals who may be or have been placed in an IMD.

xix) "Qualified Professional" means persons who are appropriately licensed, credentialed, trained and employed by a PASRR Agency.

xx) "Permanent Supportive Housing" or "PSH" refers to integrated permanent housing with tenancy rights, linked with flexible Community-Based Services that are available to consumers when they need them, but are not mandated as a condition of tenancy. For purposes of this Decree, PSH includes scattered-site housing as well as apartments clustered in a single building, but no more than 25% of the units in one building with more than four (4) units may be used to serve PSH clients known to have Mental Illness. For buildings with two (2) to four (4) units, no more than 50% of the units may be used to serve PSH clients known to have Mental Illness. However, during the first five years after finalization of the Implementation Plan, up to 75 Class Members may be placed in buildings where more than 25% of the units serve PSH clients known to have Mental Illness if those buildings were used to serve PSH clients prior to March 1, 2010. After the first five (5) years following the finalization of the Implementation Plan, all Class Members who are being served in PSH

6

shall be offered the opportunity to reside in buildings that comply with the 25% or 50% unit limits set forth above in this subparagraph.

xxi) "Service Plan" as used in this Decree means a plan containing a description of goals, including transition to Community-Based Settings, and strategies that will be employed and services provided to achieve those goals.

xxii) "State" means the State of Illinois.

## V. THE MENTAL HEALTH SERVICES SYSTEM

5. **Development of Community Capacity.** Defendants shall ensure the availability of services, supports and other resources of sufficient quality, scope and variety to meet their obligations under the Decree and the Implementation Plan. Defendants shall implement sufficient measures, consistent with the preferences, strengths and needs of Class Members, to provide Community-Based Settings and Community-Based Services pursuant to the Decree.

## VI. INDIVIDUALIZED EVALUATIONS AND PLANNING FOR INDIVIDUALS RESIDING IN IMDS

6. **Evaluations.**

a) Within two (2) years of the finalization of the Implementation Plan described below, every Class Member will receive an independent, professionally appropriate and person-centered Evaluation of his or her preferences, strengths and needs in order to determine the Community-Based Services required for him or her to live in PSH or another appropriate Community-Based Setting. Any Class Member has the right to decline to take part in such Evaluation. Any Class Member who has

declined to be evaluated has the right to receive an Evaluation any time thereafter on request.

b)   Defendants shall ensure that Evaluations are conducted by Qualified Professionals as defined in this Decree.

c)   Defendants shall ensure, as provided in the Implementation Plan, that all Class Members shall be informed about Community-Based Settings, including Permanent Supportive Housing, and Community-Based Services available to assist individuals in these settings, and the financial support Class Members may receive in these settings.

d)   After the second year following finalization of the Implementation Plan, the Evaluations described in Subsection 6(a) shall be conducted annually. As part of each Class Member's annual Evaluation, the reasons for any Class Member's opposition to moving out of an IMD to a Community-Based Setting will be fully explored and appropriately addressed as described in Section VII. Any Class Member who has received an Evaluation but has declined to move to a Community-Based Setting may request to be reassessed for transition to a Community-Based Setting any time thereafter.

7.   **Service Plans.**

a)   Based on the results of the Evaluations described above, Defendants shall promptly develop Service Plans specific to each Class Member who is assessed as appropriate for transition to a Community-Based Setting. Each Service Plan shall be periodically updated to reflect any changes in needs

8

and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate services where appropriate to assist in acquisition of basic and instrumental activities of daily living skills and illness self-management. Acquisition of such skills shall not be a prerequisite for transitioning out of the IMD.

b)    For each Class Member who does not oppose moving to a Community-Based Setting, the Service Plan shall, at a minimum, describe the Community-Based Services the Class Member requires in a Community-Based Setting, including the services the Class Member will need to transition to a Community-Based Setting, and a timetable for completing that transition. If there has been a determination that a Class Member is not currently appropriate for PSH, the Service Plan shall specify what services the Class Member needs that could not be provided in PSH and shall describe the Community-Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate.

c)    The Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and his or her legal representative. The Qualified Professional also shall consult with other appropriate people of the Class Member's choosing.

d)    Each Service Plan shall focus on the Class Member's personal vision, preferences, strengths and needs in home, community and work

environments and shall reflect the value of supporting the individual with relationships, productive work, participation in community life, and personal decision-making.

e) The Service Plan shall not be limited by the current availability of Community-Based Services and Settings; provided, however, that nothing in this subparagraph obligates Defendants to provide any type of Community-Based Service beyond the types of Community-Based Services included in the State Plan and Rule 132.

f) The Service Plan shall be completed within sufficient time to provide appropriate and sufficient transitions for Class Members in accordance with the benchmarks set forth in the Decree.

