IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ETHEL WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05 C 4673 |
| | ) | |
| PAT QUINN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# OPINION AND ORDER

This court exercises jurisdiction in this case pursuant to a Consent Decree. The plaintiffs are a certified class of Illinois residents with a mental illness who are institutionalized in a privately owned Institution for Mental Disease ("IMD") and who, with appropriate supports and services, may be able to live in an integrated community setting. *See Williams v. Blagojevich*, 2006 WL 3332844 (N.D. Ill. Nov. 13, 2006). The defendants are the Governor of Illinois and State officials, sued in their official capacities, who are responsible for the integration mandate of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. See generally Olmstead v. L.C.*, 527 U. S. 581 (1999).

When enacting Title II of the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continues to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The Attorney General of the United States was authorized to enforce Title II, *see* 42 U.S.C. § 12133, and to issue regulations implementing the statute, *id.* at § 12134.[1] The Title II regulations, 28 C.F.R. § 35.190(d), require responsible officials to "administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." The regulations explain that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Part 35, App. B § 35.130 (2011) (formerly App. A (2009)). For qualified and willing persons, community living is to be preferred rather than institutional residence. This class action was brought to enforce compliance with the legislation and regulations.

Following extensive discovery, which included the depositions and reports of experts--including the work of a team of experts from Yale University--

---

[1]In the present case, the Attorney General filed a "Statement of Interest of The United States of America." *See* Docket Entry [265].

- 2 -

the parties engaged in settlement discussions with respect to conditions in the

State of Illinois and reached agreement on the provisions of a consent decree.

Procedural protections, including a statewide class notice and a fairness hearing,

were provided.

Objectors at the fairness hearing included certain representatives of class

members.  Non-party IMDs also filed objections and spoke in opposition to the

proposed decree.  The principal concerns expressed by party and non-party

objectors were that the decree lacked sufficient integration details, there was an

insufficient role of medical professionals and family members in making

assessments of class members as qualified for community living, and resource

funding was questioned.  After hearing the presentations of the supporting parties

and the party and  non-party objectors, this court approved the Consent Decree.

*See **Williams v. Quinn**,* 748 F. Supp. 2d 892 (N.D. Ill. 2010).

The Decree was designed to meet standards set for courts dealing with

the deinstitutionalizaton process.  *See, e.g.,* ***Frederick L. v. Dep't. of Public***

***Welfare of Pa.***, 422 F.3d 151, 160 (3d Cir. 2005):

> In attempting to address the deinstitutionalization
> process, there are financial and medical constraints that
> burden DPW and inhibit its ability readily to set forth
> measurable goals for deinstitutionalization.  Furthermore, we

acknowledge that the judiciary is ill-suited to second guess
DPW's expertise in devising a regimen of community
placement. Ideally, complicated issues such as these are
confided to the entity legislatively charged with oversight.
However, where, as here, the equally compelling concerns of
discrimination and Patients' rights are in tension with state
agency planning, objective judicial guidance may be helpful.

The lengthy procedural history of this case reveals that
we would be promoting confusion rather than clarity if we
were to remand without providing DPW some specifics that
are critically important to a comprehensive, effectively
working plan. To alleviate the concerns articulated in
*Olmstead*, we believe that a viable integration plan at a bare
minimum should specify the time-frame or target date for
patient discharge, the approximate number of patients to be
discharged each time period, the eligibility for discharge, and
a general description of the collaboration required between
the local authorities and the housing, transportation, care, and
education agencies to effectuate integration into the
community.

In addition to incorporating into the Consent Decree the standards cited

in ***Frederick L.***, and in order to assist in overseeing the performance of the

provisions of the Decree, the parties proposed, and the court appointed, a well-

qualified and experienced Monitor who has served as a mental health

commissioner and has had extensive experience in mental health services

programs. The Monitor has submitted annual and interim reports to the court and

the parties of the progress of the program required by the Decree.

The case is now before the court for consideration of an interim report of the Monitor for which comments and objections have been filed. Movant Mario Durham, the brother of a class member living in the community, and certain IMDs have proposed suspension of the deinstitutonalization program and modifications of the Consent Decree.

On July 1, 2013, the Monitor submitted an interim report summarizing compliance for year two under the *Williams* Consent Decree. In general, the Monitor has expressed satisfaction with the program and progress of the parties under the Decree. Mario Durham filed a motion for a hearing. The motion states that, in the year since his brother has moved to his own apartment, there has been only deterioration and not independence in his brother's condition. Mr. Durham states that it was and is a mistake to permit his brother to live independently and he fears that his brother will injure himself or others if he is allowed to continue to live independently. Mr. Durham also points to the statistics contained in a Critical Incidents Report, prepared under the direction of the defendants, as alarming and supporting stopping or significantly modifying the Consent Decree.

