# *Williams v. Pritzker*

**Case No. 05-C4673 (N.D. Ill.)**

**Court Monitor FY2021 Compliance Assessment**
**Annual Report to the Court**

**Gail P. Hutchings, MPA**
**Court Monitor**

**January 18, 2022**

## Table of Contents

Executive Summary……………………………………………….……………….……………Page ii

Section I: Introduction.………………………………….………………………..……………Page 1

Section II: Overview of FY2021 Compliance Assessment Findings…………..……Page 9

Section III: Diversion for *Williams* Class Members…………………………….…..Page 12

Section IV: Outreach to *Williams* Class Members………………………….….……Page 16

Section V: Assessment for *Williams* Class Members…………….……….……….Page 21

Section VI: Service Planning for *Williams* Class Members.………………….…….Page 26

Section VII: Transition Activities to Support Class *Williams* Members………..….Page 33

Section VIII: Community-Based Services and Housing Development……………Page 41

Section IX: Administrative Requirements……………...........................................…Page 44

Section X: Implementation Planning…………………..........................................…Page 48

Section XI: Quality Assurance………………………………………………………Page 53

Section XII: Recommendations………………………….…………………….……..Page 56

Conclusion……………………………………………….........................................…Page 58

Appendix A…………………………………………………………………………….…..Page A1

## Executive Summary

This report provides Judge Joan Lefkow, Senior United States District Judge, Northern District of Illinois, and the *Williams* Consent Decree Parties with the Court Monitor's detailed assessment of the Defendants' fiscal year 2021 (FY2021) compliance under *Williams v. Pritzker* (Case No. 05 C 4673). Within this report, the Court Monitor endeavors to provide the Court and others with a fair and neutral assessment of the Defendants' performance relative to 113 compliance requirements contained in the *Williams* Consent Decree and the FY2021 Implementation Plan. This is the current Court Monitor's fourth annual report to the Court under the *Williams* Consent Decree.

There was a total of 113 requirements in the *Williams* Consent Decree and *Williams* FY2021 Implementation Plan. However, only 77 were applicable for compliance assessment. As displayed in Figure 1, 29 (38 percent) were found in compliance, 16 (21 percent) were found in partial compliance, and 32 (41 percent) were found out-of-compliance. Several requirements were not assessed due to an agreement among the Court Monitor and Parties – during the FY2021 Implementation Plan development process -- that they would not be counted unless the COVID-19 public health crisis subsided such that typical program operations could resume.



**Figure 1. Defendants' FY2021 Compliance with *Williams* Consent Decree Requirements**
*Total Requirements = 77*

- 🟩 In Compliance
- 🟨 Partial Compliance
- 🟥 Out-of-Compliance

Throughout this report, the Court Monitor provides compliance assessment ratings for FY2018, FY2019, FY2020, and FY2021 to allow readers to compare, make judgments, and assess trends relative to four consecutive years of compliance data and performance ratings. Figure 2 provides a comparison of compliance assessment ratings

| Figure 2. Comparison of Compliance Assessment Ratings for Colbert Consent Decree Requirements Only: FY2018-FY2021 | | | | |
|---|---|---|---|---|
| *Compliance Rating* | *FY2018* | *FY2019* | *FY2020* | *FY2021* |
| **In Compliance** | 22% | 26% | 36% | 40% |
| **Partial Compliance** | 10% | 20% | 21% | 15% |
| **Out-of-Compliance** | 58% | 54% | 43% | 47% |

– only for those Consent Decree requirements which remained constant throughout the four years – for FY2018, FY2019, FY2020, and FY2021.



Figure 3. Williams Transition Performance (FY2017-FY2021 Achieved vs. Required)

The Parties and Court Monitor agreed to not set a numeric transition requirement in FY2021 unless the public health crisis subsided. Despite not having a required transition requirement, as shown in Figure 3, the Defendants achieved 180 transitions in FY2021. This continues a multi-year trend of low transition performance.

While the full picture of the impact of COVID-19 on Class Members is difficult to quantify due to data reliability issues, in FY2021, the State of Illinois continued to cope with the COVID-19 pandemic, challenging Consent Decree implementation efforts and directly harming Class Members and those who serve them. The COVID-19 crisis exacerbated extant systems issues (e.g., behavioral health provider staffing shortages), further destabilizing the mental health and overall healthcare systems and causing a virtual halt to essential Consent Decree operations including outreach, assessments, and transitions. As of the writing of this report, the public health crisis continues. In light of the ongoing COVID-19 crisis, Defendants must continue to design and implement strategies to sustain and even expand their efforts to under the *Williams* Consent Decree, including and especially Class Member transitions.

Figure 4 illustrates the FY2021 compliance determinations relative to each domain, aggregated to the number of requirements falling within each compliance category. This report contains a dedicated section for each of the compliance domains listed below and includes the Court Monitor's rationale for each compliance assessment rating.

| Figure 4. Synopsis of FY2021 Compliance Assessments for *Williams* Consent Decree and Implementation Plan Requirements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Diversion Requirements (6) | In Compliance | 0 | Partial Compliance | 0 | Out-of-Compliance | 4 | N/A | 2 |
| Outreach Requirements (14) | In Compliance | 1 | Partial Compliance | 5 | Out-of-Compliance | 4 | N/A | 4 |
| Assessment Requirements (16) | In Compliance | 0 | Partial Compliance | 2 | Out-of-Compliance | 8 | N/A | 6 |
| Service Plan Requirements (22) | In Compliance | 2 | Partial Compliance | 3 | Out-of-Compliance | 12 | N/A | 5 |
| Transition Requirements (23) | In Compliance | 8 | Partial Compliance | 3 | Out-of-Compliance | 2 | N/A | 10 |
| Community-Based Services/Housing Requirements (10) | In Compliance | 2 | Partial Compliance | 2 | Out-of-Compliance | 0 | N/A | 6 |

| | | | | | | | N/A | |
|---|---|---|---|---|---|---|---|---|
| Administrative Requirements (8) | In Compliance | 6 | Partial Compliance | 0 | Out-of-Compliance | 0 | N/A | 2 |
| Implementation Plan Requirements (14) | In Compliance | 10 | Partial Compliance | 1 | Out-of-Compliance | 2 | N/A | 1 |
| | | | | | | | | |
| Total Requirements (113) | In Compliance | 29 | Partial Compliance | 16 | Out-of-Compliance | 32 | N/A | 36 |
| FY21 Performance: 77 Applicable Requirements | In Compliance | 39% | Partial Compliance | 21% | Out-of-Compliance | 41% | N/A | N/A |

This fiscal year marks 11 years since the filing of the *Williams* Consent Decree (filed September 2010). Early signs from fiscal year 2022 – including strong transition performance relative to their first six-month requirement, progress related to planning for Preadmission Screening and Resident Review (PASRR) implementation, and effective hospital-based diversion programming – provides reason for cautious optimism.

The Court Monitor urges the Defendants to consider the ten priority recommendations identified in Section XII centered on the following themes:

- Effective implementation and quality monitoring of the State's PASRR redesign and continued improvements to the required statewide diversion program.
- Remediation of issues that delay, or altogether prevent, Class Members from timely progression through pre-transition steps and processes (e.g., assessment, service planning, housing location); Class Members continue to get stuck in the pre-transition pipeline for months or even years, often losing hope and interest, and for some particularly in the COVID-19 era, passing away prior to their chance to experience full community life.
- Improvements to the regulatory oversight of Specialized Mental Health Rehabilitation Facilities, prioritizing safety and appropriate and adequate service delivery to institutionalized Class Members.
- Continued implementation and improvement of newer approaches within the Consent Decrees -- such as managed care organization engagement and accountability; SSI/SSDI Outreach, Access, and Recovery (SOAR); and housing first approaches – to optimize their contribution to Consent Decree programming, the lives of Class Members, and the modernization of the State of Illinois's behavioral health and disability service system.

The Pritzker administration has an important duty to design and administer systems that support Class Members' self-direction, choice, and ability to live in the community. This report provides specific recommendations for the Defendants' consideration to achieve or enhance compliance and advance Class Members' civil rights, while facilitating their full participation in, contribution to, and, in fact, enrichment of community life.

Gail P. Hutchings, MPA
Court Monitor, *Williams* v. Pritzker
January 18, 2022

## Section I. Introduction — Background and Context

This report presents the Court Monitor's assessment ratings and relevant discussions of the Defendants' compliance under *Williams v. Pritzker* (Case No. 05 C 4673; United States District Court for the Northern District of Illinois – Eastern Division) based on the assessment period of fiscal year (FY) 2021. The report's bases for compliance assessment include the original *Williams* Consent Decree requirements and commitments made by the Defendants via the *Williams* FY2021 Implementation Plan,[1] which are enforceable as requirements pursuant to the *Williams* Consent Decree.

This report is issued in fulfillment of the Consent Decree's requirement for the Court Monitor to, "within 60 days after the end of each year of service…report to the Court and the Parties regarding noncompliance with the Decree." Per the Consent Decree, "such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and the Plaintiffs to evaluate Defendants' compliance or non-compliance with the terms of the Decree."[2] This represents the fourth *Williams* compliance assessment report to the Court from Gail P. Hutchings, MPA, appointed as Court Monitor by Judge Lefkow on September 29, 2017.[3]

**Compliance Assessment Period.** The period subject to compliance assessment in this report is July 1, 2020, to June 30, 2021, otherwise referred to as fiscal year 2021, or FY2021. Other significant developments that occurred prior or after that timeframe are mentioned when deemed relevant to readers' understanding of context, trends, and the like.

**Case in Brief.** In 2005, Plaintiffs brought suit in the United States District Court, Northern District of Illinois, alleging violations of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Plaintiffs alleged that the State of Illinois was segregating and institutionalizing adults with mental illnesses in 24 Institutions for Mental Diseases (IMDs) — now known as Specialized Mental Health Rehabilitation Facilities (SMHRFs) — located across the State, failing to provide opportunities for those individuals to live and receive services in the most integrated setting appropriate to their needs.

The lawsuit named five Defendants in Illinois state government, including the Governor, the Secretary of the Illinois Department of Human Services (DHS), the Director of the Division of Mental Health (DMH) of the Illinois Department of Human Services, the Director of the Illinois Department of Healthcare and Family Services (HFS), and any of their successors. The Defendants did not admit to violations and, on September 29, 2010,[4] the State of Illinois entered into the *Williams* Consent Decree. DMH, contained within DHS, led Defendants' Consent Decree implementation efforts from initiation of

---

[1] *Williams* FY2021 Implementation Plan. Filed July 15, 2020.
[2] *Williams v. Quinn*, Case No. 05 C 4673, United States District Court for the Northern District of Illinois, Eastern Division. Filed September 29, 2010. Pg. 21.
[3] Judge Lefkow appointed Ms. Hutchings to also serve as Court Monitor for *Colbert v. Rauner* (Case No. 07 C 4737) on September 26, 2017.
[4] *Williams v. Blagojevich*, Case No. 05 C 4673, United States District Court for the Northern District of Illinois, Eastern Division. Filed August 15, 2005. Pg. 7.

that process in 2010 through 2019. In FY2020, the Office of the Secretary of DHS began leading Defendants' implementation efforts, while coordinating as needed with DMH and the other Defendant agencies.

The Consent Decree defines *Williams* Class Members as, "All Illinois residents who are eighteen (18) years of age or older and who: (a) have a Mental Illness; (b) are institutionalized in a privately owned Institution for Mental Diseases;[5] and (c) with appropriate supports and services may be able to live in an integrated community setting."[6]

The Consent Decree enumerates specific requirements placed on the Defendants, some time-limited and others ongoing, which include diversion, outreach, assessments, service plans, community-based service and housing development, transitions, implementation planning, and administrative requirements. The Consent Decree also addresses the process of hiring a Court Monitor, specifies the duties, grants specific powers, and obligates Defendants to honor requests that are relevant to the fulfillment of the Court Monitor's duties. Finally, the Consent Decree names specific instances in which the Plaintiffs and the Court Monitor must be involved in various processes and states that the Court will make final determinations on matters that the Parties cannot agree upon.

Various court orders filed before the end of the FY2021 compliance assessment period impacted Consent Decree requirements and, thus, have been recorded and include, but are not limited to:

- *Williams* Consent Decree Order, entered on September 29, 2010.
- Initial Implementation Plan, approved on July 29, 2011.
- Order by the Honorable William T. Hart appointing Dennis Jones, MSW, MBA, as Court Monitor, signed on November 1, 2010.
- Order to substitute Bruce Rauner for Pat Quinn as a named Defendant (Governor), signed on January 29, 2015.
- Case reassignment to the Honorable Joan H. Lefkow for all further proceedings, September 8, 2017.
- Order by the Honorable Joan H. Lefkow appointing Gail Hutchings, MPA, as Court Monitor, signed on September 26, 2017.
- Order to substitute J.B. Pritzker for Bruce Rauner as a named Defendant (Governor), signed on April 10, 2019.

**COVID-19 Public Health Crisis and Its Impacts.** The COVID-19 public health crisis continued into FY2021 and substantially impacted the Defendants' performance.

---

[5] The term Institutions of Mental Diseases (IMDs) represents a federal classification (pursuant to Medicaid regulations) assigned to hospitals, nursing facilities, or other institutions that each have more than 16 beds, serve adults, and where more than 50 percent of its residents have diagnoses of serious mental illness.
[6] *Williams v. Quinn*, Case 1:05-cv-04673; Docket #326, Filed 3/15/10; Page 2 of 23.

*Waived Implementation Plan Requirements Due to COVID-19.* The FY2021 Implementation Plan provided flexibility to the Defendants on certain requirements, acknowledging that that they should not be penalized for the unpredictability of the COVID-19 crisis which touches every aspect of Consent Decree programming and implementation. For this reason, the Parties agreed that 23 of the 53 Implementation Plan requirements were to be measured and assessed only when the State of Illinois enters into the "post-COVID" period. For the purposes of the Implementation Plan, post-COVID referred to "[COVID-19] restrictions being lifted, or other practice modifications being implemented to a sufficient extent to allow providers reasonable access to Class Members and FDDP [Front Door Diversion Program] participants." For FY2021, the post-COVID stage was never reached, thus outcome or other types of compliance assessment for the 22 requirements did not apply. Notably, one of the requirements that was waived during FY2021 due to COVID-19 was the annual requirement for the number of *Williams* Class Members to be transitioned to the community.

*Amended Action Plan.* During the October 21, 2020, Status Hearing, the Court Monitor notified the Court that amid the COVID-19 crisis, required Class Member diversions under the *Williams* Consent Decree and required transitions under both *Williams* and *Colbert* Consent Decrees had slowed significantly. She also updated the Court on issues undermining the Defendants' performance and compliance under the Consent Decrees, ranging from a lack of reliable COVID-19 infection and mortality data, to issues reported by Prime service provider agencies in gaining access to Class Members in SMHRFs, to the number of Prime service providers who transitioned very few Class Members or none at all since the beginning of the new Comprehensive Class Member Transition Program (Comprehensive Program) in February 2020.

The Court Monitor ultimately produced the Amended Action Plan in collaboration with the Parties, filed on December 2, 2020. The plan was intended to guide, focus, and prioritize the Defendants' efforts to provide Consent Decree required activities in the context of the COVID-19 pandemic and contained the following goals:

- Preserve and enhance the capacity of Prime service providers to deliver transition services and provide community-based services and housing to Class Members who have transitioned.
- Promote successful community tenure and wellness for Class Members who have already transitioned into the community.
- Continue to transition Class Members from SMHRFs to community-based housing and services.
- Implement and enforce Consent Decree requirements for cooperation from SMHRFs necessary to carry out compliance with the transition process.
- Continue FDDP activities for eligible individuals.
- Strengthen partnerships among all stakeholders crucial to effective Class Member transitions and overall Consent Decree compliance.

The six-month plan included 61 requirements, and at its conclusion, the Court Monitor found that the Defendants complied with 82 percent of the requirements, 10 percent were in partial compliance and 8 percent were out-of-compliance. Overall, while the Amended Action Plan did accomplish several of its purposes (e.g., provide data regarding Class Member COVID-19 infection and mortality rates, promote access to Class Members in institutions for outreach and assessment), it did not accelerate Class Member transitions to the community.

*COVID-19 Vaccination Rates.* During FY2020 and FY2021, as required by the Amended Action Plan, the Illinois Department of Public Health (IDPH) and DHS reported vaccination rates of staff and Class Members. According to DHS's COVID Vaccination Report from July 2021, Comprehensive Program organizations reported that 63 percent of their staff were fully vaccinated, four percent were partially vaccinated, and 22 percent were hesitant (not vaccinated). These agencies reported that, for *Williams* Class Members in the community, 57 percent were fully vaccinated, one percent were partially vaccinated, and 18 percent refused vaccination. In their July 2021 report, IDPH reported that 2,661 SMHRF residents and 1,169 SMHRF staff were fully vaccinated. Based on available data, this likely constitutes greater than 75 percent of SMHRF residents,[7] and a majority of SMHRF staff.[8]

*SMHRF Known COVID-19 Infection and Death Rates.* In August 2021, IDPH provided summary data of infections and deaths from COVID-19 for those residing in SMHRFs. The data included the number of SMHRF-reported COVID-19 infections and deaths from November 2020 to August 2021. From November 2020 to July 2021, there were 958 COVID-19 infections and 16 deaths. IDPH indicates that this data may not be reliable as it is self-reported by SMHRFs and that some facilities may have entered cumulative figures while others only reported instances within a given month.[9]

***Williams* Class Size: FY2012-FY2021.** Determination of the total size of the *Williams* Member Class entails counting two subgroups: Class Members residing in SMHRFs who have not yet left, and those who have used the *Williams* Consent Decree process to transition into community-based housing and services.[10] The full SMHRF census is the proxy for the number of Class Members residing in facilities. Figure 5 provides data on the total census across all SMHRFs[11] by fiscal year's end between FY2012 and FY2021.

---

[7] There were 3,484 residents in SMHRFs as of the end of FY2021. To calculate this percentage, the Court Monitor divided number of vaccinated SMHRF residents (2,661) by this figure, which equals 76 percent.

[8] Data demonstrates that 57 percent of staff in Chicago-based SMHRFs were fully vaccinated, but the percentage for SMHRFs outside of Chicago is unknown.

[9] Per IDPH, new emergency amendments – passed on November 5, 2021 – will improve the consistency of data.

[10] A third *Williams* Class Members subgroup includes those who left *Williams* facilities (IMDs) but did not do so under the *Williams* program. These individuals are not considered to be part of the current Class size (Plaintiffs' response letter to Court Monitor Draft Report, October 16, 2018).

[11] Monroe Pavilion submitted notice of closure to IDPH effective November 10, 2018. Currently, there are 23 SMHRFs in Illinois.

| **Figure 5. *Williams* Class Size: FY2012-FY2021**<br>**SMHRF Census and Number and Percentage of Class Members**<br>**Transitioned by Year[1]** |
|---|---|---|---|---|
| **FY[1]** | **SMHRF Census[1]** | **Year-to-Year % Change (Facility Census Only)** | **# of Transitioned Class Members** | **% of Transitioned Class Members based on Total Class Size (SMHRF Census Only)** |
| 2012 | 4091 | (baseline) | 263[1][1] | 6.4% |
| 2013 | 4059 | -0.8% | 354 | 8.7% |
| 2014 | 3854 | -5.1% | 321 | 8.3% |
| 2015 | 3835 | -0.5% | 374 | 9.8% |
| 2016 | 3782 | -1.4% | 374 | 9.9% |
| 2017 | 3794 | +0.3% | 377 | 9.9% |
| 2018 | 3815 | +0.5% | 315 | 8.3% |
| 2019 | 3781 | -0.9% | 256 | 6.8% |
| 2020 | 3583 | -5.5% | 170 | 4.7% |
| 2021 | 3484 | -2.8% | 180 | 5.2% |

For the compliance assessment period, HFS data indicates a SMHRF census total of 3,484 residents (reported as of the first day of FY2021).[12] This reflects a decrease of 607 residents (14.8 percent) since FY2012. In FY2012, there were approximately 170 residents per facility (24 facilities total). In FY2021, there was an average of 151 residents per facility (23 facilities total).

The second Class Member subgroup involves the number of Class Members transitioned into the community through the *Williams* program. The Court Monitor and Defendants aggregated a figure for completed transitions since the Consent Decree's inception. However, since the Defendants are obligated to track Class Members for only 18 months post-transition, it is unclear how many transitioned Class Members have since died, been re-institutionalized, or otherwise lost Class Member status. As indicated in Figure 6 below, at the FY2021 assessment period's conclusion and since FY2012 began, the Defendants transitioned 2,837[13] Class Members.

**SMHRF Resident Census Trends Analysis.** While not a specific Consent Decree requirement, one can examine the SMHRF census data to determine trends within timeframes that indicate progress toward the State's efforts to prioritize community care over institutional care. Based on HFS data reported above (Figure 5), between FY2012 and FY2021, the total census across all SMHRFs declined by 607 residents or 14.8 percent. Averaged by year, this is an annual change of 1.5 percent. During the same timeframe, the number of Class Members transitioned to the community as a percentage of the portion of the total Class size ranged from 4.7 percent to 9.9 percent.

This data demonstrates that, from a historic perspective beginning with the Consent Decree's 2012 onset until the end of FY2021, there has been a nominal decline in the overall SMHRF census that could not be characterized as true systems rebalancing.

A clear cause for the SMHRF census's slow downward trend remains an uncontrolled system front door, specifically as it relates to the inappropriate admission of people with serious mental illness into SMHRFs and other institutions. This provides one

---

[12] The Class Member census represents a point-in-time figure that varies; the census count increases throughout the year due to admissions and decreases due to transitions, deaths, and other discharges.
[13] 147 transitions were removed from this count, as they reflected the double-counting of Class Members who signed more than one lease (DMH data from August 15, 2018).

explanation of how — after a total of 2,837 transitions since 2012 — the overall SMHRF census dropped by only 607 Class Members, despite the closure of the 136-bed Monroe Pavilion facility in November of 2018.

