# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OFILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ETHEL WILLIAMS,** *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05 C 4673 |
| | ) | |
| v. | ) | Judge Joan Humphrey Lefkow |
| | ) | |
| **JB PRITZKER,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## COURT MONITOR'S COMPLIANCE INDICATORS

Kathryn Dupree
14-1 Bailey Road
Old Lyme, CT  06371
kathryn.dupree@gmail.com
(860) 961-2305

Office of the Court Monitor
Colbert Consent Decree
Williams Consent Decree

The Honorable Judge Joan Lefkow
United States District Court
Northern District of Illinois
December 8, 2023

Re: Williams v Pritzker
Case No. 1.05-cv-04673

Dear Judge Lefkow,

The Defendants, Plaintiffs and I have been working collaboratively over the past several months to determine the definition of substantial compliance and the metrics to determine if substantial compliance is achieved for the Williams Consent Decree. We have met regularly since January 2023 to discuss the requirements of the Williams Decree; how to interpret these requirements where greater specificity was needed to ensure a shared understanding of the State's obligations; to agree on the process to monitor the State's efforts to achieve substantial compliance; and the metrics that will be used to evaluate and report on performance.

As a result of these discussions and agreements I have developed a set of Compliance Indicators that specify what I expect the State will do to comply with the Williams Decree and assist Class Members to transition safely and successfully to the community. I sought and received significant input form the Defendants and the Plaintiffs in drafting and revising these Indicators. I greatly appreciate the time and thought the Parties have given to ensure these Compliance Indicators reflect the requirements of the Williams Decree and the activities that are essential to fully implement these requirements.

I am submitting these Compliance Indicators to your Honor for your review and approval. The document includes all Compliance Indicators; the expectation for valid and reliable data to verify the implementation and achievement of the Indicators; the process I will use to monitor implementation that includes a quality service review; and the metrics to review performance and determine when substantial compliance is achieved.

 I ask that we discuss any questions or concerns you have during the January Status Hearing so that you may approve their implementation and my use of them to monitor the State's progress until such time as the State achieves substantial compliance.

Sincerely,

Kathryn du Pree
Williams Court Monitor

**Compliance Indicators Williams Consent Decree Requirements Organized by Pillars**

**Outreach/Diversion**

**Williams VI.8 b. Within one year of finalization of the IP, no individual with mental illness shall be admitted to a SMHRF without a pre-screening having been conducted through the PASRR process and an initial SP completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community Based Setting (CBS); identifies CBS that would facilitate that placement; and ensures that approved admissions to SMHRFs are only for those SMHRFs that can provide treatment consistent with the individuals' initial SP and consistent with the goal of transition to a CBS After 5 years no individual with MI whose SP provides for placement in CBS shall be housed or offered placement in a SMHRF unless after being fully informed, he or she declines the opportunity to receive services in a CBS.**

**Williams VII.10. Defendants shall ensure that CMs have the opportunity to receive complete and accurate information regarding their rights to live in CBS and/or receive CBS, and the available options and opportunities for doing so. The IP shall describe the methods by which such information will be disseminated, the process by which CMs may request services, and the manner in which the Defendants will maintain current records of these requests. In addition to providing information, Defendants shall ensure that the QPs conducting evaluations engage residents who express concerns about leaving a SMHRF with appropriate frequency. The IP shall describe methods for engaging residents, including where appropriate, providing reasonable opportunities for residents to visit and observe CBSs. All costs for outreach shall be borne by Defendants.**

**W.5. CMs will not be subject to retaliation in response to any option selected, no shall they be pressured to refrain from exploring appropriate alternatives.**

**Front Door Diversion Compliance indicators**

FD-1 The pre-admission screening process will be required to be completed for any individual seeking admission to a SMHRF. Only individuals who meet the eligibility requirements for admission to a SMHRF will be admitted. (Full Compliance)

FD-2. The evaluation of the referrals for FDDP admission are completed within the time period the State requires of its contractor completing the pre-admission screening for admission to SMHRFs.

FD-3. The pre-admission screening process will include the development of a pre-admission Service Plan that includes those services the individual needs from the SMHRF if admitted or from the FDDP.

FD-4. A SMHRF commits to providing the services outlined in the initial SP as needed upon acceptance of the individual as a resident.

FD-5. The individuals who are determined eligible for SMHRF admission, who do not decline FDDP referral, and who are appropriate for community-based services are referred to FDDP. (Full Compliance)

FD-6. The State will offer meaningful community-based placement and services through the FDDP to the individuals engaged in the FDDP within sufficient time to avoid admission to a SMHRF (Full Compliance)

FD-6. The individuals who are offered FDDP services will participate in the FDDP and receive these services they choose to accept.

