# *Williams v. Pritzker*

Case No. 05-C4673 (N.D. Ill.)

Court Monitor FY2023 Compliance Assessment
Annual Report to the Court
March 11, 2024

Kathryn du Pree, MPS
Court Monitor

**Table of Contents**

Executive Summary.................................................................................................................... Page 3

Section I: Introduction.............................................................................................................. Page 5

Section II: Diversion................................................................................................................. Page 10

Section III: Outreach to *Williams* Class Members..................................................... Page 15

Section IV: Assessment for *Williams* Class Members................................................ Page 24

Section V: Service Planning for *Williams* Class Members........................................ Page 29

Section VI: Transition Activities to Support Class *Williams* Class Members......... Page 38

Section VII: Community-Based Services and Housing Development.................... Page 50

Section VIII: Administrative Requirements.................................................................... Page 58

Section IX: Implementation Planning............................................................................ Page 63

Section X: Quality Assurance............................................................................................. Page 67

Section XI: Recommendations.......................................................................................... Page 70

Section XII: Conclusion........................................................................................................ Page 73

Attachment 1: Transition Pipeline Case Study.......................................................... Page 76

Attachment 2: Court Monitor's Follow Up to the Defendant's Response to the Transition Pipeline Study.................................................................................................................... Page 95

**Executive Summary**

This report provides Judge Joan Lefkow, Senior United States District Judge, Northern District of Illinois, and the *Williams* Consent Decree Parties with the Court Monitor's detailed assessment of the Defendants' Fiscal Year 2023 (FY23) compliance under *Williams* v. Pritzker (Case No. 07 C 4673). Within this report, the Court Monitor endeavors to provide the Court and others with a fair and neutral assessment of the Defendants' performance relative to eighty-seven compliance requirements contained in the *Williams* Consent Decree and the FY23 Implementation Plan. This is the second annual report to the Court produced by Ms. Kathryn du Pree, appointed on August 1, 2022.

There were eighty-seven requirements in the *Williams* Consent Decree and FY23 Implementation Plan applicable for compliance assessment and non-duplicative. As displayed in *Table 1,* 49 (56%) were found in compliance, 21 (24%) were found in partial compliance, and 17 (20%) were found out-of-compliance. *Table 1* compares these results with FY22. The total percentage in compliance decreased from 59% in FY22 to 56% FY23.

**Table 1: Compliance Ratings for FY22 and FY23**

| Rating | FY22 # | FY22 % | FY23 # | FY23 % |
|---|---|---|---|---|
| In Compliance | 57 | 59% | 49 | 56% |
| Partial Compliance | 21 | 22% | 21 | 24% |
| Out-of-Compliance | 19 | 19% | 17 | 20% |
| Total Requirements | 97 | | 87 | |

*Table 2* illustrates the FY23 determinations for each domain including both Consent Decree and FY23 Implementation Plan requirements, aggregated to the number of requirements falling within each compliance category. This report contains a dedicated section for each of the compliance domains listed below and includes the Court Monitor's rationale for each rating. In these sections a comparison to FY22 ratings is offered where applicable.

**Table 2: Summary of FY23 Requirements and Compliance Ratings**

| | In Compliance | | Partial Compliance | | Out-of-Compliance | |
|---|---|---|---|---|---|---|
| Diversion Requirements 6 Rated | In Compliance | 2 | Partial Compliance | 4 | Out-of-Compliance | 0 |
| Outreach Requirements 13 Rated | In Compliance | 5 | Partial Compliance | 3 | Out-of- Compliance | 5 |
| Assessment Requirements 6 Rated | In Compliance | 1 | Partial Compliance | 3 | Out-of- Compliance | 2 |
| Service Plan Requirements 12 Rated | In Compliance | 2 | Partial Compliance | 7 | Out-of- Compliance | 3 |
| Transition Requirements 19 Rated | In Compliance | 11 | Partial Compliance | 2 | Out-of-Compliance | 6 |
| Community-Based Services/Housing Requirements 9 Rated | In Compliance | 6 | Partial Compliance | 2 | Out-of- Compliance | 1 |
| Administrative Requirements 9 Rated | In Compliance | 9 | Partial Compliance | 0 | Out-of-Compliance | 0 |
| Implementation Plan Requirements 13 Rated | In Compliance | 13 | Partial Compliance | 0 | Out-of-Compliance | 0 |
| | | | | | | |
| Total Requirements 87 Rated | In Compliance | 49 | Partial Compliance | 21 | Out-of-Compliance | 17 |
| FY23 Performance | In Compliance | 56% | Partial Compliance | 24% | Out-of-Compliance | 20% |

At the time of this report's submission, it has been over thirteen years since entry of the *Williams* Consent Decree. In FY23, the Defendants demonstrated similar performance achieving the Consent Decree and Implementation Plan requirements as they did in FY22 but underperformed in the very important measure of success which is transitioning Class Members. The State decreased its target of transitions to 400 in FY23 from 425 in FY22. However, it only met 80% of this requirement and transitioned fewer Class Members in FY23 than were transitioned in FY22. The success of the Front Door Diversion Program is notable which contributed to a decrease in the census of SMHRFs. The census decreased from 3,330 to 2,958 residents between the two fiscal years. This decrease of 372 (13%) in the census is the most significant decrease since the implementation of the Decree.

Significant challenges persist, and the Court Monitor offers several recommendations in each Section for the State to ensure: all Class Members have been outreached; going forward, Class Members post-60 days from admission are outreached in the required timeframe; that assessments and service plans are completed for Class Members who will be outreached in FY24 and going forward are completed in the required timeframe; and that transitions are planned and implemented so that Class Members who express the desire to return to the community do not wait for months or even years to transition. This requires the State to identify all existing Class Members who want to

transition; assure the needed resources for outreach, assessment and service planning; develop the capacity of community-based services the Class Members need to achieve successful transitions; and develop a plan for the reasonable pace of transitions to address the needs of existing Class Members and future admissions, while diverting as many individuals as possible from initial admission to a SMHRF.

These recommendations are made for the State's consideration in light of my analysis of current performance and my experiences both designing and evaluating service delivery systems. I expect the State to respond to each recommendation within three months of receiving this report indicating which recommendations will be implemented and the reasons for not implementing any others. I understand the State may have strategies they believe will lead to higher performance given their knowledge of their existing system and resources. I expect the State to inform both the Court Monitor and the Plaintiffs of any different strategies they plan to pursue as an alternative to a recommendation contained in this report, so all Parties are aware of the State's specific plans for systemic change and improved performance.

**Section I. Introduction**
This report presents the Court Monitor's assessment ratings and relevant discussions of the Defendants' compliance under *Williams* v. Pritzker (Case No. 05 C 4673; United States District Court for the Northern District of Illinois – Eastern Division) based on the assessment period of FY23. The report's basis for compliance assessment includes the original *Williams* Consent Decree requirements and commitments made by the Defendants via the Williams FY23 Implementation Plan, which are enforceable as requirements pursuant to the *Williams* Consent Decree. This report is issued in fulfillment of the Consent Decree's requirement for the Court Monitor to, "within 60 days after the end of each year of service…report to the Court and the Parties regarding noncompliance with the Decree."

Per the Consent Decree, "such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and the Plaintiffs to evaluate Defendants' compliance or non-compliance with the terms of the Decree." This represents the second *Williams* compliance assessment report to the Court from Ms. Kathryn du Pree, appointed as Court Monitor by Judge Lefkow on August 1, 2022.

Compliance Assessment Period. The period subject to compliance assessment in this report is July 1, 2022, to June 30, 2023, otherwise referred to as FY23. Other significant developments that occurred prior or after that timeframe are mentioned when deemed relevant to readers' understanding of context, trends, and initiatives.

<u>FY23 Requirements.</u> The *Williams* Consent Decree and FY23 Implementation Plan contain eighty-nine specific numeric, process, and quality-related requirements of the Defendants that focus on designing, developing, and implementing a program that facilitates and operationalizes opportunities for eligible Class Members to re-enter the community from residing in the twenty-one Specialized Mental Health Rehabilitation Facilities (SMHRFs). These eighty-nine requirements were assessed for the FY23 reporting period, after subtracting duplicated requirements, original Consent Decree requirements which apply to previous reporting periods, and requirements on the Court Monitor and Plaintiffs' Counsel. These requirements span multiple domains of the Defendants' obligations pursuant to the *Williams* Consent Decree, including diversion, outreach, assessment, service planning, transition support, expansion or development of community-based housing and services, implementation planning, and administrative support (see graphic below). Two additional Consent Decree requirements focus on Court Monitor duties and the Parties and Court Monitor's involvement in various planning and reporting aspects. Any requirements that have been deemed Not Applicable in past reports have been excluded from this report for ease of reading.

**Of the 87 requirements that apply to FY23, 49 (56%) are in compliance, 21 (24%) are in partial compliance, and 17 (20%) are out-of-compliance.**

<u>Structure of Report.</u> The Court Monitor has maintained the basic reporting structure used by her predecessor, Ms. Gail Hutchings. This is the last report that will be completed before the State begins reporting its progress meeting the Compliance Indicators which have been developed by the Court Monitor's Office with significant input and feedback from the Parties. This reporting will require the format of the Monitor's Annual Reports to change so it seemed most practical to make those format changes only once starting with the FY24 Annual Report.

Within each domain, the requirements specific to that domain from the Consent Decree and FY23 Implementation Plan are identified. As shown in the graphic below, the first five sections of the report align with the chronological sequence of a Class Member's touch points with Consent Decree processes (e.g., diversion, outreach, assessment, service planning, transition), followed by three additional sections: services and housing capacity development, administrative support, and implementation planning. Given that the report's sections are organized in this fashion, the order of the requirements in this report do not reflect the order of the requirements as they appear in source documents (i.e., Consent Decree, Implementation Plan).



Each of the domain-specific sections herein include the following components:

1. A description of the domain and how it relates to overall Consent Decree compliance.
2. A data highlights section that provides a brief synopsis of relevant data and information for the given domain.
3. A table that provides the text of each Consent Decree and Implementation Plan requirement, the Court Monitor's determination of whether the Defendants (or others, when relevant) achieved compliance with each requirement during FY23, and data/information that led the Court Monitor to make that determination. Each compliance criterion correlates to the Consent Decree or Implementation Plan. The grid also includes FY22 ratings to provide a comparison to prior performance. The Court Monitor decided to only include data from FY22, as performance was most likely skewed in the two previous fiscal years because of the COVID pandemic and its impact on all aspects of service delivery.
4. A summary and specific recommendations of the Court Monitor for improvement where applicable.

Compliance Assessment Approach. For this report's purposes, one of three determinations (i.e., in compliance, partial compliance, out-of-compliance) was assigned to each requirement applicable to the FY23 compliance assessment period. *Table 3* displays the compliance assessment determination categories and their definition of use.

**Table 3: Court Monitor Assessment Rating Categories and Definitions**

| Compliance Assessment Rating Category | Definition | Legend |
|---|---|---|
| In Compliance | The Defendants' performance was substantially in accordance with the criterion, requirement, or obligation. | Green |
| Partial Compliance | The Defendants met some aspects, but not other aspects, of the criterion, requirement, or obligation. For numeric requirements, the Court Monitor generally assigned this rating in instances where the Defendants achieved more than 50 percent compliance balanced with whether the Defendants had a system or process in place relative to the specific requirement. | Yellow |

| | | |
|---|---|---|
| Out-of-Compliance | The Defendants either failed to comply with the requirement or failed to demonstrate compliance with the standard. | Red |
| *Other Categories* | | |
| Court Monitor Requirement | Requirements reflect the Court Monitor's obligations. | |
| Duplicate Requirement | Requirements have already been represented and rated (either separately or with other requirements) and double counting would skew the overall compliance determination; in some cases, these requirements represent the overall purpose of a section of the Consent Decree. | |

Some requirements under the *Williams* Consent Decree are clearly numeric/quantitative in nature, while others require the Court Monitor's evaluation and compliance determination based on the best available data and the Court Monitor's professional judgment. In both circumstances, data and information are provided, with source citation, to support the Court Monitor's compliance assessment determinations.

In the FY23 Implementation Plan, the Defendants developed a set of metrics and "expected outcome[s]" that fall under each strategy. Given that several strategies had multiple "expected outcomes," it was difficult to assign a unified rating at the strategy-level. As such, this Court Monitor elected to rate each "expected outcome" separately. Thus, the total count of requirements for FY23 includes the original Consent Decree requirements and all expected outcomes from the FY23 Implementation Plan rated individually.

*Achieved vs. Required Transitions. Table 4* depicts the number of required vs. achieved Court-required transitions since the Consent Decree's initial implementation. Between FY12 and FY23, 3,530 Class Members were transitioned, with the Defendants exceeding transition requirements in one out of the eleven years of *Williams* implementation. For this report's compliance assessment period, FY23, the Defendants transitioned 338 Class Members, out of the 425 that were required. This is a decrease in both the number and percentage of Class Members transitioned compared to FY22.

**Table 4: Williams Transitions: FY12 – FY23**

| FY | Transitions Required | Transitions Achieved in FY | Performance % |
|---|---|---|---|
| 2012 | 256 | 263[1] | 103% |
| 2013 | 384 | 354 | 92% |
| 2014 | 423 | 321 | 76% |
| 2015 | 390 | 374 | 96% |
| 2016 | 400 | 374 | 94% |

| 2017 | 400 | 377 | 94% |
|------|-----|-----|-----|
| 2018 | 400 | 315 | 79% |
| 2019 | 400 | 256 | 64% |
| 2020 | 400 | 170 | 43% |
| 2021 | N/A | 180 | N/A |
| 2022 | 400 | 355 | 89% |
| 2023 | 425 | 338 | 80% |
| *Total* | *4,278* | *3,530* | *82.5%* |

*Williams Class Size.* One can also look at the total number of residents in SMHRFs ("SMHRF census") to understand whether Consent Decree efforts of diversion and transition are reducing the number of Class Members residing in SMHRFs overall. The Defendants have historically used this figure to reflect one sub-component of the *Williams* Class, given that most if not all SMHRF residents are likely meet the Class definition. *Table 5* provides data on the total number of residents across all SMHRFs between FY12 and FY23, generally calculated on the last day of the prior fiscal year or first day of the new fiscal year. The figure also includes the percentage year-to-year change and the percentage of transitioned Class Members compared to SMHRF census. This data reflects a decrease of 1,133 residents (27.7%) since FY12. In FY12, there was an average of 170 residents per facility (24 facilities total). In FY2023, there was an average of 141 residents per facility (21 facilities total), demonstrating a continued downward trend in census per facility. For the compliance period, HFS data indicates a SMHRF census total of 2,958 residents (reported as of the first day of FY23). This is a decrease of 372 (13%) of the SMHRF residents since the previous year. This decrease was achieved even though the State transitioned fewer Class Members in FY23 than were transitioned in FY22. The combination of transitions with the Front Door Diversion Program (FDDP) contribute to this positive trend. The current number of Class Members living in SMHRFs is below 3,000 which is the lowest census since the Consent Decree was signed.

As mentioned above, one sub-component in the *Williams* Class is the SMHRF census. The second subgroup involves the number of Class Members transitioned into the community through the *Williams* program. As indicated in *Table 4* above, the State transitioned 3,530 Class Members between FY12 and FY23.

**Table 5: FY12-23 SMHRF Census, # and % of Class Members Transitioned**

| FY | SMHRF Census | Year-to-Year % Change (Facility Census Only) | # of Transitioned Class Members | % of Transitioned Class Members in SMHRF Census |
|---|---|---|---|---|
| 2012 | 4091 | (baseline) | 263 | 6.4% |
| 2013 | 4059 | -0.8% | 354 | 8.7% |
| 2014 | 3854 | -5.1% | 321 | 8.3% |
| 2015 | 3835 | -0.5% | 374 | 9.8% |
| 2016 | 3782 | -1.4% | 374 | 9.9% |
| 2017 | 3794 | +0.3% | 377 | 9.9% |
| 2018 | 3815 | +0.5% | 315 | 8.3% |
| 2019 | 3781 | -0.9% | 256 | 6.8% |
| 2020 | 3583 | -5.5% | 170 | 4.7% |
| 2021 | 3484 | -2.8% | 180 | 5.2% |
| 2022 | 3330 | -4.4% | 355 | 10.6% |
| 2023 | 2958 | -13% | 338 | 11.4% |

*Allocated vs. Spent Budget Appropriations.* In FY23, the *Williams* program was allocated a $62.8 million budget to cover staff costs, contractors (e.g., organizations that provide outreach, assessment, and transition services), quality improvement support, and other key program activities. Notably, this budget does not include costs for mainstream resources that — while available to and used by some *Williams* Class Members — are not exclusively developed or designated for them such as some Medicaid spending, housing subsidies, community-based behavioral health services, primary healthcare, and housing services developed or paid for outside of Consent Decree implementation activities.

As shown in *Table 6* during FY18-FY22, the Defendants allowed significant amounts of appropriated funds to lapse. In FY22, Defendants' lapsed appropriation was $6.7 million, representing an improvement over previous years of lapsed appropriations. In FY23 the State did not lapse any of the Williams' budget. Rather the State reported expenditures of $60,904,326 compared to a budget of $52,651,400. This indicates the State expended 116% of its budget to support *Williams* Class Members and the activities required to support their transitions to the community. In part this was because of a larger than projected number of bridge subsidies. These are essential rent supports that enable Class Members with no or limited income to live in the community, primarily residing in their own apartments.

**Table 6: Budget Appropriations and Expenditures FY18-FY23**

| Fiscal Year | Transition Performance | Budget Allocation | Expenditures | Lapsed Funds |
|---|---|---|---|---|
| FY18 | 79% | $44.7M | $37.8M | $6.9M (15%) |
| FY19 | 64% | $44.8M | $32.9M | $11.9M (27%) |
| FY20 | 43% | $49M | $39.7M | $9.3M (19%) |

| FY21 | N/A | $60.3M | $47.5M | $12.8M (21%) |
|------|-----|--------|--------|--------------|
| FY22 | 89% | $62.8M | $56.1M | $6.7M (11%) |
| FY23 | 80% | $52.7M | $60.9M | No Lapse |

**Statewide Human Services Workforce Development**

During FY22, the Defendant State Agencies[2] met and engaged in several strategies to address the nationwide staff shortages currently impacting Illinois across the human services fields, which have been exacerbated by the COVID-19 pandemic. Multi-agency meetings were held throughout the year, and additional discussions continue to take place into FY23. Specific initiatives include launching a $5 million student loan repayment program to promote recruitment and retention efforts for the mental health workforce, an $8 million investment to recruit and train individuals with lived mental health expertise, and an additional $6 million to launch the Behavioral Health Workforce Education Center. The Center will create a consortium of institutions of higher education to create educational pathways into the workforce and provided research and analysis on the barriers and strategies to improve the workforce.

While the service delivery system continues to underperform in many of the requirements of the Decree, performance in some areas noted later in this report did improve. Prime agencies also reported during the Court Monitor's Transition Planning Case Study that the organizations were experiencing fewer vacancies and improving staff retention.

**Section II. Diversion**

*Diversion and Pre-Admission Assessments.* Many Consent Decree initiatives focus on transitioning Class Members from institutions into the community. True systems rebalancing hinges upon ending needless admissions into such facilities. Accordingly, the Consent Decree is clear that admissions to SMHRFs should be limited to those who require that level of care or elect to go there. The Consent Decree also requires that Class Members are only admitted to SMHRFs that can deliver the services specified in their pre-admission service plans. A reduction in admission and diversion of individuals who could be better served and remain in the community as a result, were to be effectuated through two Consent Decree requirements: one focused on the redesign and enhancement of the preadmission assessment process and one focused on preventing individuals who could be served in the community from needless admission unless they prefer SMHRF admission. As described in Section II, the State has implemented a new SMHRF pre-admission process designed to address the spirit of the Preadmission Screening and Resident Review (PASRR) requirement that preceded the redesign and is specified in the Decree.

Further, in acknowledgement that most SMHRF admissions derive from acute care hospital psychiatric units, the State, since 2017, has operated the FDDP as the diversion programming in hospitals. In FY22, after a range of COVID-related barriers, FDDP was operational at 46 hospitals. The program was expected to expand in FY23, but it did not. While it remains unclear whether FDDP, in concert with the redesigned SMHRF pre-admission process, is preventing all individuals appropriate for community-based services who want to live in the community from admission to SMHRFs, it is notable that such programming is now in place and has diverted a substantial number of individuals during FY23 resulting in a decreased census at the remaining twenty-one SMHRFs operating in Illinois.

The *Williams* Consent Decree includes requirements that are designed to significantly restrict the flow of needless admissions to SMHRFs, limiting admissions to those who presently cannot successfully be served outside of a long-term care setting or choose to live in such settings.

The Consent Decree mandated a redesigned PASRR process, due within one year of the initial Implementation Plan (June 2012). PASRR was to include an enhanced service planning process to assess an individual's appropriateness for community-based services, describe the types and duration of services needed, and – for those ultimately referred to SMHRFs - ensure that the SMHRF can deliver the services specified in the Service Plan (SP). The Consent Decree then provided the Defendants with four additional years (until June 2016) to ensure sufficient capacity such that no Class Member identified for community-based services at the PASRR stage is needlessly institutionalized unless, after fully informed consent, he or she elects to live in long-term care.

In addition to these two original Consent Decree requirements, the FY23 Implementation Plan included two more requirements, centered on completing timely screenings of individuals referred for an admission to a SMHRF and offering these individuals community services within a reasonable period of time to divert them from admission to SMHRFs.


While the Consent Decree identified PASRR as the mechanism to divert appropriate individuals from William's facilities, PASRR generally applies to nursing facility admissions. As of the implementation of the SMHRF Act of 2013, SMHRFs are no longer designated as nursing facilities. As such, the Defendants, in partnership with their PASRR vendor, redesigned the PASRR system for nursing facilities and also created an aligned alternative SMHRF preadmission process that encompasses diversion and admission guidelines for SMHRFs.

<u>Diversion Data Highlights.</u> This section summarizes the State's FY23 diversion data provided in their semi-annual reports.

- The Front Door Diversion Program (FDDP) was operational at 46 hospitals, with 3,213 referrals of whom 1,250 (39%) were assessed for FDDP. The FDDP made meaningful offers for community services and/or temporary housing to 639 (51%) of these individuals.
- Four hundred sixty-three (463) individuals accepted these offers and of the 463, 392 (85%) were diverted from an admission to a SMHRF. This compares favorably to the 341 individuals who were ultimately diverted in FY22.
- Of the 1,963 individuals who were referred but who were not assessed, 617 were discharged; 882 refused the assessment; and the guardians for 11 refused the assessment. The remaining 453 were either unexplained or unavailable for assessment.
- Of the 608 who were assessed but who did not receive an offer from the FDDP, 374 (61.5%) had either a psychiatric service need or had combined medical and psychiatric service needs that were too great. There was a high risk of behavioral concern for 59 (10%) and 69 (11%) had another discharge plan. Other reasons for the FDDP not being offered after assessment included functional needs, medical needs, or the unavailability of housing.
- Offers that were made but were declined totaled 179, of which 46 (26%) had other discharge plans and 44 (25%) preferred a long-term care setting. Additionally, 22 (12%) did not find the housing either adequate or in a preferred location. Another 22 (12%) declined. Other reasons included functional, medical, or mental health needs, or a lack of interest.