8. **Benchmarks for Transitions for Individuals Residing in IMDs.**

a) Within five (5) years of the finalization of the Implementation Plan, all Class Members who have been assessed as appropriate for living in a Community-Based Setting will be offered the opportunity to move to a Community-Based Setting.

b) Within one (1) year of finalization of the Implementation Plan, no individual with Mental Illness shall be admitted to an IMD without a pre-screening having first been conducted through the PASRR Process and an initial Service Plan completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community-Based Setting; identifies Community-Based Services that would facilitate that placement; and ensures that approved

10

admissions to IMDs are for only those IMDs that can provide treatment consistent with the individual's initial Service Plan and consistent with the goal of transition to a Community-Based Setting. After the first five (5) years following the finalization of the Implementation Plan, no individual with Mental Illness whose Service Plan provides for placement in Community-Based Settings shall be housed or offered placement in an IMD at public expense unless, after being fully informed, he or she declines the opportunity to receive services in a Community-Based Setting.

c) By the end of the first year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 256 Class Members who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 256 PSH units for the benefit of Class Members.

d) By the end of the second year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 640 Class Members (including the 256 referenced in subparagraph 8(c) above) who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 640 PSH units for the benefit of Class Members.

e) By the end of the third year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to at least forty percent (40%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the second year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.

f) By the end of the fourth year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to at least seventy percent (70%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the third year after the finalization of the Implementation Plan who are assessed as appropriate

for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.

g)    By the end of the fifth year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to one hundred percent (100%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the fourth year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since the finalization of the Implementation Plan.

h)    After the end of the fifth year following finalization of the Implementation Plan, Class Members who are assessed as appropriate for living in a Community-Based Setting, who do not oppose transition to a Community-Based Setting and whose Service Plans provide for placement in

13

Community-Based Settings shall be offered the opportunity to move to those settings and shall receive appropriate services consistent with the Service Plan within one hundred and twenty (120) days of the date of the Service Plan.

9.  **Community-Based Settings and Community-Based Services**

    a)  PSH will be considered the most integrated setting appropriate for Class Members except that, (1) for any Class Members (i) who have severe dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH, (ii) who have medical needs requiring a high level of skilled nursing care that may not safely be provided in PSH, or (iii) who present an imminent danger to themselves or others, the evaluator will determine the most integrated setting appropriate, which may be PSH or another setting, and (2) nothing in this paragraph shall prevent Class Members who can and wish to live with family or friends or in other independent housing that is not connected with a service provider from doing so. Those Class Members not transitioning from IMDs into PSH will have ongoing reassessments with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH.

    b)  Class Members who move to a Community-Based Setting will have access to all appropriate Community-Based Services, including but not limited to reasonable measures to ensure that their housing remains

available in the event that they are temporarily placed in a hospital or other treatment facility.

c)  Qualified Professionals shall inform Class Members of their options pursuant to subparagraphs 6(a), 6(d), and 7(b) of this Decree. Class Members shall not be subjected to any form of retaliation in response to any option selected   nor shall they be pressured to refrain from exploring appropriate alternatives to IMDs.

## VII.  OUTREACH

10.  Defendants shall ensure that Class Members have the opportunity to receive complete and accurate information regarding their rights to live in Community-Based Settings and/or to receive Community-Based Services, and the available options and opportunities for doing so. The Implementation Plan shall describe the methods by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain current records of these requests. In addition to providing information, Defendants shall ensure that the Qualified Professionals conducting the Evaluations engage residents who express concerns about leaving the IMD with appropriate frequency. The Implementation Plan shall describe methods for engaging residents, including where appropriate, providing reasonable opportunities for residents to visit and observe Community-Based Settings. All costs for outreach shall be borne by Defendants.

## VIII.  IMPLEMENTATION

11.  **Overview and Contents of the Implementation Plan.**  Defendants, with the

input of the Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree. The Implementation Plan must, at a minimum:

a) Establish specific tasks, timetables, goals, programs, plans, strategies and protocols to assure that Defendants fulfill the requirements of the Decree;

b) Describe the hiring, training and supervision of the personnel necessary to implement the Decree;

c) Describe the activities required to develop Community-Based Services and Community-Based Settings, including inter-agency agreements, requests for proposals and other actions necessary to implement the Decree;

d) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality or geographic location;

e) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services and supports which, based on demographic or other data, are expected to be required within one year to meet the obligations of the Decree;

f) Identify any necessary changes to regulations that govern IMDs in order to strengthen and clarify requirements for services to persons with Mental

Illness and to provide for effective oversight and enforcement of all regulations and laws;

g)    Describe the methods by which Defendants shall ensure compliance with their obligations under Paragraph 6 of this Decree; and

h)    Describe the mechanisms by which Defendants shall ensure compliance with their obligations under Paragraph 10 of this Decree.