Certain non-party IMD's have joined with Mr. Durham in requesting modification of the Consent Decree and suspending the transition process.

Specifically, it is proposed that quotas or benchmarks for moving residents be abolished; that the assessors who currently evaluate IMD residents to determine whether they are appropriate for community living be replaced with the original team from the University of Illinois (whom the Monitor regarded as too slow and replaced with the current team); that the appeal process be modified; and that family members and IMD residents' medical treaters be consulted before any resident is moved. The parties have responded to the objections and proposals of Mr. Durham and the IMDs, and the Monitor has filed a Supplemental Report. Responses were sent to the court by Mr. Durham and the IMDs.

Because of the importance and magnitude of the program and the continuing aspect of the Decree, the court will pay careful attention to work of the parties. Accordingly, the court will consider the views of the Monitor, the parties, and non-parties affected by the Decree in assessing progress under the Decree.

Turning first to the structure of the Decree and the implementation plan, there is in place mechanisms for addressing both class member concerns and potential systemic problems with implementation. These mechanisms include screening and assessment of class members; voluntary class member choice; transition coordination for housing and residential services; community mental

health service and supports including assigned caseworkers; a process for complaints, grievances, and appeals; and a procedure for gathering and reporting critical incidents experienced by class members who have moved into community residences.

Consistent with case law, the implementation plan has integration targets and a schedule for compliance. Contrary to the observations of the movant and the IMDs, the targets are not quotas that mandate a certain number of transfers within any particular period. For example, if adequate resources are not available to aid class members' transfers to the community, transfers are not made. Currently, due to insufficient State resources, there is a waiting list of class members who seek transfers.

Each class member living in the community has a caseworker. Also caseworkers employed by service providers render assistance if the assigned caseworker is not available. Additionally, State agencies charged with implementation have staff who respond to transition problems. The court-appointed Monitor has authority and responsibility to intercede and address transition problems. If there is disagreement over any aspect of the implementation, the Decree contains a dispute resolution process. The parties and

the Monitor are required to first address compliance issues among themselves and non-parties.

The Monitor has informed the court that the appeal process is available for any decision that impacts a class member. The Department of Mental Health ("DMH") has established an Appeals Committee. Since the beginning of the placement process, 83 class members have filed appeals. Sixty-seven of the appeals were regarding resident reviews. The Appeals Committee overturned 15 of the negative decisions regarding community placement. *See* Monitor's Supp. Report dated Nov. 8, 2013 at 16 [Docket Entry 391].

Mr. Durham has bypassed the procedure for addressing individual concerns. The appropriate step is not a hearing concerning his brother's situation but rather contact with the assigned caseworker, the service provider, plaintiffs' attorneys, the State staff, or the Monitor, all of whom are responsible to address his concerns.[2]

---

[2]The court has been provided with two reports from a licensed clinical social worker, the Team Leader for John Doe, Mr. Durham's brother. *See* Docket Entry [382] Attachment 1; Docket Entry [393] Attachment 1. The latter declaration is dated November 26, 2013. The Team staff had seen Mr. Doe at least four times per week and has been working with him since 2011. The University of Illinois assessor team evaluated Mr. Doe as eligible for community living in 2012. As of the first report, Mr. Doe had been involved in five critical incidents: two emergency room visits; one threat to harm himself (apparently as confirmed by a

Pointing to a Critical Incident Report as of June 27, 2013, it is argued by the movant and the IMDs that critical incidents experienced by class members warrant halting the program and modifying the Decree. During the period March 1, 2012 through June 27, 2013, 638 class members moved into community residences. The Report indicates that class members who have moved into the community have experienced 317 critical incidents as of June 27, 2013. (Two additional events were reported for the relevant time making the total 319). One hundred eight-seven of the transitioned class members experienced at least one incident. Most incidents were experienced by a smaller subset of the group: 62 class members--less than 10% of those transitioned--experienced 194 (61%) of the incidents. Seventy per cent of those transitioned, 451, were incident-free.

_____

psychiatric evaluation) because he had not received his spending money; a police questioning which stopped when it was clear that he was not the person being sought; and a 911 call resulting from a failed air conditioning unit. The latter report refers to a total of nine critical incidents, but does not detail the additional four incidents. Arrangements had been made to insure that Mr. Doe takes his medications on a timely basis and he met with registered nurses approximately three times a week. The professionals who oversaw his care were of the opinion that he wished to live in the community and that he was able to do so. In the fall of 2013, changes were made so that Mr. Doe's social security benefits were no longer paid through the agency monitoring his care. This apparently was a major contributor to him losing contact with the Team during the fall. As of the November declaration, contact had recently been reestablished and arrangements were being made to improve Mr. Doe's situation.