The Defendants' obligation to institute the needed processes to avoid inappropriate SMHRF placements — through the redesign of nursing facility screening processes, known as Pre-Admission Screening and Resident Review (PASRR) — is clear in the Consent Decree. PASRR redesign, to be led by HFS, was agreed to by the Parties and the Court Monitor in the FY2019, FY2020, and FY2021 Implementation Plans. However, the redesign was not completed in FY2020 or FY2021. HFS did, however, work with subject matter experts and consultants to complete a comprehensive assessment of the existing PASRR processes to inform the redesign.[14]

In FY2021, the Defendants have made progress toward PASRR reform, developing specifications for a new PASRR program in collaboration with the Court Monitor and Parties, and releasing a request for proposals to potential bidders. The Court Monitor continues to emphasize the importance of effective long-term care screening and review tools, as they are consistent with the best practices of high-quality health and mental health systems, as well as an integral — and required — strategy to help Defendants comply with and eventually exit the Decree.

| Figure 6. *Williams* Class Member Transitions: FY2012-FY2021 | | | |
|---|---|---|---|
| FY | # of Transitions Required in FY | # of Transitions Achieved in FY | Performance Percentage |
| 2012 | 256 | 263 | 103% |
| 2013 | 384 | 354 | 92% |
| 2014 | 423 | 321 | 76% |
| 2015 | 390 | 374 | 96% |
| 2016 | 400 | 374 | 94% |
| 2017 | 400 | 377 | 94% |
| 2018 | 400 | 315 | 79% |
| 2019 | 400 | 256 | 64% |
| 2020 | 400 | 170 | 43% |
| 2021 | N/A | 180 | N/A |

**Number of Transitions by Year: Required vs. Achieved.** Figure 6 depicts the number of annual Court-required Class Member transitions from SMHRFs to community-based settings as compared to transitions achieved since the Consent Decree's initial implementation. Between FY2012 and FY2021, 2,837 Class Members were transitioned, with the Defendants exceeding transition requirements in only one out of the nine years of *Williams* implementation. For this report's compliance assessment period, FY2021, the Defendants transitioned 180 Class Members. Unlike previous years, due to the COVID-19 public health crisis, the Defendants did not have a numeric transition requirement.

***Williams* Program Budgeted vs. Actual Expenditures.** In FY2021, the *Williams* program was allocated a $60.3 million budget to cover staff costs, contractors (e.g., organizations that provide outreach, assessment, and transition services), quality improvement support, and other key program activities. Notably, this budget does not include costs for mainstream resources that — while available to and used by some *Williams* Class Members — are not exclusively developed or designated for them such

---

[14] HFS did commence meaningful work on PASRR redesign in FY2021.

as some Medicaid spending, housing subsidies, community-based behavioral health services, primary healthcare, and housing services developed or paid for outside of Consent Decree implementation activities.

The Defendants' fiscal and performance data indicates that while they were unable to meet transition requirements, they are year-after-year allowing significant resources to lapse that could have been used to support compliance in a number of areas, ranging from investing in the development of additional community-based provider and housing capacity, to hiring state staff or contractors to provide operational and quality assurance support to Consent Decree planning and operations, or to improving their data enterprise system. As shown in Figure 7, across the past four fiscal years, despite poor and decreasing transition performance for the three years with measurable transition requirements, the Defendants allowed significant amounts of appropriated funds to lapse.

In FY2021, Defendants' lapsed appropriation was $12.8 million, resulting in a four-year total of $40.9 million juxtaposed with weak transition performance. While

| Figure 7. Fiscal Year Budget Allocations, Actual Expenditures, and Lapsed Appropriations (FY2018-FY2021)[15] and Concurrent Transition Performance | | | | |
|---|---|---|---|---|
| Fiscal Year | Transition Performance % | Budget Allocation | Spent Funds | Lapsed Funds |
| FY2018 | 79% | $44.7 million | $37.8 million | $6.9 million (15%) |
| FY2019 | 64% | $44.8 million | $32.9 million | $11.9 million (27%) |
| FY2020 | 43% | $49 million[16] | $39.7 million | $9.3 million (19%) |
| FY2021 | N/A | $60.3 million[17] | $47.5 million | $12.8 million (21%) |
| *Total Lapsed Appropriation FY2018-FY2021* | | | | **$40.9 million** |

some of the FY2021 lapse can be attributed to COVID-19's impact (e.g., slowing down Class Member outreach, evaluations, and transitions), the Court Monitor contends that significant underspending would have occurred even absent COVID-19.

**Compliance Assessment Approach.** The Court Monitor endeavored to use a straightforward and transparent approach to plan and carry out compliance assessment under *Williams* for FY2021. Consistent with the FY2018, FY2019, FY2020 compliance assessment approach, the Court Monitor informed the Parties that compliance assessment would be conducted for each required element in the original Consent Decree, as well as for each requirement pursuant to the *Williams* FY2021 Implementation Plan. The stated expectation was that the Defendants would demonstrate compliance under each FY2021 requirement with data (in all possible circumstances) and relevant information that provides needed context for a fair and neutral compliance assessment.

---

[15] Fiscal data for FY2019 and FY2020 was provided by DMH on November 2, 2020.
[16] The FY2020 *Williams* Consent Decree funding includes the DHS Consent Decree appropriation of $47,618,949 and general DHS/DMH funds of $1,398,147, totaling $49,017,096.
[17] The FY2021 *Williams* Consent Decree funding includes the DHS Consent Decree appropriation of $51,609,600 and general DHS/DMH funds of $8,703,099, totaling $60,312,699.

In late August 2021, the Defendants submitted a combined semiannual report covering the entire fiscal year. The Court Monitor conducted an analysis of required versus submitted information needed to assess compliance and provided the Defendants with additional opportunities to submit missing data and information. Despite some data gaps due to data collection and analysis limitations posed by the COVID-19 crisis, the report included most of the information required for the Court Monitor to assess compliance. Each year, the Defendants' data clarity and completeness has improved.

**Compliance Assessment Report Development Process.** The Court Monitor and her staff relied upon a variety of information and data sources in developing this report, including information provided by the Parties during monthly alternating Small and Large Parties Meetings and other ad hoc meetings; Court status hearings; semiannual compliance reports; *Williams* Implementation Plans and Amendments; various reports and documents issued by the State and its contractors; other data and information reported by the State; and Illinois State statutes, policies, and administrative rules. The Court Monitor has not audited or otherwise independently verified data provided by the State or other sources.

To ensure the report's data and other factual content accuracy, a draft version of the report was shared with the Defendants and the Plaintiffs Class Counsel on January 10, 2022, and they were provided an opportunity to identify factual errors or omissions. In response to Parties' feedback, the Court Monitor added clarity to, refined, or removed footnotes and language; changed one compliance assessment rating; and noted areas of disagreement with compliance findings, along with a summary of the argument for a different compliance assessment rating.

## Section II. Overview of FY2021 Compliance Assessment Findings

The *Williams* Consent Decree and FY2021 Implementation Plan contain 113 specific numeric-, process-, and quality-related requirements of the Defendants that focus on designing, developing, and implementing a program that facilitates and operationalizes opportunities for eligible Class Members to re-enter the community from residing in the 23 Specialized Mental Health Rehabilitation Facilities (SMHRFs). **Of those requirements, 29 (38 percent) were found in compliance, 16 (21 percent) were found in partial compliance, and 32 (41 percent) were found out-of-compliance. Thirty-three additional requirements were not applicable to the compliance period, including 23 requirements that were only to be assessed if the COVID-19 crisis subsided**.

These requirements span multiple domains of the Defendants' obligations pursuant to the *Williams* Consent Decree, including diversion, outreach, evaluation, service planning, transition support, expansion or development of community-based housing and services, implementation planning, and administrative support. Two additional Consent Decree requirements focus on Court Monitor duties and the Parties and Court Monitor's involvement in various planning and reporting aspects.

This report's following five sections address the individual domains of diversion, outreach, evaluation, service planning, and transition support, respectively, and reflect the step-by-step sequence by which a Class Member might interface with *Williams* program processes (Figure 8). Following these five sections, three additional report sections focus on the Defendants' compliance in the domains involving expansion of community-based services and housing, implementation planning, and administration and reporting.

**Figure 8. Sequence of Basic *Williams* Processes by Domain**



Within each domain, the requirements specific to that domain as dictated by the Consent Decree and FY2021 Implementation Plan, are listed sequentially as they align with the process itself; thus, they may not reflect the order of the compliance requirement(s) as they appeared in source documents (i.e., Consent Decree, Implementation Plan). Finally, the Court Monitor did not seek to assess and report compliance on duplicated requirements, which likely worked to benefit the Defendants.

The individual compliance domains illustrated in Figure 8 include the subsequent elements of their dedicated sections, which include:

1. A description of how the domain relates to overall Consent Decree compliance.
2. A compliance assessment ratings grid that depicts the Court Monitor's assessment of whether the Defendants (or others, when relevant) achieved compliance with specific requirements associated with that domain during the FY2021 assessment period. Each compliance criterion correlates to the Consent Decree or Implementation Plan. The grid also includes FY2018, FY2019, and FY2020 ratings for comparison and an indication (using an "X") of compliance mandates that have remained out-of-compliance for at least three consecutive fiscal years.
3. Relevant data and information used by the Court Monitor to reach the compliance determination and assessment rating, with additional narrative and analysis.

In prior years, each section also included recommendations offered by the Court Monitor for consideration on actions and/or activities intended to help the Defendants achieve or strengthen compliance with any specific domain's requirements. However, this year's report provides all recommendations in one section, Section XIII.

For this report's purposes, one of three determinations (i.e., in compliance, partial compliance, out-of-compliance) was assigned to each requirement applicable to the FY2021 compliance assessment period. Consent Decree language or provisions that do not apply to the reporting period, reflect Court Monitor or Plaintiffs' Class Counsel obligations, or represent repeat language are coded as such. Figure 9 displays the compliance assessment determination categories and their definition of use.

| Figure 9. Court Monitor Compliance Assessment Rating Categories and Definitions | | |
|---|---|---|
| Compliance Assessment Rating Category | Definition | Legend |
| In Compliance | The Defendants' performance was substantially in accordance with the criterion, requirement, or obligation. | Green |
| Partial Compliance | The Defendants met some aspects, but not other aspects, of the criterion, requirement, or obligation. For numeric requirements, the Court Monitor generally assigned this rating in instances where the Defendants achieved more than 50 percent compliance balanced with whether the Defendants had a system or process in place relative to the specific requirement. | Yellow |
| Out-of-Compliance | The Defendants either failed to comply with the requirement or failed to demonstrate compliance with the standard. In instances in which the Defendants have been on notice for multiple years of partial compliance and have taken no or too few steps to come into compliance, those ratings may have shifted to out-of-compliance. An "X" was added to indicate requirements that have been out-of-compliance for all three of the most recent fiscal years (FY2018-FY2021). | Red |
| Other Categories | | |
| N/A | The Defendants were not required to demonstrate compliance, as the requirement is applicable only before or after the FY2021 assessment period. | |
| Court Monitor Requirement | Requirements reflect the Court Monitor's obligations. | |
| Duplicate Requirement | Requirements have already been represented and rated (either separately or with other requirements) and double counting would skew the overall compliance determination; in some cases, these requirements represent the overall purpose of a section of the Consent Decree. | |

Some requirements under the *Williams* Consent Decree are clearly numeric/ quantitative in nature, while others require the Court Monitor's evaluation and compliance determination based on the best available data and the Court Monitor's professional judgment. In both circumstances, data and information are provided, with source citation, to support or justify the Court Monitor's compliance assessment determinations.



**Figure 10. Defendants' FY2021 Compliance with *Williams* Consent Decree Requirements**
*Total Requirements = 77*

- In Compliance
- Partial Compliance
- Out-of-Compliance

Figure 10 shows that, among the 77 distinct requirements applicable to the Defendants in FY2021, the Defendants were assessed as in compliance with 29 requirements (38%), in partial compliance with 16 requirements (21%), and out-of-compliance with 32 requirements (41%).

Below is a snapshot from the full set of requirements from the Consent Decree and FY2021 Implementation Plan, the entirety of which is found in Appendix A. The appendix provides the Court Monitor's FY2021 compliance assessment rating for each compliance requirement, compared with the compliance ratings from the previous compliance periods. The requirements, compliance assessment ratings, and relevant discussions for each domain are found in the sections to follow.

| FY2018, FY2019, FY2020 and FY2021 Compliance Assessment Ratings for ALL *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| **Diversion-Related Requirements** | | | | |
| Req # | Source/ Citation | ***Williams* Consent Decree Requirement Language and FY2021 Performance** | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 1 | *Williams Consent Decree* VI(8)(B) | Within one (1) year of finalization of the Implementation Plan [2012][49], no individual with Mental Illness shall be admitted to an IMD without a prescreening having first been conducted through the PASRR Process and an initial Service Plan completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community- Based setting; identifies Community-Based Services that would facilitate that placement; and ensures that approved admissions to IMDs are only for those IMDs that can provide treatment consistent with the individual's initial Service Plan and consistent with the goal of transition to a Community-Based Setting.<br><br>*Out-of-Compliance. While several key process steps (e.g., release of Request for Proposals [RFP], selection of vendor) were accomplished in FY2021, the Defendants were delayed and did not achieve implementation of the Consent Decree-required PASRR redesign.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✕ |

## Section III. Diversion from Long-Term Care for Individuals with Serious Mental Illness

The *Williams* Consent Decree includes requirements that, if implemented, would significantly restrict the flow of needless admissions to Specialized Mental Health Rehabilitation Facilities (SMHRF),[18] limiting admissions to those who cannot successfully be served outside of a long-term care setting or choose to live in such settings.

The Consent Decree mandated a redesigned Preadmission Screening and Resident Review (PASRR) process, due within one year of the initial Implementation Plan (June 2012).[19] PASRR was to include an enhanced service planning process to assess an individual's appropriateness for community-based services, describe the types and duration of services needed, and – for those ultimately referred to SMHRFs - ensure that the SMHRF can deliver the services specified in the service plan. The Consent Decree then provided the Defendants with four additional years (until June 2016) to ensure sufficient capacity such that no Class Member identified for community-based services at the PASRR stage is needlessly institutionalized unless – after fully informed consent – he or she elects to live in long-term care.

In FY2021, four additional Implementation Plan requirements intersect with the Consent Decree requirements focused on PASRR including: the implementation of a new PASRR system, training of PASRR staff to refer to the Front Door Diversion Program (FDDP), the colocation of diversion staff into 13 high-volume hospitals, and the exploration of a rapid reintegration program designed to engage newly admitted Class Members and quickly transition them into the community.

While the Consent Decree identifies PASRR as the mechanism to divert appropriate individuals from *Williams* facilities, Defendants contend that PASRR does not apply to SMHRFs because — as of the implementation of the SMHRF Act of 2013[20] — they are no longer designated as nursing facilities. However, as part of the PASRR redesign initiative, the Defendants have agreed to create an alternative process that encompasses diversion and admission guidelines for SMHRFs that parallels the new PASRR process. This requires the development of new screening tools, process and policy guidance, workflows, and training. This process will be designed in collaboration with the new PASRR vendor, and the Defendants will consult with the Monitor and Class Counsel. This work is scheduled to commence in early 2022.[21]

---

[18] The Consent Decree identifies these facilities as "IMDs" (Institutions for Mental Diseases), but they are now called (and have been licensed as) SMHRFs, pursuant to 2014 state regulation.

[19] In their review of the final draft of this report, the Defendants indicated that they, "respectfully disagree with this characterization of Consent Decree language regarding PASRR." They did not explain why they disagree with this characterization. The final report's language is unchanged.

[20] https://www.ilga.gov/legislation/ilcs/ilcs4.asp?DocName=021000490HArt%2E+1&ActID=3500&ChapterID=21&SeqStart=100000&SeqEnd=700000#:~:text=(a)%20This%20Act%20provides%20for,with%20a%20serious%20mental%20illness.

[21] This effort has commenced since the drafting of this report.

**Diversion-Related Requirements: Key Data Highlights**
As of the end of FY2021, the Defendants have been out-of-compliance with the two diversion-related Consent Decree requirements for several years; the requirement to redesign PASRR is nine years past due (due in 2012) and the requirement to ensure that no Class Member is needlessly placed in long-term care is five years past due (due in 2016). However, significant progress has been made during FY2021 toward redesigning PASRR and scaling the FDDP closer to a statewide level, moving the State closer to the Consent Decree and *Olmstead* mandate that persons with disabilities be afforded their rights to live full lives in the community.

The Defendants were required to implement the new PASRR program by October of 2021 (i.e., FY2022). The Defendants plan to complete their SMHRF pre-admission redesign by April 2022. The Department of Healthcare and Family Services (HFS), however, did achieve several process steps toward full implementation; they published a request for proposals for a new PASRR vendor in December 2020, accepted bids up to February 2021, scored proposals, and published a notice of award in May 2021. Due to a protest after the notice of award, HFS was delayed in contracting with the vendor, which has delayed the implementation until FY2022. The delays have resulted in out-of-compliance ratings for FY2021 requirements. Defendants should be credited with putting building blocks in place to accomplish PASRR redesign scheduled in FY2022, albeit ten years after the Consent Decree-mandated due date.

Although PASRR was contemplated as the mechanism for enhanced pre-admission service planning, the Defendants – in acknowledgement that most SMHRF admissions derive from acute care hospital psychiatric units – implemented the FDDP as a small pilot in 2016. Prior to the COVID-19 crisis, the Defendants expanded the program to 37 hospitals, but access to potential diversion clients due to COVID-19-related restrictions hampered the program in FY2020 and much of FY2021. The Defendants, however, achieved 191 diversions in FY2021 and released a solicitation to extend the program, awarding six FDDP providers for implementation in FY2022.

**Diversion-Related Requirements: FY2021 Compliance Assessments**
As displayed in Figure 11, for the six diversion-relevant requirements, the Defendants are found in compliance with zero requirements, in partial compliance with zero, and out-of-compliance with four. Two additional requirements are not applicable.

| Figure 11. Synopsis of FY2021 Compliance Assessments for Diversion-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (2) | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (4) | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 2 |
| Total Requirements (6) [N/A=2][22] | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 4 |

[22] Two of the diversion-related Implementation Plan requirements are not applicable. For this reason, while the total number of Implementation Plan requirements is four, the sum of in compliance, partial compliance, and out-of-compliance ratings is only two.

Figure 12 contains the text of each diversion-related requirement in the *Williams* Consent Decree and FY2021 Implementation Plan, accompanied by the Court Monitor's compliance rating. For these requirements, a brief rationale for the assigned compliance rating is also provided. Figure 12 also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since those compliance periods. Figure 12 also identifies those Consent Decree (not Implementation Plan[23]) requirements that have been found out-of-compliance for three consecutive fiscal years, indicated by an "X" below the FY2021 compliance rating.

| Figure 12. FY2018, FY2019, FY2020 and FY2021 Compliance Assessment Ratings for Diversion-Related *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 1 | *Williams* Consent Decree VI(8)(B) | Within one (1) year of finalization of the Implementation Plan [2012][24], no individual with Mental Illness shall be admitted to an IMD without a prescreening having first been conducted through the PASRR Process and an initial Service Plan completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community- Based setting; identifies Community-Based Services that would facilitate that placement; and ensures that approved admissions to IMDs are only for those IMDs that can provide treatment consistent with the individual's initial Service Plan and consistent with the goal of transition to a Community-Based Setting.<br><br>*Out-of-Compliance. While several key process steps (e.g., release of Request for Proposals [RFP], selection of vendor) were accomplished in FY2021, the Defendants were delayed and did not achieve implementation of the Consent Decree-required PASRR redesign.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br><br>✕ |
| 2 | *Williams* Consent Decree VI(8)(B) | After the first five (5) years following the finalization of the Implementation Plan [2016[25]], no individual with Mental Illness whose Service Plan provides for placement in Community-Based settings shall be housed or offered placement in an IMD at public expense unless, after being fully informed, he or she declines the opportunity to receive services in a Community-Based Setting.<br><br>*Out-of-Compliance. While the Defendants made significant efforts to redesign PASRR and strengthen their FDDP, they cannot demonstrate that all individuals admitted to SMHRFs received a pre-admission service plan. They also cannot demonstrate that SMHRF admissions were limited to those whose service plans dictated SMHRF placement or who declined community-based services.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br><br>✕ |

[23] Implementation Plan requirements typically change from year to year and thus are not conducive to compliance trend analysis.
[24] Date added.
[25] Date added.

| | | | | |
|---|---|---|---|---|
| D-1 | FY2021 Implementation Plan | Redesign of PASRR system to meet Federal requirements and evidence-based practice standards, with targeted implementation date of 10/4/21.<br><br>***Out-of-Compliance.*** *While Defendants completed several steps toward PASRR redesign (e.g., RFP published on 12/17/20, bids received by 2/17/21, bids and vendor presentations reviewed by 6/30/21), process delays and a bidder protest resulted in delayed implementation. As of the submission of this report, a vendor contract has been fully executed but full implementation has not yet been accomplished.* | **N/A** | **Out-of-Compliance** |
| D-2 | FY2021 Implementation Plan | Modification of IDHS-DMH PASRR instructions by September 1, 2020, to mandate offering FDDP referrals and services for all individuals clinically eligible for SMHRF who could be served in a Community-Based Setting.<br><br>***Out-of-Compliance.*** *Per this requirement, the Defendants were required to offer diversion services to 85 percent of all those admitted into SMHRFs. Due to data collection issues that impacted the second half of the fiscal year, they can only demonstrate that 354 of 864 admitted Class Members (41%) were offered participation in the FDDP.* | **N/A** | **Out-of-Compliance** |
| D-3 | FY2021 Implementation Plan | Complete co-location of FDDP staff in a minimum of thirteen (13) high-volume hospitals as access barriers are resolved and consistent with safety requirements.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. Due to COVID-19 restrictions, the hospitals did not permit external providers to co-locate their services.* | **N/A** | **N/A** |
| D-4 | FY2021 Implementation Plan | Post-COVID, explore and report on the feasibility of implementing program/pilot allowing FDDP staff to continue to work with individuals up to 60 days post-SMHRF admission. Report to be completed by August 1, 2020.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants did refer 59 Class Members to a small pilot rapid reintegration program, but only reintegrated (i.e., moved to the community) five of them.* | **N/A** | **N/A** |

## Section IV. Outreach to *Williams* Class Members

The Consent Decree mandates that all Class Members receive outreach. The objectives of outreach are to effectively and with appropriate frequency help Class Members understand their rights and responsibilities under the Consent Decree, promote the availability of community-based supports and services, navigate any concerns a Class Member has about the process or ultimate transition, and provide opportunities to observe community-based housing and services. Ultimately, the goal of outreach is to link interested Class Members with the opportunity to participate in an assessment to determine appropriateness for transition.

Starting in February 2020 and throughout FY2021, the Defendants implemented a new Comprehensive Class Member Transition Program ("Comprehensive Program"), engaging 12 new service delivery and housing locator organizations to serve as "prime agencies." Since the new program's implementation, prime agencies are responsible for a streamlined and coordinated approach to supplying transition-related services — including outreach, evaluation, service planning, support to transition into community-based housing, and services. Outreach staff also respond to Class Members who wish to be assessed and obtained consents for specialized testing, when needed (e.g., neuropsychological or occupational therapy).