FD-7. The supports offered through the FDDP will address the needs of the individuals resulting in no SMHRF admission for the individuals served through FDDP.

FD-9. The individuals served by FDDP participate in community services for which they are eligible and that they accept, and will be successfully transitioned to PSH or the most integrated alternative permanent housing appropriate for the individual which they accept to prevent institutionalization.

FD-10. The State will develop and maintain FDDP providers that ensure all eligible individuals have access to and can receive FDDP services that prevent institutionalization regardless of where the individual is referred from to the FDDP.

**Methods for assessing compliance**: The State will issue a semiannual and an annual summary report of the results of pre-screening for SMHRF admission and the results of the Continued Stay Reviews.

**Methods of assessing compliance**: The State will issue a semiannual and an annual summary report of the total number of individuals eligible for the FDDP; the total referred to FDDP; the total number who are offered FDDP services; the total number who accept the FDDP offer; the total number who are diverted by the FDDP; and the total number who accepted the FDDP who were admitted to a SMHRF at any time during the reporting period. The State will also report all instances when diversion did not occur due to the unavailability of temporary housing or needed services included in the FDDP service array. These data will include a breakdown by the area of the state the individual was referred from for SMHRF admission. The State will also report on the number of individuals admitted to a SMHRF or served by the FDDP and the number of these who had a pre-admission SP and verification that it was implemented. The State will also report on the results of the pre-admission screening used to determine if individuals referred for a SMHRF are eligible for admission.

The State will develop and implement a Quality Review process to determine if FDDP participants were offered sufficient transitional services to remain in the community and include their findings and recommendations in the annual report.

The Court Monitor will observe a sample of pre-screenings to determine if individuals are being well informed of the FDDP or other community options to allow them to remain in the community and not be institutionalized. The Court Monitor will interview 10% of FDDP participants to determine their satisfaction with the FDDP. Included in this sample will be 10% of any FDDP participants who were admitted to a SMHRF after starting FDDP services to determine why the admissions occurred. The results of this review including findings and recommendations will be included in the Court Monitor's annual report to the Court.

 **Outreach Compliance Indicators**
O-1. The individuals who are admitted to a SMHRF will have a completed outreach within seventy days of admission to a SMHRF. (Full Compliance)
O-2. The State will design and implement a pilot program to expand outreach using a peer model hiring staff with lived experience. This pilot will be implemented in Fiscal Year 2024 and reported to the Court Monitor periodically with a final report by December 2024. The State will at that time make

recommendations for the full implementation of this approach or modify the structure of ongoing outreach based on the results of the pilot.

O-3. Class Members who do not initially express an interest in transition will be contacted annually to discuss the opportunity to transition.

O-4. Class Members who express an interest in transition at any time after initially declining transition will be assessed within 120 days.

O-5. Class Members who remain hesitant about transitioning to the community will have their concerns addressed by Outreach staff. The Class Member will receive information about services and will be given the opportunity to visit community programs/settings.

O-6. The State will identify all existing Class Members who have no record of receiving outreach as of February 1, 2024, who have not been determined to meet exclusionary criteria and ensure that all of these CMs receive Outreach. The State will propose a schedule and strategy to complete all outreach for existing Class Members, implement this strategy and report to the Plaintiffs and Court Monitor quarterly on the number of outreaches completed and the results of these outreaches until all existing Class Members have received outreach. (Full Compliance)

O-7. Reports made to IDPH directly, by or on behalf of CMs alleging facility retaliation for expressing an interest in transition will be investigated. Investigations shall begin no later than 30 days from the reported date of the event. All such investigations and outcomes will be reported by the State to the Court Monitor and Plaintiffs semiannually. The report must include the reason for the investigation, the outcome and any sanctions or penalties levied to the facility. (Full Compliance)

**Methods for assessing compliance**: The State will report semi-annually and annually the number of outreaches to be completed based on facility census data and the number completed, including those completed within seventy days; the number of individuals who choose to pursue transition; the number who refuse transition and are referred for and receive annual follow-up outreach; of the number referred for annual follow-up outreach the number who changed their mind and expressed an interest in transition within the reporting period.

For assessing compliance, the following calculations will be done using the prescribed data below:

| Calculation | Numerator | Denominator |
|---|---|---|
| O1 | # of Outreaches completed for CMs not previously outreached | Facility census of CMs in residence 70 or more days minus CMs already outreached |
| O2 | # of Outreaches completed within 70 days of admission | Facility census of CMs in residence 70 or more days minus CMs already outreached |
| O3 | # of CMs for whom annual outreach was completed | # of CMs who did not agree to transition at initial outreach |
| O4 | # of CMs who changed their minds expressing an interest in transition in the reporting period | # of CMs referred for annual outreach |

The State will report on the number of Class Members who request to visit community settings and the number who did visit community setting during the reporting period.

| Calculation | Numerator | Denominator |
|---|---|---|
| O5 | # of CMs who visit community settings in the reporting period | # of CMs who request to visit community settings in the reporting period |

The State will assess and report on the implementation of the Support and Engagement Pilot with its recommendations for systemwide implementation by December 2024.