*Diversion-Related Requirements and Compliance Ratings. Table 7* lists the requirements for Diversion. Across the six Consent Decree and FY23 Implementation Plan requirements, **two are in compliance, and four are in partial compliance.**

**Table 7: Consent Decree Diversion Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Diversion Requirement Language and FY22 Performance | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 1 | *Williams* Consent Decree VI(8)(B) | Within one (1) year of finalization of the Implementation Plan [2012] no individual with Mental Illness shall be admitted to an IMD without a prescreening having first been conducted through the PASRR Process and an initial Service Plan completed. Defendants will ensure that the PASRR Process: identifies and assesses individuals who may be appropriate for placement in a Community-Based setting; identifies Community-Based Services that would facilitate that placement; and ensures that approved admissions to IMDs are only for those IMDs that can provide treatment consistent with the individual's initial Service Plan and consistent with the goal of transition to a Community-Based Setting.<br><br>***In Compliance.*** In April 2022, the Defendants implemented a PASRR-aligned SMHRF pre-admission assessment and referral process. The SMHRF pre-admission screening process was in place for all of FY23. 4,858 individuals received a preadmission assessment. The State did confirm that when a SMHRF admits someone to their census via Path tracker, the SMHRF confirms SMHRF commits to providing the services outlined in the SMHRF pre-admission assessment, and any subsequent assessments, as long as the person remains a resident. As a result, this is determined to be In Compliance. | **Partial Compliance** | **In Compliance** |
| 2 | *Williams* Consent Decree VI(8)(B) | After the first five (5) years following the finalization of the Implementation Plan 2016, no individual with Mental Illness whose Service Plan provides for placement in Community-Based settings shall be housed or offered placement in an IMD at public expense unless, after being fully informed, he or she declines the opportunity to receive services in a Community-Based Setting. | **Partial Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| | | ***Partial Compliance.*** The State made significant efforts implementing the PASRR-aligned SMHRF preadmission process and the Front Door Diversion Program (FDDP). The State reported on individuals referred to FDDP but not assessed (discharged, refusal, other plans, unavailable); the reasons for no offer after assessment (severity of need, high risk); and reported why offers were not accepted. However, the State is able to provide the FDDP affiliation with only forty-six (70%) of the sixty-six hospital that refer individuals to SMHRFs in FY23. Currently the program is not available statewide to all individuals who are otherwise admitted to a SMHRF. Given the lack of FDDP affiliation to all of these hospitals not everyone referred for an admission to a SMHRF has the opportunity to remain in the community and be served by the FDDP. | | |

| FD1 (1) | FY23 IP | Strategy: Via SMHRF Pre-Admission assessment redesign, all individuals who are evaluated and eligible for SMHRF admission, do not decline referral, and who are appropriate for Community-Based Services, will also be referred to FDDP.<br><br>Expected Outcome:<br>● 95% of individuals who are determined eligible for SMHRF admission, do not decline referral, and are appropriate for community-based services are referred to FDDP.<br><br>***In Compliance***. 2,644 (100%) of individuals who were determined eligible for SMHRF admission who did not decline referral and were appropriate for CBS were referred to FDDP. The State reports that 129 (5%) of these individuals were referred from hospitals with no affiliation to a FDDP. This means that there was no actual program to refer them to. However, because 95% of the 2,644 individuals determined eligible for a SMHRF and who did not decline a referral were referred to a functioning FDDP this is determined to be in compliance.<br>This is an area of reporting where there is inconsistent data. Data reported from UIC differs from the data provided by the vendor who performs the SMHRF preadmission assessments and makes the referrals to FDDP. The Court Monitor has relied on the data from the preadmission assessment vendor in making this determination of compliance. The Court Monitor will work with the State in FY24 and FY25 to insure the State is providing reliable, valid and consistent data for all compliance reporting. | **Not Rated in FY22** | **In Compliance** |

| FD1 (2) | FY23 IP | Strategy: See above.<br><br>Expected Outcome:<br>● 100% of SMHRF preadmission assessments will be completed within 48 hours of receipt of the SMHRF referral<br><br>***Partial Compliance.*** 2610 (54%) of 4858 SMHRF assessments were completed within 48 hours of receipt of the SMHRF referral. Defendant's note that extended turnaround times for SMHRF preadmission assessments are primarily due to hospitals not permitting access in the evenings and weekend which the State will need to address in the future. | **Not Rated in FY22** | **Partial Compliance** |
|---|---|---|---|---|
| FD1 (3) | FY23 IP | Strategy: See above.<br><br>Expected Outcome:<br>● 100% of SMHRF preadmission assessments will be reviewed and finalized by quality clinician during the 48-hour turnaround time. Quality review includes checks for internal consistency, ensuring the IM-CANs items are accurate based on clinical anchors in the IM-CANS manual, and resolving any issues requiring clarification or follow-<br><br>***Partial Compliance***. 2610/4858 (54%) of SMHRF preadmission assessments were reviewed and finalized by quality clinician within 48 hours of receipt of referral. | | **Partial Compliance** |
| FD2 (1) | FY23 IP | Strategy: All individuals who accept FDDP referral and remain engaged in the process for community placement, will be provided a meaningful offer[3] of a Community-Based placement and services<br><br>Expected Outcomes:<br>● 85% of individuals engaged in FDDP process are provided a meaningful offer of Community-Based placement and services within 24 hours of referral to FDDP.<br><br>***Partial Compliance.*** 560 (61%) meaningful offers were made to 921 engaged participants within 24 hours of referral to FDDP. | **Out-of-compliance** | **Partial Compliance** |

**Section III. Outreach**

The Consent Decree mandates that all Class Members receive outreach. The objectives of outreach are to effectively and with appropriate frequency help Class Members understand their rights and responsibilities under the Consent Decree, promote the availability of community-based supports and services, navigate any concerns a Class Member has about the process or ultimate transition, and provide opportunities to observe community-based housing and services. Ultimately, the goal of outreach is to link interested Class Members with the opportunity to participate in an assessment to determine appropriateness for transition.

Each Specialized Mental Health Rehabilitation Facility (SMHRF) has an assigned Prime agency responsible for outreach within its facility. Prime agencies primarily utilize each SMHRF's resident census list to inform who should receive outreach, but they also accept referrals directly from SMHRF staff, from NAMI ambassadors, and from Class Members themselves. Per the State's policy as of FY23, each Class Member who is not proceeding to transition is required to receive outreach annually from a Prime agency and is then to be contacted by a Peer Ambassador 90 days and 135 days after initially declining transition. Newly admitted Class Members
must receive outreach within a 60–70-day window after admission.

Outreach-Related Requirements. There are four *Williams* Consent Decree requirements related to outreach, one is considered duplicative (Requirement 4). They obligate the Defendants to ensure that Class Members residing in SMHRFs receive comprehensive information about their rights to live in the community, as well as to provide detailed information on the types of community-based services and housing available to them. Further, the Defendants must protect Class Members from retaliation or infringement on their rights to explore community-based options (Requirement 3). They must also bear the full cost of outreach (Requirement 6). In addition to these requirements, the State is required, pursuant to their FY23 Implementation Plan, to comply with ten additional requirements focused on timely provision of initial outreach and outreach re-attempts, enhanced Peer Ambassador programming to deepen outreach engagement and increased measures to protect Class Members from retaliation, among others.

Outreach Data Highlights. This section summarizes the Defendants' FY23 outreach data, provided in their semi-annual reports.

- 322 newly admitted Class Members were identified as needing outreach of whom 103 (32%) had a completed outreach.
- Of the 322 Class Members requiring outreach after admission, 36 (11%) were completed in seventy days or less.
- Of the 103 Class Members who had outreach completed only half, 52 proceeded to assessment and 51 declined to transition.
- 491 Class Members were identified for follow up outreach to occur at least annually. Annual outreach was attempted for 213 (43%) of these Class Members. The State only reports on attempts for this cohort not on completed outreach.
- 1,598 Class Members were identified for follow up outreach. Outreach was completed for 1,524 (95%) of these Class Members. There is no explanation of who these data represent separate from Class Members needing annual outreach.
- Of the 1,524 who completed outreach, 863 (57%) proceeded to assessment and 662 (43%) declined to transition.
- The most common reasons for outreach refusals were lack of interest, preference to remain in the facility, and Class Member refusal, collectively constituting 87% of all refusals compared to 82% of the refusals in FY22.
- The 17-20 NAMI Ambassadors made 199 community visits and contacted 349 Class Members, with 292 engagements. This means that on average, each Ambassador conducted 11 community visits (compared to 11 in FY22) and 16 (compared to 28 in FY22) Class Member engagements in the year. Engagements were decreased from FY22 to FY23 even though there were 7-10 more Peer Ambassadors in FY23. The State cannot report on unique Class Members but rather the total number of engagements and visits which may have been multiple for any one Class Member.

The inadequacy of the Defendants' data renders it difficult for the Court Monitor to quantitatively assess whether all eligible Class Members are receiving outreach, whether Class Members receive outreach often enough to facilitate rapport and education about their options to live the community, and whether that outreach is of sufficient quality. Examples of potential data reliability issues and/or questions include:

- The Court Monitor questions whether the number of Class Members identified for outreach [1,598] is the accurate denominator representing who *should* receive outreach, given that 2,958 Class Members resided in SMHRFs at the beginning of FY23. The 1,598 figure does not yet subtract Class Member discharges, transfers, and deaths. However, there are 593 CMs in the Pipeline awaiting transition so these Class Members would no longer be on a list for outreach. These two numbers account for only 2,191 of the 2,958 CMs as of

June 30, 2022.

- Only 491 CMs were identified for annual outreach with no explanation of their relationship if any to the 1,598 who had "other outreach".
- The data as currently presented provides no way to assess whether each Class Member received the 90- and 135-day outreach from the Peer Ambassadors or what the results were.
- The State identified 380 Williams Class Members late in FY23 who have no record of ever receiving outreach. The State indicated this number was not complete at that time.

Since data collection starts with outreach activities the serious concerns the Court Monitor has about the reliability and validity of the State's data will be summarized here but has implications for all areas of reporting. The data collection and analysis process are the direct drivers and information sources that provide the information necessary to determine compliance and informs the system change process in any Consent Decree. The combined experience of the Court Monitor and her Consultant in a number of Consent Decrees and Court Settlement Agreements has shown that the vast majority of States have not had a reliable and valid process for data collection and analysis initially. A current example is the Settlement Agreement between the US Department of Justice and the Commonwealth of Virginia. This Agreement was implemented eleven years ago. The data collection and analysis process were severely lacking in reliability and validity. Virginia had no written processes, no inter-rater reliability and lacked data systems development expertise. The Commonwealth over several years developed the resources to create data collection, analysis, and reporting processes that experts could attest were reliable and valid. They now have, quite possibly, one of the most reliable and valid systems of all the states in which this Monitor and Consultant have been engaged. The written processes are reviewed and signed off by the Chief Information Officer. There is an imbedded inter-rater reliability component in all the areas where data is collected. Written mitigation strategies exist for any potential contamination point.

The data collection and analysis process presently being used by the State of Illinois, to report on the requirements of the *Williams and Colbert* Consent Decrees, resembles that of Virginia's early efforts to report. Given the lack of process statements verifying that procedures are consistently implemented, the data and analysis for the decrees are unreliable and not valid. An example of this is the Outreach data collection process. As is noted in this report the State determined after being asked for reliable outreach data, that it could not verify that almost 400 *Williams* Class Members had been outreached. To its credit the State is developing an initiative in FY24 to rectify this. As part of that effort HFS engaged an expert to review the Outreach data collection process. She shared her preliminary findings with the Court Monitor's Office in October 2023.

Numerous error points and an unacceptable lag time were identified with no existing mitigation strategies. Errors include duplicate and missing identification data.

Consequently, all the following areas: Assessment, Service Planning and Transition cannot possibly have reliable or valid data simply based on the Outreach data issues identified. The State does not have a data system that can reliably report by Class Member all aspects of transition planning. Therefore, it is important for this report to emphasize that until the Illinois system achieves a confirmed data collection, analysis and reporting system of reliable and valid data, the Court Monitor can only report and analyze the states' findings relate to Consent Decree requirements but cannot attest that the reports are accurate or valid.

The Court Monitor and Consultant will be working with the State in FY24 and FY25 to determine what data is necessary to report in the future on the achievement of the Compliance Indicators (to determine substantial compliance). The Court Monitor will require that the State creates and attests to processes that confirm data reliability and validity. We have relevant experience from our work in Connecticut, Texas and Virginia and offer to work with the Defendants to develop a similar system of reliable and valid data collection and analysis for both decrees.

It is understood that not every Class Member contact can or should be captured, given that an effective outreach program includes unstructured and informal engagements that do not lend themselves to onerous data collection requirements. However, as described in the recommendations, the Court Monitor believes that it is time to design an approach that is comprehensive and outcome-oriented so that the State can report the status of Outreach for every Class Member and can use this data to better comply with the requirements of the Decree.

Outreach-Related Requirements and Compliance Ratings. *Table 8* lists the requirements for outreach. Across the thirteen Consent Decree and FY23 Implementation Plan requirements rated **five are in compliance, three are in partial compliance, and five are out of compliance.**

**Table 8 Consent Decree Outreach Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY22 Performance | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 3 | Consent Decree VII(10) | Defendants shall ensure that Class Members have the opportunity to receive complete and accurate information regarding their rights to live in Community-Based Settings and/or receive Community-Based Services, and the available options and opportunities for doing so.<br><br>***Out-of-Compliance.*** Class Members are identified for outreach through the following pathways: admitted into SMHRFs within the past 60-70 days, existing residents who have never been engaged in outreach, Class Members due for annual outreach, or Class Members who requested outreach proactively. The Defendants report that 95% of CMs received annual outreach as described in the section above, but only 32% needing initial outreach received it at all, and only 36 (11%) of them timely. The State cannot report on the actual outreach follow up for these CMs by Peer Ambassadors. The State also identified 380 existing CMs for whom there is no evidence of outreach | **Out-of-Compliance** | **Out-of-Compliance** |
| 4 | Consent Decree VI(6)(C) | Defendants shall ensure, as provided in the Implementation Plan, that all Class Members shall be informed about Community-Based Settings, including Permanent Supportive Housing, and Community-Based Services available to assist individuals in these settings, and the financial support Class Members may receive in these settings.<br><br>***Duplicate Requirement.*** The Court Monitor views Requirement 3 as the overarching requirement to assess whether Class Members received outreach. As such, this requirement is treated as a duplicate. | **N/A, Duplicate Requirement** | **N/A, Duplicate Requirement** |
| 5 | Consent Decree VI(9)(C) | Class Members shall not be subjected to any form of retaliation in response to any option selected nor shall they be pressured to refrain from exploring appropriate alternatives to IMDs.<br><br>***In Compliance.*** There were a total of five allegations of retaliation all of which were reported and investigated. Only one of the five allegations was substantiated | **Partial Compliance** | **In Compliance** |
| 6 | Consent Decree VII(10) | All costs for outreach shall be borne by Defendants.<br><br>***In Compliance.*** The Defendants covered all outreach-related costs in FY23, as required by the Decree. | **In Compliance** | **In Compliance** |
| O1 (1) | FY23 IP | Strategy: Use new data management system for tracking new and existing CMs to ensure and enforce provider contractual requirements | **Out-of-Compliance** | **Out of Compliance** |

| | | | | |
|---|---|---|---|---|
| | | regarding timely access to Outreach for Class Members.<br><br>Expected Outcome:<br>• 80% of newly admitted CM receive Initial Outreach within 70 days of admission.<br><br>***Out-of-Compliance.*** In FY23, the Defendants report that 36 (11%) of 322 newly admitted CMs completed outreach. | | |
| O1(2) | FY23 IP | Strategy: See Above<br><br>Expected Outcome:<br>• 85% of CM not currently engaged in Transition services receive Outreach annually by a Prime agency (at a minimum).<br><br>***In Compliance***: 1,524 (95%) of the 1,598 CMs due for annual outreach were reported as having a completed outreach. | **Out-of-Compliance** | **In Compliance** |
| O2 (1) | FY23 IP | Strategy: Provide peer ambassador follow-up to CM who refuse initial/annual Outreach by a Prime and follow-up Outreach by a Peer Ambassador within 90 days of refusal (90-day follow-up + 135-day follow-up), resulting in three Outreaches per year for refusing CMs, one by the Prime and two by a Peer Ambassador.<br><br>Expected Outcome:<br>• 85% of CM who refuse Prime Outreach receive Peer Ambassador follow-up Outreach within 90 days of Prime Outreach refusal.<br><br>***Out-of-Compliance.*** In FY23 349 CMs were contacted by NAMI Peer Ambassadors. The State does not have data to determine what number or percentage of CMs who refuse Prime outreach received a follow up contact by a Peer Ambassador. A total of 713 CMs declined to transition when outreached in FY23: 52 of the new admissions and 661 of annual outreach to CMs. | **Out-of-Compliance** | **Out-of-Compliance** |

| O2 (2) | FY23 IP | Strategy: See Above<br><br>Expected Outcome:<br>• 85% of CM who refuse Peer Ambassador follow-up after refusing Prime Outreach receive another Peer Ambassador follow-up within 135 days of Peer Ambassador 90-day Outreach refusal.<br><br>**Out-of-Compliance.** In FY23 349 CMs were contacted by NAMI Peer Ambassadors. The State does not have data to determine what number or percentage of CMs who refuse Prime outreach received a follow up contact by a Peer Ambassador. | **Not Rated in FY22** | **Out-of-Compliance** |
|---|---|---|---|---|
| O3 | FY23 IP | Strategy: Continue to require Comprehensive Program staff to explore CM reasons for resistance to Transition, require documentation of reasons and responses in letter declining services.<br><br>Expected Outcome:<br>• 85% of Class Members hesitant about Transitioning to the community will have their concerns addressed by Outreach staff by providing additional information and education, with Class Member concerns and staff responses documented in the declination confirmation letter.<br><br>**Partial Compliance**: In FY23 461 (65%) of 714 CMs hesitant to transition had their concerns addressed by Outreach staff. | **Not Rated in FY22** | **Partial Compliance** |
| O4 (1) | FY23 IP | Strategy: During the first or second mandated quarterly site visit in FY23 SMHRFs, Regional Ombudsmen will inquire with Resident Council President to encourage them to allow a presentation on the Long-Term Care Ombudsman Program at a future meeting. If the President agrees, a presentation will be made at the next regularly scheduled meeting. All agreed-upon presentations will occur by 6/30/23.<br><br>Expected Outcomes:<br>• 100% of SMHRFs are provided with an invitation for presentation.<br><br>**In Compliance.** 100% of 21 SMHRFs were provided with an invitation for presentation. | **In Compliance** | **In Compliance** |

| | | | | |
|---|---|---|---|---|
| O4 (2) | FY23 IP | Strategy: See above.<br><br>Expected Outcome:<br>• Before the end of FY 23 the Ombudsman will make a facility presentation to all facilities that allow it.<br><br>***Partial Compliance.*** Of the 21 invitations made, 71% (15/21) resulted in presentations during the year. There were scheduling problems with five of the six SMHRFs that did not have a presentation and one SMHRF does not have a Resident Council. | **In Compliance** | **Partial Compliance** |
| O4 (3) | FY23 IP | Strategy: See above.<br><br>Expected Outcome:<br>• The Ombudsman will provide residents with contact cards and informational materials summarizing residents' rights, the role of Ombudsman, and how to contact their Ombudsman for assistance.<br><br>***Partial Compliance.*** The Ombudsmen provided brochures to CMs at all of the presentations with information as to how to contact the Ombudsman. However, the presentations were only offered to 71% of the SMHRFs | **Out-of-Compliance** | **Partial Compliance** |
| O5 (1) | FY23 IP | Strategy: IDPH will track, investigate, and report data on CM retaliation by SMHRF or staff and enforce and track/report on recourse imposed by IDPH on facilities.<br><br>Expected Outcome:<br>• 100% of reports by or on behalf of CMs alleging facility retaliation will have their claims investigated through the regulatory process, provided those claims are reported to IDPH directly. All such investigations and outcomes will be reported in semi-annual compliance reports.<br><br>***In Compliance.*** IDPH developed and implemented a method to track complaints of retaliation and barriers to access by Primes during the reporting period. In FY23, 100% (5/5) of CMs reporting retaliation had their claims investigated. One was substantiated. | **In Compliance** | **In Compliance** |

| O6 | FY23 IP | Strategy: Continue programming for, when appropriate, introducing Community-Based settings to CMs appropriate for such visits<br><br>Expected Outcome:<br>• 85% of Class Members who request a community visit, and are appropriate for such a visit, are offered such a visit.<br><br>***Out -of -Compliance.*** The State is unable to provide data to determine if this requirement was met. | **Not Rated in FY22** | **Out-of-Compliance** |
| --- | --- | --- | --- | --- |

**Summary**

The State acknowledges that the data regarding the outreach status for Class Members is not accurate: 380 Class Members have no record of ever being outreached. The current system of requiring Prime agencies to complete both initial outreach and follow up outreach with Class Members who have declined to transition is woefully inadequate. No more than 11% of the Class Members who are post 60-day admission received a timely outreach. A very high percentage of Class Members decline to pursue transition when outreached: 50% of first-time outreach and 43% of follow up outreach. It is more likely that Class Members will decide to remain in the SMHRF after they have been there for a period of time and become comfortable with the routine while having no realistic belief that they have any options to be supported to return to community living. It is critical that Class Members receive information about community services as soon as possible and are linked with Peers to help them decide what is best for them with support from someone with lived experience.

My recommendations to improve outreach performance are:
- Use the redesigned SMHRF screening process to provide immediate information about community options so that Outreach within 60-70 days is not the first time the Class Member understands the assistance that can be available to support transition.
- Redesign the Outreach system and provide sufficient resources so that newly admitted Class Members are routinely outreached 60-70 days post admission.
- Enforce the census reporting requirements to ensure that the entity responsible for Outreach has current and accurate admission information.
- Initiate the new Engagement and Support Pilot to provide peer support for *Williams* Class Members. Determine the effectiveness of engaging Peers with Class Members who are unsure or declining transition as part of the evaluation of the project. The State must require accurate and timely data and monitor the provider's performance.

- Complete the outstanding outreach initiative to implement a schedule to outreach these Class Members in FY24.
- Develop future reports to include the status of all Class Members regarding outreach including confirmation of outreach; results/outcome of outreach; the number proceeding to assessment; the number to be outreached annually due to a declination; and the results of the annual outreach. While these elements are reported by the State, the report has never included data for all Class Members 60 days post-admission. It is the obligation of the State to report the status of all Class Members. Once this is accomplished for outreach, the data from assessment and service planning can be more accurate.
- Address the identified weaknesses and errors in the Outreach data collection process by correction and mitigation strategies.


**Section IV. Assessment**

Under the *Williams* Consent Decree, the Defendants are required to design and implement an assessment process to identify a Class Member's medical and psychiatric conditions, along with their ability to perform activities of daily living, to determine what the person would need to transition into the community. Per the Consent Decree, the Defendants must ensure that qualified professionals conduct person-centered assessments of every Class Member who agrees to such, culminating in an indication as to whether the Class Member is or is not recommended for transition.

<u>Assessment-Related Requirements.</u> The *Williams* Consent Decree includes the following requirements for the provision of assessments, including:

- Every Class Member should be offered an assessment (Requirement 8) at the appropriate frequency (Requirement 9) that describes their options to transition into the community (Requirement 7).
- Class Members who decline assessments or who decline to move after being recommended for transition can request and receive an assessment at a later time, which must be offered on a timely basis (Requirements 10 and 14).
- Assessments must be conducted by qualified professionals (Requirement 11).
- During the annual assessment process, qualified professionals must explore and address any Class Member opposition to moving out of a Specialized Mental Health Rehabilitation Facility (SMHRF) (Requirement 13).
- Another requirement was: Assessments must be conducted annually, providing Class Members who were not recommended for transition or who elected not to move after a transition recommendation are offered future re-assessment opportunities (Requirement 12). During the discussions regarding substantial compliance the Court Monitor and Parties agreed to no longer require this reassessment but rather focus

staff resources on reviewing and revising the Service Plain (SP) every 180 days. If this review indicated further assessments were needed they would be pursued at that time.

The *Williams* FY23 Implementation Plan includes two additional requirements centered on ensuring initial and annual assessments are delivered by trained and qualified staff and are completed on a timely basis.

Assessment Data Highlights. This section summarizes the Defendants' FY23 assessment data, provided in their semi-annual reports.

- In FY23, 742 assessments were due to be initiated after a positive outreach outcome within 14 days, compared to 808 in FY22. Three hundred sixty-four (364), (49%) were initiated within 14 days. This compares positively to 296 (37%) initiated in 14 days in FY22.
- Of the 742 assessments due, 661 (89%) were completed in the reporting period.
- The State reports the assessment outcome for 688 Class Members. (This number differs from the 661 because it includes assessments that may have resulted from an outreach performed in FY22). Six hundred forty-seven (647), (94%) of these CMs were recommended for transition. Twenty-five assessments were incomplete and sixteen CMs declined to transition. Everyone who received an assessment was recommended to transition.
- The State cannot directly report the number of assessments conducted by qualified professionals, defined as staff with a master's degree in counseling/social work, psychology, or another related field. The State does report that 78 (91%) of the 86 assessors funded meet these qualifications.