12.    Within 135 days of Approval of the Decree, Defendants shall provide the Monitor and Plaintiffs with a draft Implementation Plan. The Monitor and Plaintiffs will participate in developing and finalizing the Implementation Plan, which shall be finalized within nine (9) months following Approval of the Decree. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed Implementation Plan, the matter may be submitted to the Court for resolution.

13.    The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate. The Monitor and Plaintiffs may review and comment upon any such updates or amendments. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed updates or amendments, the matter may be submitted to the Court for resolution.

14.    The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of the Decree.

15.    In the event that any IMD seeks to discharge any Class Member before appropriate housing is available, including but not limited to circumstances in which an IMD decides to close, Defendants will ensure that those individuals are not left without appropriate housing options based on their preferences, strengths and needs.

## IX.   MONITORING AND COMPLIANCE

16.   **Appointment of a Monitor.** The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs serving individuals with Mental Illnesses. The Parties will attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate one person to serve as Monitor and the Court will select the Monitor. Within twenty-one (21) days of Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement.

17.   **Duties and Reporting.** The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of non-compliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. Within 60 days after the end of each year of service, the Monitor will report to the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Plaintiffs to evaluate Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports as necessary. Reports of the Monitor shall be served on all Parties.

18.   **Review and Evaluation of Data and Information.** The Monitor shall review and evaluate Defendants' compliance with the terms of the Decree. Not less than every six (6) months, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance, with the Parties and Monitor agreeing in

advance of the first report of the data and information that must be included in such report. Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendants' staff or consultants, except their attorneys. The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, buildings and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree. The Defendants shall comply with Plaintiffs' requests for information that are reasonably related to Defendants' compliance with the Decree, including without limitation requests for records and other relevant documents pertinent to implementation of the Decree or to Class Members. Plaintiffs also shall be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Plaintiffs pursuant to the Decree shall be subject to the Protective Order.

19.     **Compliance.** In the event the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Plaintiffs believe that Defendants are not complying with the terms of the Decree, Plaintiffs shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review Plaintiffs' claims of actual or potential non-compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing, filed with the Court, and incorporated into, and become

enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor will not communicate with the Court without advance notice to the Parties.

20.     **Compensation of the Monitor.** Defendants shall compensate the Monitor and his or her staff at their usual and customary rate subject to approval by the court. Defendants shall reimburse all reasonable expenses of the Monitor and the Monitor's staff, consistent with the guidelines set forth in the "Governor's Travel Control Board Travel Guide for State Employees." Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable.

## X.     NAMED PLAINTIFFS

21.     Within sixty (60) days of Approval of the Decree, Defendants shall offer each of the Named Plaintiffs the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs and wishes, including PSH. Provision of services to the Named Plaintiffs pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of the Decree.

## XI.    ATTORNEYS' FEES AND COSTS

22.     In full settlement of all attorneys' fees incurred to date in connection with the litigation, Defendants shall pay, subject to court review and approval, $1,990,000.00 to Class Counsel. In full settlement of all out-of-pocket costs and expenses (not to include attorneys' fees) incurred to date by Class Counsel, Defendants shall pay to Class Counsel such costs and

expenses incurred by Class Counsel through and including the Approval of the Decree and any appeal thereof. Such amounts shall be distributed to Class Counsel in the manner set forth in written instructions provided by Class Counsel. Furthermore, such amounts shall be set forth in a Judgment Order to be entered by the Court. Defendants shall complete and submit all paperwork necessary for payment of such amounts, plus applicable statutory post-judgment interest, within five (5) business days after expiration of the time to appeal the fee award without the filing of a Notice to Appeal or after the issuance of the mandate by the highest reviewing court, whichever is later.

## XII.    MISCELLANEOUS PROVISIONS

23.    **Approval of the Decree.** Approval of the Decree shall be deemed to occur on the date the Court enters the Decree.

24.    **Costs of Notices.** The cost of all notices hereunder or otherwise ordered by the Court shall be borne by Defendants.

25.    **Signatories.** Each undersigned representative of a Defendant to this litigation and the Attorney General for the State of Illinois certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally such Defendant to this document. Each undersigned representative of Plaintiffs certifies that he or she is authorized to enter into the terms and conditions of the Decree and to execute and bind legally the Plaintiffs to this document.

SO ORDERED THIS 29th DAY OF September, 20 10.

William T. Hart

United States District Judge

21