The movant and IMDs are correct in stating that the deaths of class members living in the community require special investigation. Certain incidents, including deaths, are classified as sentinel events by the DMH. Unexpected deaths, suicide attempts, sexual and physical assaults, serious injuries, and repeated critical incidents fall in this category. The Monitor reports that there have been 50 sentinel events reported since November 27, 2012. Twelve class members have had two or more sentinel events. DMH requires service providers to submit an analysis of the event within 14 days in order to identify any factors requiring correction.

There have been five deaths of class members living in the community for the 15-month period March 1, 2012 to June 27, 2013. In each case, there was a determination that the death was the result of natural causes--four from heart attacks and one from terminal lung cancer.

Certain IMD data for the period January 1, 2012 through July 25, 2013 has been provided. The DMH collects IMD data through a different process for different reasons. The data does not provide a complete comparison with the Critical Incident Report format created under the direction of the Monitor, but there is sufficient overlap in the information for a comparison of certain critical

incidents experienced by class members who have moved to a community residence with similar events experienced by IMD residents.[3]

The following table compares the number and estimated rates of incidents for IMD residents and class members who have moved into community residences.  Because the two sets of data are for time periods of different lengths, the numbers are annualized for comparison:

| | IMD Residents | | | Class Members | | |
|---|---|---|---|---|---|---|
| | Number | Annualized | No. Per 100 | Number | Annualized | No. Per 100 |
| Deaths | 8 | 5 | .1 | 5 | 4 | .6 |
| Missing | 18 | 11 | .27 | 5 | 4 | .6 |
| Accidents | 54 | 34 | .85 | 9 | 7 | 1 |
| Crime Victims | 513 | 323 | 8 | 26 | 20 | 3 |
| Criminal Offenders | 450 | 283 | 7 | 21 | 16 | 2.5 |
| ER Visits | 3,328 | 1,997 | 50 | 45 | 34 | 5.3 |
| Hospital Admissions | 1,143 | 686 | 17 | 35 | 26 | 4 |
| Psychiatric Admissions | 3,283 | 1,970 | 49 | 115 | 86 | 13.4 |

---

[3]The IMD data does not include the total number of residents who are victims of or participants in criminal activity.  However, the Physical Abuse, Resident to Resident Altercations, and Sexual Assault categories provide some comparable statistics for criminal activity both as victim and alleged offender. The Class Member data does not adjust for the fact that most of the 681 class members were not in the community for the entire reporting period.

While the data is not fully comparable, it indicates that class members living in the community are not necessarily experiencing significantly more incidents than are IMD residents. The data show that there were 18 IMD residents who were missing and eight IMD residents died at the IMDs. An additional unknown number of IMD residents were transferred to a hospital and died there and are not included in the reports to the DMH.

The population at large also experiences the kind of incidents of the kind described in the Critical Incident Report. For some events, class members in the community are experiencing incidents at a rate lower than the general population, as shown by the following table:

|  | **General Population** | **Class Members** |
|---|---|---|
| Deaths | Mortality rate: .8%[4] | .6% |
| ER Visits | 43 per 100 persons[5] | 5.6 per 100 persons |
| Hospitalizations | 11.4 admissions per 100 persons[6] | 11.5 admissions per 100 persons |
| Crime Victimization | 16 crimes per 100 persons[7] | 3 crimes per 100 persons |

---

[4] See http://www.cdc.gov/nchs/fastats/deaths.htm (2010 data).

[5] See http://www.cdc.gov/nchs/fastats/ervisits.htm (2010 data).

[6] See http://www.cdc.gov/nchs/fastats/hospital.htm (2010 data).

[7] See http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4494 (2011 data).

Some class members (as reported by an incident described in court papers) have decided (either themselves or their guardians) that they no longer want to live in a community and have returned to an IMD. The fact that not all transitions have been or will be successful and that some class members have experienced serious difficulties does not support a conclusion that the Decree must be fundamentally revised. It does support that close and thoughtful observation of the implementation plan must be provided.

The data compared does not support that class members moving from IMDs to a community setting have experienced any of the reported critical incidents at a rate higher than for residents of an IMD or the general population. When it is considered that the member class has a history of mental illness, the statistics do not support that the effect of the program has been or is alarming either from an individual or community point of review. On the contrary, with the assistance of able staff and service providers, it has been successful so far.

IT IS THEREFORE ORDERED AS FOLLOWS:

1. The Monitor's reports are approved.

2. The Monitor is requested to provide the most recent Critical Incident Report, his comments thereon and any available comparative date with all future reports to the court.

3. Mario Durham's motion for a hearing [375] is denied.

4. A status hearing will be held on July 10, 2014 at 2:00 p.m.

ENTER:


UNITED STATES DISTRICT JUDGE

DATED: JANUARY   10, 2014