There are four *Williams* Consent Decree requirements related to outreach. They obligate the Defendants to ensure that Class Members residing in Specialized Mental Health Rehabilitation Facilities (SMHRFs) receive comprehensive information about their rights to live in the community, as well as to provide detailed information on the types of community-based services and housing available to them. Further, the Defendants must protect Class Members from retaliation or infringement on their rights to explore community-based options. They must also bear the full cost of outreach.

In addition to these four requirements, the Defendants are required, pursuant to their FY2021 Implementation Plan, to comply with ten additional requirements focused on timely provision of initial outreach and outreach reattempts, provision of a "menu of services," training of outreach staff, increased use of peer outreach workers, notice to SMHRFs to provide unimpeded access, revision of and provision of an informed consent form that underscores non-retaliation protections, display of a non-retaliation poster in SMHRFs, and stronger outreach data reporting.

### Outreach-Related Requirements: Key Data Highlights

It is challenging, given the current state of the Defendants' outreach-related data, to determine whether all Class Members eligible for outreach receive it. The Defendants provide data that includes a mix of unduplicated and duplicated figures and utilize process-oriented terminology – such as "outreach attempts" – that render it difficult to get a full compliance picture in this domain. The Court Monitor acknowledges that quantifying and capturing all outreach – such as an informal conversation between a peer outreach worker and a Class Member, for example – may not be possible.

However, continued improvements and simplifications to outreach data collection and reporting, many of which are reflected in the FY2022 Implementation Plan, will make it easier for the Court Monitor to assess compliance and credit the Defendants with strong performance, if merited.

Per the Comprehensive Program, Class Members are required to receive quarterly outreach. Thus, to determine outreach performance in SMHRFs, the Court Monitor utilizes a basic formula, multiplying the SMHRF census by four to determine the number of outreach engagements that should take place within a fiscal year. This method is imprecise because there is a churn rate within facilities of new admissions and discharges, usually around 50-100 new admissions and 50-100 discharges per month across all 23 SMHRFs. Outreach penetration and other outreach-related data for this fiscal year include:

- In FY2021, there were 4,085 outreach attempts to 2,870 unique Class Members.
- Given that the SMHRFs' census at the beginning of FY2021 reflected 3,484 Class Members, this data shows that there was, on average, less than one (.82) outreach attempt per Class Member in FY2021, significantly below the requirement for four outreaches per annum.
- Nine-hundred and eighteen (918) Class Members were also engaged by peer outreach workers, although it is unclear to what extent these Class Members overlap with those engaged by Comprehensive Program staff.
- Additional data points contextualize and reinforce the low outreach penetration data; only 48 percent of Class Members due for outreach follow-up in the second half of the fiscal year received it, and 60 percent of new admissions flagged for outreach did not receive any outreach attempt. Only eight percent received an outreach attempt within the 60-day requirement.
- Regarding outreach outcomes, 3,298 of the 3,672 attempts were tracked. This data demonstrates that 1,195 (or 36 percent) resulted in a referral to assessment.
- There is no simple way to assess the extent to which outreach workers use accurate, complete, and contemporary information relative to the community-based services and supports. However, the Defendants created a "menu of services" and distributed it to 45 percent of Class Members receiving outreach attempts.

During this fiscal year, the Defendants, through the Amended Action Plan and other efforts, focused more energies on identifying and remedying instances of SMHRFs creating barriers to access Class Members. In FY2021, SMHRFs did not provide monthly census information (to support identification of Class Members for outreach) 33 percent of the time. Further, there were 11 instances of delayed, restricted, or prevented Class Member contact and 12 instances of SMHRF interference in obtaining Class Member records. Other activities – such as the incorporation of enhanced retaliation rights and recourse language in informed consent forms and the creation of a non-retaliation poster for display in SMHRFs – were started, but not fully realized. For example, despite an Implementation Plan requirement to do so, the Defendants cannot demonstrate that the posters were displayed in SMHRFs after being sent to them.

**Outreach-Related Requirements: FY2021 Compliance Assessments**
As displayed in Figure 13, of the 14 total outreach-related requirements, the Defendants were found in compliance with one outreach requirement, in partial compliance for five, and out-of-compliance for four. The four remaining requirements were not applicable.

| Figure 13. Synopsis of FY2021 Compliance Assessments for Outreach-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (4) | In Compliance➔ | 1 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (10) | In Compliance➔ | 0 | Partial Compliance➔ | 4 | Out-of-Compliance➔ | 2 |
| Total Requirements (14) [N/A=4][26] | In Compliance➔ | 1 | Partial Compliance➔ | 5 | Out-of-Compliance➔ | 4 |

Figure 14 contains the language for each outreach-related requirement in the *Williams* Consent Decree and Implementation Plan, along with the Court Monitor's ratings.

| Figure 14. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings for Outreach-Related *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 3 | Consent Decree VII(10) | Defendants shall ensure that Class Members have the opportunity to receive complete and accurate information regarding their rights to live in Community-Based Settings and/or receive Community-Based Services, and the available options and opportunities for doing so.<br><br>*Partial Compliance. Although only 45 percent of Class Members received the "menu of services" in the second half of FY2021, the Defendants provided training to Comprehensive Program staff on available supports and services along with other opportunities to troubleshoot outreach-related issues.* | FY2018: N/A<br>FY2019: N/A<br><br>FY2020: In Compliance | Partial Compliance |
| 4 | Consent Decree VI(6)(C) | Defendants shall ensure, as provided in the Implementation Plan, that all Class Members shall be informed about Community-Based Settings, including Permanent Supportive Housing, and Community-Based Services available to assist individuals in these settings, and the financial support Class Members may receive in these settings.<br><br>*Out-of-Compliance. As indicated above, the Defendants' data demonstrates that Class Members received less than one outreach, on average, per year. This is significant improvement from previous years, but still places the Defendants far short of their internal policy of quarterly outreach.[27]* | FY2018: Partial Compliance<br>FY2019: Partial Compliance<br><br>FY2020: Partial Compliance | Out-of-Compliance |

---

[26] Four requirements are not relevant to this reporting period. For this reason, while the total number of Implementation Plan requirements is 14, the sum of in compliance, partial compliance, and out-of-compliance ratings is only 10.

[27] In their written response to the final draft of this report, the Defendants expressed disagreement with this out-of-compliance finding. They asserted that the quarterly outreach standard is not required per the Consent Decree and

| | | | | |
|---|---|---|---|---|
| 5 | Consent Decree VI(9)(C) | Class Members shall not be subjected to any form of retaliation in response to any option selected nor shall they be pressured to refrain from exploring appropriate alternatives to IMDs.<br><br>*Out-of-Compliance. The Defendants were unable to report on their actions and the outcomes related to SMHRF interference. Further, they cannot demonstrate that non-retaliation posters were displayed in SMHRFs.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |
| 6 | Consent Decree VII(10) | All costs for outreach shall be borne by Defendants.<br><br>*In Compliance. The Defendants covered all outreach-related costs in FY2021, as required by the Decree.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| O-1 | FY2021 Implementation Plan | Initial Outreach between 60-70 days of admission.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the data referenced above demonstrates that only eight percent of those eligible for initial outreach received it on a timely basis.* | **N/A** | **N/A** |
| O-2 | FY2021 Implementation Plan | Re-attempt Outreach every three months/quarterly.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| O-3 | FY2021 Implementation Plan | Create, by July 30, 2020, and have available a "menu" of services, supports, and housing options for Class Members.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants did create the menu of services and supplied it to 45 percent of Class Members receiving outreach in the second half of FY2021.* | **N/A** | **N/A** |
| O-4 | FY2021 Implementation Plan | Creation of comprehensive training module for Outreach activities, including service array and motivational interviewing techniques.<br><br>*Partial Compliance. Per this requirement, the Defendants were obligated to ensure that 100 percent of hired outreach staff complete required trainings. Nine of 15 staff – or 60 percent - completed the required trainings.* | **N/A** | **Partial Compliance** |
| O-5 | FY2021 Implementation Plan | Increased use of Peer Outreach (Ambassadors and/or peers through Prime Agencies).<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants supplied data to demonstrate 1,977 (duplicated count) outreaches by peer outreach workers.* | **N/A** | **N/A** |

that annual outreach (in addition to other formal and informal opportunities for Class Members to receive information about community-based services) meets the "appropriate frequency" requirement in the Decree. However, the Court Monitor maintains her rating of out-of-compliance given that the Defendants' own policy requires quarterly outreach.

| | | | | |
|---|---|---|---|---|
| O-6 | FY2021 Implementation Plan | Send joint letter by September 1, 2020 to SMHRF administrators advising of their obligation to provide unimpeded access to Comprehensive Program agencies to Class Members and relevant information, including admission/census information. Follow up will be conducted as necessary.<br><br>*Partial Compliance. This multi-part requirement is measured by the number of SMHRFs that provided required monthly census information to identify Class Members for outreach, number of Class Members who did not receive contact due to SMHRF interference, and the number of Class Member records that could not be obtained due to SMHRF interference. Performance data shows that SMHRFs submitted their monthly reports 67 percent of the time. There were 23 instances of SMHRF interference resulting in delayed or prevented access to Class Members and/or their records.* | N/A | **Partial Compliance** |
| O-7 | FY2021 Implementation Plan | Enhanced non-retaliation language in Informed Consent form.<br><br>*Partial Compliance. This requirement is measured by the percentage of Class Members who sign the revised informed consent form. Due to Prime data submission issues impacting the second half of the fiscal year, the Defendants can demonstrate that 967 of 1,260 (or 77 percent) of Class Members signed the enhanced informed consent form.* | N/A | **Partial Compliance** |
| O-8 | FY2021 Implementation Plan | Poster for display in SMHRFs.<br><br>*Out-of-Compliance. This requirement is measured by the number of SMHRFs who display a poster on the rights and recourse afforded to Class Members who experience retaliation from SMHRF staff for their participation in Consent Decree programming. The posters were sent to all 23 facilities to display in the second half of the fiscal year, but the Defendants could not indicate that all (or any) were actually displayed.* | N/A | **Out-of-Compliance** |
| O-9 | FY2021 Implementation Plan | Display of poster included as compliance measure.<br><br>*Out-of-Compliance. The posters were sent to all 23 facilities to display in the second half of the fiscal year, but the Defendants did not provide data on the number of SMHRFs that received non-compliance findings based on their failure to display the posters.* | N/A | **Out-of-Compliance** |
| O-10 | FY2021 Implementation Plan | Overall Outreach data will be reported quarterly, identifying all Outreach attempts and outcomes; activity is also updated routinely as forms are submitted so that activity can be monitored monthly through the Data Dashboard. Data will be reported separately for New Class Members and Existing Class Members.<br><br>*Partial Compliance. This requirement is measured by the alignment of University of Illinois Chicago, College of Nursing (UIC-CON) and prime agency-reported outreach attempts and outcomes. The first half of the fiscal year shows that 99.8 percent of all outreach attempts and outcomes match UIC-CON's records, but the second half of the year is discrepant (1,233 from UIC-CON vs. 3,202 provider-reported), which could be partially attributed to an issue with duplicated and unduplicated counts.* | N/A | **Partial Compliance** |

## Section V. Assessment of *Williams* Class Members

Under the *Williams* Consent Decree, the Defendants are required to design and implement an assessment[28] process to identify a Class Member's medical and psychiatric conditions, along with their ability to perform activities of daily living, to determine what the person would need in order to transition into the community. Per the Consent Decree, the Defendants must ensure that qualified professionals conduct person-centered assessments of every Class Member who agrees to such, culminating in an indication as to whether the Class Member is or is not recommended for transition. The *Williams* Consent Decree includes the following requirements for the provision of assessments, including:

- Every Class Member should be offered an assessment (Requirement 8) at the appropriate frequency (Requirement 9) that describes their options to transition into the community (Requirement 7).
- Class Members who decline assessments or who decline to move after being recommended for transition can request and receive an assessment at a later time, which must be offered on a timely basis (Requirements 10 and 14).
- Assessments must be conducted by qualified professionals (Requirement 11).
- Assessments must be conducted annually, providing Class Members who were not recommended for transition or who elected not to move after a transition recommendation are offered future re-assessment opportunities (Requirement 1).
- During the annual assessment process, qualified professionals must explore and address any Class Member opposition to moving out of a Specialized Mental Health Rehabilitation Facility (SMHRF) (Requirement 13).

The *Williams* FY2021 Implementation Plan contains additional requirements in this assessment domain, largely centered on ensuring initial and annual assessments are delivered by trained and qualified staff, are completed on a timely basis, and are submitted to University of Illinois Chicago, College of Nursing (UIC-CON) for review.

### Assessment-Related Requirements: Key Data Highlights

The Defendants provided data on Class Members who were identified for assessment, received assessment attempts, received assessments (partial or complete), and who were recommended (or not) for transition. They also provided a breakdown of initial assessments and reassessments, although they were unable to break out annual assessments. Key data highlights include:

- 1,134 Class Members were identified for assessment, resulting in 1,053 Class Members (93 percent of Class Members identified for assessment) being approached for assessment.
- Ultimately, 897 Class Members participated in a partial or completed assessment, or 79 percent of those identified.

---

[28] Historically, "evaluation," "assessment," and "resident review" have been used interchangeably; evaluation is specifically used in the Consent Decree. While previous Court Monitor compliance assessment reports and briefings used the term "evaluation," in FY2020, a programmatic decision was made by the Defendants to use "assessment" to describe this Consent Decree process.

- The outcomes of assessments show that most Class Members who received completed assessments were recommended for transition. In FY2021, 662 – or 76 percent of Class Members who received assessments - were recommended for transition, while 205 (or 24 percent) of Class Members who received assessments were not recommended.
- Of the 32 Class Member-initiated assessments, three (nine percent) were completed within 14 days, 16 (50 percent) were completed in more than 14 days, and the timeliness of 13 (41 percent) were not documented.
- Needed services most identified in assessments include drop-in center, peer support, assertive community treatment, community support team, support groups, and development of self-management skills.
- The FY2021 average quality score for assessments was 94 (on a 100-point scale). Per the Defendants, quality reviews "include elements of overall completion, level of inquiry, clarity of communication, critical thinking, strength of evidence, and the identification of needs, strengths, and challenges."
- The most common rationale for "not recommended" assessments were Class Member uncontrolled/poorly controlled symptoms, lack of insight/self-management skills, active psychotic symptoms, current/planned lack of adherence, and active risk of harm.
- There were 42 referrals for neuropsychological assessments in FY2021.

Fiscal year 2021 data shows extremely poor performance as it relates to the promptness with which interested Class Members receive their assessments. Per the Comprehensive Program policy, an assessment should occur within 14 days of a positive outreach outcome. Of the 1,096 assessments for which timeliness data was provided, only 88 (eight percent) were completed on time, with 421 (38 percent) completed in more than 14 days and the remaining 587 (54 percent) not documented. Comprehensive Program providers are also required to submit their assessments to UIC-CON for review. Only 325 assessments were submitted within the seven-day timeliness requirement (28%) while the rest were submitted after the due date.

**Assessment-Related Requirements: FY2021 Compliance Assessments**
As displayed in Figure 15, the Defendants were found in compliance with zero requirements, in partial compliance for two, and out-of-compliance for eight. Four requirements are not applicable to this reporting period.

| Figure 15. Synopsis of FY2021 Compliance Assessments for Assessment-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (8) | In Compliance➔ | 0 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 5 |
| Implementation Plan Requirements (8) | In Compliance➔ | 0 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 3 |
| Total Requirements (16) [N/A=6][29] | In Compliance➔ | 0 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 8 |

[29] Six requirements in this domain are not applicable to this reporting period.

Figure 16 contains the language of each assessment-related requirement in the *Williams* Consent Decree, along with the Court Monitor's compliance rating. It also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since the past compliance periods.

| | | | | | |
|---|---|---|---|---|---|
| **Figure 16. FY2018, FY2019, FY2020 and FY2021 Compliance Assessment Ratings for Assessment-Related *Williams* Consent Decree and Implementation Plan Requirements** | | | | | |
| Req. # | Source/ Citation | ***Williams* Consent Decree Requirement Language and FY2021 Performance** | **Prior Years' Compliance Ratings** | **FY2021 Compliance Rating** |
| 7 | *Williams* Consent Decree VI(9)(C) | Qualified Professionals shall inform Class Members of their options pursuant to subparagraphs 6(a), 6(d), and 7(b) of this Decree. <br><br>*Not Applicable. This requirement is a duplication of Requirement 11 so it is designated as not applicable.* | **Duplicate Requirement, N/A** | **N/A** |
| 8 | *Williams* Consent Decree VI(6)(A) | Within two (2) years of the finalization of the Implementation Plan described below, every Class Member will receive an independent, professionally appropriate and person-centered Evaluation [Assessment] of his or her preferences, strengths and needs in order to determine the Community-Based Services required for him or her to live in PSH or another appropriate Community-Based Setting. <br><br>*Not Applicable. This requirement is a duplication Requirement 12, so is designated as not applicable.* | **FY2018: N/A** <br> **FY2019: N/A** <br><br> **FY2020: N/A** | **N/A** |
| 9 | *Williams* Consent Decree VII(10) | In addition to providing this information, Defendants shall ensure that the Qualified Professionals conducting the Evaluations engage residents who express concerns about leaving the IMD with appropriate frequency. <br><br>*Out-of-Compliance. The Consent Decree requires that assessment staff should frequently engage Class Members who have concerns about transitioning into the community. However, the Defendants largely use outreach workers — not assessment staff — for this function. Given that Class Members received only one out of the four required outreach per year, on average during FY2021, appropriate frequency has not been accomplished.* | **FY2018: Partial Compliance** <br> **FY2019: Out-of-Compliance** <br><br> **FY2020: Partial Compliance** | **Out-of-Compliance** |
| 10 | *Williams* Consent Decree VI(6)(A) | Any Class Member has the right to decline to take part in such Evaluation. Any Class Member who has declined to be evaluated has the right to receive an Evaluation any time thereafter on request. <br><br>*Out-of-Compliance. The Defendants did not provide data on Class Members who previously declined and then requested assessments thereafter. General data on Class Member-initiated assessment requests, however, shows that only nine percent of these Class Members received a timely assessment (within 14 days), and 41 percent were not documented.* | **FY2018: Out-of-Compliance** <br> **FY2019: Out-of-Compliance** <br><br> **FY2020: Partial Compliance** | **Out-of-Compliance** |
| 11 | *Williams* Consent Decree VI(6)(B) | Defendants shall ensure that Evaluations are conducted by Qualified Professionals as defined in this Decree. <br><br>*Partial Compliance. Eighty-seven (87) percent of assessments were administered by qualified professionals.* | **FY2018: In Compliance** <br> **FY2019: In Compliance** <br><br> **FY2020: In Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| 12 | *Williams* Consent Decree VI(6)(D) | After the second year following finalization of the Implementation Plan, the Evaluations described in Subsection 6(a) shall be conducted annually.<br><br>*Out-of-Compliance. The Defendants did not provide annual assessment data due to data reporting issues.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: In Compliance** | **Out-of-Compliance** |
| 13 | *Williams* Consent Decree VI(6)(D) | As part of each Class Member's annual Evaluation, the reasons for any Class Member's opposition to moving out of an IMD to a Community-Based Setting will be fully explored and appropriately addressed as described in Section VII.<br><br>*Out-of-Compliance.* While the Defendants provided training to Assessors on motivational interviewing and created a policy on exploring and documenting reasons for declines, they did not provide data to demonstrate that Class Member concerns were addressed per the policy.[30] | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 14 | *Williams* Consent Decree VI(6)(D) | Any Class Member who has received an Evaluation but has declined to move to a Community-Based Setting may request to be reassessed for transition to a Community-Based Setting any time thereafter.<br><br>*Out-of-Compliance.* The Defendants did not provide data on Class Members who previously declined to move and then requested assessments thereafter. General data on Class Member-initiated assessment requests, however, shows that only nine percent of these Class Members received a timely assessment (within 14 days), and 41 percent were not documented. | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✕ |
| A-1 | FY2021 Implementation Plan | All Assessments must be conducted by staff that meet the qualifications mandated by the Comprehensive Program requirements.<br><br>*Not Applicable. This requirement is measured by the number/percentage of assessments conducted by staff who meet program qualifications. While it duplicates Requirement 11 and is thus not applicable, eighty-seven (87) percent of assessments were administered by qualified professionals. This requirement duplicates Requirement 11 and is considered not applicable.* | **N/A** | **N/A, Duplicate Requirement** |
| A-2 | FY2021 Implementation Plan | Assessment staff receive training and education on engaging/educating Class Members and addressing their concerns.<br><br>*Out-of-Compliance. This two-part requirement is measured by the number/percentage of assessment staff who completed required trainings within 60 days and the proportion of assessments completed by those staff who satisfied training requirements. Fifteen (15) of 19 (79 percent) of assessment staff were trained within 60 days and 440 of 1,065 assessments (41 percent) were conducted by appropriately trained assessment staff.* | **N/A** | **Out-of-Compliance** |
| A-3 | FY2021 Implementation Plan | Conduct initial Assessments within 14 days of referral from Outreach.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

---

[30] In their review of the final draft of this report, the Defendants expressed their disagreement with this compliance finding. The Defendants provide training to assessors on motivational interviewing and have a policy on how Assessors should respond to and document Class Member refusals.

| | | | | |
|---|---|---|---|---|
| A-4 | FY2021 Implementation Plan | Timely annual Assessments.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| A-5 | FY2021 Implementation Plan | Quarterly assessments as requested within 14 days of request.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| A-6 | FY2021 Implementation Plan | Submission of all Assessment outcomes and full Assessments to UIC-CON/DMH within 7 days.<br><br>*Out-of-Compliance. This requirement is measured by the percentage of completed assessments submitted by the prime agencies to UIC-CON within 7 days. Only 325 of 1,161 assessments (28 percent) were submitted to UIC-CON on time.* | **N/A** | **Out-of-Compliance** |
| A-7 | FY2021 Implementation Plan | UIC-CON will review one recommended and one not recommended Assessment from each Assessor monthly and require revisions for those that do not meet Comprehensive Program standards.<br><br>*Partial Compliance. This two-part requirement is measured by the percentage of submitted and corrected assessments (one recommended and one not-recommended assessment from each assessor) that meet program standards. Eighty-eight (88) percent of submitted assessments met program standards. For non-compliant assessments, however, the Defendants did not track whether they met standards after resubmission.* | **N/A** | **Partial Compliance** |
| A-8 | FY2021 Implementation Plan | UIC-CON to review all not-recommended Assessments; may be re-submitted or overturned.<br><br>*Out-of-Compliance. This two-part requirement is measured by the percentage of not-recommended assessments submitted to UIC-CON for review, and the percentage of assessments wherein UIC-CON overturned the not recommended finding of the prime agency that resulted in transition. The Defendants did not submit data on the first part of the requirement and were only able to demonstrate that five of 220 overturned assessments (2 percent) proceeded to transition.* | **N/A** | **Out-of-Compliance** |

## Section VI. Service Planning for *Williams* Class Members

After Class Members are assessed to determine their transition readiness, they are provided with a service plan. Service plans are required to contain the services and supports that align with a Class Member's needs, vision, and goals. In addition, the following Consent Decree requirements apply to service plans:

- Service plans must be completed by qualified professionals and include a legal representative or other person of the Class Member's choosing, if desired (Requirement 15).
- Service plans must be person-centered and reflect an individual's needs at home, work, and in the community to facilitate full participation in community life (Requirement 16).
- All service plans must be completed promptly with sufficient time to support transitions (Requirements 17 and 18).
- Service plans must identify the needed community-based services and a transition timetable (Requirement 19).
- For Class Members not approved for transition, service plans must include treatment objectives to prepare them for future transition to permanent supportive housing or other community-based options; the service plans should be periodically updated to reflect Class Members' changing needs and preferences and include services that support the acquisition of living and illness self-management skills (Requirement 20).
- For Class Members in Specialized Mental Health Rehabilitation Facilities (SMHRFs), service plans should focus on support for building the skills needed to live in the community (Requirement 21).
- For Class Members transitioned into non-permanent supportive housing, the service plan must justify that placement and include community-based services that can support the most integrated setting possible (Requirement 22).
- Service plans cannot be limited to what the service and housing system currently has available; any service that is currently provided under the State Medicaid Plan and Rule 132[31] must be made available but nothing beyond those services is required to be made available (Requirement 23).