The Court Monitor will interview a sample of Class Members referred to the Support and Enhancement Program and the Peers who work with them to ascertain the impact of this part of the program on outreach. The results of this review including findings and recommendations will be included in the Court Monitor's annual report to the Court.

The State will periodically update the Court Monitor and issue a final report summarizing the results of the targeted outreach to Class Members who are existing residents of facilities who have no record of ever receiving outreach including the results of the outreach and the State's plan to assess and implement

transition planning for those who express an interest in transition. The State will identify the date by which this will be accomplished once the State can report the total number of existing Class Members who have no record of ever receiving Outreach

**Methods of assessing compliance**: The State will report the total number of Class Members who have never been outreached; the number of these Class Members who receive outreach and the outcomes of the completed outreaches.

| Calculation | Numerator | Denominator |
| --- | --- | --- |
| O6 | # of existing CMs outreached in the reporting period | # of existing CMs identified to be outreached in the reporting period |
| O7 | # of existing CMs outreached who want to transition in the reporting period | # of existing CMs who were outreached in the reporting period |
| O8 | # of existing CMs who were outreached in the reporting period referred to Peers who visit community settings | # of existing CMs who were outreached in the reporting period who request to visit community settings |

## Assessment

**Williams VI.6.a) Within 2 years of the finalization of the IP every CM will receive an independent professionally appropriate and person-centered evaluation of his/her/preferences, strengths, and needs in order to determine the CBS required for him/her to live in PSH or another appropriate CBS setting. Any CM has the right to decline to take part in such evaluation. Any CM who declined to be evaluated has the right to receive an evaluation any time thereafter on request.**

**Williams VI.6.b) Defendants will ensure the evaluation are conducted by QPs as defined in this decree.**

A-1. Class Members residing in a SMHRF who have expressed their interest to transition and who maintain this interest will receive an assessment that will identify all the specific community-based services (CBS) and supports that the CM would need to transition to the community.  (Full Compliance)

**Methods of assessing compliance**: The State will report total number of individuals who responded positively to outreach and who are awaiting an assessment, and the total number of Class Members who have an assessment within the reporting period.

For assessing compliance, the following calculations will be done using the prescribed data below:

| Calculation | Numerator | Denominator |
|---|---|---|
| A1 | # of CMs who have an assessment in the reporting period | # of CMs who responded positively to an outreach who are awaiting an assessment |

The State will verify the assessments that are completed by a Qualified Professional (QP), reporting the total number of assessments completed and the number of assessments completed by a QP.

| Calculation | Numerator | Denominator |
|---|---|---|
| A2 | # of CMs who have an assessment in the reporting period | # of CMs who have the assessment completed by a QP in the reporting period |

The State will sample a number of assessments to determine if the assessment identifies the Class Member's need for community service.

The Court Monitor will review a sample of the State's sample to verify the State's findings. The results of this review including findings and recommendations will be included in the Court Monitor's annual report to the Court.

A-2.  Class Members residing in a NF shall receive an assessment within 45 days of the referral from outreach that is initiated within 14 days expressing their interest to transition that will identify all the specific community-based services (CBS) and supports that the CM would need to, transition to the community.

**Method of assessing compliance**: The State will issue reports of the total number of individuals who responded positively to outreach within the reporting period and the total number of Class Members who have an assessment initiated within 14 days and completed within 45 days.

| Calculation | Numerator | Denominator |
|---|---|---|
| A3 | # of CMs who have an assessment completed within 45 days of the outreach in the reporting period | # of CMs who responded positively to outreach in the reporting period |

A-3. The State will develop and implement a plan to assess all Class Members who are identified as interested in transition as described under CI O-6. The plan will project the timeline for the completion of all of the assessments for existing Class Members who have been newly outreached under O-6 (Full Compliance)

**Method of assessing compliance**: The State will report the number of Class Members who are existing residents of SMHRFs for whom there is no record of outreach and the number who receive outreach with a documented positive response who received an assessment during the reporting period.

| Calculation | Numerator | Denominator |
|---|---|---|
| A3 | # of existing CMs who have received an outreach with a documented positive response who were assessed in the reporting period | # of existing CMs with a positive outreach |

**Williams VI.6.c. Defendants shall ensure, as provided in the IP, that all CMs shall be informed about CB settings including PSH and CBS available to assist individuals in these settings, and the financial support CMs may receive in these settings.**

A-4. The assessor who is a Qualified Professional as defined by the State, informs the CM during the assessment process of all of the available CBS including housing assistance and transition cost funding that respond to the Class Member's needs. The assessor documents that this information has been shared and the CM notes s/he has received the information and understands what is available to them to successfully transition to the community. (Full Compliance)

**Methods of assessing compliance:** The State will report the number of assessments completed by a Qualified Professional and report on the outcome of the sample under A.1. to verify the required information was shared with the Class Member.