*Assessment-Related Requirements and Compliance Ratings. Table 9* lists the specific requirements for Assessment. Across the six Consent Decree and FY23 Implementation Plan requirements rated below **one in compliance, three are in partial compliance, and two are out of compliance.**

**Table 9 Consent Decree Assessment Requirements and Ratings**

| Req# | Source/ Citation | *Williams* Consent Decree Requirements | FY22 Compliance Rating | FY23 Compliance Rating |
|------|------------------|----------------------------------------|------------------------|------------------------|
| 7 | *Williams* Consent Decree VI(9)(C) | Qualified Professionals shall inform Class Members of their options pursuant to subparagraphs 6(a), 6(d), and 7(b) of this Decree.<br><br>***Duplicate Requirement.*** (See Requirement 11). | **Duplicate Requirement, N/A** | **Duplicate Requirement, N/A** |
| 8 | | | **N/A** | **N/A** |

| | | | | |
|---|---|---|---|---|
| | *Williams* Consent Decree VI(6)(A) | Within two (2) years of the finalization of the Implementation Plan described below, every Class Member will receive an independent, professionally appropriate, and person-centered Evaluation [Assessment] of his or her preferences, strengths and needs in order to determine the Community-Based Services required for him or her to live in PSH or another appropriate Community-Based Setting. | | |

| 9 | *Williams* Consent Decree VII(10) | In addition to providing this information, Defendants shall ensure that the Qualified Professionals conducting the Evaluations engage residents who express concerns about leaving the IMD with appropriate frequency.<br><br>***Out-of-Compliance.*** The Consent Decree requires that assessment staff should frequently engage Class Members who have concerns about transitioning into the community. In FY23, the Defendants utilized Peer Ambassadors to engage those expressing hesitation about transition. NAMI Peer Ambassadors conducted 199 community visits in FY23. No data is available on how many CMs were hesitant to participate or how many community visits were offered, so it is not possible to assess compliance. | **Out-of-Compliance** | **Out-of-Compliance** |
|---|---|---|---|---|
| 10 | *Williams* Consent Decree VI(6)(A) | Any Class Member has the right to decline to take part in such Evaluation. Any Class Member who has declined to be evaluated has the right to receive an Evaluation any time thereafter on request.<br><br>***Partial Compliance.*** It appears that 11, compared to 49 in FY22, Class Members requested assessments (through appeals or direct requests). Seven (64%) received such assessments. All seven were completed within 120 days of the request | **In Compliance** | **Partial Compliance** |
| 11 | *Williams* Consent Decree VI(6)(B) | Defendants shall ensure that Evaluations are conducted by Qualified Professionals as defined in this Decree.<br><br>***In Compliance.*** In FY23, 91% of Assessors meet the qualifications. The State cannot report how many assessments were completed by qualified assessors, but it can be surmised that the substantial majority were completed by qualified staff. | **Partial Compliance** | **In Compliance** |
| 12 | *Williams* Consent Decree VI(6)(D) | After the second year following finalization of the Implementation Plan, the Evaluations described in Subsection 6(a) shall be conducted annually.<br><br>***No longer required by agreement among the Parties and Monitor*** | **Partial Compliance** | **No Longer Rated** |

| | | | | |
|---|---|---|---|---|
| 13 | *Williams* Consent Decree VI(6)(D) | As part of each Class Member's annual Evaluation, the reasons for any Class Member's opposition to moving out of an IMD to a Community-Based Setting will be fully explored and appropriately addressed as described in Section VII.<br><br>***Partial Compliance..*** The State reports these data under outreach as outreach staff are required to discuss the Class Member's hesitancy during the annual follow up outreach. The State reports that 461 (65%) of the 714 CMs who were hesitant to transition, had concerns addressed by Outreach staff. The Monitor questions how the State reliably knows Outreach workers have these discussions and will refine reporting requirements for FY24. | **Out-of-Compliance** | **Partial Compliance** |
| 14 | *Williams* Consent Decree VI(6)(D) | Any Class Member who has received an Evaluation but has declined to move to a Community-Based Setting may request to be reassessed for transition to a Community-Based Setting any time thereafter.<br><br>***Partial Compliance***. The State report that 11 Class Members requested a reassessment of whom 7 (67%) were reassess within 120 days. There is no documentation regarding the other 4 Class Members who requested a reassessment. | **In Compliance** | **Partial Compliance** |
| A1 (1) | FY23 IP | Strategy: Enforce Assessment performance metrics with Prime Agencies, in line with policy and procedures, including minimum standards for Qualified Professionals, with an emphasis on positive outcomes, engagement of CM, timeliness of Assessments.<br><br>Expected Improvements/Outcomes:<br>● 100% of Assessments are facilitated by Qualified Professionals per Comprehensive Program requirements.<br><br>**Duplicate Requirement.** (See Requirement 11). | **N/A** | **N/A, Duplicate Requirement** |

| A1 (2) | FY23 IP | Strategy: Enforce Assessment performance metrics with Prime Agencies, in line with policy and procedures, including minimum standards for Qualified Professionals, with an emphasis on positive outcomes, engagement of CM, timeliness of Assessments.<br><br>Expected Improvement/Outcome: 80% of Class Members receive Assessments in compliance with Comprehensive Program timeliness requirements (annual assessments within one year of prior assessment, initial assessment initiated within 14 days of positive outreach outcome; other assessments requested by CM initiated within 14 days; assessment must be completed by the date of the CM Service Plan is due).<br><br>***Out-of -Compliance***: The Parties and Court Monitor decided to no longer require annual reassessments for individuals who have SPs which are updated every 180 days. The State does report the number of CMs who had an assessment initiated within 14 days of a positive outreach. During FY23 of 742 assessments that were due, 364 (49%) were initiated within 14 days of a positive outreach | **Out of Compliance** | **Out of Compliance** |
| 2 | FY23 IP | Strategy: Assessments will be done in conjunction with Service Plans and completed by the same Care Manager to avoid handoffs and delays.<br><br>Expected Outcome:<br>● 85% of CM who consent and have an Assessment initiated within 14 days and completed within 59 days of positive Outreach outcome or other request.<br><br>***Partial Compliance.*** In FY23, the State reports that 245 (94%) of 260 Class Members has an assessment initiated within 14 days of outreach and finalized within 59 days of outreach. However, this does not match the number of 364 CMs for whom an assessment was initiated. The State reports that 260 CMs is part of the 364 CM group but excludes CMs with an incomplete assessment, who declined during assessment, were discharged before completing the assessment, or because the Prime failed to meet the 59-day deadline. Because the State cannot identify how many had an incomplete assessment or who didn't have it completed I cannot find them in compliance | | **Partial Compliance** |

**Summary**

Assessments are a critical part of the transition planning process for Class Members and to provide critical data to the State to plan for the capacity it needs within its community service array to ensure all Class Member who wish to transition can do so in a timely and successful way. The State did not perform the level of assessments it did in FY22 but increased the percentage from 37% to 49% that were initiated within 14 days. It is unclear how many were completed in the required fifty-nine days as the State reported on far fewer assessments for this data point (245 of 260) assessments compared to the report that 364 assessments were completed in 14 days. Overall, the reporting for FY23 points to the need to ensure that assessments are completed in a timely way. The acknowledgement that more than 10% of existing Class Members have not been outreached leads to the conclusion that a significant number of Class Members may decide to transition through this outstanding outreach activity and will need to be assessed. The State must redesign its assessment process to effectively respond to this future need for numerous assessments while more efficiently and timely complete assessments in the future for newly admitted Class Members.

My recommendations to improve assessment performance are:
- Use the results of the process to complete outstanding outreaches to complete assessments for existing Class Members who wish to transition to develop the State's plan for reasonable pace.
- Redesign the assessment process to ensure timely assessments initiated within fourteen days of a positive outreach and completed within fifty-nine days.
- Use assessment data to determine the needed service capacity for Class Members.

**Section V. Service Planning**

After Class Members are assessed to determine their transition readiness, they are provided with a service plan (SP). Service plans are required to contain the services and supports that align with a Class Member's needs, vision, and goals.  Class Members recommended to transition are to receive service plans soon after their assessment ("initial service plan") and prior to their transition ("transition service plan").

<u>Service Plan-Related Requirements.</u> The following Consent Decree requirements apply to service plans:
- Service plans must be completed by qualified professionals and include a legal representative or other person of the Class Member's choosing, if desired (Requirement 15).
- Service plans must be person-centered and reflect an individual's needs at home, work, and in the community to facilitate full participation in

community life (Requirement 16).

- All service plans must be completed promptly with sufficient time to support transitions (Requirements 17 and 18).
- Service plans must identify the needed community-based services and a transition timetable (Requirement 19)
- Service plans for Class Members not transitioning to PSH must include treatment objectives to prepare them for future transition to permanent supportive housing or other community-based options. These service plans should be periodically updated to reflect Class Members' changing needs and preferences and include services that support the acquisition of functional living and illness self-management skills (Requirement 20).
- Service plans for Class Members planning to transition should include support for building the skills needed to live in the community (Requirement 21).
- For Class Members transitioned into non-permanent supportive housing, the service plan must justify that placement and include community-based services that can support the most integrated setting possible (Requirement 22).
- Service plans cannot be limited to what the service and housing system currently has available; any service that is currently provided under the State Medicaid Plan and Rule 140[31] must be made available. Nothing beyond those services is required to be made available (Requirement 23).

The FY23 Implementation Plan also obligated the Defendants to six additional service plan-related requirements. These requirements focus on service plan (initial and updates) timeliness, accountability measures for providers regarding service plan quality, and increased linkage to employment services for Class Members.

Service Plan Data Highlights. This section summarizes the Defendants' FY23 service plan data, provided in their semi-annual reports.
- Regarding timeliness of initial service plans (due within 45 days after recommended assessments), among the 498 Class Members eligible for such plans 280 (56%) were received on time. This is a significant improvement from FY22 performance when only 106 (15%) were received on time. Eighty-six (86), which represents 17% of the SPs were not received in the reporting period, which compares favorably to FY22 when over half were "not received". It is unclear whether these plans were never completed, not reported to UIC-CON, or a mix of both.
- Of the 347 SPs requiring updates (within 180 days of the initial or prior SP), 115 (33%) which is a decrease from FY22 when 151 (61%) were either updated or re-assessments of those Class Members were conducted. This update is even more critical now that the Parties and Court Monitor have agreed to not have Class Members with an SP be reassessed but rather have the plan routinely updated after 180 days from its initiation.
- Of the 315 transition plans due 195 (62%) were on time and only 6 (2%) were not completed at all. This is an improvement from FY22 when 352 transition service plans were completed and 148 (42%) were on-time.

- Of the 633 SPs reviewed 472 (75%) met proficiency standards compared to 82% meeting proficiency standards in FY22.
- Service plans provide a window into housing preferences among Class Members recommended to transition, and among the 537 plans with housing preferences indicated, permanent supportive housing or private residences were indicated as the preference in 505 (94%) of plans and another 30 preferred private home, with the remainder divided among congregate housing options.
- 1,058 Class Members were recommended for employment supports in their service plans; 68 were ultimately enrolled in employment services with 43 having obtained employment compared to 70 who were employed in FY22.

Service Plan-Related Requirements and Compliance Ratings. *Table 10 lists* the specific requirements for Service Planning. The twelve Consent Decree and FY23 Implementation Plan requirements are assessed below. **Two are in compliance, seven are in partial compliance, and three are out of compliance.**

**Table 10 Williams Consent Decree Service Plan Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language and FY23 Performance | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 15 | *Williams Consent Decree VI(7)(C)* | The Service Plan shall be developed by a Qualified Professional in conjunction with the Class Member and his or her legal representative. The Qualified Professional also shall consult with other appropriate people of the Class Member's choosing.<br><br>*In Compliance.* One hundred thirty (130), (94%) of the 139 care managers funded by IDHS were verified to meet the professional standards to be qualified. | Partial Compliance | In Compliance |
| 16 | *Williams Consent Decree VI(7)(D)* | Each Service Plan shall focus on the Class Member's personal vision, preferences, strengths and needs in home, community and work environments and shall reflect the value of supporting the individual with relationships, productive work, participation in community life, and personal decision-making.<br><br>*Partial Compliance.* Service plans are reviewed by UIC-CON to ensure that they meet all content standards, including those reflected in this requirement. Seventy-five percent (75%) of service plans met quality standards in FY23 compared to 82% in FY22 | Partial Compliance | Partial Compliance |
| 17 | | | Out-of- | |

| | | | Compliance | Partial Compliance |
|---|---|---|---|---|
| | *Williams* Consent Decree VI(7)(A) | Based on the results of the Evaluations described above, Defendants shall promptly develop Service Plans specific to each Class Member who is assessed as appropriate for transition to a Community-Based Setting.<br><br>***Partial Compliance.*** 223 (54%) of 412 initial SPs completed for CMs who were assessed were completed within 59 days of positive outreach. This is a significant increase over the 15 % of initial service plans completed per Comprehensive Program timeliness standards in FY22. | | |

| 18 | *Williams* Consent Decree VI(7)(F) | The Service Plan shall be completed within sufficient time to provide appropriate and sufficient transitions for Class Members in accordance with the benchmarks set forth in the Decree.<br><br>***Partial Compliance.*** 195 (62%) of 315 CMs had an SP completed within 14 days of the transition. This is an improvement from 51% of transition service plans were completed per Comprehensive Program timeliness standards in FY22. | **Out-of-Compliance** | **Partial Compliance** |
|---|---|---|---|---|
| 19 | *Williams* Consent Decree VI(7)(B) | For each Class Member who does not oppose moving to Community-Based Setting, the Service Plan shall, at a minimum, describe the Community-Based Services the Class Member requires in a Community-Based Setting, and a timetable for completing the transition.<br><br>***Partial Compliance***. Service plans are reviewed by UIC-CON to ensure that they meet all content standards, including those reflected in this requirement. 75% of service plans met quality standards. | **Partial Compliance** | **Partial Compliance** |
| 20 | *Williams* Consent Decree VI(9)(A) | Those Class Members not transitioning from IMDs to Permanent Supportive Housing will have ongoing reassessments with treatment objectives to prepare them for subsequent transition to the most integrated setting appropriate, including PSH.<br><br>***Out-of-Compliance.*** In FY23, 58 (18%) of the 314 CMs reported as transitioning were documented as having moved to non-PSH settings. However, the Defendants did not supply data on how many were engaged to develop objectives to facilitate future moves to PSH. This data does not match the previous data that 315 CMs transitioned through Prime agencies. | **Out-of-Compliance** | **Out-of-Compliance** |

| 21 | *Williams* Consent Decree VI(7)(A) | Each Service Plan shall be periodically updated to reflect any changes in needs and preferences of the Class Member, including his or her desire to move to a Community-Based Setting after declining to do so, and shall incorporate services where appropriate to assist in acquisition of basic instrumental activities of daily living skills and illness self-management. Acquisition of such skills shall not be a prerequisite for transitioning out of the IMD.

***Out-of- Compliance.*** For the 347 Class Members who required service plan updates, 115 (33%) received updates which is a decrease from FY22 when 55% of the CMS needing an updated SP received one. | **Partial Compliance** | **Out-of-Compliance** |
| :--- | :--- | :--- | :--- | :--- |
| 22 | *Williams* Consent Decree VI(7)(B) | If there has been a determination that a Class Member is not currently appropriate for PSH, the Service Plan shall specify what services the Class Member needs that could not be provided in PSH and shall describe the Community- Based Services the Class Member needs to live in another Community-Based Setting that is the most integrated setting appropriate.

***Out-of-Compliance***. Service plans are reviewed by UIC-CON to ensure that they meet all content standards, including those reflected in this requirement.        Seventy-five (75) percent of service plans met quality standards. However, the State has not offered any specific information to confirm that the SPs for CMs moved to non-PSH include these necessary elements or how many of the SPs for this subset of CMs were reviewed for proficiency. | **Partial Compliance** | **Out-of-Compliance** |
| 23 | *Williams* Consent Decree VI(7)(E) | The Service Plan shall not be limited by the current availability of Community-Based Services and Settings; provided, however, that nothing in this subparagraph obligates Defendants to provide any type of Community-Based Service beyond the types of Community-Based Services included in the State Plan and Rule 140.

***Partial Compliance.*** The State only provides data that 472 (75%) of the 633 SPs reviewed were proficient which should indicate that UIC CON has determined the SPs rated as proficient have all of the services needed by the CM and are not limited by availability. | **In Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| SP1 (1) | FY23 IP | Strategy: IDHS' partner, UIC-CON will review Service Plans to ensure the meet requirements for content/person-centered planning and timeliness.<br><br>Expected Outcome:  90% of Service Plans meet Comprehensive Program quality standards. | **Not Rated Duplicate of Requirement 19** | **Not Rated Duplicate of Requirement 19** |
| SP1 (2) | FY23 IP | Strategy: See above.<br><br>Expected Outcome:<br>• 85% of initial Service Plans are completed within 59 days of positive Outreach outcome. | **Not Rated Duplicate of Requirement 17** | **Not Rated Duplicate of Requirement 17** |
| SP1 (3) | FY23 IP | Strategy: See above.<br><br>Expected /Outcome:<br>• 90% CMs transitioning to the community have a Transition Service Plans completed before the date of Transition.<br><br>***Duplicate Requirement.*** See Requirement 18. | **Not Rated Duplicate of Requirement 18** | **Not Rated Duplicate of Requirement 18** |
| SP2 | FY23 IP | Strategy: Enforce referrals to Employment Services where included in Service Plan<br><br>Expected Outcomes:<br>• 100% of CMs whose SPs include Employment Services are referred to Employment Services. These data are included in the Data Dashboards and will encompass both referral data and employment outcomes for all individuals referred for employment services.<br><br>***In Compliance***. 100% of the 1,058 CMs with a recommendation for employment services were referred and these data were reported in the monthly data dashboards. | **In Compliance** | **In Compliance** |

| | | | | |
|---|---|---|---|---|
| SP3 | FY23 IP | Strategy: Benefits analysis software will be available by 9/30/22.<br><br>Expected Outcome:<br>• Class Members and providers will use benefits analysis software to learn about the impact of employment on benefit eligibility, which will help alleviate the misconceptions regarding employment, and clarify how employment would impact the amount and availability of SSI/SSDI and other benefits.<br><br>***Partial Compliance***: The State made the software available 9/1/22 and offered webinars and technical assistance to providers. There are no data regarding the use of the software by either providers or CMs or any outcomes. | **Not Rated in FY22** | **Partial Compliance** |
| SP4 | FY23 IP | Strategy: Defendants will assess the reasons Class Members decline to participate in supported employment/training and will report to the Parties and Monitor the findings by 3/1/23.<br><br>Expected Outcome:<br>• Defendants will use information learned from the assessment of employment outcomes to develop strategies to improve employment supports engagement. DRS will lead the efforts in developing new strategies and members of the Class Member Advisory Council will be consulted.<br><br>***Partial Compliance.*** JACSW completed an employment report in February 2023. The study made several findings noted below and recommendations that the State is pursuing. However, the Study was unable to assess the reasons that CMs are declining employment. The data was not deemed to be reliable or valid and the Study determined that it may be an assumption that CMs were uninterested in employment. | **Not Rated in FY22** | **Partial Compliance** |

**Related Reports**

As indicated earlier in this report, the State contracted with JACSW to review Employment Support Services and the lack of employment support and job acquisition for Class Members. The report was issued in February and discussed with the Plaintiffs and Monitor in April. The purpose of the report was to determine why a significant number of Class Members referred for employment were declining support; what

barriers to employment support exists; and what solutions were recommended. The Study found serious inconsistencies in the implementation of the referral process, barriers to successful referrals in the design and implementation of the Service Plan itself; inaccurate assumptions being made about declinations by Class Members; and consideration of non-work services, i.e., sheltered workshops considered as employment support.

The research team at JACSW found the data to be neither reliable nor valid, which limited the study's analysis. The data submitted lacked the most basic information about employment outcomes and had missing data. The definitions of terms are inconsistent leading to various interpretations and no standardization. The State reports everyone with employment in their SP is referred but JACSW uncovered that referral are made monthly by IDHS using an automatic process of data transfer. These are not individual referrals which in all likelihood account for the lack of enrollment in employment support services for Class Members who desire to work. The research team also determined that it was only an assumption that a large number of Class Members were declining employment support.

JACSW could not fully meet the purpose of the Study because of the poor quality of the data. JACSW was able to make recommendations to develop common definitions; revise the SP to better reflect meaningful information about Class Members' employment history and interests; address the economic barriers to employment while the Class Member resides in a facility; and provide technical assistance and training to providers and care managers.

The State convenes a *Williams and Colbert* Employment Work Group that meets monthly to address employment support services issues and plan for future development. The Work Group includes staff from DRS, DMH and Olmstead Compliance. In April the lead staff presented next steps to the Plaintiffs and Court Monitor. These include redesigning the employment section of the SP; discuss the referral process to DRS-VR; and develop employment resources and guidance from UIC-CON. While the SP employment section has been redesigned in FY24 and is being piloted with Primes it serves as a referral to an employment service provider. The State shared templates for the employment profiles and plans which are more thorough and include goals, strengths, preferences and needs for employment support.


**Summary**

Service planning is critical to successful transitions for Class Members. Class Members need to be involved in meaningful ways in the planning process, so the SP reflects their desires and needs. The SP needs to include measurable goals and strategies to achieve

these goals while ensuring the plan is reasonable in its scope. The Court Monitor Consultant met with a group of Assessors who work for Prime agencies during FY23 to understand what if any barriers the service planning process presented and how it might be streamlined. The Court Monitor, Consultant and a Nurse Consultant initiated a Transition Pipeline Case Study in FY23 that was completed in the first quarter of FY24. Both efforts indicate the need to revise the SP document and the planning process. The Court Monitor Consultant met with a group of Prime agency staff over several months who completed assessments and SPs and supervisors of these functions. The barriers to completing these functions were consistent with the findings of the Case Study. Prime agency assessors have difficulty accessing relevant clinical records; assessments take several hours to complete ranging from eight to forty-five hours; the length of time to complete assessment and service planning is protracted in part because of difficulties entering and retaining data in the CASPIO system. Both the Consultant's Work Group and the Case Study highlighted concerns with the Service Plan format and process. There are redundancies in the assessment and SP forms and the process of entering data causes duplicative effort. The Court Monitor and Consultant believe from our experience that there are far too many goals and mitigation strategies which are overwhelming for a Class Member and not always person-centered. Some of the goals appear to reflect a paternalistic attitude by either providers or the UIC CON reviewers resulting in a SP with an overemphasis on medical intervention rather than life skills and strategies to achieve a meaningful life in the community. Overall, in the SPs reviewed as part of these activities, there was a mean of thirty goals and forty-seven mitigation strategies.

The conclusions drawn from the Transition Pipeline Case Study (Attachment 1) regarding the service planning process and SP document are aligned with the above statements. Providers reported similar barriers and the redundancy between assessment and SP data was confirmed by the record review. The study includes observations that the SPs were not person-centered and instead captured routine transition activities necessary for any transition. The State took steps to address this in FY24. The Court Monitor has provided input based on her and the Consultant's findings.

During this first year in the role of Court Monitor and Consultant we have spent time learning about the CCMTP and the CTI program, both of which serve Class Members pursuing transition to the community. The role of the Managed Care Organizations (MCOs) through the CTI program is expanding. Over 25% of the transitions for *Colbert* Class Members in FY23 were made by the six CTI programs, but roll-out efforts for CTI transitions in Williams occurred more slowly and resulted in 23 out of 338 (7%) Williams transitions in FY23. The requirements and expectations vary for CCMTP and for CTI. The length of time to complete assessment, service plans and transitions are somewhat different. The CTI programs report less time to complete assessments, service plans and

a more timely and responsive review of these documents by UIC CON. Part of the CTI's efficiency completing the assessment and SPs is likely better data systems utilized by the MCOs then by the Primes using CASPIO. The CTI programs also report a higher percentage of SPs deemed proficient than are reported for the Prime agencies. As the role of the CTI program under the state's contracts with MCOs continues, it is important to align the expectations for all providers and learn from the policies and procedures of both IDHS for the CCMTP and HFS for the CTI program which lead to the best outcomes for Class Members.

The State continues to underperform meeting the requirements of the Decree related to Service Planning. Resources must be brought to bear to improve the overall performance of the system.

My recommendations to improve service planning performance are:
- Assess the level of staffing resources needed to develop SPs within expected timeframes so the data from the assessments are current and can be used to create a meaningful plan.
- Implement the changes proposed by the State to streamline the planning process and SP document including recommendations made by the Court Monitor and Consultant. This implementation should include a testing period by the Primes which uses their feedback to determine and formalize revisions.
- Ensure that all Class Members who are being delayed from transitioning are referred for a CAST review that is completed timely. Class Members who are not approved by CAST to continue to be on hold for transition should be immediately assisted by the Prime agency or CTI program to begin transition activities.
- Clarify the State's follow up on SPs reported as not completed within expected timeframes to verify that they were eventually completed.
- Address the recommendations made by JACSW to improve the actual employment outcomes for Class Members who express a desire to work and have an employment goal in their SP.

**Section VI. Transition Activities to Support Class *Williams* Class Members**
Along with diversion, a second, central purpose underlying the *Williams* Consent Decree is to transition willing and clinically appropriate Class Members into the community, creating a pathway for them to rejoin and fully participate in community life. Along with Front Door diversion, this requirement is often viewed as the most important and visible indicator of compliance. Success or failure to

achieve the number of required transitions signals the Defendant's ability to effectively reach and identify appropriate institutionalized Class Members, prepare for, and effectuate transitions, and, at the systems-level, move toward rebalancing the mental health services system away from institution-based and restrictive care settings to community-based services, supports, and housing.

From March 2020 to present, the Defendants have primarily utilized the Comprehensive Class Member Transition Program involving eleven Prime Agencies that were responsible for transitions and all related activities.

Transition-Related Requirements. In addition to reaching the numeric transition requirements, the Defendants are required to:
- Utilize permanent supportive housing (PSH) for all Class Members, except for those who meet the exceptions outlined in Part VI 9(a) of the Decree (quoted in the table below) (Requirement 24).
- Hold housing units for Class Members who are temporarily hospitalized by paying their rent (Requirement 25).
- Offer all CMs who have been assessed as appropriate for living in community-based settings the opportunity to transition (Requirement 26).
- Ensure Class Members amid the transition process receive added support and are not left without options when Specialized Mental Health Rehabilitation Facilities (SMHRFs) close (Requirement 27).
- Utilize buildings for community-based housing where fewer than 25 percent of tenants have a mental illness, unless the building has four or fewer units, at which time 50 percent of tenants with mental illness is permitted (Requirement 29).
- Offer all transition-approved Class Members placement in the community, with moves completed within 120 days (Requirement 30).

The FY23 Implementation Plan includes nine other requirements, identifying a numeric transition figure, timeliness standards for transition, remediation of pipeline issues, coordinating service development between health plans and providers, and requirements on prioritizing permanent supportive housing, among others.