The FY2021 Implementation Plan also obligated the Defendants to 13 additional service plan-related requirements. These requirements focus on service plan (initial and updates) timeliness; performance in the Supplemental Security Income/Social Security Disability Insurance (SSI/SSDI) Outreach, Access, and Recovery performance (SOAR); Class Member participation in employment services; provider participation in assessment and training regarding co-occurring (mental health and substance use disorder) capabilities; staff participation in a training module on service plans; and provider submission of service plans to University of Illinois Chicago, College of Nursing (UIC-CON); and service plan quality.

---

[31] The State Medicaid Plan and Rule 132 dictate the standard set of services available to persons with serious mental illness in Illinois.

**Service Plan-Related Requirements: Key Data Highlights**

There are two types of service plans completed by Comprehensive Program providers in partnership with Class Members: initial service plans and transition service plans. In previous years, the Defendants have been unable to submit data on completeness, quality, and timeliness relative to both types of service plans. While the Defendants should be credited for the availability of such data for FY2021, the data shows significant performance issues in this domain, particularly related to the timeliness of service plan completion. Data highlights include:

- For initial service plans completed for the 471 Class Members recommended for transition, only 66 Class Members (14 percent) were completed within the 45-day timeliness requirement. Most initial service plans (65 percent) were not submitted to UIC-CON. It remains unknown whether those plans were completed timely.

- Only 73 (41 percent) of those who transitioned (n=180) in FY2021 had a transition service plan completed within 14 days of the transition, with another 56 (54 percent) completed outside of the 14-day requirement.

- Class Members also receive service plans if they are not recommended to transition, in the form of "service plan goals" that are tied to their assessments. 158 of 168 (94 percent) received these initial plans. However, when it came time to update these plans (within 180 days), only 20 percent of these Class Members received timely updates, with 59 percent having no record of an update.

- For those recommended to transition who remain in SMHRFs, they are also entitled to service plan updates within 180 days of their previous service plan. Less than one percent of these Class Members received a timely update, with more than 82 percent of them having no record of an update.

- Comprehensive Program providers submitted 55 percent of service plans within the seven-day timeframe to UIC-CON, and only 36 percent met quality standards.

In this domain, the Defendants also provided data on employment supports and SOAR. This data demonstrated that 74 Class Members were newly enrolled in Individual Placement and Support - a model of supported employment for people with serious mental illness. The Defendants are obligated to offer SOAR services to Class Members who are identifying as having low or no income (n=167). The Defendants linked 151 Class Members (90 percent) to SOAR, but only 17 SSI/SSDI applications and 4 SSI/SSDI appeals were filed (14 percent of those linked to SOAR) with only five applications and zero appeals receiving approval (three percent linked to SOAR).

Nationally, the 2021 success rate for initial applications filed through the SOAR program was 60 percent, with an average approval time of 155 days from submission. This program has brought over $564 million directly to low-income persons with disabilities and thus the economies of participating states and localities. However, in Illinois, the success of SOAR under the Comprehensive Program lags far behind; the initial application success rate under the Comprehensive Program was only 29 percent for the extremely limited group of Class Members – only 17 – who had an initial application filed under the program.[32]

---

[32] Some of these applications may still be pending and will ultimately be approved, which could boost the approval rate.

**Service Plan-Related Requirements: FY2021 Compliance Assessments**
As displayed in Figure 17, the Defendants were found in compliance for two requirements, in partial compliance for three, and out-of-compliance for twelve. Five requirements are not applicable.

| Figure 17. Synopsis of FY2021 Compliance Assessments for Service Plan-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (9) | In Compliance➔ | 0 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 8 |
| Implementation Plan Requirements (13) | In Compliance➔ | 2 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 4 |
| Total Requirements (22) [N/A=5] [33] | In Compliance➔ | 2 | Partial Compliance➔ | 3 | Out-of-Compliance➔ | 12 |

Figure 18 contains the language of each service plan-related requirement in the *Williams* Consent Decree and Implementation Plan, along with the Court Monitor's compliance rating. It also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since the past compliance periods.

| Figure 18. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings for Service Plan-Related *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 15 | *Williams* Consent Decree VI(7)(C) | The Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and his or her legal representative. The Qualified Professional also shall consult with other appropriate people of the Class Member's choosing. <br><br> *Out-of-Compliance. The Defendants did not provide data on whether service plans were completed by qualified professionals.* | FY2018: Partial Compliance <br> FY2019: Out-of-Compliance <br> FY2020: Out-of-Compliance | Out-of-Compliance ✗ |
| 16 | *Williams* Consent Decree VI(7)(D) | Each Service Plan shall focus on the Class Member's personal vision, preferences, strengths and needs in home, community and work environments and shall reflect the value of supporting the individual with relationships, productive work, participation in community life, and personal decision-making. <br><br> *Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | FY2018: Out-of-Compliance <br> FY2019: Out-of-Compliance <br> FY2020: Out-of-Compliance | Out-of-Compliance ✗ |
| 17 | *Williams* Consent Decree VI(7)(A) | Based on the results of the Evaluations described above, Defendants shall promptly develop Service Plans specific to each Class Member who is assessed as appropriate for transition to a Community-Based Setting. <br><br> *Out-of-Compliance. Only 14 percent of initial service plans and 41 percent of transition service plans were completed per Comprehensive Program timeliness standards.* | FY2018: Out-of-Compliance <br> FY2019: Out-of-Compliance <br> FY2020: Out-of-Compliance | Out-of-Compliance ✗ |

---

[33] Five requirements in this domain are not applicable to this reporting period.

| | | | | |
|---|---|---|---|---|
| 18 | *Williams Consent Decree VI(7)(F)* | The Service Plan shall be completed within sufficient time to provide appropriate and sufficient transitions for Class Members in accordance with the benchmarks set forth in the Decree.<br><br>*Out-of-Compliance. Only 41 percent of transition service plans were completed per Comprehensive Program timeliness standards.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 19 | *Williams Consent Decree VI(7)(B)* | For each Class Member who does not oppose moving to Community-Based Setting, the Service Plan shall, at a minimum, describe the Community-Based Services the Class Member requires in a Community-Based Setting, and a timetable for completing the transition.<br><br>*Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 20 | *Williams Consent Decree VI(9)(A)* | Those Class Members not transitioning from IMDs to Permanent Supportive Housing will have ongoing reassessments with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH.<br><br>*Out-of-Compliance. The Defendants did not provide data or any other evidence relative to this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 21 | *Williams Consent Decree VI(7)(A)* | Each Service Plan shall be periodically updated to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate services where appropriate to assist in acquisition of basic instrumental activities of daily living skills and illness self-management. Acquisition of such skills shall not be a prerequisite for transitioning out of the IMD.<br><br>*Out-of-Compliance. For most Class Members eligible for service plan updates, the Defendants have no record of such updates having been completed, including 59 percent of those not recommended to transition who were due for a service plan update and 82 percent of those recommended to transition who were due to a service plan update.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 22 | *Williams Consent Decree VI(7)(B)* | If there has been a determination that a Class Member is not currently appropriate for PSH, the Service Plan shall specify what services the Class Member needs that could not be provided in PSH and shall describe the Community- Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate.<br><br>*Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |

| | | | | |
|---|---|---|---|---|
| 23 | *Williams Consent Decree VI(7)(E)* | The Service Plan shall not be limited by the current availability of Community-Based Services and Settings; provided, however, that nothing in this subparagraph obligates Defendants to provide any type of Community-Based Service beyond the types of Community-Based Services included in the State Plan and Rule 132.<br><br>***Partial Compliance.*** *Per the Defendants, the service plan template used with Class Members is very broad and does not limit Class Members to specific services and settings. Defendants also report that they have granted exceptions so that Primes can provide services not including in the State Plan or Rule 132. However, given that the Defendants have not provided data from service plans to indicate which services are not available in adequate quantity and type – and how those limitations impact service access and availability for Class Members -- the Court Monitor cannot find the Defendants in full compliance.*[34] | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Partial Compliance** |
| SP-1 | FY2021 Implementation Plan | Service Plans must be completed within 45 days of the completion of the Assessment.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-2 | FY2021 Implementation Plan | Service Plans must be updated every 180 days at a minimum.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-3 | FY2021 Implementation Plan | Transition Service Plans must be completed 14 days prior to Transition.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-4 | FY2021 Implementation Plan | Service Plans must be person-centered, include input from others, include services, supports and goals.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

---

[34] In their written response to the final draft of this report, the Defendants argued that they should be found in compliance with this requirement. They contend that service plans are broad and needs-based and as such, do not pose limitations of available services. They also authorize Primes (service providers) to use funds to provide services outside of State Plan and Rule 132. The Court Monitor's rationale for a partial compliance rating is provided above; it remains unchanged.

| | | | | |
|---|---|---|---|---|
| SP-5 | FY2021 Implementation Plan | SOAR services must be provided to assist Class Members with no income.<br><br>*In Compliance.* *This requirement is measured by the number/percentage of Class Members residing in SMHRFs on financial holds who are offered SOAR services. Eighty-four (84) percent of Class Members on financial holds were offered SOAR, with additional Class Members being offered SOAR prior to being placed on financial holds.* | **N/A** | <span style="color:white">In Compliance</span> |
| SP-6 | FY2021 Implementation Plan | SOAR services must be provided to assist Class Members with no income.<br><br>***Out-of-Compliance.*** *This requirement is measured by the number/percentage of Class Members who consent to SOAR who have applications submitted within three months of consent. Only 17 of 176 Class Members – or ten percent – had applications submitted within the required timeframe.* | **N/A** | <span style="color:white">Out-of-Compliance</span> |
| SP-7 | FY2021 Implementation Plan | SOAR services result in CM approval for SSI/SSDI.<br><br>***Out-of-Compliance.*** *This two-part requirement is measured by the number/percentage of Class Members who receive funding after initial application or appeal. Five of 17 Class Members (29 percent) received funding after initial application, while none of the four Class Members who were subject to appeals received funding.* | **N/A** | <span style="color:white">Out-of-Compliance</span> |
| SP-8[35] | FY2021 Implementation Plan | Encourage Class Members to explore employment opportunities; enhance employment supports.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-9 | FY2021 Implementation Plan | Dual Diagnosis Capability in Addiction Treatment (DDCAT) analysis of provider services for co-occurring substance use disorders and provision of targeted training.<br><br>***Out-of-Compliance.*** *This two-part requirement is measured by the proportion of prime agencies who complete the DDCAT assessment and received any indicated follow-up trainings based on the assessment results. Five of the 13 prime agencies received an analysis but none received the required follow-up trainings.* | **N/A** | <span style="color:white">Out-of-Compliance</span> |
| SP-10 | FY2021 Implementation Plan | Hold Evidence Based Practice Conference to include best practices in services for individuals with co-occurring substance use disorders by November 1, 2020.<br><br>*In Compliance.* *This requirement is measured by the number of prime agencies who attended this conference; all 13 prime agencies did so. The conference was held on August 4, 2020.* | **N/A** | <span style="color:white">In Compliance</span> |

---

[35] The FY2021 Implementation Plan had a numbering error – indicating Requirement SP6, then SP7, and then back to SP6. The error has been corrected for this report and requirements were renumbered.

| SP-11 | FY2021 Implementation Plan | Creation of comprehensive training module for Service Planning standards.<br><br>***Partial Compliance.*** *This two-part requirement is measured by the number of newly hired service planning staff who complete required trainings and then receive certification. Thirteen of 22 (59 percent) new staff completed the required training and 10 of the 13 trained received certification.* | **N/A** | **Partial Compliance** |
|---|---|---|---|---|
| SP-12 | FY2021 Implementation Plan | Require agencies to submit all Service Plans to UIC-CON for review.<br><br>***Partial Compliance.*** *This requirement is measured by the percentage of completed service plans that are submitted to UIC-CON for review within seven days. Fifty-five (55) percent (551 of 994) of service plans met this standard. This rating was assigned because Defendants exceeded the 50 percent standard; this standard could change in future years, so the Court Monitor advises a substantial focus on increasing compliance.* | **N/A** | **Partial Compliance** |
| SP-13 | FY2021 Implementation Plan | Review sample of all types of Service Plans (initial, update, transition) to ensure they meet Comprehensive Program standards and requirements.<br><br>***Out-of-Compliance.*** *This requirement is measured by the number of reviewed service plans (sample includes initial, update, and transition service plans) that score below an 85 percent compliance rate relative to the overall number of service plans. 74 of 116 (or 64 percent) of service plans fell below the 85 percent standard, resulting in an out-of-compliance finding.* | **N/A** | **Out-of-Compliance** |

### Section VII. Transitions for *Williams* Class Members

Along with diversion, a second, central purpose underlying the *Williams* Consent Decree is to transition willing and clinically appropriate Class Members into the community, creating a pathway for them to rejoin and fully participate in community life. Along with Front Door diversion, this requirement is often viewed as one of the most important and visible indicators of compliance. Success or failure to achieve the number of required transitions signals the Defendant's ability to effectively reach and identify appropriate institutionalized Class Members, prepare for and effectuate transitions, and, at the systems-level, move toward rebalancing the mental health services system away from institution-based and restrictive care settings to community-based services, supports, and housing.

From March 2020 to present, the Defendants have utilized a new approach – titled the Comprehensive Class Member Transition Program (Comprehensive Program) – wherein 12 Prime Agencies were responsible for transitions. In addition to reaching the numeric transition requirements, the Defendants are required to:

- Utilize permanent supportive housing (PSH) for all Class Members, except for those who have severe dementia or other severe cognitive impairments preventing effective service in PSH, require skilled nursing care such that they cannot be served safely in PSH, or are a danger to self or others (Requirement 24).
- Hold housing units for Class Members who are temporarily hospitalized by paying their rent (Requirement 25).
- Ensure Class Members amid the transition process receive added support and are not left without options when Specialized Mental Health Rehabilitation Facilities (SMHRFs) close (Requirement 26).
- Utilize buildings for community-based housing where fewer than 25 percent of tenants have a mental illness, unless the building has four or fewer units, at which time 50 percent of tenants with mental illness is permitted (Requirement 27).
- Offer all transition-approved Class Members placement in the community, with moves completed within 120 days (Requirement 28).

**Unlike previous years, due to the COVID-19 crisis, the Defendants did not have a numeric transition requirement in their Implementation Plan**. However, pursuant to the FY2021 Implementation Plan, they were required to effectuate timely transitions, strengthen reporting on pipeline issues,[36] prioritize permanent supportive housing, comply with disability segregation limit rules, provide services to involuntarily discharged Class Members, increase use of the managed care organization (MCO) transition program, engage MCO staff including Chief Executive Officers (CEOs) and operations staff, ensure MCO staff are trained, and develop a plan on how to leverage MCO performance improvement plans or formal measures to strengthen MCO engagement.

---

[36] "Pipeline issues" is the shorthand term used by the Parties to refer to the any process-related snags or bottlenecks that prevent Class Members from timely progress through the multiple steps from outreach to transition.

**Transition-Related Requirements: Key Data Highlights**

The Defendants effectuated 180 Class Member transition in FY2021 under the *Williams* Consent Decree program. Other data highlights in this domain include:

- On the last day of fiscal year 2021 (June 30, 2021), there were 554 Class Members who had been recommended between January to December 2020 that were still awaiting transition. Of those 554 Class Members, 177 (32 percent) were in an agency intake/planning stage, 60 (11 percent) were in a housing stage, 110 (20 percent) were in a transition delay stage, 45 (8 percent) were in a "change" stage,[37] and 162 (29 percent) were unaccounted for.
- The Consent Decree requires the Defendants to transition Class Members within 120 days of their initial service plan. Lease signing is used as the official transition date; however, 42 transitions had no lease tied to them leaving only 138 of the 180 transitions with an end point for this timeliness standard. Data shows that 81 Class Members (59 percent) were transitioned per the timeliness standard.[38] Twenty-six (or 19 percent) moved within 121-200 days, ten moved in over 200 days (seven percent), and the rest were unknown or were moved before the transition process was completed. However, this data only applies to those who were transitioned, not those who received initial service plans but should have transitioned. The percentages would also decrease if the 180 transition denominator were used to calculate performance.
- Defendants largely complied with rules focused on not segregating persons with disabilities into multi-unit buildings; while data is limited to those who received bridge subsidies (rental vouchers that can be used in scattered-site apartments), only ten exceptions were granted in FY2021, constituting 4.4 percent of all bridge subsidies.
- The Defendants also complied with the requirement to provide short-term rental assistance to Class Members who are at risk of losing their housing due to long-term care placement, incarceration, income issues, health concerns, or other reason. They did so for 75 Class Members during FY2021.
- The Defendants transitioned 136 Class Members (76 percent of those transitioned) into PSH. Twenty-seven (27) Class Members were transitioned into congregate residential settings (15 percent), with the rest in settings deemed as "other."

**Transition-Related Compliance Requirements: FY2021 Compliance Assessment**

As displayed in Figure 19 the Defendants were found in compliance with eight requirements, in partial compliance for three, and out-of-compliance for two. Ten requirements are not applicable.

---

[37] "Change" is defined as change in facility, verified in facility, prime re-engaging, change in Prime agency, or change in care manager.

[38] In their review of the final draft of this report, Class Counsel indicated that calculating the timeliness standard based on the "first service plan that a Prime prepare[s] for a Class Member under the Comprehensive Program" is flawed, because previous service plans that have been developed should start the clock for the 120-day timeliness standard. The Court Monitor disagrees and believes – for the purposes of calculating this timeliness standard – the 120-day timeframe should start after the "initial service plan" is administered. The "initial service plan" is defined as the service plan that is developed after a Class Member is recommended to transition.

| Figure 19. Synopsis of FY2021 Compliance Assessments for Transition-Related *Williams* Consent Decree and Implementation Planning Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (12) | In Compliance➔ | 2 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (11) | In Compliance➔ | 6 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 0 |
| Total Requirements (23) [N/A=10][39] | In Compliance➔ | 8 | Partial Compliance➔ | 3 | Out-of-Compliance➔ | 2 |

Figure 20 relays each transition-related requirement in the *Williams* Consent Decree and FY2020 Implementation Plan, along with the Court Monitor's compliance rating. Figure 20 also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since those compliance periods.

| Figure 20. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings for Transition-Related *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 24 | Consent Decree VI(9)(A) | PSH will be considered the most integrated setting appropriate for Class Members except that, (1) for any Class Members (i) who have severe dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH, (ii) who have medical needs requiring a high level of skilled nursing care that may not safely be provided in PSH, or (iii) who present an danger to themselves or others, the evaluator will determine the most integrated setting appropriate, which may be PSH or another setting, and (2) nothing in this paragraph shall prevent Class Members who can and wish to live with family or friends or in other independent housing that is not connected with a service provider from doing so.<br><br>***Partial Compliance.*** *The Defendants are unable to demonstrate that non-PSH referrals meet these strict criteria. However, reported data from FY2021 shows that most Class Members (76 percent) were moved into PSH versus other congregate residential settings.* | **FY2018: Partial Compliance**<br><br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **Partial Compliance** |
| 25 | Consent Decree VI(9)(B) | Class Members who move to a Community-Based Setting will have access to all appropriate Community-Based Services, including but not limited to reasonable measures to ensure that their housing remains available in the event that they are temporarily placed in a hospital or other treatment facility.<br><br>***In Compliance.*** *Seventy-five (75) Class Members received assistance to maintain housing during temporary placement during FY2021.[40]* | **FY2018: Partial Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |

---

[39] Ten requirements are not applicable to this reporting period.