As described under A-1 the Court Monitor will review a sample of the State's sample to verify the results.

**Williams VI.6.d. After the second year following finalization of the Implementation Plan, the Evaluation described in Subsection 6(a) shall be conducted annually. As part of each Class Members annual evaluation, the reasons for any Class Member's opposition to moving out of a SMHRF to a CBS will be fully explored and appropriately addressed as described in Section VII. Any Class Member who has received an evaluation but has declined to move to a CBS may request to be reassessed for transition to a CBS any time thereafter.**

A-5. The State will inform all CMs who dispute a decision regarding eligibility for or approval of services, transition costs, and /or housing assistance or placement in a CBS of their right to appeal such decision through administrative review of such decisions.

**Method of assessing compliance**: The State will report annually the number of CMs filing an appeal, the reason for the appeal, the length of time for the appeal to be processed and the decision.

A-6. Class Members who agree to a reassessment shall be reassessed annually if they were previously found not recommended to transition. (Full Compliance)

**Method of assessing compliance**: The State will identify the number of Class Members who remain in the SMHRF and were previously not recommended to transition and the number of these Class Members who were due for, agreed, and were reassessed in the reporting period. The State will report if this reassessment confirms or alters the plan to transition the Class Member.

| Calculation | Numerator | Denominator |
|---|---|---|
| A4 | # of CMs who were reassessed during the reporting period | # of CMs who were previously not recommended to transition |

A-7. Class Members who request an assessment after previously declining to be evaluated will be assessed within 120 days of their request. (Full Compliance)

**Method of assessing compliance**: The State will report the number of CMs who request an assessment after previously declining an assessment and the number of these Class Members for whom the assessment is completed within 120 days.

| Calculation | Numerator | Denominator |
|---|---|---|
| A5 | # of CMs assessed within 120 days of request | # of CMs who requested an assessment after previously declining |

**Service Planning**

**Williams VI.7.a. Based on the results of the evaluation Defendants shall promptly develop Service Plans (SPs) specific to each Class Member who is assessed as appropriate for transition to a Community Based Setting (CBS). Each SP shall be periodically updated to reflect any changes in needs and preferences of the CM, including his/her desire to move to a CBS after declining to do so,**

**shall incorporate services where appropriate to assist in the acquisition of basic and instrumental ADLs and illness self-management. Acquisition of such skills shall not be a prerequisite for transitioning from the SMHRF.**

**Williams VI.7.e. The SP shall not be limited by the current availability of CBS and settings; provided however that nothing in this subparagraph obligates the Defendants to provide any type of CBS beyond the types of CBS included in the State Plan and Rule 132.**

**Williams VI.7.f. The SP shall be completed within sufficient time to provide appropriate and sufficient transitions for CMs in accordance with the benchmarks set forth in the Decree (Section 8)**

**Williams VI.7.d) Each SP shall focus on the CMs personal vision, preferences, strengths and needs in home, community, and work environments and shall reflect the value of supporting the individual with relationships, productive work, participation in community life, and personal decision-making.**

**Williams VI.7.c. The SP shall be developed by a QP in conjunction with the CM and his or her legal representative. The QP shall consult with other appropriate people of the CMs choosing.**

SP-1. Initial Service Plans will be developed for all CMs who express an interest in transition. (Full Compliance)

SP-2. Initial Service Plans will be developed for the Class Members within 90 days of the positive outreach with the Class Member.

SP-3 All SPs are developed with the involvement of the Class Member, guardian (if any) or person chosen to represent the CM, and are based on the needs, strengths, and preferences of the CM. (Full Compliance)

SP-4 Initial SPs for Class Members planning to transition within the year will include all community-based services, housing, and the related costs of transition, home accessibility adaptation and housing assistance identified as needed by the CM in the assessment, and not be limited by the availability of these services while not requiring the State to approve or provide any services not included in the State Plan or Rule 140. (Full Compliance)

SP-5 Initial SPs for Class Members planning for transition within the year shall include services to assist the CM to develop needed skills in the areas of activities

of daily living and health management and all necessary transition activities. The acquisition of these skills will not be a pre-requisite to transition (Full Compliance)