Transition Data Highlights. This section summarizes the Defendants' FY23 transition data, provided in their semi-annual reports.
- 338 Class Members were transitioned in FY23 representing 80% of their requirement of 425 transitions, a decrease in both number and percentage compared to FY22 when 358 Class Members transitioned.
- 118 (35%) of 338 of Class Members were transitioned within 120 days of their initial service plans compared to 42% of Class Members in FY22.
- Class Members continued to experience protracted delays once approved for

transition. As of June 30, 2023, 190, (32%) of the 593 Class Members in the transition pipeline had been in the pipeline for more than 120 days.

▪ 1,675 Class Members were identified with low- or no incomes. 1,276 were referred to the Supplemental Security income and Social Security Disability Outreach, Access, and Recovery (SOAR) program. Among those individuals, only thirty-five applications were filed with twelve approved. Two reconsiderations were also filed and approved.

▪ 257 (82%) of Class Members who transitioned were moved to permanent supporting housing (PSH) compared to 74% in FY22. Among the 58 CMs who moved to non-PSH settings, 25 (43%) met exclusionary criteria[4] and 33 (57%) elected to move to a non-PSH setting.

▪ 338 new Bridge Subsidies were issued, and 33 Class Members received Statewide Referral Network or Section 811 units. Buildings and units occupied by Class Members complied with relevant disability segregation rules.

▪ In FY23, 117 Class Members had rent payments covered by the State while they were temporarily placed in a hospital or other treatment facility.

▪ There were 258 involuntary discharges/transfers in FY23 compared to 111 in FY22.

Transition-Related Requirements and Compliance Ratings. *Table 11* lists the specific requirements for Transition. Across the nineteen Consent Decree and FY23 Implementation Plan requirements assessed below, **eleven are in compliance, two are in partial compliance, and six are out of compliance.**

**Table 11 Williams Consent Decree Transition Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Transition Requirements | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 24 | Consent Decree VI(9)(A) | PSH will be considered the most integrated setting appropriate for Class Members except that, (1) for any Class Members (i) who have severe dementia or other severe cognitive impairments requiring such a high level of | In Compliance | In Compliance |

| | | staffing to assist with activities of daily living or self-care management that they cannot effectively be served in PSH, (ii) who have medical needs requiring a high level of skilled nursing care that may not safely be provided in PSH, or (iii) who present an danger to themselves or others, the evaluator will determine the most integrated setting appropriate, which may be PSH or another setting, and (2) nothing in this paragraph shall prevent Class Members who can and wish to live with family or friends or in other independent housing that is not connected with a service provider from doing so. *In Compliance.* The Defendants indicated that 257 (82%) of the 315 Class Members who transitioned moved to permanent supportive housing (PSH). Among the remaining 58 Class Members, 25 (43%) met exclusionary criteria and 33 ((57%) preferred a non-PSH option. | | |
|---|---|---|---|---|
| 25 | Consent Decree VI(9)(B) | Class Members who move to a Community-Based Setting will have access to all appropriate Community-Based Services, including but not limited to reasonable measures to ensure that their housing remains available in the event that they are temporarily placed in a hospital or other treatment facility. **In Compliance**. 117 Class Members received assistance to maintain housing during temporary placement during FY22, reflecting a total of 174 rent payments. | **In Compliance** | **In Compliance** |
| 26 | VI(8)(A) | Within five years of the finalization of the Implementation Plan, all Class Members who have been assessed as appropriate for living in a Community-Based Setting will be offered the opportunity to move to a Community-Based Setting. ***Out-of-Compliance***. The State maintains a transition pipeline of Class Members waiting to transition. 190 CMs are waiting more than 120 days. The State can also not verify all of the CMs who wish to transition and have identified 380 who have no record of outreach. | **Out-of-Compliance** | **Out-of-Compliance** |
| 27 | Consent Decree VIII(15) | In the event that any IMD seeks to discharge any Class Member before appropriate housing is available, including but not limited to circumstances in which an IMD decides to | **Out-of-Compliance** | **Out-of-Compliance** |

| | | | | |
|---|---|---|---|---|
| | | close, Defendants will ensure that those individuals are not left without appropriate housing options based on their preferences, strengths, and needs.<br><br>***Out-of-Compliance.*** The State reported that all of the 258 Class Members who were involuntarily discharged (100%) were provided notices regarding community-based services and housing which is rated under T4 of the IP. The State was unable to provide data relative to this requirement as to whether any of these CMs were provided necessary housing based on their preferences, strengths, and needs. | | |
| 28 | Consent Decree VI(8)(G) | By the end of the fifth year after the finalization of the Implementation Plan, Defendants will have: (1) offered placement to one hundred percent (100%) of all individuals who are assessed as appropriate for living in a Community- Based Setting and who do not oppose moving to a Community-Based Setting; and (2) developed the corresponding number of PSH units or other Community-Based Settings sufficient for these individuals. For purposes of this subparagraph, these individuals include the total of (1) all Class Members as of the end of the fourth year after the finalization of the Implementation Plan who are assessed as appropriate for living in a Community-Based Setting and who do not oppose moving to a Community-Based Setting, and (2) all former Class Members who have already transitioned from the IMD to a Community-Based Setting or to another community setting since the finalization of the Implementation Plan. | **Not Rated Separately See Req. 26 and IP requirement** | **Not Rated Separately See Req.26 and IP requirement** |

| 29 | Consent Decree VI(8)(G) | For purposes of this Decree, PSH includes scattered-site housing as well as apartments clustered in a single building, but no more than 25% of the units in one building with more than 4 units may be used to serve PSH clients known to have mental illness. For buildings with 2 to 4 units, no more than 50% of the units may be used to serve PSH clients known to have mental illness. However, during first 5 years after finalization of the IP, up to 75 class members may be placed in buildings where more than 25% of the units serve PSH clients known to have MI if those buildings were used to serve PSH clients prior to March 1, 2010. After first 5 years following the finalization of the IP, all class members served in PSH shall be offered the opportunity to reside in buildings that comply with 25%- or 50%-units limit set forth above in this subparagraph.<br><br>*In Compliance.* The Defendants reported that all permanent supportive housing units occupied by transitioned Class Members complied with disability concentration rules set forth in the Consent Decree. | **In Compliance** | **In Compliance** |
| 30 | Consent Decree VI(8)(H) | After the end of the fifth year following finalization of the Implementation Plan, Class Members who are assessed as appropriate for living in a Community-Based Setting, who do not oppose transition to a Community-Based Setting and whose Service Plans provide for placement in Community-Based Settings shall be offered the opportunity to move to those settings and shall receive appropriate services consistent with the Service Plan within one hundred and twenty (120) days of the date of the Service Plan.<br><br>*Out-of-Compliance.* The Defendants produced data that shows that 118 (37%) of the 315 transitioned Class Members transitioned within 120 days of their initial service plans. This is a decrease from 41% in FY22 of transitioned CMS moving within 120 days of the SP. Additionally, 593 CMs were in the Transition Pipeline as of 6/30/23. Of these CMs 190 (32%) were waiting more than 120 days to transition. | **Out-of-Compliance** | **Out-of-Compliance** |

| T1 (1) | FY23 IP | Strategy: Defendants will manage the Williams providers system to conduct quality transitions of Class Members from the SMHRF to the community.<br><br>Expected Outcome:<br>• 425 Williams CMs will transition by 6/30/23<br><br>**Partial Compliance.** 338 (80%) of 425 CMs transitioned during FY23. | **In Compliance** | **Partial Compliance** |
|---|---|---|---|---|
| T1 (2) | FY23 IP | Strategy: Defendants will focus some of providers' transition efforts on Class Members who have been waiting 120+ days since date of Service Plan as of 6/30/22<br><br>Expected Outcome:<br>• At least 35% of CMs who Transition are CMs waiting 120+ days since date of Service Plan as of 6/30/2022.<br><br>**In Compliance.** 189 (56%) of the CMs who transitioned waited 120 or more days | **Not Rated in FY22** | **In Compliance** |
| T1 (2) | FY23 IP | Strategy: # of Class Members transitioned within 120 days of their SP.<br><br>Expected Outcome:<br>• 50% of Transitions will occur within 120 days of SP.<br><br>**Partial Compliance.** 118 of 338 CMs transitioned within 120 days of the SP which is 70% of the expected number of 169 (50%) of transitions | **Out-of-Compliance** | **Partial Compliance** |

| T2 | FY23 IP | Strategy: Additional datapoints will be collected in the SP to track non-PSH transitions. All non-PSH transitions will be reviewed to ensure they meet Decree requirements.<br><br>Expected Outcomes:<br>• 90% of CMs recommended to transition to a non-PSH setting meet exclusionary criteria or are documented as the CMs choice.<br>• 85% of CMs who prefer PSH and transition, will transition to PSH.<br><br>*In Compliance:* 58 Class Members transitioned to non-PSH. 100% of these CMs either met exclusionary criteria (25) or non-PSH was their preference (33). Subtracting those with a preference for a non-PSH setting from the total of 315, 282 individuals transitioned. Of these 282, 257 (91%) transitioned to a PSH settings and the remainder (25) met exclusionary criteria. Everyone who transitioned who did not meet exclusionary criteria or who did not prefer a non-PSH setting were transitioned to a PSH setting. | **N/A** | **In Compliance** |
| T3 | FY23 IP | Strategy: CTI Transition requirements for the second half of FY22 and for the first half of FY23 (1/1/22-6/30/22 and 7/1/22-12/31/22) have been set at 23 Williams CMs.<br><br>Expected Outcome:<br>• CY22 CTI Transitions of 23 Williams Class Members have been set; the MCO contracts are by CY and not FY but in December 2022, HFS will be setting 6-month targets for CTI Transitions starting January 1, 2023.<br><br>*In Compliance.* 23 CMs were transitioned through the CTI program in FY23 | **Out-of-Compliance** | **In Compliance** |

| T4 | FY23 IP | Strategy: Continue to use IDPH's ITD process for reviewing involuntary discharges before Administrative Law judges in accordance with the rules. A script is included in the Notice of Hearing for ITDs and read by Administrative Law Judges at the start of an ITD hearing for SMHRFs and Long-Term Care Facilities in Cook County to provide service and housing referral information for potential Class Members.<br><br>Expected Outcome:<br>• 90% of CMs subject to involuntary discharge are provided resources for Community-Based services and supports and housing.<br><br>**In Compliance.** The Defendants reported that 258 (100%) of the 258 Class Members who were involuntarily discharged in FY23 received information about available community resources/services. | **Not Rated Duplicate** | **In Compliance** |
| T5 (1) | FY23 IP | Strategy: For any CM who Transitioned to a non-PSH setting, the Prime Agency will evaluate CM interest and appropriateness to move to PSH at the time of their SP update at 180 days post Transition SP. If evaluation reveals the Class Member desires PSH but is not ready or appropriate, a plan with goals to prepare Class Member for PSH will be developed within 30 days.<br><br>Expected Outcome:<br>• 85% of CMs wanting to move to PSH but not ready, receive plan with goals within 30 days of PSH evaluation.<br><br>**Out-of-Compliance**. 15 (26%) of 58 CMs who moved to a non-PSH setting received an SP with a planned secondary transition to PSH. The State does not report if this occurs within 30 days. | **Not Rated in FY22** | **Out-of-Compliance** |
| T5 (2) | FY23 IP | Strategy: See Above<br><br>Expected Outcome:<br>• 85% of Class Members in non-PSH settings are offered the option to move to PSH in the future<br><br>**Out-of-Compliance.** 15 (26%) of 58 CMs who moved to a non-PSH setting received an SP with a planned secondary transition to PSH. | **Not Rated in FY22** | **Out-of-Compliance** |

| | | | | Not Rated in FY22 | Out-of-Compliance |
|---|---|---|---|---|---|
| T-5 (3) | FY23 IP | Strategy: See above.<br><br>Expected Improvements/Outcomes:<br>● 85% of CMs who engage in a secondary Transition plan to move to PSH and who are deemed appropriate, receive an offer to move to PSH within 60 days of their SP update.<br><br>***Out-of- Compliance.*** 4 (17%) of the 58 CMs who moved to a non-PSH setting completed a secondary transition to a SPH. | | **Not Rated in FY22** | **Out-of-Compliance** |
| T6 | FY23 IP | Strategy: Enhance coordination and accountability between MCO Health Plans and Prime Agencies in supporting CM Transitions, via quarterly meetings coordinated by HFS/DHS with MCO Health Plan CTI lead staff and Prime Agency Comprehensive Transition Program lead staff.<br><br>Expected Outcome:<br>● Quarterly meetings held. Representatives from 100% of MCO CTI lead staff and 100% of Prime Agency lead staff in attendance..<br><br>***In Compliance.*** IDHS & HFS have hosted quarterly collaborative meetings with CTI and Prime Agencies. Dates of these meetings included: July 12, 2022, September 26, 2022, March 21, 2023, and May 16, 2023.<br><br>Representatives from each MCO & Prime were in attendance. | | **In Compliance** | **In Compliance** |

| T7 | FY23 IP | Strategy: Increase collaboration, information sharing, identification of training needs and prompt resolution of any issues to further CTI/Prime Agency coordination. Data will be collected by HFS/DHS for six months (July-December 2022) to gather information on responsiveness of MCO Health Plans and Prime Agencies in areas of Transition planning participation, service requests, etc.<br><br>Expected Outcome:<br>• Data analysis to identify strengths and opportunities for improvement in MCO/Prime Agency Coordination<br><br>*In Compliance.* HFS and DHS surveyed the MCOs and Primes to identify issues and needs between July and December. An analysis was produced and discussed with the Parties/Monitor on 12/30/22 which summarized findings and next steps. | **In Compliance** | **In Compliance** |
|---|---|---|---|---|
| T8 | FY23 IP | Strategy: Prime Agencies will be required to complete a survey (which will be shared with the Parties/Monitor prior to distribution) regarding the most common barriers to achieving transitions and recommendations will be conducted, and a report on the barriers and potential remedies (including those proposed by Primes) will be submitted to the Parties and Monitor by 11/30/22<br><br>Expected Improvements/Outcomes:<br>• Data analysis to identify strengths and opportunities for improvement in MCO/prime Agency coordination.<br><br>*In Compliance.* The CTI report outline was submitted to the Court Monitor on 11/15/21, followed by a CTI Report submitted to Court Monitor and Parties on 6/30/22. | **N/A** | **In Compliance** |
| T8 | FY23 IP | Strategy: See above.<br><br>Expected Improvements/Outcomes:<br>• Identification of barriers to develop and implement strategies to address and improve Transition process for Class Members.<br><br>*In Compliance.* IDHS surveyed the Prime Agencies to identify common barriers they experience in achieving transitions. IDHS produced and distributed a report to the Parties & Monitor on 11/30/22, which included a summary of findings, recommendations, and next steps | **Not Rated in FY22** | **In Compliance** |

**Related Reports**

JACSW conducted a study regarding the causes of untimely transitions: *IDHS CCMTP Timeliness: A Mean Comparison Study* which was issued June 14, 2023. The guiding research questions were:

1. What differences between Class Members based on their independent living needs impact transition timeliness?
2. How many days on average does it take the Prime agencies to complete outreach, assessment, service planning and transition?
3. What is the overall average timeliness of the CCMTP system between the different functions and from the point the Class Member is under the responsibility of the Prime Agency?

The study analyzed data related to these research questions for the 341 Class Members who transitioned between July and December 2022. The Mean number of days for each activity was:

1. Outreach: 436 days (expected within 60-70 days of admission)
2. Outreach to Assessment Start: 75 days (expected in 14 days)
3. Assessment completion: 46 days (expected 45 days)
4. Assessment Completion to SP start: 197 days (expectation SP is completed within 45 days of assessment start)
5. SP start to SP completion 26 days
6. Transition date after SP completion: 221 days (expected within 120 days)
7. Start Date to Transition Date: 739 days (expected 249 days)

There were significant delays initiating outreach, starting the SP after assessment, and transitioning the Class Member after the SP was completed. There were not significant differences in the demographics, diagnoses or needs of the Class Members to explain any of the significant delays. These findings are similar to those found by the previous Court Monitor who issued a Timeliness Study to the Court in August 2022, and the Transition Pipeline Case Study completed by this Court Monitor in August 2023. The JACSW study did find missing data which made it challenging to provide definitive and reliable findings. This is another example of the lack of reliable and valid data available through the CASPIO data application used by UIC CON.

The State undertook two initiatives to improve timeliness of transitions. One was specific to *Colbert* Class Members and is reviewed in the *Colbert* Annual Report.

The second initiative was in response to the previous Court Monitor's analysis of the timeliness of transitions, submitted to the Court in August 2022. She made numerous recommendations for systems improvement. One of these suggested the state implement three strategies to address administrative barriers experienced by the Prime

agencies. The State changed access to medical records to apply for waiver services; the process to obtain state identification documents for Class Members, and reduced requirements for completing and uploading assessments. During the last quarter of FY23, the State queried the Prime agencies to determine if these changes had positive impact on timely transitions. The first policy had no impact; one Prime reported benefiting from the change to obtaining an ID; and three agencies found the changes to the assessment requirements saved staff work hours. UIC-CON made recommendations, to which the Court Monitor responded, to improve the success of future policy changes including greater involvement of the providers in designing solutions.

The Court Monitor and her consultant issued a report: *Transition Pipeline Case Study* on September 21, 2023, which reported the findings and recommendations of a study that was undertaken in May 2023. The case study included a small sample of thirty-three Class Members who had been in the Transition Pipeline's Planning Phase for more than 120 days. The purpose of the study was to determine what causes significant delays for these Class Members. During the study Class Members and their transition staff were interviewed based on record review of the assessment, Service Plan and Plan of Care. Three Prime agencies were involved directly who had assigned responsibility for serving 88% of the Class Members who were in the Planning Phase of the Pipeline for over 120 days. All other Primes and CTI programs were interviewed for a more comprehensive understanding of barriers and recommendations for improvement. Seven barriers were identified including medical and behavioral concerns that providers believed must be addressed before a successful transition could be effectuated. Other significant barriers included the need for skill building, a lack of appropriate community services and a lack of appropriate residential settings. The Williams Decree expects that skill building will not pose a barrier to transition and can be addressed in the community. The Court Monitor's Office made several recommendations for improvement and subsequently submitted to the state four recommendations that were priorities to address in FY24 and FY25 to improve the infrastructure of the program serving Class Members and increase the timeliness of transitions. These include:

- Adequate staffing resources for transition activities: outreach, assessment, and service planning.
- The development of a comprehensive plan to increase service and housing capacity to meet the needs of Class Members who wish to transition so these transitions are not unduly delayed.
- Effective and regular communication with Class Members who want to transition so they are aware of when transition activities will occur and what the projected timeframe is to transition.
- A review of all recommendations for Class Members to live in other than a PSH setting and a plan to develop sufficient housing resources for those Class

Members who do need greater supervision or structure either temporarily or permanently.

The Study Report and the Priority Recommendations are included as Attachments 1 and 2 of this Annual Report.

**Summary**
The State failed to meet its transition requirement for FY23 moving only 338 (80%) of the 425 Class Members required to transition this year. Its Prime agencies underperformed, and the CTI program met its target transitioning 23 Class Members. The State did not include the CTI program in the JACSW timeliness study, but it appears the CTI program has transitioned Class Members more quickly from the performance outcomes and the data reviewed in the Court Monitor's Transition Pipeline Case Study. It will be important for the State to determine what the differences are and how to capitalize on activities and strategies that will lead to timely transitions in the future.

 Almost 600 Class Members remained in the transition pipeline as of June 30, 2023, of whom 190 (32%) were waiting more than 120 days. It is unacceptable for Class Members to wait so long to transition or not be outreached soon after admission and provided information about community services to make a reasonable decision about transition. The State needs to address its resources for outreach, assessment, and service planning, and ensure sufficient service and housing capacity so that Class Members transition in a timelier fashion.

My recommendations to improve transition performance:
- Conduct an analysis using assessment and SP data of the service and housing needs of the Class Members who wish to transition with a projection for future admissions.
- Develop and implement a plan to increase and expand housing and service capacity.
- Develop the plan for reasonable pace creating a multi-year plan to transition Class Members timely.
- Determine the staffing resources needed to perform the outreach, assessment and service planning functions associated with transition in a timely manner.

**Section VII. Community-Based Services and Housing Capacity Development**

The *Williams* Consent Decree issues a clear imperative that the Defendants must ensure the array and quantity of community-based services and housing needed to successfully transition appropriate Class Members from SMHRFs to community living. From the onset, the Parties, the Court Monitor, and other stakeholders agreed that the current types and quantities of available services and housing in the community are insufficient to adequately support diversion and transition.

Beyond the development of services and housing that specifically serve Class Members, the *Williams* Consent Decree also provides an opportunity for Illinois to begin rebalancing its mental health and disability services system, moving away from its heavy reliance on institutional care toward community-based, recovery-oriented, and person-centered services and housing. By using Class Member data, other states' best practices, and a multimillion-dollar funding allocation, the Illinois systems' leaders can leverage the Consent Decree for real and lasting systems change that strengthens its community-based mental health and housing systems.

Community-Based Services and Housing Capacity Development-Related Requirements. The Consent Decree requires that Defendants create and provide to Class Members an adequate system of housing and services. Further, the FY23 Implementation Plan requires further study of service capacity, increasing marketing for SRN/811 housing development, and SOAR capacity development.

Community-Based Services and Housing Capacity Development-Related Data Highlights.
- The State transitioned thirty-three Williams Class Members to SRN/811 units
- DMH launched a landlord helpline in September 2022
- IDHS partnered with CHS to develop and issue educational materials for landlords which were distributed in September 2023.

Community-Based Services and Housing Capacity Development-Related Requirements and Compliance Ratings. *Table 12* lists the specific requirements in this domain. Across the nine Consent Decree and FY23 Implementation Plan requirements, **six are in compliance, two are in partial compliance, and one is out of compliance.**

**Table 12 Williams Consent Decree Community Services and Housing Capacity Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Requirement Language | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 36 | *Williams* | | Out-of- | |

| | Consent Decree V(5) | Defendants shall ensure the availability of services, supports, and other resources of sufficient quality, scope and variety to meet their obligations under the Decree and the Implementation Plan.<br><br>**Out-of-Compliance.** While the Defendants did submit an updated capacity development plan, hundreds of Class Members remain in the transition pipeline due to inadequate outreach, assessment, service planning, transition support, and community-based services capacity. Specific data that demonstrates inadequate capacity can be found in previous sections about these activities and the Transition Pipeline | **Compliance** | **Out-of-Compliance** |
|---|---|---|---|---|

| 37 | *Williams* Consent Decree V(5) | Defendants shall implement sufficient measures, consistent with the preferences, strengths, and needs of Class Members, to provide Community-Based Settings and Community-Based Services pursuant to the Decree.<br><br>***Partial Compliance***. The Defendants report on the continued funding for bridge subsidies which secures tenant-based vouchers to cover any CM housing needs not otherwise funded. There were 385 new Bridge Subsidies for CMs and 119 new Bridge Subsidies for FDDP participants. IHDA reports an increase in affordable SRN housing units (349 in FY23 compared to 308 in FY22) for which CMs are prioritized from the SRN/811 waiting lists. There were no new 811 units in FY23. The State made 126 SRN units available and 90 811 units available for CMs but only 12 CMs secured an SRN unit and 21 CMs secured an 811 unit. However, their continued inability to transition Class Members – and particularly address identified pipeline issues – demonstrates that the availability of supports and services is inadequate to address need. | **Partial Compliance** | **Partial Compliance** |

| | | | | |
|---|---|---|---|---|
| D1 | FY23 IP | Strategy: IDHS and UIC will continue service needs-based study, in consultation with the Parties and Monitor, to verify adequate services and supports are available for Transitioning CMs, including FY23 Comprehensive Program capacity. Study will be completed and shared with the Parties and Monitor by 1/31/23. Plans to address any identified gaps will be developed and shared with the Parties and Monitor by 3/31/23.<br><br>Expected /Outcome:<br>● CMs who Transition have access to adequate services and supports to meet their needs and preferences in the community.<br><br>**Partial Compliance.** IDHS, in partnership with UIC-JACSW conducted an analysis of the Comprehensive Program/Prime Agency jobs to understand the potential to analyze and study Transition services capacity. JACSW compared and analyzed the job descriptions of each Prime Agency's positions compared to the program deliverables and found stark differences across how each Prime implements staffing and service delivery, making studying capacity challenging. The report was submitted to the Court Monitor and Parties on 5/22/23. The report was submitted several months after it was due and did not offer specific recommendations to address service capacity as this was considered an initial study. While the State is exploring ways to enhance the system specific plans have not been developed as of 6/30/23. | **Not Rated in FY22** | **Partial Compliance** |
| CD2 | FY23 IP | Strategy: IDHS and IHDA will implement data quality process improvements when appropriate and needed, as well as increase marketing of SRN/811 to CMs to increase CM SRN/811 utilization.<br><br>Expected Outcome:<br>● 15 Williams CM offered SRN/811 units will Transition into SRN/811 units.<br><br>**In Compliance.** As of 6/30/23 33 Class Members transitioned to SRN/811 units | **Not Rated in FY22** | **In Compliance** |

| CD3 | FY23 IP | Strategy: Defendants will be implementing the FY22 Capacity Development Plan and the FY22 Housing Choice Voucher Strategic Plan. Updates on implementation of both of these plans will be provided to the Parties and Court Monitor on a quarterly basis.<br><br>Expected Outcome:<br>• The Plans' strategies will address service access barriers that may be causing delays in Transition for some CMs.<br><br>***In Compliance.*** Defendants provided quarterly updates throughout FY23. | **In Compliance** | **In Compliance** |
|---|---|---|---|---|
| CD4 | FY23 IP | Strategy: IDHS is working with our supportive housing vendor, CSH, to develop marketing and educational materials. IDHS is also launching a "housing helpline" that will connect tenants and landlords directly to DMH Housing Coordinators who can answer questions and provide support. These materials will be completed by October 31, 2022, and shared with Class Counsel and Monitor before they are finalized.<br><br>Expected Outcome:<br>• Educational materials will be distributed by 10/31/22 to help private market landlords to better understand the Bridge Subsidy. The helpline will be implemented by 10/31/22 and will connect tenants and landlords directly to DMH Housing Coordinators who can answer questions and provide support.<br><br>***In Compliance.*** IDHS partnered with CSH for the development (in consultation with Parties & Monitor) of landlord educational materials which were made available and distributed by 9/28/22. The landlord helpline was launched by DMH by 9/28/22. | **Not Rated in FY22** | **In Compliance** |
| CD5 | FY23 IP | Strategy: A SOAR progress report will be prepared at the end of the first half of the Fiscal Year. The report will be shared with the Parties and Monitor by 1/15/23.<br><br>Expected Outcome:<br>• Defendants will have determined status and necessary outcome goals to meet Illinois' SOAR standards.<br><br>***In Compliance.*** The State provided a SOAR progress report in January 2023 | **Not Rated in FY22** | **In Compliance** |

| CD6 | FY23 IP | Strategy: IDHS will examine other SOAR service provider alternatives, including but not limited to issuing a Request For Information (RFI) by 11/1/22 and/or seeking a short-term Notice of Funding Opportunity deviation from GOMB to bring on alternative providers.<br><br>Expected Outcome:<br>● Defendants will determine if there are alternate providers to deliver higher volumes of SOAR services and achieve improved outcomes for Class Members.<br><br>*In Compliance.* IDHS issued a SOAR RFI 11/2/22 and received six responses. IDHS is exploring options for SOAR expansion which may include securing a new SOAR provider. | **Not Rated in FY22** | **In Compliance** |
| CD7 | FY23 IP | Strategy: IDHS will issue a Request for Information (RFI) to assess and invite in- and out-of-state provider interest, capacity, and innovative approaches to address capacity gaps by 1/31/23.<br><br>Expected Outcome:<br>● Defendants will gauge in- and out-of state provider interest in entering the Williams provider network in FY24 or FY25.<br><br>*In Compliance.* IDHS issued a Transition provider RFI on 2/27/23. IDHS received two responses, which informed the State of little to no interest in new providers entering the network.<br><br>The State is exploring options for system enhancement (presented at Aug substantial compliance meeting). | **Not Rated in FY22** | **In Compliance** |

**Related Reports**

The State provided quarterly reports through FY23 titled: Quarterly Reports for Developing Capacity for Key Services and Illinois Housing Capacity and the Bridge Subsidy to Permanent Rental Assistance Strategic Plan. These were done to report on the implementation of recommendations from a service and housing capacity analysis completed by JACSW in FY22. These quarterly reports became more specific over the curse of the year culminating in the most informative quarterly update in June 2023.