[40] In their review of the final draft of this report, Class Counsel indicated that compliance assessment with this requirement should extend beyond maintaining Class Member housing (and include ensuring access to "all appropriate Community-Based Services"). Given that community-based services may be suspended during a Class Member's tenure in a hospital or other institutional setting, for compliance assessment, the Court Monitor has historically focused on the Defendants' efforts to ensure housing retention for these Class Members. The Court Monitor will explore with the Parties whether a more expansive view of this mandate should be considered for future compliance assessment. The FY2021 compliance rating remains unchanged.

| | | | | |
|---|---|---|---|---|
| 26 | Consent Decree VIII(15) | In the event that any IMD seeks to discharge any Class Member before appropriate housing is available, including but not limited to circumstances in which an IMD decides to close, Defendants will ensure that those individuals are not left without appropriate housing options based on their preferences, strengths, and needs.<br><br>*Out-of-Compliance. The Defendants did not provide data on the provision of services for unexpected discharges.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 27 | Consent Decree VI(8)(G) | For purposes of this Decree, PSH includes scattered-site housing as a well as apartments clustered in a single building, but no more than 25% of the units in one building with more than 4 units may be used to serve PSH clients known to have mental illness. For buildings with 2 to 4 units, no more than 50% of the units may be used to serve PSH clients known to have mental illness. However, during first 5 years after finalization of the IP, up to 75 class members may be placed in buildings where more than 25% of the units serve PSH clients known to have MI if those buildings were used to serve PSH clients prior to March 1, 2010. After first 5 years following the finalization of the IP, all class members served in PSH shall be offered the opportunity to reside in buildings that comply with 25% or 50% units limit set forth above in this subparagraph.<br><br>*In Compliance. Data demonstrates that more than 95 percent of Class Members who received bridge subsidies were transitioned to housing that comply with disability segregation rules.* | **FY2018: Out-of-Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 28 | Consent Decree VI(8)(H) | After the end of the fifth year following finalization of the Implementation Plan, Class Members who are assessed as appropriate for living in a Community-Based Setting, who do not oppose transition to a Community-Based Setting and whose Service Plans provide for placement in Community-Based Settings shall be offered the opportunity to move to those settings and shall receive appropriate services consistent with the Service Plan within one hundred and twenty (120) days of the date of the Service Plan.<br><br>*Out-of-Compliance. The Defendants produced data that shows that 59 percent of Class Members who signed leases were transitioned within 120 days of their initial service plans. However, this data does not include the 42 Class Members who transitioned without leases; when the data point is adjusted, only 44 percent of Class Members transitioned within 120 days. Further, this data does not include a number of Class Members who received initial service plans and were not transitioned.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 29 | Consent Decree X(21) | Within sixty (60) days of Approval of the Decree, Defendants shall offer each of the Named Plaintiffs the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs and wishes, including PSH. Provision of services to the Named Plaintiffs pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of the Decree.<br><br>*Not Applicable. This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br>**FY2020: N/A** | **N/A** |

| 30 | Consent Decree VI(8)(C) | By the end of the first year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 256 Class Members who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 256 PSH units for the benefit of Class Members.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: N/A** | **N/A** |
|---|---|---|---|---|
| | | | **FY2019: N/A** | |
| | | | **FY2020: N/A** | |
| 31 | Consent Decree VI(8)(D) | By the end of the second year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 640 Class Members (including the 256 referenced in subparagraph 8c above) who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 640 PSH units for the benefit of Class Members.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: N/A** | **N/A** |
| | | | **FY2019: N/A** | |
| | | | **FY2020: N/A** | |
| 32 | Consent Decree VI(8)(E) | By the end of the third year after the finalization of the Implementation Plan, Defendants will have (1) offered placement to at least forty percent (40%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Settings; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the second year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: N/A** | **N/A** |
| | | | **FY2019: N/A** | |
| | | | **FY2020: N/A** | |
| 33 | Consent Decree VI(8)(F) | By the end of the fourth year after the finalization of the Implementation Plan, Defendants will have (1) offered placement to at least seventy percent (70%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other | **FY2018: N/A** | **N/A** |
| | | | **FY2019: N/A** | |

| | | | | |
|---|---|---|---|---|
| | | Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the third year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2020: N/A** | |
| 34 | Consent Decree VI(8)(A) | Within five (5) years of the finalization of the Implementation Plan, all Class Members who have been assessed as appropriate for living in a Community-Based Setting will be offered the opportunity to move to a Community-Based Setting.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 35 | Consent Decree VI(8)(G) | By the end of the fifth year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to one hundred percent (100%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the fourth year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since the finalization of the Implementation Plan.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br><br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| T-1 | FY2021 Implementation Plan | Transition Class Members based on monthly target of 33 Class Members per month post-COVID.<br><br>**Not Applicable.** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| T-2 | FY2021 Implementation Plan | Providers shall transition Class Members within 120 days of initial service plan, while maintaining clinical and safety standards.<br><br>**Not Applicable.** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| T-3 | FY2021 Implementation Plan | Providers will regularly report (quarterly at a minimum) on transition pipeline issues and address bottlenecks or delays; UIC-CON will analyze and engage provider to remedy.<br><br>**_Partial Compliance._** _The Defendants were able to report on pipeline status for 71 percent of Class Members. Twenty-nine percent were unaccounted for._[41] | **N/A** | **Partial Compliance** |
| T-4 | FY2021 Implementation Plan | Prime Agencies are required to utilize PSH for Class Member transitions unless one or more of the exclusionary conditions are met, and to document and justify transitions using alternative housing (Supportive or Supervised Residential).<br><br>**_Partial Compliance._** _This two-part requirement is measured by the percentage of Class Members transitioned to PSH and evidence that those transitioned to non-PSH settings have documented justification that reflect Class Member choice or Consent Decree-approved exclusionary criteria. 136 of 180 Class Members (76 percent) were transitioned to PSH. For the remaining 44 Class Members, the Defendants cannot confirm that all such instances of non-PSH placement – outside of when a Class Member elects to move to non-PSH settings – comply with the exclusionary criteria in the Consent Decree._ | **N/A** | **Partial Compliance** |
| T-5 | FY2021 Implementation Plan | Housing subsidy administrators will track and report on Class Member concentrations, and document where concentration[42] not met based on Class Member request (waiver).<br><br>**_In Compliance._** _This two-part requirement is measured by the number of transitions that meet PSH concentration limits as well as the number of instances where waivers to those rules are fully documented. Ninety-six (96) percent of Class Member transitions followed PSH concentration rules, and all ten instances of waivers were documented._ | **N/A** | **In Compliance** |
| T-6 | FY2021 Implementation Plan | Defendants and Prime agencies will work with SMHRF administration to ensure they are notified of any upcoming discharges so that housing can be identified.<br><br>**_Not Applicable._** _This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021._ | **N/A** | **N/A** |
| MC-1 | FY2021 Implementation Plan | Develop guidance, documentation standards, tracking system, and training for MCOs.<br><br>**_In Compliance._** _This requirement is measured by the number of Class Members transitioned by MCOs relative to the number of Class Members enrolled with the MCOs. For FY2021, the Defendants were required to calculate a baseline against which to compare future years' performance. The baseline for this year was zero transitions effectuated by the MCOs._ | **N/A** | **In Compliance** |

---

[41] In their review of the final draft of this report, Class Counsel suggested additional framing for this compliance rating, which has been incorporated into recommendation 3 in Section XIII.
[42] Class Member concentration in buildings shall not exceed 25% (for over 4 units) or 50% (for 4 units or less).

| | | Review existing contract language to identify any barriers to Consent Decree Implementation.<br><br>*In Compliance. This requirement is measured by the completion of a brief report of findings on opportunities to align MCO contract language with Consent Decree objectives. This report was completed and submitted to the Court Monitor and Parties on 10/30/2020, by the deadline.* | | |
|---|---|---|---|---|
| MC-2 | FY2021 Implementation Plan | | **N/A** | **In Compliance** |
| MC-3 | FY2021 Implementation Plan | Devote quarterly sessions with CEOs and operations teams to Consent Decree topics.<br><br>*In Compliance. This requirement is measured by the completion of quarterly meetings with CEOs and operations teams from the MCOs. Such meetings were held on 9/16/20, 12/10/20, 3/25/21, and 6/17/21 for CEOs and 9/3/20, 12/10/20, 3/25/21, and 6/10/21 for the operations teams.* | **N/A** | **In Compliance** |
| MC-4 | FY2021 Implementation Plan | Adapt/develop content about Consent Decree operations to be used for training new MCO care management staff by March 31, 2021.<br><br>*Per the Defendants, all Health Plans submitted attestations to HFS verifying that all newly hired Care Coordinator staff April 1, 2021 through June 30, 2021 had completed the required Olmstead Training – 100% compliance.* | **N/A** | **In Compliance** |
| MC-5 | FY2021 Implementation Plan | Assess each option, considering potential impact, required resources, etc. [for Performance Improvement Plan and formal performance measure].<br><br>*In Compliance. This requirement is measured by a plan shared with Court Monitor and Parties, which was provided on 3/31/21.* | **N/A** | **In Compliance** |

## Section VIII. Community-Based Services and Housing Capacity Development

The *Williams* Consent Decree issues a clear imperative that the Defendants must ensure the array and quantity of community-based services and housing needed to successfully transition appropriate Class Members from Specialized Mental Health Rehabilitation Facilities (SMHRFs) to community living.[43] From the onset, the Parties, the Court Monitor, and other stakeholders agreed that the current types and quantities of available services and housing in the community are insufficient to adequately support diversion and transition.

Beyond the development of services and housing that specifically serve Class Members, the *Williams* Consent Decree also provides an opportunity for Illinois to begin rebalancing its mental health and disability services system, moving away from its heavy reliance on institutional care toward community-based, recovery-oriented, and person-centered services and housing. By using Class Member data, other states' best practices, and a multimillion-dollar funding allocation, the Illinois systems' leaders can leverage the Consent Decree for real and lasting systems change that strengthens its community-based mental health and housing systems.

The Consent Decree requires that Defendants create and provide to Class Members an adequate system of housing and services. Further, the FY2021 Implementation Plan requires a briefing to Parties on specific resource commitments, an updated capacity development plan, the receipt of specific services and housing among Class Members, measurement of Class Member utilization of Statewide Referral Network and Section 811 units, and comprehensive provider tracking of receipt of services and housing among Class Members consistent with their needs and geographic preferences.

### Community Services and Housing Development-Related Compliance Requirements: FY2021 Compliance Assessment

As displayed in Figure 21, the Defendants were found in compliance with two requirements, in partial compliance for two, and out-of-compliance for zero within this domain. Five requirements were not applicable to this reporting period.

| Figure 21. Synopsis of FY2021 Compliance Assessments for Community-Based Services and Housing Capacity-Related Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (2) | In Compliance➔ | 0 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 0 |
| Implementation Plan Requirements (8) | In Compliance➔ | 2 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |
| Total Requirements (10) [N/A=6][44] | In Compliance➔ | 2 | Partial Compliance➔ | 2 | Out-of-Compliance➔ | 0 |

---

[43] *Williams* Consent Decree, Section IV.
[44] Six requirements are not applicable and thus not counted in this row.

Figure 22 contains the language of each of this domain's requirements in the *Williams* Consent Decree and Implementation Plan, along with the Court Monitor's compliance rating. Figure 22 also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since the past three compliance periods.

| | | **Figure 22. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings for Community-Based Services and Housing Capacity-Related *Williams* Consent Decree Requirements** | | |
|---|---|---|---|---|
| Req # | Source/ Citation | ***Williams* Consent Decree Requirement Language and FY2021 Performance** | **Prior Years' Compliance Ratings** | **FY2021 Compliance Rating** |
| 36 | *Williams* Consent Decree V(5) | Defendants shall ensure the availability of services, supports, and other resources of sufficient quality, scope and variety to meet their obligations under the Decree and the Implementation Plan.<br><br>***Partial Compliance.*** *While the Defendants did submit an updated capacity development plan, their continued inability to transition adequate numbers of Class Members – and to conduct adequately and timely the essential phases of outreach, assessment, service planning, and transitioning (pipeline phases) – demonstrates that availability of supports and services is inadequate to address need.* | **FY2018: Out-of-Compliance** **FY2019: Out-of-Compliance** **FY2020: Out-of-Compliance** | **Partial Compliance** |
| 37 | *Williams* Consent Decree V(5) | Defendants shall implement sufficient measures, consistent with the preferences, strengths, and needs of Class Members, to provide Community-Based Settings and Community-Based Services pursuant to the Decree.<br><br>***Partial Compliance.*** *While the Defendants did submit an updated capacity development plan, their continued inability to transition Class Members – and particularly address identified pipeline issues – demonstrates that availability of supports and services is inadequate to address need.* | **FY2018: Out-of-Compliance** **FY2019: Out-of-Compliance** **FY2020: Out-of-Compliance** | **Partial Compliance** |
| C-1 | FY2021 Implementation Plan | Using FY2021 IP as the basis, Defendants will brief the Court Monitor and Parties on FY2021 resource commitments, expected compliance outcomes, and FY2022 budget implications by October 31, 2020.<br><br>***In Compliance.*** *This requirement is measured by the completion of an on-time briefing to the Court Monitor and Parties; the briefing was completed and shared on 10/20/20.* | **N/A** | **In Compliance** |
| C-2 | FY2021 Implementation Plan | Update capacity development plan by January 31, 2021 or earlier in order to inform Defendants' budget requests for the Governor's proposed FY2022 budget.<br><br>***In Compliance.*** *This requirement is measured by an updated capacity development plan, which was updated and shared with the Court Monitor and Parties on 2/1/21.* | **N/A** | **In Compliance** |
| C-3 | FY2021 Implementation Plan | Require Prime Agencies to maintain and develop sufficient services and supports to meet the needs of the Class Members served by their agency.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| C-4 | FY2021 Implementation Plan | Require Prime Agencies to develop, maintain and locate housing and services sufficient to meet the preferences and needs of their assigned Class Members.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-5 | FY2021 Implementation Plan | Development of Statewide Referral Network Units for Class Member utilization (250 per year, depending on awarded LIHTC projects; 31 of which are available for Class Members).<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-6 | FY2021 Implementation Plan | Development of Section 811 Units for Class Member utilization.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-7 | FY2021 Implementation Plan | Require Prime agencies to routinely report on Class Member service needs and available staffing and capacity.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-8 | FY2021 Implementation Plan | Require Prime agencies to track and report on Class Member geographic housing preferences and transition locations.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

## Section IX. Administrative Requirements

It is critical that the Defendants support Consent Decree planning and operations with strong management and administrative processes. As such, the *Williams* Consent Decree includes several administrative requirements, including obligations for timely reporting on performance relative to Consent Decree and Implementation Plan requirements, responsiveness to the Court Monitor and Plaintiffs' data and information requests, and unfettered access to Class Members and their records, as well as to various staff and stakeholders related to Consent Decree planning, operations, and implementation. The Defendants' administrative requirements during this compliance period include:

- Delivering semiannual reports containing the information and data agreed to by the Court Monitor and Parties (Requirement 38).
- Providing the Court Monitor unrestricted access to documents, information, and staff involved with the Consent Decree, without counsel present (Requirement 39).
- Ensuring the Court Monitor's unrestricted access to Class Members and their records (Requirement 40).
- Providing data and information requested by Plaintiffs (Requirement 41).
- Compensating the Court Monitor and her staff consistent with their customary rates (Requirement 42).
- Covering all costs associated with the Decree (Requirement 43).

There are no additional requirements in this domain within the FY2021 Implementation Plan.

**Administrative Compliance Requirements: Compliance Assessment for FY2021**

As displayed in Figure 23, the Defendants were found in compliance with six requirements. They did not receive any partial or out-of-compliance ratings in this domain. The two requirements on the Court Monitor were also in compliance.

| Figure 23. Synopsis of FY2021 Compliance Assessments for Administration-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (8) | In Compliance➔ | 6 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |
| Implementation Plan Requirements (0) | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |
| Total Requirements (8) [N/A=2][45] | In Compliance➔ | 6 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |

Figure 24 contains the language of each administration-related requirement in the *Williams* Consent Decree and the FY2021 Implementation Plan, along with the Court Monitor's compliance ratings. Figure 24 also contains FY2018, FY2019, and FY2020 ratings to demonstrate whether compliance improved or worsened since those compliance periods.

---

[45] Two requirements in this domain are not applicable to the FY2021 reporting period.

| | | Figure 24. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings<br>For Administrative-Related *Williams* Consent Decree Requirements | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 38 | Consent Decree IX(16) | The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs serving individuals with Mental Illnesses. The Parties will attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate one person to serve as Monitor and the Court will select the Monitor. Within twenty- one (21) days of Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: In Compliance**<br><br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 39 | Consent Decree IX(18) | Not less than every six (6) months, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress toward achieving compliance, with the Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report.<br><br>***In Compliance.*** *The Defendants produced semi-annual reports that contained the data and information necessary to assess compliance and performance on the Consent Decree and Implementation Plan requirements.* | **FY2018: Partial Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 40 | Consent Decree IX(18) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendants' staff or consultants, except their attorneys.<br><br>***In Compliance.*** *Although there were some significant delays in receiving information, the Defendants ultimately complied with data and information requests.* | **FY2018: In Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 41 | Consent Decree IX(18) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, building and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree.<br><br>***In Compliance.*** *The Defendants complied with this requirement.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |

| | | | | |
|---|---|---|---|---|
| 42 | Consent Decree IX(18) | The Defendants shall comply with Plaintiffs' requests for information that are reasonably related to Defendants' compliance with the Decree, including without limitation requests for records or other relevant documents pertinent to implementation of the Decree or to Class Members. Plaintiffs shall also be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Plaintiffs pursuant to the Decree shall be subject to the Protective Order.<br><br>**In Compliance.** *The Court Monitor queried Class Counsel on 1/3/21 and received a response on 1/6/21. While the Class Counsel considered some responses inadequate, they did not report any instances wherein the Defendants did not supply requested data and information.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 43 | Consent Decree IX(20) | Defendants shall compensate the Monitor and his or her staff and consultants at their usual and customary rate subject to approval by the court. Defendants shall reimburse all reasonable expenses of the Monitor and the Monitor's staff, consistent with guidelines set forth in the "Governor's Travel Control Board Travel Guide for State Employees." Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable.<br><br>**In Compliance**. *The Defendants complied with this requirement.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 44 | Consent Decree XII(24) | The cost of all notices hereunder or otherwise ordered by the Court shall be borne by the Defendants.<br><br>**In Compliance.** *The Defendants complied with this requirement.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 45 | Consent Decree XI(22) | In full settlement of all attorneys' fees incurred to date in connection with the litigation, Defendants shall pay, subject to court review and approval, $1,990,000.00 to Class Counsel. In full settlement of all out-of-pocket costs and expenses (not to include attorneys' fees) incurred to date by Class Counsel, Defendants shall pay to Class Counsel such costs and expenses incurred by Class Counsel through and including the Approval of the Decree and any appeal thereof. Such amounts shall be distributed to Class Counsel in the manner set forth in written instructions provided by Class Counsel. Furthermore, such amounts hall be set forth in a Judgment Order to be entered by the Court. Defendants shall complete and submit all paperwork necessary for payment of such amounts, plus applicable statutory post-judgment interest, within five (5) business days after expiration of the time to appeal the fee award without the filing of a Notice to Appeal or after the issuance of the mandate by the highest reviewing court, whichever is later.<br><br>**Not Applicable**. *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br><br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| CM1 | Consent Decree IX(17) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of non-compliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. Within 60 days after the end of each year of service, the Monitor will report to the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Plaintiffs to evaluate the Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports as necessary. Reports of the Monitor shall be served on all Parties.<br><br>*In Compliance. The Court Monitor produced her annual report and it was filed on January 19, 2021. The Court Monitor also developed – in consultation with the Parties – the Amended Action Plan, filed on December 2, 2020.* | **FY2018: In Compliance (Court Monitor Requirement)**<br><br>**FY2019: In Compliance (Court Monitor Requirement)**<br><br>**FY2020: In Compliance (Court Monitor Requirement)** | **Court Monitor Require-ment -- In Compliance** |
| CM2 | Consent Decree IX(19) | In the event that the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Plaintiffs believe that Defendants are not complying with the terms of the Decree, Plaintiffs shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review the Plaintiffs' claims of actual or potential non-compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing, filed with the Court, and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor will not communicate with the Court without advance notice to the Parties.<br><br>*In Compliance. The Court Monitor convened regular Large Parties, Small Parties, and ad hoc meetings to identify and attempt to resolve issues of disagreement or non-compliance. A meeting dedicated specifically to Defendants' FY2020 areas of partial- and non-compliance was led by the Court Monitor March 16, 2021.* | **FY2018: In Compliance (Court Monitor Requirement)**<br><br>**FY2019: In Compliance (Court Monitor Requirement)**<br><br>**FY2020: In Compliance (Court Monitor Requirement)** | **Court Monitor & Plaintiffs' Require-ment — In Compliance** |

## Section X. Implementation Planning

The Defendants are required to develop an annual implementation plan in consultation with the Court Monitor and Plaintiffs' Counsel, an integral annual deliverable that identifies desired performance indicators and outcome measures, key tasks and action steps, responsible parties, and timeframes/due dates for the forthcoming fiscal year. The *Williams* Consent Decree contains a requirement that Defendants "shall create and implement an Implementation Plan that outlines how they intend to operationalize concrete strategies to satisfy their Consent Decree obligations." The Implementation Plan is filed with the Court and the commitments contained therein become enforceable under the Decree.

The *Williams* Consent Decree contains several requirements that dictate the required components of the Implementation Plan, obligate its development and timely filing, and sanction its enforceability under the Decree. The Court Monitor has determined that some Consent Decree requirements (Requirements 48, 49, and 51-58) apply to the FY2021 Implementation Plan and thus fall under this report. However, other Implementation Plan-related requirements (Requirements 50 and 59) apply to the FY2022 Implementation Plan. The requirements in this domain include:

- The FY2021 Implementation Plan's described methods by which Class Members can understand their rights to and request Consent Decree-related services and procedures for recording those requests (Requirement 48).
- The FY2021 Implementation Plan's inclusion of methods for engaging Class Members and a procedure to provide opportunities to visit community-based services settings (Requirement 49).
- Completion of the FY2022 Implementation Plan (Requirement 50), which takes place during the FY2021 compliance period.
- The FY2021 Implementation Plan's delineation of specific tasks, timetables, goals, and plans to assure the Defendants' fulfillment of the Decree's obligations (Requirement 51).
- The FY2021 Implementation Plan's inclusion of hiring, training, and supervision sufficient to implement Decree obligations and operate the Decree overall (Requirement 52).
- The FY2021 Implementation Plan's description of activities required to develop community-based services and housing in sufficient measure (Requirement 53).
- The FY2021 Implementation Plan's description of a data-driven process that utilizes Class Member service plan data (Requirement 54) and demographic data (Requirement 55) to inform community-based services and housing development.
- The FY2021 Implementation Plan's inclusion of key regulatory changes governing SMHRFs that will facilitate stronger Consent Decree compliance (Requirement 56).
- The FY2021 Implementation Plan's inclusion of tasks that will support the critical Consent Decree functions of evaluation (Requirement 57) and outreach (Requirement 58).
- The annual development of an Implementation Plan, in this case for FY2022 (Requirement 59).
- The FY2021 Implementation Plan's Decree enforceability (Requirement 60).