SP-6 The State will develop a Waiting List of Class Members who wish to transition to include existing CMs, until such time as all existing CMs transition within 120 days of the Service Plan being completed. The State will include newly admitted CMs on the Waiting List defined as CMs who were outreached since the beginning of the current fiscal year in which transitions are being planned.  The Waiting List will remain in place until the State's plan for reasonable pace has been successfully implemented and all existing CMs on the Waiting List have been transitioned and the State is able to transition newly admitted CMs within 120 days of the SP being completed. (Full Compliance)

SP-7 Initial SPs will be developed for the Class Members who are on the Waiting List and who are not projected to transition within the year. Initial SPs shall include services to assist the Class Member to develop needed skills in the areas of activities of daily living or health management, but the acquisition of these skills will not be a prerequisite to transition. The Class Member will be informed of their placement on the Waiting List and the anticipated time when they will transition.

SP-8 The State will develop and implement a quality review process to determine and report on the quality of the initial SPs to ensure they address all needed services, address skill building as needed but do not include pre-requisite skill acquisition that delays transition.

SP-9 The SP will be updated every 180 days for any Class Member approved to need longer than 180 days to transition, or who remains institutionalized 180 days after the SP is completed to reflect any changes in need for community-based services and housing. (Full Compliance)

SP-10 Class Members who are identified as interested in transition as described under CI O-6. and who are assessed (CI A-3), will have an SP developed by the date the State projects as reasonable and the Court Monitor and Plaintiffs agree to once the identification through Outreach is completed. (Full Compliance)

The State will report separately on the number of Class Members identified under O-6 who will need a SP and the number of these Class Members who have the SP completed within the reporting period.

**Methods for assessing compliance:** The State will issue a semi-annual and an annual report of the Service Plans due; and the number of SPs completed within

ninety days of a positive outreach; the number of transition SPs due to be updated in 180 days when transition is delayed; and the number of these SPs that were completed within 180 days.

For assessing compliance, the following calculations will be done using the prescribed data below:

| Calculation | Numerator | Denominator |
|---|---|---|
| SP1 | # of SPs completed in the reporting period | # of CMs with a positive outreach and a completed assessment awaiting a SP |
| SP2 | # of SPs completed within 90 days of a positive outreach | # of SPs due to be completed (90 days post outreach) |
| SP3 | # of SPs updated 180 days after initial SP completed | # of SPs due to be updated 180 days after initial SP completed |
| SP4 | # of SPs completed for existing CMs identified to transition through outstanding outreach (O-6) in the reporting period | # of CMs identified through outstanding outreach (O-6) who request to transition |

The State will use the quality review process developed under SP-8 to determine and report on the quality of the SPs and to assess whether the SPs include the individual's preferences and all needed services available to them through the requirements of the Decree. (SP-3,4, 5 ,7, and 12). The report will include findings and recommendations for systems improvements and will be issued annually.

The Court Monitor will review a 10% sample of SPs to determine if the SPs meet the requirements of CIs SP-3,4,5, 7 and 12. The Court Monitors findings and recommendations will be included in the Monitor's annual report to the Court.

**Williams VI.7.b) For each CM who does not oppose moving to a CB setting, the SP shall, at a minimum, describe the CBS the CM requires in a CB setting, including the services the CM will need to transition   to a CB setting, and a timetable for completing the transition. If there has been a determination that the CM is not currently appropriate for PSH, the SP shall specify what services**

**the CM needs that could not be provided in a PSH and shall describe the CBS the CM needs to live in another CB setting that is the MIS appropriate.**

SP-11.  Class Members who select to transition to PSH will be given appropriate options in which fewer than 25% of the units are occupied by individuals known to the State to have disabilities. (Full Compliance)

SP-12 Class Members will be given the opportunity to visit one or more community-based setting options being offered by the provider.

SP- 13. Class Members who select or need services that are not available in a PSH or who select to transition to a non- PSH setting shall be provided the setting and services that meet their needs and preferences within the options available in the State plan and HCBS waivers. (Full Compliance)

SP-14. The State will utilize the information from assessment and SPs to develop the needed service and housing capacity including non-traditional PSH settings with staff onsite.

SP-15. The State will develop a plan detailing the service capacity that Class Members who have been assessed need. An initial plan will be completed no later than December 2024. The Plan will specify the services these Class Members need; how the State will increase service capacity and housing; and in what time period. This plan will be updated and reported annually, and revised periodically to reflect the service and housing needs of Class Members who indicate their interest in transitioning after the initial service and housing capacity plan is completed.

**Methods for assessing compliance**: The State will report semi-annually and annually the housing preferences of all Class Members engaged in transition and the number of Class Members who were offered the housing reflecting their preference during the reporting period.