The reports include service capacity information about Assertive Community Treatment (ACT), Community Support Teams (CST), Peer Supports, Employment Supports, and Substance Use Disorder (SUD) Services, while also addressing the workforce shortage. Regarding housing the reports discuss SRN/811, Bridge Subsidies, Bridge Subsidy to permanent rental assistance, and Class Member Education and Counseling.

The reports include the existing capacity of the various services needed by Class Members who transition. ACT teams serve 1,326 individuals and had only 91 (7%) vacancies in June. Of the 1,132 *Colbert* Class Members in the Pipeline as of June 2023, 965 had a completed SP. Of these 965 Class Members, 190 were recommended for ACT. There were 594 *Williams* Class Members in the Pipeline of whom 494 had a completed SP. Of these 494 190 were recommended for ACT services. This indicates the existing ACT teams can only serve approximately 25% of the Class Members progressing to transition who need this service. There are references to assistance and training be planned by DMH in partnership with UIC-CON but there is no indication if this was completed in FY23. One Prime/FDDP provider received start up finds in FY23 Quarter 3, added two positions, and increased the program's capacity by fifteen. The CST programs have similar limited capacity with only 339 (10%) openings for new participants in programs serving 3,437 individuals. Again, many more Class Members with completed SPs are recommended for CST: 156 Williams CMs and 370 Colbert CMs in the Pipeline, totaling 526 Class Members for 339 openings. One provider did receive startup funds for CST in FY23 Quarter 3 which will expand this provider's CST capacity by forty-five individuals.

The updates on SUD Services do not report the capacity of these services. The State has yet to share a plan for the development of these services. It is critical that the State include an in-depth analysis of the need among Class Members and the availability of these services. From interviews with Prime agency staff, I have learned that SUD among Class Members, *Williams* in particular is growing and providers are reticent to transition Class Members with active substance use. As of June 2023, there were 128 Williams and 256 Colbert Class Members in the Pipeline who were recommended for SUD services.

Employment Services are not addressed in any specific way except to report that the State is working with JACSW to assess pathways to employment and explore barriers to employment experienced by Class Members. There is no assessment of employment need and interest of what capacity is needed for supportive employment services. JACSW's employment study cited earlier in this report found significant weaknesses in the referral process and SP design. The State has made initial steps to address referrals and redesigned the SP. The Court Monitor will continue to review and monitor these actions to determine if they have any significant impact improving employment support. Class Members need employment to successfully remain in the community and not

experience reinstitutionalization. It is incumbent upon the State to include in its analysis of service gaps in FY24 the capacity of employment support providers and the need and desires of Class Members to work. Very few Class Members actually are employed after transition.

Housing is key to successful and sustained transitions. The State has engaged in activities this year to address the access to and capacity of housing for Class Members. Changes in the housing application process has increased the volume of applications and the number of units although no baseline information is provided. The Bridge Subsidy program is very successful and well-funded by the State. In FY23 the State over expended its *Williams* budget as a result of the number of bridge subsidies it authorized. Catholic Charities has been made the subsidy administrator for *Colbert* because of its successful track record with *Williams*. The State is aware that the federal fair market rates have not kept pace with the rental costs in Chicago. The State has granted 215 waivers for rental costs this year of the 221 waiver requests made to enable Class Members to rent apartments of their choice. As noted earlier in this report the State also concentrated efforts on landlord education and marketing the CCMTP with them. The State has also developed educational materials for Class Members, in collaboration with the Corporation for Supportive Housing (CSH).

IDHS sent a survey to all of the Prime agencies in the fall of 2022 and issued a report: Prime Agency Barriers to Transition. The survey was a review of service and housing availability and capacity including HCBS waiver services, community Mental Health services, SUD services and grant funded staffing for the CCMTP. The report included a section on Barriers, Proposed Remedies, and the State's Response. All eleven Prime agencies responded to the survey but with a varying number of staff who responded making it more difficult to determine themes and variations. Barriers were noted with the availability of services and housing; the limitation of covered services and the difficulty obtaining MCO approval to access these services. Prime agencies reported difficulty accessing CST, ACT and in-home supports. Primes reported that the DRS waiver includes more of the services Class Members need than the services under the IDoA waiver.

The State's response did address the work force shortage as noted earlier in this report and included allowing Prime agencies to hire BA level staff with State approval to conduct care coordination functions. The State offered startup funds for CSTs but did not have specific recommendations to increase CST, ACT, or in-home supports to meet the identified needs of Class Members who want to transition. The State created a pre-housing inspection process for Primes to determine if available housing would potentially meet the state's inspection requirements and established a process to

approve rental costs over the Fair Market Value (FMV) which has not kept up with the increased cost of renting in the Chicago area.

JACSW also completed a Prime Capacity Study in May 2023 which was presented to the Court Monitor and Parties at the June 23, 2023, Substantial Compliance meeting. The study sought to determine the similarities and differences in the job functions of key CCMTP staff to determine if there was any impact on performance or staff capacity to complete the various activities associated with transition. This was a preliminary study and did not make substantive recommendations regarding CCMTP capacity.

IDHS issued a SOAR Progress Report to the Parties and Court Monitor in January 2023. It summarized the State's efforts to improve the outcomes of SOAR. IDHS established the SOAR Learning Collaborative for Colbert/Williams SOAR workers which meets monthly. IDHS developed new case follow -up procedures with the Social Security Administration (SSA) to ensure SOAR applications are expedited appropriately. The report contains data for the first six months of FY23 and all of FY22. While more applications were filed for Colbert Class Members (48 compared to 29), fewer applications were approved (17 in FY22 and 11 in FY23) and only one reconsideration was approved in FY23. Very few Class Members benefit from SOAR. The State issued a Notice of Funding Opportunity (NOFO) for a new SOAR provider, but the Notice did not generate the interest of new providers.


**Summary**
The State has committed in its FY24 Implementation Plan and its plan to achieve substantial compliance that it will develop a plan for the reasonable pace of transitions to address the desire for transition among existing Class Members, and projecting for new admissions; and will develop and implement a plan to increase community services and housing so that al Class Members who want to and are appropriate for transition can do so without waiting an inordinate amount of time while remaining institutionalized.. Both of these initiatives are critical to successfully transitioning Class Members in a timely way and eventually meeting the requirements of the Consent Decree. To date, the State has not had the data about all Class Members that it needs to either determine reasonable pace of comprehensively project the needs for service expansion and housing development.

My recommendations for improved service capacity performance are:
- As reported earlier, the State should insure assessments and SPs are timely and the needs included in these person-centered documents are used to project service and housing need.
- Develop a multi-year plan to increase community-based services that allows

more Class Members to transition each year.
- Increase the service provider network to respond to the service and housing capacity plan.
- Determine if the State needs to develop more robust incentives to attract suitable providers who can develop and sustain the necessary qualified workforce.

**Section VIII. Administrative Requirements**

It is critical that the Defendants support Consent Decree planning and operations with strong management and administrative processes. As such, the *Williams* Consent Decree includes several administrative requirements, including obligations for timely reporting on performance relative to Consent Decree and Implementation Plan requirements, responsiveness to the Court Monitor and Plaintiffs' data and information requests, and unfettered access to Class Members and their records, as well as to various staff and stakeholders related to Consent Decree planning, operations, and implementation.

Administrative Requirement. The Defendants' administrative requirements during this compliance period include:
- Delivering semiannual reports containing the information and data agreed to by the Court Monitor and Parties (Requirement 38).
- Providing the Court Monitor unrestricted access to documents, information, and staff involved with the Consent Decree, without counsel present (Requirement 39).
- Ensuring the Court Monitor's unrestricted access to Class Members and their records (Requirement 40).
- Providing data and information requested by Plaintiffs (Requirement 41).
- Compensating the Court Monitor and her staff consistent with their customary rates (Requirement 42).
- Covering all costs associated with the Decree (Requirement 43).

The FY23 Implementation Plan also required that the Defendants provide quarterly budget updates, share monthly dashboards with the Parties, convene regular meetings with the Parties and Monitor, maintain Consent Decree related staff; and discuss substantial compliance. These requirements were included in the Implementation Plan for FY23 but not as measurable conditions. The State met all of these expectations in FY23.

Administrative-Related Data Highlights.
- The Parties engaged with the Court Monitor and her consultant in January 2023 to begin discussions of the various components of substantial compliance and to

design the Compliance Indicators (CIs) that the Monitor would use going forward to determine the State's progress annually to meet the performance expectations of the CIs, come into substantial compliance and progress towards an exit plan.

- The State responded to all of the Monitor's requests for records for the Transition Pipeline Case Study and ensured access to Prime agency staff, SMHRF staff and Class Members for interviews.

Administrative-Related Requirements and Compliance Ratings. *Table 13* lists the specific administrative requirements. **All nine Consent Decree requirements are in compliance.**

**Table 13 Williams Consent Decree Administrative Requirements and Ratings**

| Req # | Source/ Citation | *Williams* Consent Decree Administration Requirement Language and FY23 Performance | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 38 | Consent Decree IX(16) | The Court will appoint an independent and impartial Monitor who is knowledgeable concerning the management and oversight of programs serving individuals with Mental Illnesses. The Parties will attempt to agree on the selection of a Monitor to propose to the Court. If the Parties are unable to reach agreement, each party will nominate one person to serve as Monitor and the Court will select the Monitor. Within twenty-one (21) days of Approval of the Decree, the Parties shall submit their joint recommendation or separate nominations for a Monitor to the Court. In the event the Monitor resigns or otherwise becomes unavailable, the process described above will be used to select a replacement.<br><br>*In Compliance.* Ms. du Pree officially commenced her role in August 2022. | **Not Rated in FY22** | **In Compliance** |
| 39 | Consent Decree IX(18) | Not less than every six (6) months, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress toward achieving compliance, with the Parties and Monitor agreeing in advance of the first report of the data and information that must be included in such report.<br><br>*In Compliance.* The Defendants produced semi-annual reports that contained the data and information necessary to assess compliance and performance on the Consent Decree and Implementation Plan requirements. | **In Compliance** | **In Compliance** |
| 40 | Consent Decree IX(18) | Defendants will not refuse any request by the Monitor for documents or other information that are reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree, and Defendants will, upon reasonable notice, permit confidential interviews of Defendants' staff or consultants, except their attorneys.<br><br>*In Compliance.* The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |

| 41 | Consent Decree IX(18) | The Monitor will have access to all Class Members and their records and files, as well as to those service providers, facilities, building and premises that serve, or are otherwise pertinent to, Class Members, where such access is reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree.<br><br>*In Compliance*. The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |
|---|---|---|---|---|
| 42 | Consent Decree IX(18) | The Defendants shall comply with Plaintiffs' requests for information that are reasonably related to Defendants' compliance with the Decree, including without limitation requests for records or other relevant documents pertinent to implementation of the Decree or to Class Members. Plaintiffs shall also be permitted to review the information provided to the Monitor. All information provided to the Monitor and/or Plaintiffs pursuant to the Decree shall be subject to the Protective Order.<br><br>*In Compliance.* The Court Monitor queried Class Counsel on December 12, 2023, and received a response on December 18,2023. While the Class Counsel considered some responses inadequate, they did not report any instances wherein the Defendants did not supply requested data and information. | **In Compliance** | **In Compliance** |
| 43 | Consent Decree IX(20) | Defendants shall compensate the Monitor and his or her staff and consultants at their usual and customary rate subject to approval by the court. Defendants shall reimburse all reasonable expenses of the Monitor and the Monitor's staff, consistent with guidelines set forth in the "Governor's Travel Control Board Travel Guide for State Employees." Defendants may seek relief from the Court if Defendants believe that any of the Monitor's charges is inappropriate or unreasonable.<br><br>*In Compliance*. The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |
| 44 | Consent Decree XII(24) | The cost of all notices hereunder or otherwise ordered by the Court shall be borne by the Defendants.<br><br>*In Compliance.* The Defendants complied with this requirement. | **In Compliance** | **In Compliance** |

| CM1 | Consent Decree IX(17) | The Monitor's duties include evaluating Defendants' compliance with the Decree, identifying actual and potential areas of non-compliance with the Decree, mediating disputes between the Parties, and bringing issues and recommendations for their resolution to the Court. Within 60 days after the end of each year of service, the Monitor will report to the Court and the Parties regarding compliance with the Decree. Such reports shall include the information necessary, in the Monitor's professional judgment, for the Court and Plaintiffs to evaluate the Defendants' compliance or non-compliance with the terms of the Decree. The Monitor may file additional reports, as necessary. Reports of the Monitor shall be served on all Parties.<br><br>**In Compliance.** The Court Monitor produced her annual report, and it was filed January 4, 2023. | Court Monitor Requirement<br>--<br>In Compliance | Court Monitor Requirement<br>--<br>In Compliance |
|---|---|---|---|---|

| CM2 | Consent Decree IX(19) | In the event that the Monitor finds Defendants not in compliance with the Decree, the Monitor shall promptly meet and confer with the Parties in an effort to agree on steps necessary to achieve compliance. In the event that Plaintiffs believe that Defendants are not complying with the terms of the Decree, Plaintiffs shall notify the Monitor and Defendants of Defendants' potential non-compliance. The Monitor then shall review the Plaintiffs' claims of actual or potential non-compliance and, as the Monitor deems appropriate in his or her professional judgment, meet and confer with Defendants and Plaintiffs in an effort to agree on steps necessary to achieve compliance with the Decree. If the Monitor and Parties agree, such steps shall be memorialized in writing, filed with the Court, and incorporated into, and become enforceable as part of, the Decree. In the event that the Monitor is unable to reach agreement with Defendants and Plaintiffs, the Monitor or either Party may seek appropriate relief from the Court. In the event that Plaintiffs believe that Defendants are not in compliance with the Decree and that the Monitor has not requested appropriate relief from the Court, Plaintiffs may seek relief from the Court. The Monitor will not communicate with the Court without advance notice to the Parties.<br><br>*In Compliance*. The Court Monitor convened regular Parties and ad hoc meetings to identify and attempt to resolve issues of disagreement or non-compliance. Beginning in January the Monitor and Parties met regularly, mostly in-person to discuss substantial compliance and design Compliance Indicators. | **Court Monitor & Plaintiffs' Requirement**<br>—<br>**In Compliance** | **Court Monitor & Plaintiffs' Requirement**<br>—<br>**In Compliance** |

## Section IX. Implementation Planning

The Defendants are required to develop an annual implementation plan in consultation with the Court Monitor and Plaintiffs' Counsel, an integral annual deliverable that identifies desired performance indicators and outcome measures, key tasks and action steps, responsible parties, and timeframes/due dates for the forthcoming fiscal year. The *Williams* Consent Decree contains a requirement that Defendants "shall create and implement an Implementation Plan that outlines how they intend to operationalize concrete strategies to satisfy their Consent Decree obligations." The Implementation Plan is filed with the Court and the commitments contained therein become enforceable under the Decree.

Implementation Plan-Related Requirements. The *Williams* Consent Decree contains several requirements that dictate the required components of the Implementation Plan, obligate its development and timely filing, and sanction its enforceability under the Decree. The requirements in this domain include:

- The FY23 Implementation Plan's described methods by which Class Members can understand their rights to and request Consent Decree-related services and procedures for recording those requests (Requirement 48).
- The FY23 Implementation Plan's inclusion of methods for engaging Class Members and a procedure to provide opportunities to visit community-based services settings (Requirement 49).
- Completion of the FY22 Implementation Plan (Requirement 50), which takes place during the FY2021 compliance period.
- The FY23 Implementation Plan's delineation of specific tasks, timetables, goals, and plans to assure the Defendants' fulfillment of the Decree's obligations (Requirement 51).
- The FY23 Implementation Plan's inclusion of hiring, training, and supervision sufficient to implement Decree obligations and operate the Decree overall (Requirement 52).
- The FY23 Implementation Plan's description of activities required to develop community-based services and housing in sufficient measure (Requirement 53).
- The FY23 Implementation Plan's description of a data-driven process that utilizes Class Member service plan data (Requirement 54) and demographic data (Requirement 55) to inform community-based services and housing development.
- The FY23 Implementation Plan's inclusion of key regulatory changes governing SMHRFs that will facilitate stronger Consent Decree compliance (Requirement 56).
- The FY23 Implementation Plan's inclusion of tasks that will support the critical Consent Decree functions of evaluation (Requirement 57) and outreach (Requirement 58).
- The annual development of an Implementation Plan, in this case for FY24 (Requirement 59).
- The FY23 Implementation Plan's Decree enforceability (Requirement 60).

Implementation Plan-Related Requirements and Compliance Ratings. *Table 14* lists the thirteen specific requirements in this domain. **All thirteen of the Consent Decree requirements are In Compliance.**

**Table 14 Williams Consent Decree Implementation Plan Requirements and Ratings**

| Req# | Source/ Citation | *Williams* Consent Decree Implementation Plan Requirement Language and FY23 Performance | FY22 Compliance Rating | FY23 Compliance Rating |
|---|---|---|---|---|
| 48 | Consent Decree VII(10) | The Implementation Plan shall describe methods by which such information will be disseminated, the process by which Class Members may request services, and the manner in which Defendants will maintain current records of these requests.<br><br>*In Compliance.* The Defendants complied with this requirement. | In Compliance | In Compliance |
| 49 | Consent Decree VII(10) | The Implementation Plan shall describe methods for engaging residents, including where appropriate, providing reasonable opportunities for residents to visit and observe Community-Based Settings.<br><br>*In Compliance.* The State included such strategies and are found in compliance with this requirement. | In Compliance | In Compliance |
| 50 | Consent Decree VII(11) | Defendants, with the input of the Monitor and Plaintiffs, shall create and implement an Implementation Plan to accomplish the obligations and objectives set forth in the Decree.<br><br>*In Compliance.* The Implementation Plan was filed in July 2023. As such, they are found in compliance with these requirements. | In Compliance | In Compliance |
| 51 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum*: a) Establish specific tasks, timetables, goals, programs, plans, strategies, and protocols to assure that Defendants fulfill the requirements of the Decree.<br><br>*In Compliance.* The FY23 Implementation Plan included specific, measurable, and time bound activities to advance fulfillment of the requirements of the Decree. | In Compliance | In Compliance |
| 52 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum*: b) Describe the hiring, training, and supervision of the personnel necessary to implement the Decree.<br><br>*In Compliance.* The State is in compliance with this requirement. | In Compliance | In Compliance |

| 53 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum*: c) Describe the activities required to develop Community-Based Services and Community-Based Settings, including inter-agency agreements, requests for proposals and other actions necessary to implement the Decree.<br><br>***In Compliance****. The State is in compliance with this requirement | **In Compliance** | **In Compliance** |
| 54 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum*: d) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services or supports anticipated or required in Service Plans formulated pursuant to the Decree that are not currently available in the appropriate quantity, quality, or geographic location.<br><br>***In Compliance****. The State is in compliance with this requirement. | **In Compliance** | **In Compliance** |
| 55 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* e) Identify, based on information known at the time the Implementation Plan is finalized and updated on a regular basis, any services and supports which, based on demographic and other data, are expected to be required within one year to meet the obligations of the Decree.<br><br>***In Compliance****. The FY23 Implementation Plan included quarterly updates on service capacity as a follow up to the UIC study completed in FY22. | **In Compliance** | **In Compliance** |
| 56 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* f) Identify any necessary changes to regulations that govern IMDs in order to strengthen and clarify requirements for services to persons with Mental Illness and to provide for effective oversight and enforcement of all regulations and laws.<br><br>***In Compliance****. The FY23 Implementation Plan addresses changes to census reporting using Path Tracker for greater accuracy. | **In Compliance** | **In Compliance** |
| 57 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* g) Describe the methods by which Defendants shall ensure compliance with their obligations under Paragraph 6 *(Evaluations)* of this Decree.<br><br>***In Compliance****. The FY23 Implementation Plan included activities and tasks associated with compliance in the assessment (formerly referred to as evaluation) domain. | **In Compliance** | **In Compliance** |

| 58 | Consent Decree VII(11) | *The Implementation Plan must, at a minimum:* h) Describe the mechanisms by which Defendants shall ensure compliance with their obligations under Paragraph 10 *(Outreach)* of this Decree.<br><br>***In Compliance.*** The FY23 Implementation Plan included activities and tasks associated with compliance in the outreach domain. | **In Compliance** | **In Compliance** |
|----|----|----|----|----|
| 59 | Consent Decree VIII(13) | The Implementation Plan shall be updated and amended annually, or at such earlier intervals as Defendants deem necessary or appropriate. The Monitor and Plaintiffs may review and comment upon any such updates or amendments. In the event the Monitor or Plaintiffs disagree with the Defendants' proposed updates or amendments, the matter may be submitted to the Court for resolution.<br><br>***In Compliance.*** The State is in compliance with these requirements. | **In Compliance** | **In Compliance** |
| 60 | Consent Decree VIII(14) | The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of the Decree.<br><br>***In Compliance.*** The State is in compliance with these requirements. | **In Compliance** | **In Compliance** |

**Recommendations**

The Implementation Plan (IP) for FY25 will need to reflect the Parties and Court Monitor agreement to utilize the Compliance Indicators (CIs) as the future measures for determining substantial compliance. These have been shared with the Court and approved by Judge Lefkow at the January 2024 Status Hearing. The CIs will not change over the course of oversight of the Consent Decree. The metrics for determining the State is in Substantial Compliance have been set as has the review methodology. Future IPs will reflect specific activities the State commits to each year to further the success achieving the CIs.

Currently the State only reports transition numbers for the CTI program. To date, the State has not included any data from the CTI programs related to assessment, service planning, critical incidents, or quality of life for Class Members who have transitioned. The Court Monitor expects data on all requirements to be reported for all programs serving Class Members in future SACRs.