**Implementation Plan Compliance Requirements: FY2021 Compliance Assessment**
As displayed in Figure 25, the Defendants were found in compliance with 10
requirements, in partial compliance for one, and in out-of-compliance for two.

| Figure 25. Synopsis of FY2021 Compliance Assessments for Implementation Plan-Related *Williams* Consent Decree and Implementation Plan Requirements | | | | | | |
|---|---|---|---|---|---|---|
| Consent Decree Requirements (14) | In Compliance➔ | 10 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 2 |
| Implementation Plan Requirements (0) | In Compliance➔ | 0 | Partial Compliance➔ | 0 | Out-of-Compliance➔ | 0 |
| Total Requirements (14) [N/A=1][46] | In Compliance➔ | 10 | Partial Compliance➔ | 1 | Out-of-Compliance➔ | 2 |

Figure 26 contains the language of each Implementation Plan-related requirement in the
*Williams* Consent Decree and Implementation Plan, along with the Court Monitor's
compliance rating. Figure 26 also contains FY2018, FY2019, FY2020 ratings to
demonstrate whether compliance improved or worsened since these past three
compliance periods.

| Figure 26. FY2018, FY2019, FY2020, and FY2021 Compliance Assessment Ratings for Implementation Planning-Related *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 48 | Consent Decree VII(10) | The Implementation Plan shall describe methods by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain current records of these requests.<br><br>*In Compliance. The Defendants complied with this requirement, as this required content was included in the FY2021 Implementation Plan.* | FY2018: Out-of-Compliance<br>FY2019: Partial Compliance<br>FY2020: In Compliance | In Compliance |
| 49 | Consent Decree VII(10) | The Implementation Plan shall describe methods for engaging residents, including where appropriate, providing reasonable opportunities for residents to visit and observe Community-Based Settings.<br><br>*Partial Compliance. The Implementation Plan is required to include the Defendants' strategies for actively engaging Class Members, as well as the process by which Class Members can observe community-based services and housing options for which they are eligible. While they shared detailed information on outreach and engagement strategies, there was no performance measure on assisting Class Members to visit the community and observe community-based settings. If that is not explicitly included and attained in the next fiscal year, the Court Monitor will assign an out-of-compliance rating for this requirement.* | FY2018: Out-of-Compliance<br>FY2019: Partial Compliance<br>FY2020: Partial Compliance | Partial Compliance |

---

[46] One requirement reflected in this total is not applicable to this reporting period.

| | | | | |
|---|---|---|---|---|
| 50 | Consent Decree VII(11) | Defendants, with the input of the Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree.<br><br>*In Compliance. This requirement pertains to whether the Defendants developed the FY2022 Implementation Plan (due near the end of the FY2021 compliance period) to identify commitments for FY2022. They did so, as the Implementation Plan was filed on August 18, 2021. As such, they are found in compliance with these requirements.* | **FY2018: Out-of-Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 51 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* a) Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure that Defendants fulfill the requirements of the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included specific, measurable, and timebound activities to advance fulfilment of the requirements of the Decree.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 52 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* b) Describe the hiring, training and supervision of the personnel necessary to implement the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan contained several provisions on personnel and their training requirements.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 53 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* c) Describe the activities required to develop Community-Based Services and Community-Based Settings, including inter-agency agreements, requests for proposals and other actions necessary to implement the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan outlined activities to expand capacity of community-based services and housing.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 54 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* d) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality or geographic location.<br><br>*Out-of-Compliance. The FY2021 Implementation Plan made no clear link between Class Member service needs data to inform housing and services capacity development.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 55 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* e) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services and supports which, based on demographic and other data, are expected to be required within one year to meet the obligations of the Decree.<br><br>*Out-of-Compliance. The FY2021 Implementation Plan made no clear link between Class Member demographics and service needs data or efforts and activities outlined in their plan.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |

| | | | | In Compliance |
|---|---|---|---|---|
| 56 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum*: f) Identify any necessary changes to regulations that govern IMDs in order to strengthen and clarify requirements for services to persons with Mental Illness and to provide for effective oversight and enforcement of all regulations and laws.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with needed regulatory changes, including a special meeting on potential rules and regulations to support Consent Decree compliance.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Partial Compliance** | **In Compliance** |
| 57 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* g) Describe the methods by which Defendants shall ensure compliance with their obligations under Paragraph 6 *(Evaluations)* of this Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with compliance in the assessment (formerly referred to as evaluation) domain.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 58 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* h) Describe the mechanisms by which Defendants shall ensure compliance with their obligations under Paragraph 10 *(Outreach)* of this Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with compliance in the outreach domain.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 59 | Consent Decree VIII(13) | The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate. The Monitor and Plaintiffs may review and comment upon any such updates or amendments. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed updates or amendments, the matter may be submitted to the Court for resolution.<br><br>*In Compliance. This requirement pertains to whether the Defendants developed the FY2022 Implementation Plan (due near the end of the FY2021 compliance period) to identify commitments for FY2022. They did so, as the Implementation Plan was filed on August 18, 2021. As such, they are found in compliance with these requirements.* | **FY2018: Out-of-Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 60 | Consent Decree VIII(14) | The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of the Decree.<br><br>*In Compliance. The FY2022 Implementation was filed and will be enforced in accordance with the Consent Decree, with agreement from the Defendants.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |

| 61 | Consent Decree VIII(12) | Within 135 days of Approval of the Decree, Defendants shall provide the Monitor and Plaintiffs with a draft Implementation Plan. The Monitor and Plaintiffs will participate in developing and finalizing the Implementation Plan, which shall be finalized within nine (9) months following Approval of the Decree. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed Implementation Plan, the matter may be submitted to the Court for resolution. | **FY2018: N/A** | **N/A** |
| | | | **FY2019: N/A** | |
| | | | **FY2020: N/A** | |

## Section XI. Quality Assurance — Class Member Quality of Life, Safety, and Mortality

*Williams* Class Members are adults with diagnoses of serious mental illness, often co-occurring with substance use disorders, medical comorbidities, unstable housing, and poverty.  Ensuring that they are provided quality services and supports in safe environments is a fundamental responsibility of the Defendants. Use of quality assurance mechanisms and tools buttressed by a commitment to examining process and outcome data to inform decision-making and program implementation is key to successfully meeting this responsibility.

Several data sources — identified in the Defendants' semiannual reports — enable one to examine Class Member quality of life and safety. These include pre- and post-transition quality of life survey data completed by Class Members and analyzed by the Illinois Department of Mental Health (DMH), Specialized Mental Health Rehabilitation Facility (SMHRF) Reportable Performance Indicators data from the Illinois Department of Public Health (IDPH), post-transition critical incident data provided by DMH, and annual mortality data collected and analyzed by the University of Illinois in Chicago, College of Nursing (UIC-CON) under contract to DHS.

*Critical Incident Data.* Critical incidents reflect any actual or alleged events or situations that create significant risk for substantial or serious harm to the physical or mental health, safety, or wellbeing of Class Members.[47] On a monthly basis, IDPH collects — via the SMHRF Reportable Performance Indicators form — the number of specific types of critical incidents reported by SMHRFs, including suicide attempts and completions; resident deaths that occur in SMHRFs and acute care hospital visits by SMHRF residents; incidents of abuse, neglect, or maltreatment; and other critical incident types. A similar set of critical incident categories are collected by the DMH for the first 18 months following a Class Member's transition to the community.

Comparing SMHRF and post-transition critical incident data would ideally allow sound assessment of Class Members' outcomes and experiences in SMHRFs versus in the community. However, several factors render it difficult to conduct a meaningful comparison between SMHRF and post-transition (community-based) critical incident data, including:

- Post-transition critical incident data is only collected for 18 months after transition date, leaving critical incidents that occur for Class Members transitioned longer than this period unreported and thus unknown.
- The critical incident categories across both cohorts have not been independently verified to ensure that definitions and reporting procedures align between SMHRF and community categories.

---

[47] Critical Incident Reporting Policy, North Dakota Department of Human Services, found at https://www.nd.gov/dhs/info/pubs/mfp/docs/critical-incidents-reporting-policy.pdf.

- The reported critical incidents across both cohorts represent reports of alleged incidents, not necessarily limited only to substantiated incidents.
- Some incidents — such as assaults — may be counted within multiple categories (e.g., sexual assault, abuse, assault, and criminal conduct), potentially giving a misleading picture regarding the true extent of critical incidents.

| Figure 27. Comparative Analysis, FY2021 Critical Incidents in SMHRF vs. Post-Transition to Community | | |
|---|---|---|
| Incident Type/Category | Within SMHRFs | Post-Transition to Community |
| Sexual Assault | 33 | 0 |
| Abuse/Neglect/Maltreatment | 48 | 4 |
| Death | 15 | 6 |
| Assault | 20 | 11 |
| Missing Person | 159 | 4 |
| Criminal Conduct | 32 | 4 |
| Fires | 0 | 1 |

Notwithstanding these methodological issues, the raw count of these critical incidents occurring in FY2021—provided in Figure 27 — suggests that critical incidents are much less frequent among the Class Members transitioned to the community cohort than the SMHRF resident cohort. This includes significantly higher reported instances of sexual assaults; abuse, neglect, and maltreatment; deaths; assaults; missing persons; and criminal conduct in SMHRFs versus community.

In FY2021, the most common categories of reportable incidents in SMHRFs were instances of a missing person (for less than 24 hours), allegations of abuse/neglect/maltreatment, and allegations of sexual assault. Two (of the 23) SMHRFs constituted 35 percent of all first-half FY2021 critical incidents. Four SMHRFs constituted 62 percent of all second-half FY2021 critical incidents. The most common categories of incidents in the community are emergency department visits, psychiatric hospital admissions, and medical hospital admissions. For the second half of the fiscal year, an average of ten percent of Class Members in the community had a critical incident, with more than half experiencing the incident within one to three months or seven to ten months after transition to the community.

*Mortality Review Data.* Six deaths occurred among Class Members in the community in FY2021. Two such deaths were attributed to accidental overdose, one was attributed to respiratory disease, one was attributed to cardiovascular disease, one was attributed to cancer, and one is pending. Three decedents were male and three were female.

*Quality of Life Data.* DMH administers quality of life surveys to Class Members at two points: SMHRF move-out and one-year after transition. Class Members are asked to self-report their satisfaction across seven key domains: living situation, choice and control of living arrangements, access to personal care, treatment with respect/dignity from caregivers, community integration and inclusion, overall life satisfaction, and mood and health status. In previous years, quality of life data determined that — across most domains — Class Members reported an enhanced quality of life after transitioning into the community from SMHRFs.

FY2021 data is limited to the 191 respondents to the survey from the first half of the fiscal year – 105 participating in the baseline survey and 86 participating in the post-transition annual survey. Figure 28 compares responses to select questions between the two cohorts -- those who took their baseline survey from January to June 2021 (n=60) and those who took their one-year survey from January to June 2021 (n=35). While this is small sample size and does not reflect the same group of people, it does demonstrate that, generally, affirmative responses to the quality-of-life questions are more prevalent for those in the community than those who live in SMHRFs.

| Figure 28. Baseline and Post-Transition Survey Data Highlights | | |
|---|---|---|
| Survey Domain | Baseline | Post-Transition |
| Do you like where you live? | 48% | 80% |
| Do you feel safe living here? | 78% | 88% |
| Can you be by yourself when you want to? | 52% | 100% |
| Can you choose the foods you eat? | 25% | 76% |
| Do you ever go without a bath or shower when you need one? | 22% | 0% |
| Can you see your friends and family when you want to see them? | 52% | 80% |
| Do you go out and do fun things in your community? | 30% | 88% |
| During the past week, have you been happy with the way you live your life? | 55% | 72% |
| During the last week have you felt sad or blue? | 42% | 28% |

## Section XII. Recommendations for FY2022 and FY2023

Based on her review and assessment of Defendants' performance with Consent Decree requirements in FY2021, the Court Monitor recommends the following priority actions (Figure 28) for the remainder of FY2022 and FY2023. Many of these recommendations have been provided in previous years' annual and special reports.

| Figure 28. Priority Recommendations for FY2022 and FY2023 | |
|---|---|
| 1) Fully implement PASRR with special focus on quality. | Now ten years past the Consent Decree-mandated due date, it appears that Preadmission Screening and Resident Review (PASRR) redesign may occur in FY2022. This redesign process will include a Specialized Mental Health Rehabilitation Facility (SMHRF) pre-screening process. The Defendants must ensure these programs are implemented effectively, but also develop quality assurance mechanisms to ensure that PASRR does not slip back into its historical defects (e.g., inflating physical diagnoses to justify long-term care placement, assessor paternalism/subjectivity). PASRR must also be leveraged as a key data source to identify needed services/supports not readily available in the community. |
| 2) Scale the Front Door Diversion Program (FDDP) statewide. | Momentum is growing in the FDDP, with strong initial FY2022 performance. The Defendants should continue to build on the program by enhancing its housing options (prioritizing permanent supportive housing), continuing its efforts to co-locate staff, and building stronger relationships between FDDP staff and hospital discharge planners. It should also become truly statewide in scope and impact. |
| 3) Address and improve upon severe issues regarding the timeliness of pre-transition processes (e.g., outreach, assessment, transition). | When Class Members consent to outreach, assessment, and transition processes, they should be able to move through these phases promptly. However, data provided herein shows that only eight percent of Class Members received prompt assessments (within 14 days of positive outreach outcome) and only 14 percent received prompt initial service plans (within 45 days of assessment). While the organizing principle for the Comprehensive Program was to reduce handoffs among providers and improve process efficiency, it has now become standard that Class Members wait for months (and even years) to move through the rudimentary process steps, which likely erodes their confidence and trust in the program. The State with its partner UIC-CON should identify and address such issues. |
| 4) Create mechanisms to ensure that Class Members who are easier to transition are not prioritized over Class Members with higher acuity/needs. | While it is positive that the State is bringing on new partners – such as Medicaid Managed Care Organizations (MCOs) to effectuate Consent Decree processes and transitions, it is critical that there are quality assurance processes in place to ensure that all Class Members have equitable access to services and receive care that meets their needs. As such, the Court Monitor recommends that the Defendants propose a methodology to measure and ensure that all Class Members, regardless of whether they are served via a prime agency in the Comprehensive Program, an MCO, and/or any other state-funded program receive parity in access and availability of Consent Decree required rights and services. |
| 5) Ensure that those who have waited longest to transition receive priority in the transition pipeline. | At the end of FY2021, there were 554 Class Members recommended to transition in calendar year 2020 stuck in the pipeline. Like the previous recommendation, there is a concern that these Class Members will become lost in the pipeline or continue to experience protracted delays if they ever do transition. The Defendants should design and implement a concerted effort to transition these Class Members. |

| | | |
|---|---|---|
| 6) | Implement a housing first[48]-oriented program, including a landlord engagement program, to facilitate access to high-quality permanent supportive housing (PSH) rental units that match Class Member location preferences. | It is not uncommon for Class Members to reject units on Statewide Referral Network/811 listings because of the units' location or quality. As such, the Defendants should implement a concerted effort to recruit landlords in areas that are highly desired by Class Members (using data that exists on this) and implement national best practices from housing first organizations. Further, the Defendants should deploy a housing first approach, prioritizing prompt access to PSH, wrapping supports around each individual, and qualifying individuals for housing without any preconditions. The approach should be offered to diverted individuals and transitioned Class Members. |
| 7) | Continue to leverage the State's Medicaid MCOs as a key partner in the *Williams* Consent Decree. | The vast majority of *Williams* Class Members, whether residing in SMHRFs or the community, are enrollees under a Medicaid MCO. The Department of Healthcare and Family Services (HFS) has made significant strides in FY2021 to engage the Medicaid MCOs in the Consent Decrees, there were no MCO transitions for *Williams* Class Members. The Court Monitor advises HFS to dedicate concerted attention to the design of requirements, incentives, accountability, and performance measures so that the Medicaid MCO potential to achieve and support transitions consistent with *Olmstead* is fully realized in both *Williams* and *Colbert* Consent Decrees. Relatedly, MCOs must be required to timely review and approve (when warranted) the services needed by Class Members enrolled in their plans for transition and community tenure. |
| 8) | Identify SMHRF regulations that could improve SMHRF quality of care and cooperation with the Consent Decree. | The Illinois Department of Public Health (IDPH) — the regulatory oversight agency for SMHRFs — contends that they are limited in their statutory and regulatory authority to influence SMHRF operations and clinical quality. The Consent Decree requires that the Implementation Plan include regulatory changes necessary to achieve the goals of the Consent Decree, but to date, very little regulatory action has been taken to improve SMHRF clinical quality, mandate their participation in *Olmstead* and other rebalancing efforts, or design a clear admission criterion, all of which undermine Consent Decree compliance. For the past several years, the Court Monitor has recommended expanded rules in key areas such as critical incident reporting, active treatment, and substance use disorder/co-occurring services. |
| 9) | Conduct deeper analysis of critical incidents and COVID-19 data in SMHRFs and identify prevention and remediation strategies. | Critical incident data within SMHRFs remains a cause for alarm. The Defendants should conduct a more robust analysis of this data to determine trends, root causes, and potential strategies to prevent or address identified issues. This analysis should include a review of SMHRF policies and operational procedures that might contribute to critical incidents and a regulatory framework that can address SMHRFs that do not address issues. Further, the Defendants should improve tracking of COVID-19 infections and mortalities within facilities. |
| 10) | Select and use new SOAR contractor/ vendor to enroll Class Members into SSI and SSDI. | The Consent Decree-associated SSI/SSDI Outreach, Access, and Recovery (SOAR) program – designed to expedite access to SSI and SSDI – performs well-below the national average on every metric, including submitted and approved SSI/SSDI applications and appeals. The State should consider new models for improving outcomes, such as centralizing the program within one or more different/new contracted entities – those with specialized legal expertise. |

---

[48] According to the National Alliance to End Homelessness, housing first is defined as a homeless assistance approach that prioritizes providing permanent housing to people experiencing homelessness, thus ending their homelessness and serving as a platform from which they can pursue personal goals and improve their quality of life.

## Conclusion

This report is submitted to the Court in fulfillment of the Court Monitor's duty to assess compliance with the *Williams* Consent Decree and Implementation Plan requirements at least annually; it represents the effort to conduct a fair and impartial assessment. The compliance assessment period covered is fiscal year 2021 (FY2021). Based on FY2021 performance data and outcomes on the 77 applicable requirements[49] in the Consent Decree and FY2021 Implementation Plan combined, the Defendants were in compliance with 38% of requirements, in partial compliance with 21%, and out-of-compliance with 41%.

While the Pritzker Administration revised Consent Decree operations and processes intended to transition Class Members who want to and are able avoid or exit SMHRFs for community living (e.g., Comprehensive Class Member Transition Program, Front Door Diversion Program), they also inherited a multiyear divestment in community-based mental health services including a dismantled crisis stabilization system, an under-developed and poor performing diversion program, an affordable housing shortage, a subjective long-term care admissions process, and many other systems, policy, and practice issues that span the Defendant agencies. Further, the COVID-19 crisis exacerbated these pre-existing systems issues (e.g., behavioral health provider staffing shortages), further destabilizing the mental health and overall healthcare systems and causing a virtual halt to essential Consent Decree operations including outreach, assessments, and transitions.

Despite the Administration's efforts, serious programmatic issues remain. Some Class Members recommended to transition experience extreme delays. Class Members without income often do not receive ample or effective support to enroll in financial benefits that can help them afford to live in the community, leaving them inappropriately institutionalized in Specialized Mental Health Rehabilitation Facilities (SMHRFs). Critical incidents in SMHRFs jeopardize the health and safety of institutionalized Class Members. However, the Defendants – particularly in FY2022 – have developed plans that, along with the recommendations identified in this report – if fully implemented – could address many of the long-standing issues with Illinois's behavioral health and disability system of care. These include the full implementation of the redesigned Preadmission Screening and Resident Review process, deeper Medicaid managed care organization involvement and accountability for Class Member transitions, and remedies to lack of timeliness in the key pre-transition processes, including assessment, housing location and service planning.

Class Members must have their rights to live in the least restrictive setting appropriate for their needs, including community-based care, respected. When achieved, this will prevent the inappropriate admission of adults with serious mental illness into SMHRFs and other institutions and transition those who are currently institutionalized, as appropriate, into the communities of their choice. When accomplished, this will forge a new path for the State of Illinois and the *Williams* Class. The Court Monitor remains eager to support this path forward.

---

[49] There were 113 total requirements but 36 were not applicable in FY2021.