The State will report semi-annually and annually the number of Class Members engaged in housing location and the number of Class Members who visited housing options during the reporting period.

| Calculation | Numerator | Denominator |
|---|---|---|
| SP5 | # of CMs offered housing reflecting their preference in the reporting period | # of housing preferences for all CMs engaged in transition during the reporting period |

The Court Monitor will sample 10% of Class Members who have transitioned during the reporting period to determine if the Class Member was given their choice of housing type and had the opportunity to visit housing options. The results of this review will be included in the Court Monitor's Annual Report to the Court.

The State will issue its plan to build service and housing capacity by December 2024 and will verify that the plan is based on assessment, service planning and other relevant data regarding the needs of Class Members.

The State will report on the status of its service and housing capacity plan annually to the Court Monitor and Plaintiffs and will update its service and housing capacity plan periodically including the status of increasing service and housing capacity and its future implementation plan to assure sufficient service and housing capacity to successfully implement its plan for reasonable pace.

## Transition
**Williams Section V. 5. Development of Community Capacity. Defendants shall ensure the availability of services, supports, and other resources of sufficient quality, scope, and variety to meet their obligations under the Decree and the IP. Defendants shall implement sufficient measures, consistent with the preferences, strengths and needs of CMs, to provide CB Settings and CBS pursuant to the Decree.**

**Williams VI.7.g. By the end of the 5th year after the finalization of the IP, Defendants will have:**
1. **Offered placements to 100% of all individuals who are assessed as appropriate for living in a CB setting and who do not oppose moving to a CB setting.**
2. **Developed the corresponding number of PSH units or other CB settings sufficient for these individuals. This includes all individuals who are assessed as appropriate for transition and do not oppose moving and all CMs who have already transitioned to a CB setting.**

**Williams VI.7.h. After the end of the 5th year CMs who are assessed as appropriate for living in a CB setting, who do not oppose transition to a CB setting and whose SP provide for placement in CB settings shall be offered the opportunity to move to these settings and shall receive appropriate services consistent with the SP within 120 days of the date of the SP.**

T-1. The State will develop a plan for reasonable pace to transition all existing CMs who have expressed a desire to transition; all those not yet outreached who once outreached request to transition; and for those who will be admitted to a SMHRF in the future, using past admission data to make reasonable projections for future admissions. The plan will be a multi-year initiative and will set a percentage of transitions for newly admitted CMs (30%) and for existing CMs (70%).

T-2. The plan will identify the total number of existing Class Members in SNFs who are 60 days post-admission as of June 2023. The Plan for Reasonable Pace will address the remaining CMs and include projections for future admissions.

T-3. The Plan for Reasonable Pace will include the Waiting List for existing CMs and for newly and future admitted Class Members. The State will project the length of time existing CMs who have expressed the desire to transition will wait for the resources and services to successfully transition and present this to the Plaintiffs and Court Monitor. This aspect of the Plan will be updated annually.

T-4. The State will use Assessment, Service Plan and Waiting List data to project its service and housing capacity development plan. The initial service and housing capacity plan will be completed by December 2024 and updated periodically. (Also reflected under SP 15)

T-5 The State will implement its Plan for Reasonable Pace and transition the total number of Class Members identified each year to transition.

T-6 Class Members will be transitioned within 120 days of their Initial Service Plan.

T-7. The state will continue to provide all the services in the Class Members approved SP for which they accept and remain eligible for after transition while they are participating in the transition program, including all in-home supports, transportation, mental health, social/recreation, employment, housing, and income support. The State will ensure that all CMs who are transitioned to the community receive the services included in the SP which reflect the assessment. Services are to be made available through the State Plan including DRS and Aging HCBS waiver services and services under Rule 140.  (Full Compliance)

T-8. The State will ensure that all individuals who are interested in employment are referred for employment support through either IPS or DRS and connected to an employment provider within 30 days of the referral. (Full Compliance)

T-9. All Class Members who are referred for employment support and continue to be interested in securing work will be assisted to become employed.

T-10. The State will ensure that a SP is developed for CMs who are exiting the transition program so that the community services for which they accept and are eligible are in place to prevent reinstitutionalization. (Full Compliance)

T-11. The State shall provide all necessary funding to plan and implement all transitions projected in the Reasonable Pace Plan by fiscal year.

T-12. The State will develop and implement a quality assurance process to determine and report on the quantity and quality of the services delivered to Class Members in the community that are specified in their SPs, that they remain eligible for, and they wish to continue, to ensure that all needed services are delivered. The process will review and determine if the quantity of services matches the SP for frequency, duration, and amount of services.

**Methods for assessing compliance**:  The State will report semi-annually and annually the number of Class Members who are targeted to transition in each fiscal year and the number who are transitioned (numerator) including the number who transition within 180 days of the Initial SP.