**Section X. Quality Assurance**

*Williams* Class Members are adults with diagnoses of serious mental illness, often co-occurring with substance use disorders, medical comorbidities, unstable housing, and poverty. Ensuring that they are provided quality services and supports in safe

environments is a fundamental responsibility of the State. Use of quality assurance mechanisms and tools buttressed by a commitment to examining process and outcome data to inform decision-making and program implementation is key to successfully meeting this responsibility.

Several data sources — identified in the Defendants' reports — enable one to examine Class Member quality of life and safety. These include pre- and post-transition quality of life survey data completed by Class Members and analyzed by the University of Illinois in Chicago, College of Nursing (UIC CON); Specialized Mental Health Rehabilitation Facility (SMHRF) Reportable Performance Indicators data from the Illinois Department of Public Health (IDPH); post-transition critical incident data provided by DMH; and annual mortality data collected and analyzed by UIC CON.

*Incident Data.* On a monthly basis, IDPH collects the number of specific types of critical incidents reported by SMHRFs, including resident deaths that occur in SMHRFs and acute care hospital visits by SMHRF residents; incidents of abuse, neglect, or maltreatment; and other critical incident types. Not all information is available: for example, outcomes for individuals who are hospitalized may not be reported unless the individual returns to the SMHRF. *Table 15* summarizes reportable Incidents during FY23 that were substantiated and rose to the level of a complaint investigation.

A similar set of critical incident categories are collected by the DMH for the first eighteen months following a Class Member's transition to the community.

Comparing SMHRF and post-transition critical incident data would ideally allow sound assessment of Class Members' outcomes and experiences in SMHRFs versus in the community. However, several factors make it difficult to conduct a meaningful comparison between SMHRF and post-transition (community-based) critical incident data, including:

- Post-transition critical incident data is only collected for eighteen months after transition date, leaving critical incidents that occur for Class Members transitioned longer than this period unreported and thus unknown.
- The critical incident categories across both cohorts have not been independently verified to ensure that definitions and reporting procedures align between SMHRF and community categories.
- Some incidents — such as assaults —may be counted within multiple categories (e.g., sexual assault, abuse, assault, and criminal conduct), potentially giving a misleading picture regarding the true extent of critical incidents. In the community data totals are separated for CMs who are alleged perpetrators and victims for physical assault and sexual assault. There are no distinctions for these categories for residents of SMHRFs.

- The numbers of incidents reported in SMHRFs is dramatically lower in FY23 compared to FY22. The total number of Critical Incidents was 688 in FY22 and 53 in FY23. Sexual assaults decreased from 108 to 7; abuse/neglect/mistreatment from 403 to 29; assaults from 74 to 8; and criminal activity from 65 to 0 incidents. These significant decreases in reporting have not been explained by the State.
- Of the 53 critical incidents reported occurring in SMHRFs, 16 (30%) were substantiated.
- The denominators for the subgroups are different. At the beginning of FY23, the census in SMHRFs was approximately 3,200, while the number of people in the community (within 18 months of transition) was fewer than 1,000.

**Table 15 Comparative Analysis of Critical Incidents in FY23**

| Incident Type/Category | Within SMHRFs | Post-Transition to Community |
|---|---|---|
| Sexual Assault | 7 | 5 |
| Abuse/Neglect/Maltreatment | 29 | 9 |
| Death | 9 | 10 |
| Assault | 8 | 8 |
| Missing Person | 0 | 11 |
| Criminal Conduct | 0 | 3 |
| Fires | 0 | 1 |

Notwithstanding these methodological issues, the raw count of these critical incidents occurring in FY23 suggests that critical incidents are similar among the Class Members transitioned to the community cohort than the SMHRF resident cohort. This is not consistent with data reported by the State in previous years when it was more likely to experience a critical incident in a SMHRF than in the community.

In FY23, the most common categories of reportable incidents in SMHRFs were instances of abuse/neglect/maltreatment, sexual assault, and assault. The most common category of incident experienced by post-transition Class Members in the community is unexpected hospital visits or admission. Out of 782 post-transition incidents reported in FY23, 461 (59%) of them were related to hospital visits or admissions, compared to 61% in FY22. The total number of incidents increased between FY22 and FY23 from 420 to 782 incidents, an increase of 86%. This significant increase has not been explained by the State but is of serious concern.

*Mortality Review Data.* Ten deaths occurred among Class Members in the community in FY23. One of these deaths was attributed to substance use compared to four in FY22, four were attributed to cardiovascular disease/failure, one to liver failure, two to suicide one to a fire, and one was pending at the time of Defendants' report submission. There

were no suicides reported in FY21 or FY22. Seven decedents were male and three were female. The average age at time of death was 50. The average number of months living in the community at time of death was 9.6 months, although 42% of the Class Members died between 12-18 months after transition. The percentage of deaths remained at .03 deaths per active Williams Class Member.

*Quality of Life Data.* Quality of life survey data consistently indicates that Class Members report an enhanced quality of life after transitioning into the community from SMHRFs. In FY23, UIC CON facilitated completion of quality-of-life (QOL) surveys for *Williams* Class Members. Surveys are attempted at two points, first at transition/community move (baseline) reflecting their quality of life during their SMHRF stay, and then at one-year post-transition reflecting their experience with community living. Class Members are asked to self-report their satisfaction across seven key domains: Living Situation; Choice and Control of Living Arrangements; Access to Personal Care; Respect and Dignity from Caregivers; Community Integration and Inclusion; Overall Life Satisfaction; and Health Status (includes mood).

The Defendants shared a report prepared by UIC CON summarizing QOL survey findings for both *Williams* and *Colbert* class members, spanning the period of July 1, 2020-June 30, 2023. FY23 data reflects information gathered from 117 survey responses. The average response rate across all surveys (i.e., both baseline and post-transition surveys) in FY22 was 42%.

Several survey items showed an increase in happiness or satisfaction indicating an improvement in quality of life of *Williams* Class Members post-transition at statistically significant levels. Class Members reported a statistically significant increase from 49% to 87% liking where they live post-transition as compared to baseline. Class Members report significantly increased control over the daily aspects of their lives in the community compared to in the SMHRF. Class Members also report being more respected by their caregivers in the community than in the facilities (75% to 96%). Additionally, Class Members were significantly happier with their lives in the community an increase of 30% from 55% at baseline to 85% at year one.

Williams Class Member were more interested in employment than Colbert Class Members while in the facilities. Both Classes identified transportation and facility restrictions and regulations as barriers to community access while living in the facilities. Overall, quality of life survey findings indicate positive changes in Class Member satisfaction, mood, and community access post-transition. The UIC CON survey reports do not note any areas of concern for Class Members post-transition.

To summarize, data and analyses shared by Defendants indicate that *Williams* Class Members experience statistically significant improvements in several important quality

of life measures post-transition.

## Section XI. Recommendations

For this Annual Report I have included my recommendations under each section of the report to which those recommendations relate. In this section I provide a status of the recommendations I made in the FY22 Annual Report. Based on my review and assessment of Defendants' performance with Consent Decree requirements in FY22, I recommended the following priority actions in the FY22 Annual Report for the remainder of FY23 and FY24. *Table 16* summarizes the status of these recommendations at the end of FY23.

## Table 16 FY22 Annual Report Recommendations Status in FY23

| | |
|---|---|
| 1) Continue to implement and improve the SMHRF re-admission process and Front Door Diversion Program (FDDP) to fully comply with Consent Decree diversion requirements | The Court Monitor commends the Defendants with Preadmission Screening and Resident Review (PASRR) redesign, which included a SMHRF pre-screening process. When braided with an effective and far-reaching FDDP program, these programs have the potential to ensure that Class Members who can successfully be served in the community (and elect to live there) will not experience needless SMHRF admission. The Defendants should create simple performance indicators that capture the proportion of SMHRF admissions who – either through the PASRR process or FDDP program – were meaningfully offered community-based services and housing. Further, Defendants must ensure these programs are implemented effectively and that quality assurance mechanisms are in place to ensure that the newly designed PASRR system continues to be implemented as it is constructed.<br><br>**Status:** The State reports quarterly on the SMHRF screening process and the timeliness of the reviews and referrals to FDDP. FDDP reporting is included in the monthly data dashboards and the Semi-Annual Comprehensive Reports. As indicated under earlier in this report the FDDP continues to successfully divert individuals from admission to SMHRFs. The Compliance indicators require reporting as to the effectiveness of the FDDP and the transition of FDDP participants to sustainable community services. |
| 2) Design a new outreach data reporting approach | The current outreach data renders it difficult to assess outreach penetration, appropriate frequency, and quality. The Court Monitor acknowledges that every Class Member contact cannot (and perhaps should not) be captured. A robust outreach program should include unstructured and informal engagements that do not lend themselves to onerous data collection requirements. However, the Court Monitor believes that it is time to design an approach that acknowledges the unquantifiable elements of an effective and organic outreach program while focused on capturing and providing data that reliably reports completed outreach and the time period in which the outreach occurs to relate to compliance expectations..<br><br>**Status:** The state designed a pilot for Engagement and Support by Peers to be |

| | | |
|---|---|---|
| | | implemented in FY24. The evaluation methodology had been developed and shared with the Monitor in December 2023. The State has identified almost 400 Williams Class Members who have no record of outreach and is implementing strategies to complete outreach for these CMs in FY24.The Monitor has made recommendations for significant changes in the outreach process to ensure in the future it is timely and effective presenting community alternatives to Class Members. |
| 3) | Address severe delays in all stages of the pre-transition process | When Class Members consent to outreach, assessment, service planning and transition processes, they should be able to move through these phases promptly. However, data provided herein – and in the August 2022 timeliness analysis – demonstrates that only 41% percent of Class Members received prompt initial outreach (within 60-70 days of admission), 41% received prompt initial assessments (within 14 days of positive outreach outcome), 29 percent received prompt initial service plans (within 45 days of assessment), and 41% were transitioned within 120 days of the initial service plan. While the organizing principle for the Comprehensive Program was to reduce handoffs among providers and improve process efficiency, it has now become standard that Class Members wait for months (and even years) to move through the rudimentary process steps, which likely erodes their confidence and trust in the program. |
| | | **Status:** As noted in the related sections of this report there have not been significant improvements in performance in the key areas of pre-transition. The State is undertaking changes to the pipeline and improving the monitoring of the Primes. The State has addressed the needs of many Class Members in the pipeline who were waiting for their SP to be developed. The State has also revised the CAST process to make it less cumbersome so that CMs delayed because of cognitive, functional, or significant behavioral or medical needs can be reviewed and assisted to transition when possible. The State is also analyzing its outreach and assessment functions to determine the changes needed to improve performance and meet decree requirements. |
| 4) | Ensure that those who have waited longest to transition receive priority in the transition pipeline | Near the end of FY22, an estimated 1,100 *Williams* and *Colbert* Class Members – who were recommended to transition between July 2020 and December 2021 – remained stuck in the pipeline, nearly two years after their recommended assessments. While it is positive to conduct outreach and assessments to add more Class Members to the transition pipeline, Class Members who were already recommended but wait in the pipeline should be prioritized for transition. |
| | | **Status**: The Parties and Court Monitor have agreed that each year at least 70% of the CMs transitioned will be individuals who have waited at least 120 days to transition. The State met its target for this subgroup in FY23. The State is more closely monitoring the Prime agencies through monthly meetings to assure targets are met for transition. This is critical for Williams since only 80% of the transition requirement was met in FY23. The State is developing a plan for reasonable pace and undertaking a comprehensive analysis of service and housing needs to develop a capacity plan in FY24.This will build off the existing studies done by JACSW and the State's existing activities in response to these previous studies. |
| 5) | Address critical incidents in SMHRFs and in the community, including reducing avoidable hospitalizations | Critical incident data within SMHRFs remains a cause for alarm. The Defendants should conduct a more robust analysis of this data to determine trends, root causes, and potential strategies to prevent or address identified issues. This analysis should include a review of SMHRF policies and operational procedures that might contribute to critical incidents and a regulatory framework that can address SMHRFs that do not address issues. Further, the Defendants should |

| | | |
|---|---|---|
| | | develop dedicated interventions and programmatic strategies to prevent avoidable psychiatric and physical health-related hospitalizations, which constitute over half of all community-based critical incidents. Such strategies could include (but are not limited to): enhancements of mobile crisis infrastructure, implementation and increased linkage to/utilization of peer respite and living room models, and enhanced access to ACT services when Class Members are escalating or experiencing crisis.<br><br>**Status:** The State has not provided any reports this year regarding any progress towards addressing this recommendation. |
| 6) | Increase the role of the State's Medicaid MCOs in transitioning *Williams* Class Members. | The vast majority of *Williams* Class Members, whether residing in SMHRFs or the community, are enrollees under a Medicaid MCO. However, there was only one MCO-facilitated transition in FY22. The Court Monitor advises HFS to dedicate concerted attention to the design of requirements, incentives, accountability, and performance measures so that the Medicaid MCO potential to achieve and support transitions consistent with Olmstead is fully realized in both *Williams* and *Colbert* Consent Decrees. Relatedly, MCOs must be required to timely review and approve (when warranted) the services needed by Class Members enrolled in their plans for transition and community tenure.<br><br>**Status:** The CTI program had a target to transition 23 Williams CMs this year and met this goal. The State is determining an expanded role for managed care to meet the CI requirements including the plan for reasonable pace. |
| 7) | Develop innovative service delivery partnerships to expand transition support and services capacity | In addition to fully optimizing the MCO role in the Consent Decree processes, the State should continue to engage new organizations to perform transition support and community-based services and housing. Such organizations include (but are not limited to): specialty behavioral health organizations, primary/medical care organizations (including health systems that serve complex populations and federally qualified health centers), aging and disability services organizations, housing first organizations, and others. By deepening understanding of the needs of Consent Decree subpopulations (using four-quadrant and other data sources), the State can design dedicated care pathways for specific subpopulations and identify providers who can address their needs, ensuring that Class Members receive accurate care.<br><br>**Status:** The State has discussed its preliminary plans to address this recommendation during the meetings with the Court Monitor and Parties regarding substantial compliance. |

## Section XII. Conclusions

The State was rated on eight-seven requirements from the Consent Decree and the FY23 Implementation Plan, which include all unique, non-duplicative requirements. The State is in compliance with 49 (56%) of the requirements; in partial compliance with 21 (24%) of the requirements; and out-of-compliance with 17 (20%) of the requirements. This performance is similar to the State's achievements in FY22. The Front Door Diversion Program (FDDP) appears to be a successful initiative to divert individuals from

admission to SMHRFs. In FY23, 639 individuals were diverted which is more than the number of Class Members who were transitioned this year and led to a decrease in the census of SMHRFs. The census as of June 30, 2022, was 2,958, which is a decrease of 13% since the implementation of the Decree. As noted in the report this is the lowest census the State has ever reported and there are now only twenty-one SMHRFs in operation, of the twenty-three SMHRFs that were licensed. For the first time the State did not surplus any of its funding appropriation for *Williams* Class Members, but rather overspent its FY23 appropriation by $8 million to support needed Bridge Subsidies.

The State continued to not meet performance targets for outreach, assessment, service planning and transitions, both in percentages expected and most importantly for total transitions for the fiscal year. Timeliness remains a major hurdle for the State. Only 11% of initial outreaches were completed within 70 days of admission; only 49% of assessments were initiated within fourteen days of outreach; only 56% of SPs were completed on time; and almost 600 Class Members remain in the transition pipeline of whom 190 have waited more than 120 days to transition. Assessment timeliness did improve from 37% in FY22 to 49% in FY23; SP completion from 15% to 56% on time; and transition SPs done on time 62% in FY23 compared to 42% in FY22. These are positive improvements but remain far below the expected performance agreed to by the State in the FY23 Implementation Plan. As reported, the greatest disappointment is that only 338 of the required 425 Class Members were able to transition.

Outreach to existing Class Members was significantly better than it was to those who are newly admitted with 95% of the almost 1600 Class Members needing a follow up outreach receiving it. It is concerning that only half of the initial outreaches resulted in Class Members expressing interest in transition and only 57% of existing Class Members wanting to return to the community. This is important for the State to know as it develops its plan for reasonable pace. Although Class Members can change their minds at any time and the fact 57% expressed a new interest to transition at the annual outreach is proof of that, it is helpful data to project transition volume and activity. It is more important to use this information to determine how to more effectively outreach Class Members providing understandable and timely information about community resources; involving Class Members more quickly with peers with lived experience; and providing timely opportunities for Class Members to visit actual community programs to make a more informed decision about their futures. Once Class Members make this decision it is incumbent on the State to ensure there is active transition planning, clear communication with Class Members about their status for transition, and timely transitions to the greatest extent possible.

Service and housing capacity development must be a priority for the State if it is to transition Class Members at a reasonable pace. It is critical for there to be sufficient

mental health, substance use, and employment supports for Class Members to not only transition but remain in the community and experience a quality of life with needed supports and services.

It is very easy for the Consent Decree implementation process to become focused on the most tangible requirement and measure its success solely based on achieving the required number of transitions. This is an egregious error in an initiative that is focused on achieving systemic change. That is because the majority of the effort is applied to completing transitions which distracts from correcting the significant flaws in the system that led to a class action lawsuit and an eventual Consent Decree. This is evidenced by the scope and magnitude of all the requirements and the lack of timely outreach, assessment, and service planning; housing capacity, community-based services capacity especially to address SMI, SUD; and the need for employment. The development of a comprehensive service delivery system can only be achieved through an effective partnership of private providers and public sector administration. The focus on transition numbers can result in a tunnel vision approach to achieving the numbers to exit without achieving the person-centered quality necessary for achieving the level of true system change at both the level of engagement with Class Members and in the community services needed to sustain them in the community and prevent reinstitutionalization. Prevention of institutionalization must be a key component of the systemic response. When this true change occurs and is sustained so the Decree can be exited, the system can then be responsive to the needs of not only Class Members, but others in similar situations, meeting their needs for many years to come.

This report is based on the data the State provided in its monthly dashboards, Semiannual compliance reports; ad-hoc reports and presentations at Parties meetings and to the Court Monitor separately. A caveat must be included that the data has been reviewed and analyzed as reported. However, there are numerous indications that the data is not consistently reliable or valid. This has been reported directly by the State on occasion; is evidenced by the number of Class Members discovered to have never been outreached; and by the findings of the JACSW in its various studies conducted in FY22 and FY23. The State does not have the data to report by Class Member the status of outreach, assessment, and service planning. The review of the State's ability to meet the recently developed Compliance Indicators requires reliable and valid data that the State can verify as being both, and the Court Monitor's Office can similarly verify through a review of the data collection, analysis and reporting processes that assure consistency, reliability, and validity. Developing these processes will be a critical undertaking for the State during the remainder of FY24 and FY25.

Conclusions have also been made based on direct input to the Court Monitor and her consultant from numerous program visits; conversations with Class Members and FDDP participants; briefings with providers; attendance at Provider meetings; meetings with state agency staff; conversations with the Plaintiffs; observations of staff engaged in outreach, assessment and transition planning; and the record review and interviews conducted as part of the Transition Pipeline Timeliness Case Study. The Court Monitor greatly appreciates the time, insights, articulation of barriers and proposed solutions that have been provided by the many stakeholders engaged with the *Williams* Consent Decree. Those involved exhibit a great commitment to the Class Members and an effort to overcome systemic barriers. During the last half of FY23 and first half of FY24 the Parties engaged in numerous meaningful discussions to clarify interpretations of the Decree requirements; to design new strategies to address issues that were diminishing performance, and to agree to Compliance Indicators and a review process that creates the path to an exit plan for the State to finally implement the requirements of the Williams Consent Decree fully, honoring the wishes and life plans of Class Members.

**Attachment 1**
**Transition Pipeline Case Study**


**Conducted by the Office of the Court Monitor**
**Colbert and Williams Consent Decrees**


## Abstract

The purpose of this study was to answer the question of what might be causing the delays to transition into the community for Class Members stuck in the pipeline at the planning phase of the transition process. The study sought to determine the length of time Class Members waited in this phase, identify the barriers to timely transition planning and make recommendations for improvement. In addition, we hoped that the process and results of this study would inform the Court Monitor team as to the structure of future annual Quality Service Reviews which will be an important component of monitoring substantial compliance.

## Methodology

There are eleven Primes in the Comprehensive Class Member Transition Program (CCMTP) responsible for Outreach, Assessment, Service Planning and Transition of Class Members (CMs). We requested the list of CMs in the Planning Phase of the Pipeline as of May 2023. We decided to select the sample from those CMs who had been in this phase for at least 120 days. The three Primes with the highest number of CMs in their respective Planning Phase of their Pipelines were chosen for this small study. The three Primes selected were Trilogy, Envision and LSSI, which had a cumulative total of 207 or 88% of the CMs in the planning phase of the statewide Pipeline The total of CMs in the planning phase of the pipeline for at least 120 days for all eleven Primes was 235. Of the CMs served by the three Primes in the study, 62 were Williams CMs and 145 were Colbert CMs. The CM representations for each of the three Primes are as follows: Trilogy 96, LSSI 65 and Envision 46. We selected a stratified random sample of thirty-three CMs in the pipeline from the three Primes. The sample from each Prime is as follows: Trilogy 19, LSSI 8, and Envision 6. The study including the record review, CM interviews and Prime staff interviews for individuals in the study were conducted by the Court Monitor, Court Monitor Consultant who is a Psychologist, and a RN who is a national expert and has operated community services for individuals with disabilities.

In addition, we interviewed five MCOs (County Care, Molina, Meridian, BCBS, and Aetna) that were involved in the CTI program. (Humana was not interviewed as they had only

one CM transition and we had spoken to them earlier in the year.) We requested each MCO select one or two CMs to discuss any barriers they encountered to timely transition as well as any suggestions they could offer to better navigate those identified barriers including recommendations as to what the state may implement or modify to reduce barriers.. These CMs were not interviewed. We also interviewed the eight other prime agencies which did not have any CMs selected for the Case Study. These included Age Options, Association House, Cornerstone, Heritage, KYC, NYAP, Sertoma and Thresholds. We did so to gain an understanding of the barriers to transition planning from their perspective and to determine if they had any recommendations to effectively address the challenges they identified to the transition process.

For all CMs selected for the study, we conducted chart reviews, in-person interviews with CM, and interviews with Prime staff who either worked directly with the individual or was in a supervisory capacity for the transition process. Charts were requested and provided by UIC-CON. Charts contained the assessment, service plan and any notes made for the individual. We also requested all Plans of Care from the facilities. IDPH facilitated the acquisition of the requested POCs. These were reviewed by the RN who is a member of the Court Monitor's Team. A standard set of questions was developed for all of the interviews and are attached to this report.

In-person interviews with the CMs were conducted at the facilities they were residing in at that time. The standard set of questions was developed to extract specific information and to also assist with the engagement of a fluid person-centered conversation with the CM.

Analysis of the data collected did not warrant a high-level statistical formula as the sample size was intentionally small and all analysis only required a simple mathematical process.


**<u>Findings</u>**

This section will provide a summary of the findings of the Case Study. As described in the Methodology Section of the report we drew our information from three sources. Our primary source was the review of the thirty-three Class Members selected for the study which included record review, interviews with Prime staff and interviews with the Class Members directly. The second source was interviews with key staff from the eight Prime agencies who did not have Class Members who they serve in the sample. The third source was interviews with the Managed Care Organizations (MCOs) that administer the Community Transition Initiative (CTI) program which also transitions Class Members. We appreciate everyone involved in these programs for their time, insights, and candor. It

would not be possible to have analyzed the data and determined the key findings without their active participation and willingness to share what works effectively to enable timely transitions and what creates barriers to timely and successful transitions.

***Table 1: Summary of the Transition Pipeline Case Study*** depicts data regarding the timing of outreach, assessment, and service plan completion; whether a Care Manager was assigned at the time of the interviews with Class Members in June, and whether transition staff were engaged with the Class Member; the projected transition date; the type of residence recommended for the Class Member; and the barriers to transition. Of the thirty-three CMs in the study only one transitioned and that transition occurred in July 2023. One other CM self-discharged prior to our scheduled visit in June. Four of the CMs declined the opportunity to transition after the sample was selected; and one CM died while still residing in a SMHRF. We were able to interview all but three CMs. One had self-discharged; one was out for the day visiting family; and we were told one had already transitioned who had not.

**Timeliness:** The first set of findings describe the timeliness of the functions required prior to transition. All thirty-three CMs were outreached between 8/20 and 12/22. Five (15%) were outreached in 2020; twelve in 2021 (36%); and fifteen in 2022 (46%); the outreach date was unknown for one (3%) Colbert Class Member. One CM was transitioned during the study period. With few exceptions these individuals have been waiting for seven to thirty-six months to transition since indicating their interest to return to the community. These Class Members all remained in the Planning Phase of the Pipeline and had not advanced to the housing phase or transition delay phase as of July 2023.

Everyone in the sample had an assessment, and all but one Williams CM had a Service Plan (SP). The Table provides the dates of outreach, assessment, and service planning. We analyzed the time that lapsed between outreach and service planning which is captured in Table 1. The length of time to complete an SP after Outreach for a CM ranges from 1-24 months. Only eight (24%) were completed within sixty days of Outreach as required.