Compliance Assessment Ratings for All *Williams* Consent Decree and FY2021 Implementation Plan Requirements

| FY2018, FY2019, FY2020 and FY2021 Compliance Assessment Ratings for ALL *Williams* Consent Decree Requirements | | | | |
|---|---|---|---|---|
| **Diversion-Related Requirements** | | | | |
| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY2021 Performance | Prior Years' Compliance Ratings | FY2021 Compliance Rating |
| 1 | *Williams* Consent Decree VI(8)(B) | Within one (1) year of finalization of the Implementation Plan [2012][50], no individual with Mental Illness shall be admitted to an IMD without a prescreening having first been conducted through the PASRR Process and an initial Service Plan completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community- Based setting; identifies Community-Based Services that would facilitate that placement; and ensures that approved admissions to IMDs are only for those IMDs that can provide treatment consistent with the individual's initial Service Plan and consistent with the goal of transition to a Community-Based Setting.<br><br>*Out-of-Compliance. While several key process steps (e.g., release of Request for Proposals [RFP], selection of vendor) were accomplished in FY2021, the Defendants were delayed and did not achieve implementation of the Consent Decree-required PASRR redesign.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 2 | *Williams* Consent Decree VI(8)(B) | After the first five (5) years following the finalization of the Implementation Plan [2016[51]], no individual with Mental Illness whose Service Plan provides for placement in Community-Based settings shall be housed or offered placement in an IMD at public expense unless, after being fully informed, he or she declines the opportunity to receive services in a Community-Based Setting.<br><br>*Out-of-Compliance. While the Defendants made significant efforts to redesign PASRR and strengthen their FDDP, they cannot demonstrate that all individuals admitted to SMHRFs received a pre-admission service plan. They also cannot demonstrate that SMHRF admissions were limited to those whose service plans dictated SMHRF placement or who declined community-based services.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |

---

[50] Date added.
[51] Date added.

| | | | | |
|---|---|---|---|---|
| D-1 | FY2021 Implementation Plan | Redesign of PASRR system to meet Federal requirements and evidence-based practice standards, with targeted implementation date of 10/4/21.<br><br>*Out-of-Compliance. While Defendants completed several steps toward PASRR redesign (e.g., RFP published on 12/17/20, bids received by 2/17/21, bids and vendor presentations reviewed by 6/30/21), process delays and a bidder protest resulted in delayed implementation. As of the submission of this report, a vendor contract has been fully executed but full implementation has not yet been accomplished.* | **N/A** | **Out-of-Compliance** |
| D-2 | FY2021 Implementation Plan | Modification of IDHS-DMH PASRR instructions by September 1, 2020, to mandate offering FDDP referrals and services for all individuals clinically eligible for SMHRF who could be served in a Community-Based Setting.<br><br>*Out-of-Compliance. Per this requirement, the Defendants were required to offer diversion services to 85 percent of all those admitted into SMHRFs. Due to data collection issues that impacted the second half of the fiscal year, they can only demonstrate that 354 of 864 admitted Class Members (41%) were offered participation in the FDDP.* | **N/A** | **Out-of-Compliance** |
| D-3 | FY2021 Implementation Plan | Complete co-location of FDDP staff in a minimum of thirteen (13) high-volume hospitals as access barriers are resolved and consistent with safety requirements.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. Due to COVID-19 restrictions, the hospitals did not permit external providers to co-locate their services.* | **N/A** | **N/A** |
| D-4 | FY2021 Implementation Plan | Post-COVID, explore and report on the feasibility of implementing program/pilot allowing FDDP staff to continue to work with individuals up to 60 days post-SMHRF admission. Report to be completed by August 1, 2020.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants did refer 59 Class Members to a small pilot rapid reintegration program, but only reintegrated (i.e., moved to the community) five of them.* | **N/A** | **N/A** |

| | | **Outreach-Related Requirements** | | |
|---|---|---|---|---|
| 3 | Consent Decree VII(10) | Defendants shall ensure that Class Members have the opportunity to receive complete and accurate information regarding their rights to live in Community-Based Settings and/or receive Community-Based Services, and the available options and opportunities for doing so.<br><br>***Partial Compliance.*** *Although only 45 percent of Class Members received the "menu of services" in the second half of FY2021, the Defendants provided training to Comprehensive Program staff on available supports and services along with other opportunities to troubleshoot outreach-related issues.* | FY2018: N/A<br>FY2019: N/A<br><br>**FY2020: In Compliance** | **Partial Compliance** |
| 4 | Consent Decree VI(6)(C) | Defendants shall ensure, as provided in the Implementation Plan, that all Class Members shall be informed about Community-Based Settings, including Permanent Supportive Housing, and Community-Based Services available to assist individuals in these settings, and the financial support Class Members may receive in these settings.<br><br>***Out-of-Compliance.*** *As indicated above, the Defendants' data demonstrates that Class Members received less than one outreach, on average, per year. This is significant improvement from previous years, but still places the Defendants far short of their internal policy of quarterly outreach.*[52] | **FY2018: Partial Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **Out-of-Compliance** |
| 5 | Consent Decree VI(9)(C) | Class Members shall not be subjected to any form of retaliation in response to any option selected nor shall they be pressured to refrain from exploring appropriate alternatives to IMDs.<br><br>***Out-of-Compliance.*** *The Defendants were unable to report on their actions and the outcomes related to SMHRF interference. Further, they cannot demonstrate that non-retaliation posters were displayed in SMHRFs.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |
| 6 | Consent Decree VII(10) | All costs for outreach shall be borne by Defendants.<br><br>***In Compliance.*** *The Defendants covered all outreach-related costs in FY2021, as required by the Decree.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| O-1 | FY2021 Implementation Plan | Initial Outreach between 60-70 days of admission.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the data referenced above demonstrates that only eight percent of those eligible for initial outreach received it on a timely basis.* | **N/A** | **N/A** |

---

[52] In their written response to the final draft of this report, the Defendants expressed disagreement with this out-of-compliance finding. They asserted that the quarterly outreach standard is not required per the Decree and that annual outreach (in addition to other formal and informal opportunities for Class Members to receive information about community-based services) meets the "appropriate frequency" requirement in the Decree. However, the Court Monitor maintains her rating of out-of-compliance given that the Defendants' own policy requires quarterly outreach.

| | | | | |
|---|---|---|---|---|
| O-2 | FY2021 Implementation Plan | Re-attempt Outreach every three months/quarterly.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| O-3 | FY2021 Implementation Plan | Create, by July 30, 2020, and have available a "menu" of services, supports, and housing options for Class Members.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants did create the menu of services and supplied it to 45 percent of Class Members receiving outreach in the second half of FY2021.* | **N/A** | **N/A** |
| O-4 | FY2021 Implementation Plan | Creation of comprehensive training module for Outreach activities, including service array and motivational interviewing techniques.<br><br>***Partial Compliance.*** *Per this requirement, the Defendants were obligated to ensure that 100 percent of hired outreach staff complete required trainings. Nine of 15 staff – or 60 percent - completed the required trainings.* | **N/A** | **Partial Compliance** |
| O-5 | FY2021 Implementation Plan | Increased use of Peer Outreach (Ambassadors and/or peers through Prime Agencies).<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021. However, the Defendants supplied data to demonstrate 1,977 (duplicated count) outreaches by peer outreach workers.* | **N/A** | **N/A** |
| O-6 | FY2021 Implementation Plan | Send joint letter by September 1, 2020 to SMHRF administrators advising of their obligation to provide unimpeded access to Comprehensive Program agencies to Class Members and relevant information, including admission/census information. Follow up will be conducted as necessary.<br><br>***Partial Compliance.*** *This multi-part requirement is measured by the number of SMHRFs that provided required monthly census information to identify Class Members for outreach, number of Class Members who did not receive contact due to SMHRF interference, and the number of Class Member records that could not be obtained due to SMHRF interference. Performance data shows that SMHRFs submitted their monthly reports 67 percent of the time. There were 23 instances of SMHRF interference resulting in delayed or prevented access to Class Members and/or their records.* | **N/A** | **Partial Compliance** |
| O-7 | FY2021 Implementation Plan | Enhanced non-retaliation language in Informed Consent form.<br><br>***Partial Compliance.*** *This requirement is measured by the percentage of Class Members who sign the revised informed consent form. Due to Prime data submission issues impacting the second half of the fiscal year, the Defendants can demonstrate that 967 of 1,260 (or 77 percent) of Class Members signed the enhanced informed consent form.* | **N/A** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| O-8 | FY2021 Implementation Plan | Poster for display in SMHRFs.<br><br>*Out-of-Compliance. This requirement is measured by the number of SMHRFs who display a poster on the rights and recourse afforded to Class Members who experience retaliation from SMHRF staff for their participation in Consent Decree programming. The posters were sent to all 23 facilities to display in the second half of the fiscal year, but the Defendants could not indicate that all (or any) were actually displayed.* | **N/A** | **Out-of-Compliance** |
| O-9 | FY2021 Implementation Plan | Display of poster included as compliance measure.<br><br>*Out-of-Compliance. The posters were sent to all 23 facilities to display in the second half of the fiscal year, but the Defendants did not provide data on the number of SMHRFs that received non-compliance findings based on their failure to display the posters.* | **N/A** | **Out-of-Compliance** |
| O-10 | FY2021 Implementation Plan | Overall Outreach data will be reported quarterly, identifying all Outreach attempts and outcomes; activity is also updated routinely as forms are submitted so that activity can be monitored monthly through the Data Dashboard. Data will be reported separately for New Class Members and Existing Class Members.<br><br>*Partial Compliance. This requirement is measured by the alignment of University of Illinois Chicago, College of Nursing (UIC-CON) and prime agency-reported outreach attempts and outcomes. The first half of the fiscal year shows that 99.8 percent of all outreach attempts and outcomes match UIC-CON's records, but the second half of the year is discrepant (1,233 from UIC-CON vs. 3,202 provider-reported), which could be partially attributed to an issue with duplicated and unduplicated counts.* | **N/A** | **Partial Compliance** |
| **Assessment-Related Requirements** | | | | |
| 7 | *Williams Consent Decree VI(9)(C)* | Qualified Professionals shall inform Class Members of their options pursuant to subparagraphs 6(a), 6(d), and 7(b) of this Decree.<br><br>*Not Applicable. This requirement is a duplication of Requirement 11 so it is designated as not applicable.* | **Duplicate Requirement, N/A** | **N/A** |
| 8 | *Williams Consent Decree VI(6)(A)* | Within two (2) years of the finalization of the Implementation Plan described below, every Class Member will receive an independent, professionally appropriate and person-centered Evaluation [Assessment] of his or her preferences, strengths and needs in order to determine the Community-Based Services required for him or her to live in PSH or another appropriate Community-Based Setting.<br><br>*Not Applicable. This requirement is a duplication Requirement 12, so it is designated as not applicable.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 9 | *Williams Consent Decree VII(10)* | In addition to providing this information, Defendants shall ensure that the Qualified Professionals conducting the Evaluations engage residents who express concerns about leaving the IMD with appropriate frequency.<br><br>*Out-of-Compliance. The Consent Decree requires that assessment staff should frequently engage Class Members who have concerns about transitioning into the community. However, the Defendants largely use outreach workers — not assessment staff — for this function. Given that Class Members received only one out of the four required outreach per year, on average during FY2021, appropriate frequency has not been accomplished.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Partial Compliance** | **Out-of-Compliance** |

| | | | | |
|---|---|---|---|---|
| 10 | *Williams Consent Decree VI(6)(A)* | Any Class Member has the right to decline to take part in such Evaluation. Any Class Member who has declined to be evaluated has the right to receive an Evaluation any time thereafter on request.<br><br>*Out-of-Compliance. The Defendants did not provide data on Class Members who previously declined and then requested assessments thereafter. General data on Class Member-initiated assessment requests, however, shows that only nine percent of these Class Members received a timely assessment (within 14 days), and 41 percent were not documented.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Partial Compliance** | **Out-of-Compliance** |
| 11 | *Williams Consent Decree VI(6)(B)* | Defendants shall ensure that Evaluations are conducted by Qualified Professionals as defined in this Decree.<br><br>**Partial Compliance.** *Eighty-seven (87) percent of assessments were administered by qualified professionals.* | **FY2018: In Compliance**<br><br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **Partial Compliance** |
| 12 | *Williams Consent Decree VI(6)(D)* | After the second year following finalization of the Implementation Plan, the Evaluations described in Subsection 6(a) shall be conducted annually.<br><br>**Out-of-Compliance.** *The Defendants did not provide annual assessment data due to data reporting issues.* | **FY2018: Partial Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: In Compliance** | **Out-of-Compliance** |
| 13 | *Williams Consent Decree VI(6)(D)* | As part of each Class Member's annual Evaluation, the reasons for any Class Member's opposition to moving out of an IMD to a Community-Based Setting will be fully explored and appropriately addressed as described in Section VII.<br><br>**Out-of-Compliance.** *While the Defendants provided training to Assessors on motivational interviewing and created a policy on exploring and documenting reasons for declines, they did not provide data to demonstrate that Class Member concerns were addressed per the policy.[53]* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 14 | *Williams Consent Decree VI(6)(D)* | Any Class Member who has received an Evaluation but has declined to move to a Community-Based Setting may request to be reassessed for transition to a Community-Based Setting any time thereafter.<br><br>**Out-of-Compliance.** *The Defendants did not provide data on Class Members who previously declined to move and then requested assessments thereafter. General data on Class Member-initiated assessment requests, however, shows that only nine percent of these Class Members received a timely assessment (within 14 days), and 41 percent were not documented.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |

[53] In their review of the final draft of this report, the Defendants expressed their disagreement with this compliance finding.

| | | | | |
|---|---|---|---|---|
| A-1 | FY2021 Implementation Plan | All Assessments must be conducted by staff that meet the qualifications mandated by the Comprehensive Program requirements.<br><br>***Not Applicable.*** *This requirement is measured by the number/percentage of assessments conducted by staff who meet program qualifications. While it duplicates Requirement 11 and is thus not applicable, eighty-seven (87) percent of assessments were administered by qualified professionals. This requirement duplicates Requirement 11 and is considered not applicable.* | **N/A** | **N/A, Duplicate Requirement** |
| A-2 | FY2021 Implementation Plan | Assessment staff receive training and education on engaging/educating Class Members and addressing their concerns.<br><br>***Out-of-Compliance.*** *This two-part requirement is measured by the number/percentage of assessment staff who completed required trainings within 60 days and the proportion of assessments completed by those staff who satisfied training requirements. Fifteen (15) of 19 (79 percent) of assessment staff were trained within 60 days and 440 of 1,065 assessments (41 percent) were conducted by appropriately trained assessment staff.* | **N/A** | **Out-of-Compliance** |
| A-3 | FY2021 Implementation Plan | Conduct initial Assessments within 14 days of referral from Outreach.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| A-4 | FY2021 Implementation Plan | Timely annual Assessments.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| A-5 | FY2021 Implementation Plan | Quarterly assessments as requested within 14 days of request.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| A-6 | FY2021 Implementation Plan | Submission of all Assessment outcomes and full Assessments to UIC-CON/DMH within 7 days.<br><br>***Out-of-Compliance.*** *This requirement is measured by the percentage of completed assessments submitted by the prime agencies to UIC-CON within 7 days. Only 325 of 1,161 assessments (28 percent) were submitted to UIC-CON on time.* | **N/A** | **Out-of-Compliance** |
| A-7 | FY2021 Implementation Plan | UIC-CON will review one recommended and one not recommended Assessment monthly from each Assessor and require revisions for those that do not meet Comprehensive Program standards.<br><br>***Partial Compliance.*** *This two-part requirement is measured by the percentage of submitted and corrected assessments (one recommended and one not-recommended assessment from each assessor) that meet program standards. Eighty-eight (88) percent of submitted assessments met program standards. For non-compliant assessments, however, the Defendants did not track whether they met standards after resubmission.* | **N/A** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| A-8 | FY2021 Implementation Plan | UIC-CON to review all not-recommended Assessments; may be re-submitted or overturned.<br><br>*Out-of-Compliance. This two-part requirement is measured by the percentage of not-recommended assessments submitted to UIC-CON for review, and the percentage of assessments wherein UIC-CON overturned the not recommended finding of the prime agency that resulted in transition. The Defendants did not submit data on the first part of the requirement and were only able to demonstrate that five of 220 overturned assessments (2 percent) proceeded to transition.* | **N/A** | **Out-of-Compliance** |
| | | **Service-Plan Related Requirements** | | |
| 15 | *Williams* Consent Decree VI(7)(C) | The Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and his or her legal representative. The Qualified Professional also shall consult with other appropriate people of the Class Member's choosing.<br><br>*Out-of-Compliance. The Defendants did not provide data on whether service plans were completed by qualified professionals.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |
| 16 | *Williams* Consent Decree VI(7)(D) | Each Service Plan shall focus on the Class Member's personal vision, preferences, strengths and needs in home, community and work environments and shall reflect the value of supporting the individual with relationships, productive work, participation in community life, and personal decision-making.<br><br>*Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |
| 17 | *Williams* Consent Decree VI(7)(A) | Based on the results of the Evaluations described above, Defendants shall promptly develop Service Plans specific to each Class Member who is assessed as appropriate for transition to a Community-Based Setting.<br><br>*Out-of-Compliance. Only 14 percent of initial service plans and 41 percent of transition service plans were completed per Comprehensive Program timeliness standards.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |
| 18 | *Williams* Consent Decree VI(7)(F) | The Service Plan shall be completed within sufficient time to provide appropriate and sufficient transitions for Class Members in accordance with the benchmarks set forth in the Decree.<br><br>*Out-of-Compliance. Only 41 percent of transition service plans were completed per Comprehensive Program timeliness standards.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** |

| 19 | *Williams* Consent Decree VI(7)(B) | For each Class Member who does not oppose moving to Community-Based Setting, the Service Plan shall, at a minimum, describe the Community-Based Services the Class Member requires in a Community-Based Setting, and a timetable for completing the transition.<br><br>*Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
|----|-----|-----|-----|-----|
| 20 | *Williams* Consent Decree VI(9)(A) | Those Class Members not transitioning from IMDs to Permanent Supportive Housing will have ongoing reassessments with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH.<br><br>*Out-of-Compliance. The Defendants did not provide data or any other evidence relative to this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 21 | *Williams* Consent Decree VI(7)(A) | Each Service Plan shall be periodically updated to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate services where appropriate to assist in acquisition of basic instrumental activities of daily living skills and illness self-management. Acquisition of such skills shall not be a prerequisite for transitioning out of the IMD.<br><br>*Out-of-Compliance. For most Class Members eligible for service plan updates, the Defendants have no record of such updates having been completed, including 59 percent of those not recommended to transition who were due for a service plan update and 82 percent of those recommended to transition who were due to a service plan update.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |
| 22 | *Williams* Consent Decree VI(7)(B) | If there has been a determination that a Class Member is not currently appropriate for PSH, the Service Plan shall specify what services the Class Member needs that could not be provided in PSH and shall describe the Community- Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate.<br><br>*Out-of-Compliance. Only 36 percent of service plans met quality standards that align with this requirement.* | **FY2018: Partial Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance**<br>✕ |

| | | | | |
|---|---|---|---|---|
| 23 | *Williams Consent Decree VI(7)(E)* | The Service Plan shall not be limited by the current availability of Community-Based Services and Settings; provided, however, that nothing in this subparagraph obligates Defendants to provide any type of Community-Based Service beyond the types of Community-Based Services included in the State Plan and Rule 132.<br><br>*Partial Compliance. Per the Defendants, the service plan template used with Class Members is very broad and does not limit Class Members to specific services and settings. Defendants also report that they have granted exceptions so that Primes can provide services not including in the State Plan or Rule 132. However, given that the Defendants have not provided data from service plans to indicate which services are not available in adequate quantity and type – and how those limitations impact service access and availability for Class Members -- the Court Monitor cannot find the Defendants in full compliance.[54]* | **FY2018: Partial Compliance**<br><br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Partial Compliance** |
| SP-1 | FY2021 Implementation Plan | Service Plans must be completed within 45 days of the completion of the Assessment.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-2 | FY2021 Implementation Plan | Service Plans must be updated every 180 days at a minimum.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-3 | FY2021 Implementation Plan | Transition Service Plans must be completed 14 days prior to Transition.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-4 | FY2021 Implementation Plan | Service Plans must be person-centered, include input from others, include services, supports and goals.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-5 | FY2021 Implementation Plan | SOAR services must be provided to assist Class Members with no income.<br><br>*In Compliance. This requirement is measured by the number/percentage of Class Members residing in SMHRFs on financial holds who are offered SOAR services. Eighty-four (84) percent of Class Members on financial holds were offered SOAR, with additional Class Members being offered SOAR prior to being placed on financial holds.* | **N/A** | **In Compliance** |

---

[54] In their written response to the final draft of this report, the Defendants argued that they should be found in compliance with this requirement. They contend that service plans are broad and needs-based and that they even authorize Primes to use funds to provide services outside of State Plan and Rule 132.

| | | | | |
|---|---|---|---|---|
| SP-6 | FY2021 Implementation Plan | SOAR services must be provided to assist Class Members with no income.<br><br>*Out-of-Compliance. This requirement is measured by the number/percentage of Class Members who consent to SOAR who have applications submitted within three months of consent. Only 17 of 176 Class Members – or ten percent – had applications submitted within the required timeframe.* | **N/A** | **Out-of-Compliance** |
| SP-7 | FY2021 Implementation Plan | SOAR services result in CM approval for SSI/SSDI.<br><br>*Out-of-Compliance. This two-part requirement is measured by the number/percentage of Class Members who receive funding after initial application or appeal. Five of 17 Class Members (29 percent) received funding after initial application, while none of the four Class Members who were subject to appeals received funding.* | **N/A** | **Out-of-Compliance** |
| SP-8[55] | FY2021 Implementation Plan | Encourage Class Members to explore employment opportunities; enhance employment supports.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| SP-9 | FY2021 Implementation Plan | Dual Diagnosis Capability in Addiction Treatment (DDCAT) analysis of provider services for co-occurring substance use disorders and provision of targeted training.<br><br>*Out-of-Compliance. This two-part requirement is measured by the proportion of prime agencies who complete the DDCAT assessment and received any indicated follow-up trainings based on the assessment results. Five of the 13 prime agencies received an analysis but none received the required follow-up trainings.* | **N/A** | **Out-of-Compliance** |
| SP-10 | FY2021 Implementation Plan | Hold Evidence Based Practice Conference to include best practices in services for individuals with co-occurring substance use disorders by November 1, 2020.<br><br>*In Compliance. This requirement is measured by the number of prime agencies who attended this conference; all 13 prime agencies did so. The conference was held on August 4, 2020.* | **N/A** | **In Compliance** |
| SP-11 | FY2021 Implementation Plan | Creation of comprehensive training module for Service Planning standards.<br><br>*Partial Compliance. This two-part requirement is measured by the number of newly hired service planning staff who complete required trainings and then receive certification. Thirteen of 22 (59 percent) new staff completed the required training and 10 of the 13 trained received certification.* | **N/A** | **Partial Compliance** |

[55] The FY2021 Implementation Plan had a numbering error – indicating Requirement SP6, then SP7, and then back to SP6. The error has been corrected for this report and requirements were renumbered.

| | | | | |
|---|---|---|---|---|
| SP-12 | FY2021 Implementation Plan | Require agencies to submit all Service Plans to UIC-CON for review.<br><br>*Partial Compliance. This requirement is measured by the percentage of completed service plans that are submitted to UIC-CON for review within seven days. Fifty-five (55) percent (551 of 994) of service plans met this standard. This rating was assigned because Defendants exceeded the 50 percent standard; this standard could change in future years, so the Court Monitor advises a substantial focus on increasing compliance.* | **N/A** | **Partial Compliance** |
| SP-13 | FY2021 Implementation Plan | Review sample of all types of Service Plans (initial, update, transition) to ensure they meet Comprehensive Program standards and requirements.<br><br>*Out-of-Compliance. This requirement is measured by the number of reviewed service plans (sample includes initial, update, and transition service plans) that score below an 85 percent compliance rate relative to the overall number of service plans. 74 of 116 (or 64 percent) of service plans fell below the 85 percent standard, resulting in an out-of-compliance finding.* | **N/A** | **Out-of-Compliance** |
| **Transition-Related Requirements** | | | | |
| 24 | Consent Decree VI(9)(A) | PSH will be considered the most integrated setting appropriate for Class Members except that, (1) for any Class Members (i) who have severe dementia or other severe cognitive impairments requiring such a high level of staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH, (ii) who have medical needs requiring a high level of skilled nursing care that may not safely be provided in PSH, or (iii) who present an danger to themselves or others, the evaluator will determine the most integrated setting appropriate, which may be PSH or another setting, and (2) nothing in this paragraph shall prevent Class Members who can and wish to live with family or friends or in other independent housing that is not connected with a service provider from doing so.<br><br>*Partial Compliance. The Defendants are unable to demonstrate that non-PSH referrals meet these strict criteria. However, reported data from FY2021 shows that most Class Members (76 percent) were moved into PSH versus other congregate residential settings.* | **FY2018: Partial Compliance**<br><br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **Partial Compliance** |
| 25 | Consent Decree VI(9)(B) | Class Members who move to a Community-Based Setting will have access to all appropriate Community-Based Services, including but not limited to reasonable measures to ensure that their housing remains available in the event that they are temporarily placed in a hospital or other treatment facility.<br><br>*In Compliance. Seventy-five (75) Class Members received assistance to maintain housing during temporary placement during FY2021.*[56] | **FY2018: Partial Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |

---

[56] In their review of the final draft of this report, Class Counsel indicated that compliance with this requirement should extend beyond maintaining Class Member housing (and include ensuring access to "all appropriate Community-Based Services." Given that community-based services may be suspended during a person's tenure in a hospital or institutional setting, for compliance assessment, the Court Monitor has historically focused on the Defendants' efforts to ensure housing retention for these Class Members. The Court Monitor will explore with the Parties whether a more expansive view of this mandate should be considered.

| | | | | |
|---|---|---|---|---|
| 26 | Consent Decree VIII(15) | In the event that any IMD seeks to discharge any Class Member before appropriate housing is available, including but not limited to circumstances in which an IMD decides to close, Defendants will ensure that those individuals are not left without appropriate housing options based on their preferences, strengths, and needs.<br><br>*Out-of-Compliance. The Defendants did not provide data on the provision of services for unexpected discharges.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 27 | Consent Decree VI(8)(G) | For purposes of this Decree, PSH includes scattered-site housing as a well as apartments clustered in a single building, but no more than 25% of the units in one building with more than 4 units may be used to serve PSH clients known to have mental illness. For buildings with 2 to 4 units, no more than 50% of the units may be used to serve PSH clients known to have mental illness. However, during first 5 years after finalization of the IP, up to 75 class members may be placed in buildings where more than 25% of the units serve PSH clients known to have MI if those buildings were used to serve PSH clients prior to March 1, 2010. After first 5 years following the finalization of the IP, all class members served in PSH shall be offered the opportunity to reside in buildings that comply with 25% or 50% units limit set forth above in this subparagraph.<br><br>*In Compliance. Data demonstrates that more than 95 percent of Class Members who received bridge subsidies were transitioned to housing that comply with disability segregation rules.* | **FY2018: Out-of-Compliance**<br><br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 28 | Consent Decree VI(8)(H) | After the end of the fifth year following finalization of the Implementation Plan, Class Members who are assessed as appropriate for living in a Community-Based Setting, who do not oppose transition to a Community-Based Setting and whose Service Plans provide for placement in Community-Based Settings shall be offered the opportunity to move to those settings and shall receive appropriate services consistent with the Service Plan within one hundred and twenty (120) days of the date of the Service Plan.<br><br>*Out-of-Compliance. The Defendants produced data that shows that 59 percent of Class Members who signed leases were transitioned within 120 days of their initial service plans. However, this data does not include the 42 Class Members who transitioned without leases; when the data point is adjusted, only 44 percent of Class Members transitioned within 120 days. Further, this data does not include a number of Class Members who received initial service plans and were not transitioned.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✕ |
| 29 | Consent Decree X(21) | Within sixty (60) days of Approval of the Decree, Defendants shall offer each of the Named Plaintiffs the opportunity to receive appropriate services in the most integrated setting appropriate to his or her needs and wishes, including PSH. Provision of services to the Named Plaintiffs pursuant to this paragraph shall not be used to determine any other individual's eligibility for services under the terms of the Decree.<br><br>*Not Applicable. This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |

| 30 | Consent Decree VI(8)(C) | By the end of the first year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 256 Class Members who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 256 PSH units for the benefit of Class Members.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
|---|---|---|---|---|
| 31 | Consent Decree VI(8)(D) | By the end of the second year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement in a Community-Based Setting to a minimum of 640 Class Members (including the 256 referenced in subparagraph 8c above) who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed 640 PSH units for the benefit of Class Members.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 32 | Consent Decree VI(8)(E) | By the end of the third year after the finalization of the Implementation Plan, Defendants will have (1) offered placement to at least forty percent (40%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Settings; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the second year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.<br><br>**Not Applicable.** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 33 | Consent Decree VI(8)(F) | By the end of the fourth year after the finalization of the Implementation Plan, Defendants will have (1) offered placement to at least seventy percent (70%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other | **FY2018: N/A**<br>**FY2019: N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| | | Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the third year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since finalization of the Implementation Plan.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2020: N/A** | |
| 34 | Consent Decree VI(8)(A) | Within five (5) years of the finalization of the Implementation Plan, all Class Members who have been assessed as appropriate for living in a Community-Based Setting will be offered the opportunity to move to a Community-Based Setting.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 35 | Consent Decree VI(8)(G) | By the end of the fifth year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to one hundred percent (100%) of all individuals who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the fourth year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since the finalization of the Implementation Plan.<br><br>***Not Applicable.*** *This requirement is not applicable to this reporting period.* | **FY2018: N/A**<br><br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| T-1 | FY2021 Implementation Plan | Transition Class Members based on monthly target of 33 Class Members per month post-COVID.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| T-2 | FY2021 Implementation Plan | Providers shall transition Class Members within 120 days of initial service plan, while maintaining clinical and safety standards.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| T-3 | FY2021 Implementation Plan | Providers will regularly report (quarterly at a minimum) on transition pipeline issues and address bottlenecks or delays; UIC-CON will analyze and engage provider to remedy.<br><br>***Partial Compliance.*** *The Defendants were able to report on pipeline status for 71 percent of Class Members. Twenty-nine percent were unaccounted for.[57]* | **N/A** | **Partial Compliance** |
| T-4 | FY2021 Implementation Plan | Prime Agencies are required to utilize PSH for Class Member transitions unless one or more of the exclusionary conditions are met, and to document and justify transitions using alternative housing (Supportive or Supervised Residential).<br><br>***Partial Compliance.*** *This two-part requirement is measured by the percentage of Class Members transitioned to PSH and evidence that those transitioned to non-PSH settings have documented justification that reflect Class Member choice or Consent Decree-approved exclusionary criteria. 136 of 180 Class Members (76 percent) were transitioned to PSH. For the remaining 44 Class Members, the Defendants cannot confirm that all such instances of non-PSH placement – outside of when a Class Member elects to move to non-PSH settings – comply with the exclusionary criteria in the Consent Decree.* | **N/A** | **Partial Compliance** |
| T-5 | FY2021 Implementation Plan | Housing subsidy administrators will track and report on Class Member concentrations, and document where concentration[58] not met based on Class Member request (waiver).<br><br>***In Compliance.*** *This two-part requirement is measured by the number of transitions that meet PSH concentration limits as well as the number of instances where waivers to those rules are fully documented. Ninety-six (96) percent of Class Member transitions followed PSH concentration rules, and all ten instances of waivers were documented.* | **N/A** | **In Compliance** |
| T-6 | FY2021 Implementation Plan | Defendants and Prime agencies will work with SMHRF administration to ensure they are notified of any upcoming discharges so that housing can be identified.<br><br>***Not Applicable.*** *This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| MC-1 | FY2021 Implementation Plan | Develop guidance, documentation standards, tracking system, and training for MCOs.<br><br>***In Compliance.*** *This requirement is measured by the number of Class Members transitioned by MCOs relative to the number of Class Members enrolled with the MCOs. For FY2021, the Defendants were required to calculate a baseline against which to compare future years' performance. The baseline for this year was zero transitions effectuated by the MCOs.* | **N/A** | **In Compliance** |

[57] In their review of the final draft of this report, Class Counsel suggested additional framing for this compliance rating, which has been incorporated into recommendation 3 in Section XIII.
[58] Class Member concentration in buildings shall not exceed 25% (for over 4 units) or 50% (for 4 units or less).

| | | | | |
|---|---|---|---|---|
| MC-2 | FY2021 Implementation Plan | Review existing contract language to identify any barriers to Consent Decree Implementation.<br><br>*In Compliance.* This requirement is measured by the completion of a brief report of findings on opportunities to align MCO contract language with Consent Decree objectives. This report was completed and submitted to the Court Monitor and Parties on 10/30/2020, by the deadline. | **N/A** | In Compliance |
| MC-3 | FY2021 Implementation Plan | Devote quarterly sessions with CEOs and operations teams to Consent Decree topics.<br><br>*In Compliance.* This requirement is measured by the completion of quarterly meetings with CEOs and operations teams from the MCOs. Such meetings were held on 9/16/20, 12/10/20, 3/25/21, and 6/17/21 for CEOs and 9/3/20, 12/10/20, 3/25/21, and 6/10/21 for the operations teams. | **N/A** | In Compliance |
| MC-4 | FY2021 Implementation Plan | Adapt/develop content about Consent Decree operations to be used for training new MCO care management staff by March 31, 2021.<br><br>*Per the Defendants, all Health Plans submitted attestations to HFS verifying that all newly hired Care Coordinator staff April 1, 2021 through June 30, 2021 had completed the required Olmstead Training – 100% compliance.* | **N/A** | In Compliance |
| MC-5 | FY2021 Implementation Plan | Assess each option, considering potential impact, required resources, etc. [for Performance Improvement Plan and formal performance measure].<br><br>*In Compliance.* This requirement is measured by a plan shared with Court Monitor and Parties, which was provided on 3/31/21. | **N/A** | In Compliance |
| **Community-Based Services and Housing Capacity-Related Requirements** | | | | |
| 36 | *Williams Consent Decree V(5)* | Defendants shall ensure the availability of services, supports, and other resources of sufficient quality, scope and variety to meet their obligations under the Decree and the Implementation Plan.<br><br>*Partial Compliance.* While the Defendants did submit an updated capacity development plan, their continued inability to transition adequate numbers of Class Members – and to conduct adequately and timely the essential phases of outreach, assessment, service planning, and transitioning (pipeline phases) – demonstrates that availability of supports and services is inadequate to address need. | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Partial Compliance** |
| 37 | *Williams Consent Decree V(5)* | Defendants shall implement sufficient measures, consistent with the preferences, strengths, and needs of Class Members, to provide Community-Based Settings and Community-Based Services pursuant to the Decree.<br><br>*Partial Compliance. While the Defendants did submit an updated capacity development plan, their continued inability to transition Class Members – and particularly address identified pipeline issues – demonstrates that availability of supports and services is inadequate to address need.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br>**FY2020: Out-of-Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| C-1 | FY2021 Implementation Plan | Using FY2021 IP as the basis, Defendants will brief the Court Monitor and Parties on FY2021 resource commitments, expected compliance outcomes, and FY2022 budget implications by October 31, 2020.<br><br>*In Compliance. This requirement is measured by the completion of an on-time briefing to the Court Monitor and Parties; the briefing was completed and shared on 10/20/20.* | **N/A** | **In Compliance** |
| C-2 | FY2021 Implementation Plan | Update capacity development plan by January 31, 2021 or earlier in order to inform Defendants' budget requests for the Governor's proposed FY2022 budget.<br><br>*In Compliance. This requirement is measured by an updated capacity development plan, which was updated and shared with the Court Monitor and Parties on 2/1/21.* | **N/A** | **In Compliance** |
| C-3 | FY2021 Implementation Plan | Require Prime Agencies to maintain and develop sufficient services and supports to meet the needs of the Class Members served by their agency.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-4 | FY2021 Implementation Plan | Require Prime Agencies to develop, maintain and locate housing and services sufficient to meet the preferences and needs of their assigned Class Members.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-5 | FY2021 Implementation Plan | Development of Statewide Referral Network Units for Class Member utilization (250 per year, depending on awarded LIHTC projects; 31 of which are available for Class Members).<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-6 | FY2021 Implementation Plan | Development of Section 811 Units for Class Member utilization.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-7 | FY2021 Implementation Plan | Require Prime agencies to routinely report on Class Member service needs and available staffing and capacity.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |
| C-8 | FY2021 Implementation Plan | Require Prime agencies to track and report on Class Member geographic housing preferences and transition locations.<br><br>*Not Applicable. This requirement is not applicable as it was to be measured three months after the State entered a "post-COVID" stage, which did not occur in FY2021.* | **N/A** | **N/A** |

| | | **Administrative-Related Requirements** | | |
|---|---|---|---|---|
| 38 | Consent Decree IX(16) | The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs serving individuals with Mental Illnesses. The Parties will attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate one person to serve as Monitor and the Court will select the Monitor. Within twenty- one (21) days of Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement.<br><br>**Not Applicable.** This requirement is not applicable to this reporting period. | **FY2018: In Compliance**<br><br>**FY2019: N/A**<br><br>**FY2020: N/A** | **N/A** |
| 39 | Consent Decree IX(18) | Not less than every six (6) months, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress toward achieving compliance, with the Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report.<br><br>**In Compliance**. The Defendants produced semi-annual reports that contained the data and information necessary to assess compliance and performance on the Consent Decree and Implementation Plan requirements. | **FY2018: Partial Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 40 | Consent Decree IX(18) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendants' staff or consultants, except their attorneys.<br><br>**In Compliance**. Although there were some significant delays in receiving information, the Defendants ultimately complied with data and information requests. | **FY2018: In Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 41 | Consent Decree IX(18) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, building and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree.<br><br>**In Compliance**. The Defendants complied with this requirement. | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 42 | Consent Decree IX(18) | The Defendants shall comply with Plaintiffs' requests for information that are reasonably related to Defendants' compliance with the Decree, including without limitation requests for records or other relevant documents pertinent to implementation of the Decree or to Class Members. Plaintiffs shall also be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Plaintiffs pursuant to the Decree shall be subject to the Protective Order.<br><br>**In Compliance.** The Court Monitor queried Class Counsel on 1/3/21 and received a response on 1/6/21. While the Class Counsel considered some responses inadequate, they did not report any instances wherein the Defendants did not supply requested data and information. | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |

| | | | | |
|---|---|---|---|---|
| 43 | Consent Decree IX(20) | Defendants shall compensate the Monitor and his or her staff and consultants at their usual and customary rate subject to approval by the court. Defendants shall reimburse all reasonable expenses of the Monitor and the Monitor's staff, consistent with guidelines set forth in the "Governor's Travel Control Board Travel Guide for State Employees." Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable.<br><br>***In Compliance***. *The Defendants complied with this requirement.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 44 | Consent Decree XII(24) | The cost of all notices hereunder or otherwise ordered by the Court shall be borne by the Defendants.<br><br>***In Compliance.*** *The Defendants complied with this requirement.* | **FY2018: In Compliance**<br>**FY2019: In Compliance**<br>**FY2020: In Compliance** | **In Compliance** |
| 45 | Consent Decree XI(22) | In full settlement of all attorneys' fees incurred to date in connection with the litigation, Defendants shall pay, subject to court review and approval, $1,990,000.00 to Class Counsel. In full settlement of all out-of-pocket costs and expenses (not to include attorneys' fees) incurred to date by Class Counsel, Defendants shall pay to Class Counsel such costs and expenses incurred by Class Counsel through and including the Approval of the Decree and any appeal thereof. Such amounts shall be distributed to Class Counsel in the manner set forth in written instructions provided by Class Counsel. Furthermore, such amounts hall be set forth in a Judgment Order to be entered by the Court. Defendants shall complete and submit all paperwork necessary for payment of such amounts, plus applicable statutory post-judgment interest, within five (5) business days after expiration of the time to appeal the fee award without the filing of a Notice to Appeal or after the issuance of the mandate by the highest reviewing court, whichever is later.<br><br>***Not Applicable***. *This requirement is not applicable to this reporting period.* | FY2018: N/A<br><br>FY2019: N/A<br><br>FY2020: N/A | **N/A** |
| CM1 | Consent Decree IX(17) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of non-compliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. Within 60 days after the end of each year of service, the Monitor will report to the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Plaintiffs to evaluate the Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports as necessary. Reports of the Monitor shall be served on all Parties.<br><br>***In Compliance.*** *The Court Monitor produced her annual report and it was filed on January 19, 2021. The Court Monitor also developed – in consultation with the Parties – the Amended Action Plan, filed on December 2, 2020.* | **FY2018: In Compliance (Court Monitor Requirement)**<br>**FY2019: In Compliance (Court Monitor Requirement)**<br>**FY2020: In Compliance (Court Monitor Requirement)** | **Court Monitor Require-ment**<br><br>**In Compliance** |

| | | | | |
|---|---|---|---|---|
| CM2 | Consent Decree IX(19) | In the event that the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Plaintiffs believe that Defendants are not complying with the terms of the Decree, Plaintiffs shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review the Plaintiffs' claims of actual or potential non- compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing, filed with the Court, and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor will not communicate with the Court without advance notice to the Parties.<br><br>*In Compliance. The Court Monitor convened regular Large Parties, Small Parties, and ad hoc meetings to identify and attempt to resolve issues of disagreement or non-compliance. A meeting dedicated specifically to Defendants' FY2020 areas of partial- and non-compliance was led by the Court Monitor March 16, 2021.* | **FY2018: In Compliance (Court Monitor Requirement)**<br><br>**FY2019: In Compliance (Court Monitor Requirement)**<br><br>**FY2020: In Compliance (Court Monitor Requirement)** | **Court Monitor & Plaintiffs' Require-ment**<br><br>—<br><br>**In Compliance** |
| | | **Implementation Planning-Related Requirements** | | |
| 48 | Consent Decree VII(10) | The Implementation Plan shall describe methods by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain current records of these requests.<br><br>*In Compliance. The Defendants complied with this requirement, as this required content was included in the FY2021 Implementation Plan.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 49 | Consent Decree VII(10) | The Implementation Plan shall describe methods for engaging residents, including where appropriate, providing reasonable opportunities for residents to visit and observe Community-Based Settings.<br><br>*Partial Compliance. The Implementation Plan is required to include the Defendants' strategies for actively engaging Class Members, as well as the process by which Class Members can observe community-based services and housing options for which they are eligible. While they shared detailed information on outreach and engagement strategies, there was no performance measure on assisting Class Members to visit the community and observe community-based settings. If that is not explicitly included and attained in the next fiscal year, the Court Monitor will assign an out-of-compliance rating for this requirement.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| 50 | Consent Decree VII(11) | Defendants, with the input of the Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree.<br><br>*In Compliance. This requirement pertains to whether the Defendants developed the FY2022 Implementation Plan (due near the end of the FY2021 compliance period) to identify commitments for FY2022. They did so, as the Implementation Plan was filed on August 18, 2021. As such, they are found in compliance with these requirements.* | **FY2018: Out-of-Compliance**<br>**FY2019: In Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 51 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* a) Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure that Defendants fulfill the requirements of the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included specific, measurable, and timebound activities to advance fulfilment of the requirements of the Decree.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 52 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* b) Describe the hiring, training and supervision of the personnel necessary to implement the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan contained several provisions on personnel and their training requirements.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: In Compliance** | **In Compliance** |
| 53 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* c) Describe the activities required to develop Community-Based Services and Community-Based Settings, including inter-agency agreements, requests for proposals and other actions necessary to implement the Decree.<br><br>*In Compliance. The FY2021 Implementation Plan outlined activities to expand capacity of community-based services and housing.* | **FY2018: Out-of-Compliance**<br>**FY2019: Partial Compliance**<br><br>**FY2020: Partial Compliance** | **In Compliance** |
| 54 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* d) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality or geographic location.<br><br>*Out-of-Compliance. The FY2021 Implementation Plan made no clear link between Class Member service needs data to inform housing and services capacity development.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |
| 55 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* e) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services and supports which, based on demographic and other data, are expected to be required within one year to meet the obligations of the Decree.<br><br>*Out-of-Compliance. The FY2021 Implementation Plan made no clear link between Class Member demographics and service needs data or efforts and activities outlined in their plan.* | **FY2018: Out-of-Compliance**<br>**FY2019: Out-of-Compliance**<br><br>**FY2020: Out-of-Compliance** | **Out-of-Compliance** ✗ |

| | | | | |
|---|---|---|---|---|
| 56 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* f) Identify any necessary changes to regulations that govern IMDs in order to strengthen and clarify requirements for services to persons with Mental Illness and to provide for effective oversight and enforcement of all regulations and laws.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with needed regulatory changes, including a special meeting on potential rules and regulations to support Consent Decree compliance.* | **FY2018: Out-of-Compliance** **FY2019: Out-of-Compliance** **FY2020: Partial Compliance** | **In Compliance** |
| 57 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* g) Describe the methods by which Defendants shall ensure compliance with their obligations under Paragraph 6 *(Evaluations)* of this Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with compliance in the assessment (formerly referred to as evaluation) domain.* | **FY2018: Out-of-Compliance** **FY2019: Out-of-Compliance** **FY2020: In Compliance** | **In Compliance** |
| 58 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* h) Describe the mechanisms by which Defendants shall ensure compliance with their obligations under Paragraph 10 *(Outreach)* of this Decree.<br><br>*In Compliance. The FY2021 Implementation Plan included activities and tasks associated with compliance in the outreach domain.* | **FY2018: Out-of-Compliance** **FY2019: Partial Compliance** **FY2020: In Compliance** | **In Compliance** |
| 59 | Consent Decree VIII(13) | The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate. The Monitor and Plaintiffs may review and comment upon any such updates or amendments. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed updates or amendments, the matter may be submitted to the Court for resolution.<br><br>*In Compliance. This requirement pertains to whether the Defendants developed the FY2022 Implementation Plan (due near the end of the FY2021 compliance period) to identify commitments for FY2022. They did so, as the Implementation Plan was filed on August 18, 2021. As such, they are found in compliance with these requirements.* | **FY2018: Out-of-Compliance** **FY2019: In Compliance** **FY2020: In Compliance** | **In Compliance** |
| 60 | Consent Decree VIII(14) | The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of the Decree.<br><br>*In Compliance. The FY2022 Implementation was filed and will be enforced in accordance with the Consent Decree, with agreement from the Defendants.* | **FY2018: In Compliance** **FY2019: In Compliance** **FY2020: In Compliance** | **In Compliance** |

| 61 | Consent Decree VIII(12) | Within 135 days of Approval of the Decree, Defendants shall provide the Monitor and Plaintiffs with a draft Implementation Plan. The Monitor and Plaintiffs will participate in developing and finalizing the Implementation Plan, which shall be finalized within nine (9) months following Approval of the Decree. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed Implementation Plan, the matter may be submitted to the Court for resolution. | FY2018: N/A | N/A |
|---|---|---|---|---|
| | | | FY2019: N/A | |
| | | | FY2020: N/A | |