For assessing compliance, the following calculations will be done using the prescribed data below:

| Calculation | Numerator | Denominator |
|---|---|---|
| T1 | # of CMs who transition in the fiscal year | # number of CMs required to transition in the fiscal year |
| T2 | # of CMs who transition within 120 days of the initial SP | # of CMs required to transition in the fiscal year |
| T3 | # of CMs who transition within 120 days of the initial SP | # of CMs with an initial SP completed |

The State will develop and submit to the Plaintiffs and Court Monitor its plan for reasonable pace including its framework; data sources; and multi-year projections for Class Member transitions. The State will update this plan after completing the

outstanding outreach to individuals with no previous outreach/engagement and may refine the plan in following years. The original plan and any subsequent refinements shall be prepared and submitted in accordance with VI.5 and 7 of the Decree.

The State will implement a Waiting List and report semi-annually and annually the number of Class Members on the Waiting List and the year they are projected to transition.

The State will report semi-annually and annually on its progress to secure employment for CMs who are referred for and want to be employed. This will include the number who were referred; the number who are engaged with a supported employment provider; and the number who were actually employed during the reporting period. The report will include recommendations for improvement as needed.

The State will report the budget to the Plaintiffs and Court Monitor for each fiscal year and verify that the funding is available to fully implement the plan for reasonable pace and the plan to increase service and housing capacity.

The State will report annually on the findings and recommendations of its quality review process to verify that Class Members are receiving all of the services included in their SPs, that they accept and remain eligible for, during the time period they are in the Class Member Transition Program and reside in the community after transitioning from a facility.

The Court Monitor will review a 10% sample of Class Members who transition each year to determine if they are receiving all of the services included in their SPs that the Class Members accept and remain eligible for. The Court Monitor will develop a probe tool with the input of the Parties. The review will include a record review, interviews with Class Members, and interviews with Care Managers. The results of this review will be included in the Court Monitor's Annual Report to the Court.

T-13. That State will maintain and continue its commitment to fund all existing services and housing for up to 60 days when a CM living in the community and receiving transition services is hospitalized or re-institutionalized.

**Method for assessing compliance**: The State will report semi-annually and annually the number of Class Members living in the community who are re-institutionalized or hospitalized and are in jeopardy of losing their PSH and the number of Class Members for whom the State maintained their PSH and service package for up to 60 days.

| Calculation | Numerator | Denominator |
|---|---|---|
| T4 | # of CMs for whom the State maintained the PSH and service package for up to 60 days | # of CMs living in the community who were reinstitutionalized |

**Williams VI.9.c. QPs shall inform CMs of their options pursuant to this decree. CMs shall not be subjected to any form of retaliation in response to any option selected nor shall they be pressured to refrain from exploring appropriate alternatives to SMHRFs.**

Addressed under CI O-7

**Williams VI.9.a. PSH will be considered the MIS appropriate for CMs except that, (1) for any CM (i)who have severe dementia or other severe cognitive impairments requiring such a high level of staffing to assist with ADLs or self-care management that they cannot be effectively served in PSH, (ii) who have medical needs requiring a higher level of skilled nursing care that may not safely be provided in PSH, or (iii) who present an imminent danger to themselves or others, the evaluator will determine the MIS appropriate, which may be a PSH or another setting, and (2) nothing in this paragraph shall prevent CMs who can and wish to live with family or friends or in independent housing that is not connected with a service provider from doing so. Those CMs not transitioning from SMHRFs into PSH will have ongoing reassessments with treatment objectives to prepare them for subsequent transition in the MIS appropriate, including PSH**.

EC-1. The State will continue to plan for CMs who need or prefer a greater level of support and supervision than is available in a PSH with the community supports available under the State Plan and Rule 140 for individuals living independently. The Class Members whose needs can be met in community settings that the State

offers including supervised living, supported residences, group homes and assisted living will be transitioned, as will those Class Members who can return to live with their families. The need for these supervised settings will be included in the State's plan to expand service and housing capacity.

EC-2. The State will continue its review of individuals who are recommended for continued stay in a SMHRF because of a serious medical condition or illness that makes it unsafe for them to live in the community, or who present serious risk to themselves or others that makes it unsafe for them to live in the community. No CM will be excluded from transition planning until their diagnosis, condition and level of need has been reviewed through the State's clinical/medical review process and this process confirms the recommendation for the CM to remain living in a SMHRF.

**Methods for assessing Compliance**: The State will report semi-annually and annually all Class Members who transition to a setting other than PSH, by setting type, and differentiating between CM preference and clinical recommendation for that setting. Annually the State will report on the number of CMs who want and may be able to transition to PSH in the future. The State will work with providers to ensure plans are in place for these CMs to acquire skills that support living in PSH.