For the remaining CMs:
- 11 (33%) were completed within 3-12 months
- 10 (30%) were completed within 13-23 months
- 3 (9%) were completed in 24 or more months
- 1 (3%) is not completed

This is not dissimilar to the findings of the timeliness study completed by the Jane Addams College of Social Work (JACSW) as captured in a report that was issued in May

2023. IDHS did not have its revised definitions for the Pipeline in place in 2023. Effective July 2024 no Class Member should remain in the planning phase of the pipeline for more than forty-five days after Outreach. The SPs were current for twenty-four (73%) of the thirty-three CMs.

Table 1 also includes the dates of each CMs assessment. The Primes perform more to expectation for the time between assessment and service plan for these thirty-three CMs then between Outreach and SP completion.. Twenty (61%) had a SP completed within 90 days of the assessment; of these twenty CMs, fifteen (45%) had a completed SP within the required 45 days of the assessment being initiated.

**Care Manager and Transition Team Assistance**: Of particular concern is the engagement of the Class Members with Prime agency staff who are to be working with them to address barriers and actively plan for the CMs transition. Only twenty (61%) of the CMs in the sample had a Care Manager assigned to them at the time of the case study. Six of these CMs did not have a Care Manager assigned until early 2023 (January-May even though they were outreached in 2020, 2021 or 2022). The remaining thirteen were on a waiting list for a Care Manager. It was anticipated by the Prime that three of the CMs would have a Care Manager assigned in July or August. Related to the lack of Care Managers for all Class Members is that the transition teams were only engaged with nineteen (58%) of the CMs in the sample. Many CMs reported to us during their interview that there was no one working with them or communicating with them regularly regarding their transition status.

The Prime agencies in the study who had CMs waiting for a Care Manager to be assigned reported two reasons for this significant and unacceptable delay. Primes have experienced difficulty filling all of their vacant positions although all three reported in July that they had made significant progress recruiting and hiring staff during the past few months. With more of their positions filled they were assigning Care Managers to CMs over the summer. However, these Primes and the other Primes we interviewed also expressed the concern about not having sufficient positions to manage the number of CMs in the Pipeline and also continue to outreach and assess individuals who are newly admitted or who are existing residents but who still need outreach. The Primes who raised this as a concern indicated that the State only level funded the Primes for FY23 and FY24. There was no opportunity to request funding for additional positions. This will be discussed in greater detail later in this report.

Twenty-four of the CMs had a projected transition date in their Service Plan. The Transition date had passed for eighteen of the twenty-four CMs who had a projected date. Eight of these CMs had no Care Manager working with them. What is most troubling about this information is that it is a clear example of the complaint we heard

from many CMs that they do not have regular communication from the Prime agency. One Colbert CM complained extensively that he was told last summer that he would transition within the year (his projected date was 4/23), yet no one has been helping him plan or communicating about the delay in his transition. He is one of the CMs without a Care Manager at the time we interviewed him. The Class Members we interviewed for the most part were very interested in transitioning and wanted to leave the facilities as soon as possible. It was a notable frustration for them to not have regular communication about their status and how the Prime staff were helping to address and resolve the barriers that prevent them from transitioning.

Barriers: The SPs list the activities and issues that need to be addressed before the CM can successfully transition. These activities are typically part of transition planning. We have listed those activities that seem to be keeping CMs from moving to a more active phase of the Pipeline (housing or transition delay) and certainly not allowing them to transition within the expected timeframe of 120 days. These are barriers for the individual CMs we reviewed as the lack of ability to address these needs has kept these individuals in the Planning Phase for longer than the expected time to successfully transition. We found seven issues that were causing delays listed in the SPs of the thirty-three CMs in the study. In rank order these include:

1. identification documents (6)
2. lack of appropriate residential setting (14)
3. income (15)
4. medical (19)
5. lack of community services (20)
6. behavioral concerns (23), and
7. skill building (27)

The majority of Class Members were listed as having multiple issues that were delaying their transitions; all but three had three or more listed. There was variance in the type of barriers experienced by The Williams CMs compared to the Colbert CMs in a few areas. Securing identification was a barrier for only one Colbert CM but was a barrier for five Williams CMs. The lack of community services was noted as a barrier for four Colbert CMs compared to fifteen Williams CMs. Lack of a specific residential setting was noted for fifteen Williams CMs but not noted as a barrier for any Colbert CMs. Of the fifteen Williams CMs for whom residential setting was a barrier, seven wanted a PSH setting and eight wanted or were recommended for a supervised residential setting including Mental Health group homes. Almost 50% of all of the CMs were recommended for other than PSH residential settings (as discussed further in the report) but the lack of these settings was only noted as an actual barrier for Williams CMs. The barriers of income,

medical, behavioral needs, and skill building were barriers for a comparable number of Colbert and Williams CMs.

Nineteen CMs (8 Williams and 11 Colbert) had medical concerns listed as a barrier and twenty-three (12 Williams and 11 Colbert) had behavioral concerns listed as a challenge. For many this meant they were not being engaged in transition planning because the Prime believed the CMs needs in these areas may be significant enough to place them in a situation of transition hold. For some Colbert CMs, the medical concern included a possible diagnosis of dementia. Dementia reviews were not being scheduled and the Primes seemed reluctant to schedule the CAST review because of the onerous and time-consuming process. Many of the Primes, including those with CMs in the sample and those we interviewed who did not have CMs in the study, spoke of giving CMs "false hope." This term was used consistently to describe the situation staff believe a CM experiences when awaiting a CAST review or an annual follow up to reconfirm a CAST determination. The State ended the practice of a Prime deciding to classify a CM as "not recommended" for very sound reasons. The State's belief and mission is to give all CMs the opportunity to live in communities rather than in institutions for which they are commended. However, there is a strong sentiment among the service providers that not everyone can be served in the community, not because they couldn't be successful, but because the current service array available to CMs is not sufficiently extensive to meet significant medical or behavioral needs.

Income is a barrier for fifteen of the CMs in the study; eight Colbert and seven Williams CMs have no income. The SOAR application and approval process is lengthy and results in many disapprovals and appeals. Bridge subsidies are reported as being very helpful but cannot pay for a CMs utilities unless the utilities are included in the rental amount. Primes encourage CMs to work if at all possible while still residing at the facilities to both secure income towards transition expenses and have proof of income to better appeal to landlords for tenancy.

The three additional areas noted as barriers are: lack of residential settings, lack of community services and skill building. They are grouped together in this report as they each have implications for the State's responsibilities to develop sufficient community capacity to successfully transition Class Members. As noted before the lack of community services is a more significant barrier for Williams CMs in the study: it was noted for fifteen (88%) of the seventeen CMs we reviewed. Primes discussed the lack of ACT and CST services primarily and also the need for support for individuals with substance use disorder (SUD). The lack of residential settings was noted for fifteen Williams CMs as a barrier but not for any Colbert CMs. The lack of a supervised residential setting including MH group homes was a barrier for eight Williams CMs, while the lack of PSH was a barrier for seven Williams CMs.

Overall, eighteen (54%) of the CMs were recommend for a non-PSH setting. These included:

- Community Integrated Living Arrangement (CILA)
- Supportive Living Program (SLP)
- Supported Residential and Supervised Residential (SRS) and
- MH Group Home (this is not an actual residential program funded by the State and may reflect SRS settings but it was a term found in many SPs)

These CMs were evenly divided between the Colbert and Williams classes with nine Colbert and nine Williams CMs recommended for non-PSH setting. Of interest, the need for these settings was not noted as a barrier in the SPs for Colbert CMs but the Primes spoke of the lack of availability of these settings for CMs generally. It was somewhat surprising to determine that over half of the CMs in the study were recommended for settings other than PSH, as the data reported in the monthly data dashboards indicates that approximately 25% of the CMs favor these settings. In some cases, the CMs we interviewed agreed they were interested in a supervised setting because they needed more assistance with activities of daily living, managing their medical needs, maintaining a home, and accessing the community. However, some spoke to us about wanting to live on their own, either initially or after gaining more skills needed to live independently. It seems likely that fewer individuals who do transition favor non-PSH, but that a higher percentage of CMs stuck in the pipeline may want or need these settings and are delayed from transitioning because of the lack of these settings. We were also informed by various staff that individuals with certain medical conditions including diabetes may be precluded from living in these settings including group homes. If this is true it indicates more CMs will be stuck for attenuated periods of time without the availability of settings that can comprehensively meet their needs. In some cases, it seems that the CMs may both want and be able to live independently with the available community supports but the team working with the CM is reluctant to support the individual to plan and arrange needed services and take reasonable risks as other members of the community do who value their independence and privacy.

The barrier that was noted with the most frequency overall was the need for skill building. A total of twenty-seven (82%) CMs, including thirteen Colbert and fourteen Williams CMs had this listed as a barrier to transition. During our interviews with the Prime staff, we learned that some had staff who were teaching independent living skills while others reported either the agency did not have sufficient staff to assist the CMs while they were residents of SNFs or SMHRFs or that the facilities were not cooperative. Many facilities do not have designated areas where skill training can occur. In a few

instances it as reported that the facility staff were assisting with some of the skill building. Some SPs included working on areas of community skill building as goals.

The Decrees address the issue of skill building but indicate that the need to develop skills should not delay or prevent a CM from transitioning. The Purpose Section of both Decrees discuss providing the opportunity for CMs to learn skills in the community to live independently. The Williams Decree specifically prohibits delaying a CMs transition because the CM needs to develop community living skills. While this study includes a small sample, it is still startling that the need to develop skills is the primary barrier listed that delays transitions for CMs. The lack of community skills is keeping CMs institutionalized and not transitioning at a reasonable pace. Most appear to be living in facilities that do not see the development of these skills to effect discharge as their responsibility. CMs need a variety of skills to care for themselves and their home. For many, medication management was an important area to build the ability for self-care. CMs cannot be kept in facilities because of the need to develop skills. The State must either develop sufficient staffing resources for transition programs to address skill building in a timely way while the CM is undertaking other aspect of transition planning; require the facilities as part of rehabilitation and discharge planning to develop greater independence among the CMs; or develop community programs that can help CMs build these skills once they have transitioned. This will be addressed on more detail in the Recommendations section of this report.

**Class Member Feedback and Declinations:** Four Class Members signed letters of declination in May 2023. They were all interviewed as the declinations were not completed when the sample was selected, and all agreed to meet with us. The one Colbert CM who declined is still very much interested in transitioning, but he will not transition without his friend who is one of his roommates at the SMHRF. Hie roommate does not feel ready to transition at this time. Three of the Williams CMs declined. They were outreached between 5/22 (one) and 9/22 (two). The assessments were completed immediately and within three months. All had current SPs but none of them had a Care Manager or a transition team assisting them. It is concerning when CMs change their minds. During the interviews one of these CMs expressed the desire to remain in the facility; one's guardian had declined the transition and the third still spoke of wanting to transition. We recognize that a life change, especially a significant change such as radically changing your living arrangement is daunting. It is concerning that these CMs did not have ongoing communication about their status for transitioning and did not necessarily have someone to contact with questions or concerns for several months. This lack of support may have contributed to their reluctance to transition.

Without exception the Class Members we interviewed were anxious to transition. Some reported that their provider was doing all they could to make this happen. Others

expressed frustration that the process took so long, or they were not receiving information about their status. Some of the CMs needed very little support to live in the community: a home and assistance with a medical condition, particularly diabetes. None of them reported that they were satisfied to live in a SNF or SMHRF or that their needs were being met. The lack of meaningful activity, ongoing treatment, privacy, and individualization was bothersome. Many of them were admitted to the facility because of their inability to financially maintain their homes, sometimes after the loss of a parent or spouse, or because of an inability to manage their diabetes. Hopefully with the new PASRR and SMHRF screens and follow up to short term placements, people whose primary need is housing rather than medical or clinical treatment, or those who need short term rehabilitation or medical intervention will not experience prolonged, unnecessary stays in facilities that are not well equipped to address their needs. The following Table summarizes this information.

### Table 1: Summary of Transition Pipeline Case Study

| | Outreach Date | Assess Date | SP Date | Time Lapsed Betwn Outreach and SP | SP Curr | Care Mngr Assign | Care Mngr Trans Staff Engaged with CM | Trans. Date | Plan Res. | Barriers* | No Longer Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C1 | 8/25/21 | 10/12/21 | 10/21/21 | 2 months | NO | NO | NO | 4/12/22 | SRS | 2,3,4,5,6 | |
| C2 | 12/23/20* | 10/22/21 | 4/21/222 | 16 months | NO | NO | NO | NONE | NONE | unknown | |
| C3 | Unknown | 9/28/22 | 10/18/22 | Unk | YES | YES | YES | 4/18/23 | PSH | 1,2,3,4,5 | Volun. discharge; left facility |
| C4 | 8/29/20 | 3/24/22 | 4/21/22 | 19 months | NO | YES 1/23 | YES | 8/23 | CILA | 2,4,5, | |
| C5 | 10/07/22 | 10/07/22 | 12/12/22 | 2 months | YES | NO | NO | 4/23/23 | MH group home | 2, 3,5,6 | |
| C6 | 2/23/21 | 10/19/22 | 4/22/22 | 14 months | NO | YES 2/23 | YES | 4/19/23 | SRS | 3,4, 5, | **** |
| C7 | 12/20 | 3/3/22 | 4/21/22 | 15 months | NO | NO | Once, 6 months ago | NONE | NONE | 2, 3, 5 | |
| C8 | 11/21 | 12/21 | 5/09/23 | 18 months | YES | YES 4/23 | YES | 11/09/23 | PSH | 2,3,4,5 | |
| C9 | 11/09/22 | 11/22 | 12/07/22 | 1 month | YES | YES 2/23 | YES | 7/18/23 | PSH | 2, has housing | Transition 6/23 |
| C10 | 8/11/22 | 8/23/22 | 9/14/22 | 1 month | NO | NO*** | YES | 3/14/23 | PSH, SLP | 2, 3, 4, 5 | |
| C11 | 9/14/22 | 9/14/22 | 10/17/22 | 1 month | YES | NO*** | NO | 4/17/23 | SLP, CST | 3,4,5,6***** | |
| C12 | 10/07/22 | 10/07/22 | 12/12/22 | 2 months | YES | NO*** | NO | 4/07/23 | MH group home | 3, 4, 5,6***** | |
| C13 | 10/07/22 | 10/07/22 | 12/31/22 | 3 months | YES | NO^ | NO | 6/20/23 | SLP | 2, 3, 4,5 | |
| C14 | 8/12/22 | 12/13/22 | 1/27/23 | 5 months | YES | YES 3/23 | YES | 2/27/23 | PSH | 3, 4, 5 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C15 | 12/08/22 | 1/18/23 | 1/06/23 | 1 month | YES | YES 2/23 | YES | 4/06/23 | MH group home | 4,5 | |
| C16 | 12/08/22 | 1/23/23 | 1/27/23 | 1 month | YES | YES | YES | NONE | MH group home | 3, 4, 5 | Signed declination letter on 5/23 |
| | | | | | | | | | | | |
| W1 | 11/4/2020 | 6/21/21 | 11/14/22 | 24 months | YES | YES | NO | NONE | MH group home | 4,5,6 | |
| W2 | 2/20/21 | 9/27/22 | 12/9/22 | 10 months | YES | YES | NO | 6/9/23 | MH group home | 2,5,6,7 | |
| W3 | 2/3/21 | 1/3/23 | 1/4/23 | 23 months | YES | YES | YES | NONE | PSH | 2,5,6,7 | |
| W4 | 11/23/20 | 11/23/21 | 12/19/22 | 13 months | YES | YES | YES | 12/26/22 | PSH | 1-7 CAST | |
| W5 | 12/20/21 | 3/15/22 | 9/22/22 | 9 months | YES | YES | YES | 3/22/23 | SLP | 3,4,5,6,7 | |
| W6 | 10/4/21 | 11/24/21 | 8/17/22 | 10 months | NO | YES | YES | 2/17/23 | PSH | 3,5,6,7 | Died prior to move |
| W7 | 12/24/21 | 12/9/22 | 1/11/23 | 25 months | YES | YES | YES | 6/11/23 | PSH | 4,6,7 | |
| W8 | 12/23/21 | 1/5/22 | Not initiated to date | 18 months+ | NO | YES 5/23 | YES | NONE | PSH | 1,2,4,5,7 | Initial CTI CM. MCO returns to PRIME RE: income |
| W9 | 9/30/21 | 1/18/23 | 2/11/23 | 17 months | YES | YES | YES | 8/1/23 | PSH | 7 | |
| W10 | 1/22/21 | 3/1/22 | 2/9/23 | 25 months | YES | YES | YES | 8/10/23 | SLP | 1-7 CAST | |
| W11 | 1/4/22 | 4/7/22 | 11/9/22 | 10 months | YES | YES | YES | 10/1/22 | SLP | 3,4,5,6,7 | |
| W12 | 12/20/21 | 5/9/23 | 3/7/22 | 15 months | NO | NO | NO | 9/7/22 | GH | 2,3,4,5,6,7 | ****** |
| W13 | 5/26/22 | 5/26/22 | 10/20/22 | 5 months | YES | NO | NO | NONE | PSH | 3,4,5,6 | Signed declination letter 5/ 23 |
| W14 | 5/30/22 | 5/31/22 | 10/20/22 | 5 months | YES | NO | NO | 4/28/23 | SLP | 1-7 | |
| W15 | 9/28/22 | 12/28/22 | 12/28/22 | 3 months | YES | NO | NO | NONE | SLP | 6,7 | Signed declination letter 5/23 |
| W16 | 9/4/22 | 12/13/22 | 3/14/23 | 6 months | YES | YES | YES | 7/7/23 | GH | 4,5,6,7 | |
| W17 | 9/28/22 | 1/4/23 | 12/22/22 | 3 months | YES | NO | NO | NONE | PSH | 1,4,5,6,7 | Signed declination letter 5/23 |
| | | | | | 73% (24) | 61% (20) | 58% (19) | | | | |

\*        Barriers Key: 1=identity documents; 2=income; 3=medical; 4=behavioral; 5=skill building; 6=lack of necessary community services; 7=lack of residential setting identified

\*\*        Grand Prairie client, then transferred to Trilogy

\*\*\*        Care Managers not assigned at tie of CM interview but assigned in July 2023

\*\*\*\*        Currently in hospital, ICU

\*\*\*\*\*        Has a seizure disorder and Staff report that MH group homes may not accept seizure disorders; Care Manager to be assigned in August

\*\*\*\*\*\*        CM was in a group of CMs that were in Albany Care and were assigned to another PRIME. In 2023 this CM was transferred back to LSSI

We learned of other areas that should be addressed to improve the overall timeliness of transitions from our review of the records and interviews with Prime staff. The review of the SNF and SMHRF Plans of Care (POCs) was very revealing. Of the thirty-two people who were in the study and who had a POC, sixteen or fully half of them had a discharge planning diagnosis that stated that their future is for long –term placement in the facility and their discharge potential was "Poor". Many did not identify the resident as a Class Member. Several diagnosis statements even went on to say that the person did not even want to be asked about discharge. All sixteen wanted to leave the facility and in fact, two had already left, one as a self-discharge, and one through transition.

We reviewed the assessments and SPs for all of the Class Members for whom they were available which was all but one CM in the study. Primes use different assessment tools, but most rely on the IM+CANS. The assessments were very thorough and provided a lot of information. In some cases, the assessment indicated the individual had a greater skill level then was reflected in the SP in areas of ADLs or IADLs. There is a focus on identifying substance and alcohol use, even if it is in the past and the CM appears to be stable. Prime staff report that UIC nurses who review the SPs expect this to be addressed with goals even if the use is not currently active.

The IM+CANS includes a section of goals. This is redundant of the SP, yet the Prime staff must create the SP and cannot upload the same information that is in the IM+CANS assessment. The SP includes multiple goals. We did not find the SP format or requirements to lead to the creation of a person-centered plan. The goals are very similar across SPs; include an abundance of activities that are part of the majority of transitions; and focus mostly on the pre-transition and actual transition phases of the CMs life, rather than a long-range plan of what the individual wants his or her life to look like once they live in the community. These activities often capture staff responsibilities to assist the CM rather than create individualized goals the CM wants to address. Some examples of commonly stated goals that reflect staff activities include obtain transportation; locate physicians and a pharmacist; secure benefits and identification documents; purchase furniture, groceries, and medications; find a representative payee; and secure Durable Medical Equipment (DME). Many programs in other states engaged in deinstitutionalization or transition use transition checklists to capture routine activities that must be accomplished for a transition to be successful, rather than include these tasks and activities in the SP as goals. If Illinois adopted this approach for the SPs of Class Members it would streamline the development of the SP and ensure that it focused on person- centered goals meaningful to the individual. The State has indicated that transition checklists were used in the past but eliminated as a

requirement after receiving provider feedback. We do not know how the use of checklists previously impacted the detail of the SP. Our recommendation of a transition checklist is made to standardize the typical transition activities and document these activities more efficiently, while reducing the amount of information and routine activities in the SP. The SP should  focus on actual individualized goals. The providers we spoke to were favorable about using transition checklists.


**Recommendations From our review**

1. Assess and determine the most frequent health challenges facing Class Members. Focus service delivery on those diagnoses or events which are most frequent. Ensure that community services are responsive to co-morbidities. For example, many psychotropic medications contribute to pre-diabetes or diabetes. Seven (44%) of the Colbert CMs have diabetes. Community services need to be structured to manage this diagnosis. Individuals are being delayed transitioning because of the need to be able to manage their own medications. Three Colbert CMs (19%) have a seizure disorder. One Prime stated that community residential providers don't have the capacity to serve people with seizures, even if the seizures are infrequent and controlled as they were for the person we were discussing. Seizures are relatively common in the I/DD field and providers have years of experience managing them. It is shocking that this would be considered a reason for keeping someone in a nursing facility.

2. Implement the section of the PASRR regulations that require Specialized Services in order for people to gain or maintain skills that will enable them to return to the community more quickly. None of the CMs were receiving consistent therapeutic services and they all would benefit from the specialized services the State is planning to develop for residents of SNFs who have mental health diagnoses.

3. Communicate expected time frames to people that are based on actual delivery of services. Don't use "projected transition date" as a place holder. It creates an unrealistic expectation for the CM and creates confusion, disappointment, and frustration for many of the CMs we interviewed.

4. Communicate each CMs status to them regularly throughout the process once they have been outreached. Let them know when to expect the assessment and service plan to be completed with them. After that keep them informed of the activities even if they are waiting for a particular phase of transition planning.

5. Collaborate with the nursing facility to develop the nursing diagnosis of "Discharge Planning" in the POC that reflects the resident's status as a Class Member and reflects their interest in transition. that helps the facility to see that

people are in transition. POCs should reflect the activities the facility staff are responsible to complete to effect transitions. DPH surveyors should review a sample of POCs during inspections if not done already to confirm this information.

6. Provide an active educational program to assist people to learn community skills and maintain the ones they have. Educate them regarding their mental health symptoms and how to manage them. Educate them regarding their medications and the health conditions they have. Keep them accessing the community when they are a resident so that they remain part of the community outside the facility to stay connected with the daily rhythms of community life. The need to develop skills should in no way be a barrier to transition.

7. Review the psychotropic medications people are receiving. If polypharmacy is occurring, consider a review by a clinical pharmacologist or community psychiatrist.

8. Consider prioritizing transitions from facilities that offer poor quality; have a higher rate of critical incidents or have poor licensing surveys. One nursing facility, City View, was dirty, unkempt, reeked of urine and had very few staff. The main activity seemed to be smoking. An altercation occurred as we arrived on one floor during which the patient was grabbed by the staff person and taken down the hallway, losing his shoe and headphones. People should not have to live in these conditions. The POCs from this facility were well written but the observation of care and activity did not match the written plans during our visit with three residents.

9. Streamline the Service Plan and use a transition checklist. This recommendation is being made as a result of the Case Study and also the work of Joseph Marafito, Court Monitor Consultant who established a Work Group of Prime assessor staff during the past year to explore the assessment and service planning processes. The recommendation to make sure the SP is not redundant of the assessment; is person centered and includes meaningful goals for the CM will be supported by Mr. Marafito's report summarizing the findings, conclusions, and recommendations from the Assessors' Work Group.

10. As noted above 50% of the CMs in this study are recommended for some type of supervised residential setting. In some cases, the CM wants to live more independently than the team is recommending. The State should develop a review process to review and approve any recommendation for residential settings other than PSH to make sure it is necessary, and it reflects the Class Member's preference. If it is necessary but does not reflect the CMs preferences there needs to be a process to resolve these recommendations when they

conflict with CM desire in the best interest of the CM. Without this type of administrative review CMs are remaining stuck in the Pipeline.

11. Recognizing the number of CMs for whom skill building and the number for whom a supervised setting is recommended, the State should consider the development of short-term residential settings where CMS can develop these skills in the community, rather than expecting them to learn community skills while living in institutions.