The State will identify the number of Class Members who require the support of a SMHRF, as determined under EC-2 and report on this number annually.

The Court Monitor may review the records of a 10% sample of these Class Members to verify the State's process and findings.

EC-3. The State will report the notification of any SMHRF that is projected to close immediately upon receiving notification. The State will plan for the transition of all Class Members to an alternate setting where their needs can be suitably met. Whenever possible the State will transition those Class Members who wish to live in the community setting to a community setting depending on availability.

**Method for assessing compliance**: Immediate notification from the State and periodic reports until all Class Members are transitioned. The State will issue a final report of the dispositions of all affected Class Members.

DPH will investigate all complaints made as a result of the facility closure and the transition process and report to the Court Monitor and Plaintiffs.

**Implementation Plan Requirements**

**Colbert VII.A. and Williams' VIII. require creation and implementation of an annual IP**

**VII.B-D. Needs to be developed with the Monitor and Plaintiffs, be updated annually.**

1. Establish specific tasks, timetables, goals, progress, plans, strategies and protocols
2. Describe hiring, training and supervision of the personnel to implement the Decree (Monitor needs clarification of this requirement)
3. Describe activities to support development of transition services including inter-agency agreements, RFPs and mechanisms for housing assistance
4. Identify services that are needed in SPs that are not currently available in the appropriate quantity, quality or geographic location
5. Identify changes needed in NF regulations- has this been accomplished?
6. Describe the methods by which Defendants ensure compliance with obligations

The Parties and Court Monitor will agree to an annual Implementation Plan to be issued for each fiscal year and submitted to the Court. The Implementation Plan will be developed from the Compliance Indicators and will include any specific activities, pilots, system design implementation, studies and follow up to recommendations of the Court Monitor the State plans to undertake in each fiscal year to assist the State to achieve compliance with the CIs. It may include interim metrics if the State sets these to enhance systems performance.

**Compliance indicator for Quality Data Reporting**:
QD-1. The State will develop and maintain an effective data collection system to report on the Compliance indicators. The State develops a Data Quality Monitoring Plan to ensure that it is collecting and analyzing consistent, accurate

and reliable data. Under the Data Quality Monitoring Plan, the State assesses data quality, including the validity and reliability of data and makes recommendations to the appropriate administrator on how data quality issues may be remediated. Data sources will not be used for compliance reporting until they have been found to be valid and reliable. This evaluation occurs at least annually and includes a review of, at a minimum, data validation processes, data origination, and data uniqueness.

The Court Monitor will review the Data Quality Monitoring Plan. The review will include the following: A validation of the reliability of the data collection processes, the inter-rater reliability components, spot checks to confirm the reliability and validity of the data sources and processes. The Court Monitor will continue to review any revisions made to the processes and reporting system to verify its continued reliability and validity.

The State will continue to report monthly pipeline data and completed transitions compared to annual requirements as stipulated in the reasonable pace plan. All other data regarding outreach, assessment, service planning and service delivery as stipulated in the CIs, will be reported semiannually and annually. The Court Monitor may request ad-hoc reports or interim data if the Monitor or Plaintiffs raise any concerns regarding Consent Decree implementation.

The State will develop its quality assurance process to address the CIs that require a quality review by the State and a sampling review process by the Court Monitor. The process will be reviewed and approved by the Court Monitor.


**Determining Compliance**

The Court Monitor will review the semiannual and annual reports from the State and using the calculations set forth in this document will determine the metrics the State has achieved towards compliance with all requirements expressed as Compliance Indicators. This plan for achieving substantial compliance articulates the Indicators of Compliance that the Court Monitor believes must be achieved for the State to be in substantial compliance with the Williams Consent Decree and eventually exit from Court oversight.

Substantial compliance with the Decree is achieved when the total level of compliance for each Pillar of the Decree: Outreach, Assessment, Service Planning, Transition, VI.D.3 and Quality Monitoring is 85% overall, with no metric for a specific CI within a Pillar area below 75% and all data sources and processes have been verified.

The CIs that are marked as requiring Full Compliance must individually achieve a performance level of 85%. When a CI has met the benchmark metric for two sequential reporting periods the Court Monitor will determine that the compliance with the CI has been sustained. CIs that have been sustained will no longer be monitored but the State will be expected to report if there is any significant reduction in performance and how this change in performance will be addressed. The performance metric for all CIs within a Pillar will be calculated to determine the overall performance level for the Pillar. The Court Monitor will use the last percentage achieved for any CIs that are sustained to make this overall calculation annually.

Kathryn du Pree MPS
Court Monitor
Williams Consent Decree
December 4, 2023