12. It is incumbent on the State to develop its plan to build both service and housing capacity. This is not new information as it has been identified by the Plaintiffs and previous Court Monitors. It has been confirmed in studies commissioned by IDHS and conducted by JACSW. Service gaps continue to be identified by providers. This study confirms the lack of appropriate housing and community services causes significant delays for Class Members and does not allow the State to meet its obligation to Class Members to transition them at a reasonable pace. The majority of CMs wish to live independently but as referenced under Recommendation 10 there may be a significant number of CMS who linger in the Pipeline as a result of needing or wanting a more supervised residential setting. The state's need assessment must include the residential needs of these Class Member and project residential development to ensure sufficient capacity. While the need for greater capacity is acknowledged, it has not been addressed in a meaningful, well-paced way. The State should utilize assessment and SP information to identify the services that are needed and in what quantity. This analysis should include areas outside of Chicago where Williams CMs select to live. This is a critical requirement to develop and implement an Exit Plan successfully.

13. The State has a responsibility to ensure that provider agencies are funded to hire the number of staff needed to address the CMs in each provider's pipeline. Given the length of time each aspect of transition planning is delayed and that the number of individuals in the Pipeline far exceeds the number the State commits to transition annually, it is evident that the Primes do not have sufficient staff to complete the functions of outreach, assessment, service planning and transition as required. The State has been reticent to establish caseloads but must determine a more effective method to determine the actual staffing levels providers need to meet the requirements of the Decree.

**Commendations**:

1. The OT assessments are well done and can provide a good foundation for service referrals. A few people were receiving OT while still in the nursing facility; more people should be able to access this and sooner so that they do not lose skills.
2. The IM CANS were thorough, comprehensive, and provided important information regarding the individual.
3. Case managers, where assigned, knew the individual on their case load and were in frequent contact.
4. Transition staff were very committed to assisting the CMs transition and approached the barriers and concerns with creativity and knowledge of community resources. The leadership of the Primes support the Comprehensive Program and their staff. Program leadership is very involved in CCMTP.
5. One of the nursing facilities and two of the SMHRF's social workers were very interested in working with the Prime's to help people leave the facility.
6. Grasmere (SMHRF) did provide skill building activities for CMs. Generations Regency (SNF) had staff who were very positive about the potential for CMs to transition and tried to provide learning opportunities for them as well as time to engage in community activities.

## Interviews with the Prime Agencies and MCOs

We interviewed the eight Primes who did not have CMs in the study so that we had a more robust understanding of the barriers the Primes face in general and could benefit from their insight and recommendations for improvement. We also interviewed five of the six MCOs that operate CTI programs. Each MCO selected one or two Class Members who experienced barriers and delayed transitions during this past year to provide examples of systemic barriers and to also suggest areas for improvement.

**Primes:** The Primes identified similar barriers to those we found experienced by CMs in the Case Study sample and their teams. These included difficulties coordinating with the facilities to gain access to records or to cooperate to assist the CM prepare for transition; accessing identification documents for CMs; lack of income; the prolonged and document intensive CAST process; lack of resources to assist CMs to develop the skills needed for independent living; the dearth of residential options for CMs who need supervision and support; the lack of community services including ACT, recovery, and homemaker services; the time consuming process of developing the SP; the lack of a person centered approach to service planning; staff vacancies; and staffing inadequacy for the number of Class Members and tasks to be accomplished. All of these barriers were also noted by the three Primes with CMs selected for the Case Study.

In addition, these eight Primes identified difficulty using the WebApp/ CASPIO system and the need for better coordination with the MCOs to access the services the CMs need to live in the community. Many of these barriers are described earlier in this report. I do want to provide the details of the interviews with the Primes regarding staffing and service capacity. Similar to the Primes described above, many of these eight agencies had prolonged staff vacancies which delayed transitions for Class Members. These Primes also reported that the State would not consider increasing funding so more positions could be authorized and filled. Primes are not necessarily sufficiently staffed to address outreach and then assessment and SP development for everyone in the pipeline.

As an example, one agency has 208 CMs who have been outreached but not yet assessed.. They have 5.5 assessors who each complete 7-9 assessments per month. The staff can complete forty-four assessments per month in total. It will take five months to catch up on the assessments due. Approximately thirty-five CMs who are interested in transition are added to the assessment cue through outreach per month. This Prime has the staff to complete only forty-four each month so cannot possibly get to all of the pending assessments in five months unless they create a waiting list for the newly identified Class Members who have a positive response to outreach. To address the backlog and maintain timely assessments for new Outreaches, this agency would need four more assessors at least until the backlog was addressed. Another Prime reports having the staff to complete up to sixteen assessments per month and have 221 to complete for CMs who have been outreached or were identified for reassessment. This will take fourteen months to complete without further outreach. (Some of these are reassessment so will hopefully not need to be done as rule as changed.) Primes struggle to maintain reasonable caseloads for their staff. This sometimes results in CMs waiting to have a Care Manager assigned which delays transitions. Some Primes report not assigning a Care Manager if the CM is on transition delay. We identified a number of CMs in the study who went months without a Care Manager assigned, sometimes because of vacancies and other times as a result of an insufficient number of staff.

The Prime staff interviewed shared similar concerns about the Service Plan and process of preparing it to those expressed by the three Primes in the study. Primes resoundingly express concerns that the SPs are not person-centered nor consumer friendly. We were told many times by Prime staff that CMs do not want to see or read their SPs because they are not terribly meaningful to them. Three Williams CMs reported this directly to the interviewer. Providers find the SPs developed post transition are more person centered then the SPs that direct transition activities.

Prime staff were also concerned about the lack of community services. They gave examples of CMs waiting for unacceptable periods of time who need supervised residential settings especially for those CMs who are under 65. Similar to the Case Study, we learned about the lack of ACT and other mental health services. These Primes also expressed concerns that CMs need more hours of homemaker services then are authorized by the MCOs to live in their own apartments.

There was strong agreement about the need for more supervised residential settings such as MH Group Homes and cluster housing, and/or short-term community residential settings structured to support CMs to learns the skills they need to live in the community successfully.

**MCO CTI Programs:** It was evident from our interviews that the CTI Programs are evolving and developing or revising their administrative structure and staffing to be responsive to the needs of the Colbert and Williams Class Members. The staff we interviewed were excited about this program and committed to assisting the Class Members. CTI staff discussed clarifying roles among transition team members; revising caseloads to be manageable for the intensity of transition planning activities; developing expertise to assist CMs to find suitable housing; and developing relationships with Prime agencies and other providers to develop an adequate service network. CTI staff raised many of the same barriers that were elaborated by the Prime agencies. The CTI staff report more difficulty obtaining identification documents and assisting CMs who do not have income. One
CTI program reported that six of their members were on hold for transition because of a lack of income. All could easily transition otherwise. It is unfortunate that a lack of income becomes the sole reason a person remains institutionalized. As was true among the Primes, CTI staff advocated for more transitional housing programs to address skill building and recovery, and for an increase in more transitional supervised residential settings.

As was common in the feedback from the Primes, the CTI programs recommend improved relationships with the SNFs and SMHRFs. These program administrators also spoke of the need for the State to clarify the role of the CTI program versus the Prime programs with facility administrators  and to help all of the providers and facilities communicate and collaborate more effectively to benefit the CM. CCMTP providers are responsible for outreach which is to occur between 60-70 days after a CMs admission to a SMHRF or SNF. CTI programs are to contact CMs who are not already paired with a Prime  ninety days after admission . If the CM is interested in transitioning they work with their health plan. If they are not interested at the time of contact, they will be outreached in the future by a Prime. The staff report this sometimes creates conflict or

confusion if the CM has already been outreached by a Prime. CTI staff also advocate they be able to contact their members earlier in their stay. While data indicates very few CMs are outreached within 60-70 days of admission by Prime agencies, as this percentage increases and the role of the MCOs increases this needs to be addressed by the involved State agencies. CTI staff do not report having sufficient staff to assist the CMs to skill build and do not find that the facility staff are addressing these needs for most CMs.

There was a strong difference of opinion among the CTI programs compared to the Prime agencies regarding the development of the assessment and SP. CTI staff reported the process as being less time consuming. CTI staff do not use CASPIO and found the ability to upload these documents to UIC easier than the Primes found using the Web/App. The CTI program has ninety days to complete the assessment and SP. CTI program staff report the overall timeframe is workable but within the ninety days for both to be completed, would like more flexibility to complete the assessment since the retrieval of records is more time consuming and more of a challenge. CTI staff report good relationships with UIC and find their feedback from the review of the SPs helpful and timely. It appears there are different expectations for the Prime agencies and the MCO CTI program regarding the process of completing, submitting, and reviewing assessments and SPs.

Recommendations of the Primes and CTI Programs: In this section we will share recommendations made by the eight Primes and five CTI Programs that have not already been shared in the previous section of this report. As stated, there is strong concurrence of opinion among the Primes with CMs in study; the other Prime agencies and the MCOs regarding the recommendations offered earlier in his report.

**Prime Agency Recommendations**

1. Enhance the Web/App so it is more user friendly. Allow Primes to create their own reports and create a tracker for SP due dates.
2. Identify newly admitted CMs more quickly so agencies can better plan the completion of outreach within 60-70 days of admission.
3. Require facilities to secure CMs identification documents
4. Allow bridge subsidies to be used to pay for utilities for CMs without income
5. Streamline the CAST system. Determine if the policy changes made by the State for FY24 have positive impact resulting in CMs being reviewed and knowing the results of the review in a timely way.

6. Use a transition checklist for transition plans.
7. Ensure Prime agencies are staffed to address the volume of the CMS in their Pipelines so CMS do not experience significant delays to transition.


**MCO/CTI Recommendations**

1. Require the SNFs and SMHRFs to secure the residents identification documents if they do not have them at the time of admission. While the State has taken steps to make this a more streamlined process, the lack of identification has been noted by some Primes and all of the CTI programs as a reason transitions are delayed. Every resident of a facility should have in their possession their birth certificate, state identification and documentation of eligibility benefits. Residents should also have a way at facilities to secure these documents. At least two CMs in the study reported their documents were stolen since their admission to the facility. Because many CMs become residents after losing their housing they often arrive without these identifying documents. Whatever level of delay the retrieval of documents causes for a CM, it is a time-consuming responsibility that now falls to Prime and CTI staff who have abundant tasks and activities to plan successful transitions. If it cannot be accomplished by the facilities, we recommend it be the responsibility of the CMs' MCO care coordinator for those CMS who have managed care. The CTI staff also recommend that the fees to obtain identification be waived for CMs.
2. Extend CMs waiver service eligibility for more than sixty days. CMs who have MLTSS may lose their waiver services once in a facility for sixty days. The CTI program is not working with them in this time period to help them return to the community. This then causes greater delays for their transitions. CTI staff report HFS staff are very helpful to address this on a case-by-case basis but recommend that a more systemic solution be created.
3. Allow the CTI to engage with CMs sixty rather than ninety days post admission.
4. Require the SNFs and SMHRFs to provide records timely for the completion of assessments.
5. Determine how some of the areas of concern, sufficient staff to work with CMs while in the facility and lack of income, may be addressed by the service expansion envisioned as part of the 1115 waiver amendment.


**Conclusions**

We undertook a small sample for this study, understanding that its implications might be limited by its size. However, we found great consistency with the recent timeliness study and previous housing and service capacity studies completed by the JACSW. This, in addition to the fact we were able to interview all of the service providers who transition Class Members, and the uniformity of the barriers and delays they experience and reported, makes us confident that our findings are not discrete and are reflective of systemic issues facing the State as it implements the Colbert and WIlliams Consent Decrees.

We have made various recommendations and included thematic recommendations the provider community shared with us. We were encouraged by the level of involvement and commitment of the staff we spoke with to learn about transition. There is great investment among providers to assist Class Members to successfully transition. Many providers have been discouraged that vacancies have reduced their ability to provide timely assistance and regret that Class Members have waited for too long at the various stages of transition planning. The majority of the providers report more confidence in hiring and maintaining their work force post-COVID.

We have two major concerns. The primary concern is whether the State is funding providers adequately to employ a sufficient number of staff to complete the work of transition planning, from outreach to the CMs return to the community. In addition to the reports from providers and our findings of unacceptable delays, each month's reports from the State indicate poor timeliness for all activities and a growing number of CMs in the Pipeline. While the State provides substantial funding for the implementation of the Colbert and Williams Decrees, and actually lapsed funds in previous years, the Primes report they have not had requests for additional positions that would have an annualized cost, approved.

The issues associated with transition planning that are causing delays for CMs to transition are effectively barriers to transition. The Primes ability to address these activities successfully seem to be a combination of a lack of community service capacity and a lack of sufficient staff to address the needs of all CMs in the Pipleine in a timely way. The State must determine the quantity of staff Primes need to transition CMs within the timeframes expected by the Consent Decrees. Recruitment of qualified staff has been a challenge in the past few years but most providers report an improved hiring situation. However, as noted in this report many Primes do not confirm they have sufficient staff positions to comply with the timeframes expected for the various tasks of transition: outreach, assessment, service planning and actual community transition. We have not seen evidence that the State has determined what caseloads should be so that all of these requirements can be completed on time for the number of Class Members

who must be outreached and then engaged in transition planning if they are interested in transitioning.

Our second greatest concern is for the number of CMs whose transitions appear to be delayed because of a lack of community service capacity including other residential options for CMs who cannot initially live in independent settings. We encourage the State to create both a review process to affirm whether the CMs identified with this level of need, do indeed need, or want more supervision and support, and for those who do, to build more options into the capacity development plan. We suggest the State give serious consideration to the recommendation to develop more intensive short-term residential supports. These options can be faded as CMs develop greater independence but assure they can leave facilities as they wish to do and are not delayed because of skill building. The best place to learn community living skills is in the community.

As part of substantial compliance, the State will be developing more detailed service and housing plans to build capacity, which should, over time respond to the existing service gaps. We are encouraged by the State's willingness to engage in system reform involving multiple public agencies and a broad array of community providers to meet the requirements of the Decrees and the needs of Class Members. We hope to see the recommendations we have made addressed by the state as the design of changes to the system are undertaken.

We thank everyone who participated in this study. UIC and DPH are to be thanked for securing all of the records needed and IDHS for organizing this effort. We appreciate the time the Prime and MCO staff gave to sharing their experiences and ideas for improvement. We especially want to thank Envision, LSSI and Trilogy for making so many staff available for our interviews. Our understanding of the system and our recommendations would not be as robust without the candor, reflections, and insights of the Class Members we were fortunate to meet and interview. We hope in some way, the findings and recommendations of this study contribute to improvements in timely and successful transitions for them.

Submitted 9/21/23

Kathryn du Pree, Court Monitor

Joseph Marafito, Consultant

**Attachment 2**
**Court Monitor's Follow Up to the Defendant's Response to the Transition Pipeline Study**

The Case Study was briefly discussed at the Substantial Compliance meeting on October 24th. The Defendants had sent a written response to the Court Monitor that was shared with the Parties. After a brief discussion of the possible implications of the system enhancements to address substantial compliance on the Case Study recommendations, the Parties asked the Court Monitor to review her comprehensive recommendations and set priorities for what she views as the most important areas to address during the next two years. I determined what I believe are the priorities to achieve the following goals:

1. Maintain or increase the number of transitions for Class Members
2. Maintain the existing CCMTP and CTI structure and staffing so that all aspects of decree implementation do not fall further behind, and limited resources are used effectively, and
3. Help develop or advance the existing service delivery system to improve performance in a reasonable and acceptable period of time.

**Priority Recommendations**

The Court Monitor believes the most important Transition Pipeline Case Study recommendations to implement are:

- **Provide adequate staffing resources (Recommendation 13)-** Primes do continue to report unfilled funded vacancies but most report recruitment, hiring and retention are improving. But Primes also consistently reported that they do not have a sufficient number of funded positions to meet the benchmarks for performance for outreach, assessment, service planning and timely transitions. This concern that the funded level of staffing positions is inadequate is validated by the poor performance of Primes in these areas as reported by the State in the monthly data dashboards and the Semi-Annual Compliance Reports (SACR). The State has been reluctant to determine caseloads. While it is legitimate to have concerns that Primes have somewhat different organizational structures; funded positions have not been consistently filled; and Class Members needs vary in intensity, it is important that the State has an understanding of the work activity involved in conducting outreach, assessment, service planning, transition and continued care coordination, so that Primes are adequately staffed and caseload size will be well defined for the work to occur in timely fashion in the redesigned system. The State's response was promising in recognizing that caseload size for care management would be reexamined, and that the work of outreach and

assessment will be analyzed to determine how to achieve the substantial compliance benchmarks. The State will need to work with Primes to determine the level of staffing needed to perform these functions in the time periods required by the Consent Decrees.

Suggested actions:

1. Set a timeline to analyze work and set caseload size for care coordination and transition coordination. Determine the resources needed to meet the expectations for timely outreach, assessment, service planning and transition that respond to Consent Decree requirements and the Compliance Indicators.
2. Address the identified backlog of Existing Class Members who have no record of outreach and develop a plan with timelines to complete outreach for all existing Class Members who have no evidence of receiving outreach.
3. Determine what level of performance improvement the State expects its providers to achieve. The State should identify all Class Members who have been outreached but do not have an assessment; all Class Members who have had an assessment but do not have a Service Plan and propose to the Court Monitor the schedule for these Class Members to have the Consent Decree obligations met.
4. I do not recommend that all individuals who are outreached through the efforts to address outstanding outreach have an assessment and SP within the usual timeframes but rather refer to my specific set of recommendations regarding outstanding outreach. I make this recommendation because I do not conclude the current system has the resources to complete these assessments and SPs in a timely way without diverting staff from addressing the needs of the CMs already in the Pipeline who are waiting to transition.

- **Develop the plan to increase community-based services and housing options for Class Members (Recommendation #12).** A primary reason for the delay in transitions is the lack of needed community-based services and affordable housing. The State must create the necessary network of community-based providers to meet the needs of the Class Members who want to return to the community and to support the State to implement its plan for reasonable pace. The State has a vision to enhance the health delivery system to address the needs of Medicaid recipients with SMI and/or physical disabilities; and those who become homeless and are impacted by a lack of income and who need community-based health care to avoid unnecessary hospitalizations and institutionalization. Illinois is engaged in expanding its 1115 waiver and other initiatives to focus on the social determinants of health care and address these needs in a more focused and successful way throughout Illinois. Class Members

are within the population of individuals who will be eligible for these new and expanded services.

It is important that the work of assessing community capacity for Class Members continue this year with more specific plans by the State for community service development. The State's initial response proposed to provide Bridge Subsidies to individuals who are not Class Members who are living in supervised residential settings but are ready for PSH. This would than free up these locations for Class Members who need this support initially when they transition. This is helpful. However, the State did not address how it planned to assess and then build needed service capacity in the areas of mental health, employment, and in-home supports such as homemaker services.

Suggested Actions:
1. The State should develop a methodology to use assessment and/or service planning data to ascertain the need for various community-based services; analyze the existing capacity; and propose steps to increase capacity in the key areas that are delaying transitions.
2. Use this data and the State's analysis to develop its multi-year capacity building plan to compliment the plan for reasonable pace and to set contract expectations for the Primes and managed care organizations.
3. Factor the analysis for capacity building for Class Member services into the systemic changes the State is undertaking as part of its broader Medicaid health care initiatives.

- **Communicate effectively with Class Members so they understand their status regarding transition planning (recommendations #3 and #4)** Class Members do not all receive regular contact with their Care Manager nor are they clearly informed of the realistic projection for their transition date. In the State's response to these recommendations, it was noted that the Decrees require the SP includes transition dates, but they are open to discussing this requirement with the Plaintiffs and the Monitor; that the redesigned SP will help set clearer expectations; and it will be easier to project timeframes for transition when there is a plan for reasonable pace. IDHS plans to identify and address "unexplainable extended periods of time without contact" by the Primes. Class Members should be able to expect regular contact and the Prime should not be unaccountable for this just because they can explain the lack of contact. The State's response lacks specificity as to how it plans to address these issues currently.

Overall, there are 1162 Colbert CMs and 551 Williams Class Members in the Pipeline. One hundred twenty-nine (129) Colbert and 87 Williams Class Members

have transitioned this fiscal year through September 30th. That means that an additional 421 Colbert CMs and 313 Williams CMs will transition by the end of June. If the target numbers remain the same for FY25 another 550 Colbert CMs and 400 Williams CMs will transition.

If 70% of the transitions are from the existing list then approximately 385 Colbert and 280 Williams Class Members will be transitioned from the existing Pipeline this year. That will mean 777 of the existing Colbert CMs and 271 of the existing Williams CMs will remain in the Pipeline. Not all of these CMs will be transitioned in FY25 when one considers the target numbers; the remaining size of the Pipeline; and newly admitted CMs who will be outreached and want to transition. The Table below depicts the numbers for FY24 considering all CMs in the Pipeline as of September 2024.

| Class | Pipeline # as of 9/30/24 | FY24 Target | 70% from Pipeline | Remaining Pipeline 6/30/24 |
|-------|--------------------------|-------------|-------------------|----------------------------|
| Colbert | 1162 | 550 | 385 | 777 |
| Williams | 551 | 400 | 280 | 271 |
| Totals | 1713 | 950 | 665 | 1048 |

Suggested Actions:

1. Enforce monthly contact between care managers and Class Members. IDHS has revised its CCMTP policies to include the requirement that Prime agencies have staff make monthly contact with CMs engaged in pre-transition activities. I support the implementation of this policy and both monitoring and follow up by the State in situations where CMs are not being contacted monthly and informed of the status of their transition.

2. Inform CMs who have a Service Plan of the reasonable projected date of their anticipated transition. It appears once there is a plan for reasonable pace the State will be able to project a Class Member's transition date more accurately. The State is raising that the Decrees require the SP to include a projected date and is willing to discuss this with Plaintiffs and the Court Monitor. But the CM is entitled to know approximately when they can expect to transition. Until there is a plan for reasonable pace, each Prime should be expected to project an accurate date of transition for each CM by analyzing its own pipeline; its target transition numbers for the fiscal year; and the complexity of the CM's needs or the barriers presented that make transition easier or more difficult. Certainly, this projected timeline may be delayed, but then the CM can be informed of that extension when it becomes evident. This would mean that

not all CMs in the Pipeline would be told they are transitioning this year, or possibly even in FY25.

3. Address the causes of transition delays for Class Members. Recent data from IDHS notes that 521 (45%) of the 1,162 Colbert CMs and 183 (33%) of the 551 Williams CMs are on transition delay. IDHS should continue to track them to confirm the Prime is taking all needed steps to address the delay. This will include CAST reviews and the NCD review by Maximus for the Colbert CMs who have a cognitive delay. Anyone else delayed more than 90 days should be scheduled for a case consultation per IDHS CCMTP policy. The State should provide regular updates to the Court Monitor.

- **Determine the level of need for supervised residential settings (Recommendations #10 and #11)**. This issue in part relates to capacity building and also to promoting the concept of Housing First with providers who may be limiting the number of Class Members for whom they support and facilitate transitions to PSH. I fully support the State's vision of Housing First as the best, most viable, and most integrated approach to housing for Class Members that fosters their independence. However, the State's response to the Court Monitor's recommendations largely ignores the reality of what many CMs face who either want a more supervised setting or whose provider believes the CM needs supervision. Many of the CMs in the Case Study whose transition is delayed is because they are recommended for a more supervised setting, and it is not available for them.

I appreciated the State's response that it supported my recommendation that all Class Members who are recommended for a non-PSH setting would undergo a clinical review by the State to determine if this recommendation is supported as necessary and approved by the State. Those CMs who are determined to not need this level of support should be assisted to transition to a PSH setting and not experience further delays because the team did not recommend the most integrated setting initially. It is also encouraging that the State is planning to secure more cluster housing.

The State has a responsibility to all of its Class Members and is obligated to offer CMs residential options within the spectrum of residential settings offered by DMH which includes CILAs; Supported Residential and Supervised Residential settings.

Suggested Actions:
1. The State should review all Class Members who are in the Pipeline who have been recommended for non-PSH. When the State does not agree that the CM

needs a non-PSH setting the Prime should be immediately informed and directed to plan the transition to a PSH setting so the CM is appropriately supported and not delayed any longer.

2. The State should identify the number of Class Members recommended for non-PSH with whom the State agrees with the recommendation. The State should share a more specific plan with information on number of settings needed and a timetable to have these settings available.

I continue to recommend that the State consider temporary transitional housing with greater levels of support for those Class Members who need this initially and not just view it as an option for individuals in the FDDP.

I have focused on the recommendations that I believe should be given priority during the next two years. I have suggested actions which the State may or may not decide are the most effective within their resources and structure to address these priorities. There may be other actions that will contribute to performance improvement and the State should recommend alternative actions when it believes different strategies or actions are more viable than those I have proposed.

Some other recommendations in the Transition Pipeline Case Study are either being addressed by IDHS and/or IHFS: service plan redesign, developing specialized services; census compliance; and reimbursement for CTI programs that encounter fees securing identifications for Class Members. Other recommendations regarding the role of facilities in transition planning and coordination including the timeliness of record availability; the initiation of planning for CMs who are outreached by CTI programs; which entities are responsible for securing documents; addressing medical needs such as diabetes; and enhancing the CMs preparation for transition through education and skill building will be better addressed with  systems enhancements or are not as critical during the next two years when significant time, attention and resources will be devoted to addressing the Pipeline; addressing delays to transition; determining the appropriate level of staff resources; developing the plan for reasonable pace; and analyzing and addressing service and housing capacity in a meaningful way.

Kathryn du Pree
Williams and Colbert Court Monitor
November 9, 2023